# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **MEDICAL INFORMATICS ENGINEERING, INC.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:06-CV-173** |
| | ) | |
| **ORTHOPAEDICS NORTHEAST, P.C.; TRIPRACTIX, LLC; RAYMOND KUSISTO; and TODD PLESKO,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |
| | ) | |
| **ORTHOPAEDICS NORTHEAST, P.C.; TRIPRACTIX, LLC; RAYMOND KUSISTO; and TODD PLESKO,** | ) | |
| | ) | |
| **Defendants/Counterclaim Plaintiffs and Third Party Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MEDICAL INFORMATICS ENGINEERING, INC.,** | ) | |
| | ) | |
| **Plaintiff/Counterclaim Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **DOUG HORNER,** | ) | |
| | ) | |
| **Third Party Defendant.** | ) | |

## OPINION AND ORDER

This matter is before the court on the "Motion to Dismiss All Defamation Claims Against

Medical Informatics Engineering, Inc. and Doug Horner" filed by Plaintiff/Counterclaim Defendant

Medical Informatics Engineering, Inc. ("MIE") and Third Party Defendant Doug Horner ("Horner")

on July 17, 2006. On August 9, 2006, Defendants/Counterclaim Plaintiffs and Third-Party Plaintiffs

triPRACTIX, LLC ("TPX") and Todd Plesko ("Plesko") filed their response in opposition to the

motion, and on that same day Defendants/Counterclaim Plaintiffs and Third-Party Plaintiffs

Orthopaedics Northeast, P.C. ("ONE") and Raymond Kusisto ("Kusisto") filed their separate

response. MIE and Horner replied on August 24, 2006.

For the reasons discussed in this Order, the Motion to Dismiss All Defamation Claims

Against Medical Informatics Engineering, Inc. and Doug Horner will be DENIED.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

ONE is a medical practice group specializing in orthopedic services. MIE sells and supports

software products and provides a telecommunications network for the transmission of health

information and medical practice data. On October 24, 2004, ONE and MIE entered into a License

Agreement, which allowed ONE to use certain software known as "WebChart" that electronically

stores medical records. On that same day, the parties also entered into a Maintenance and Support

Agreement ("MSA") that obligated MIE to support WebChart for ONE.

Three months after entering into the agreements with MIE, ONE began constructing three

wireless towers in Fort Wayne. Shortly thereafter, ONE began to evaluate different software

packages in an effort to, among other things, improve its use and storage of medical records. By June

2005, ONE had evaluated twenty-three software packages, including WebChart. WebChart,

however, was not ultimately selected by ONE.

---

[1] For purposes of its review of the motion to dismiss, the court assumes the truth of all well-pled allegations and draws all reasonable inferences in the light most favorable to TPX, Plesko, ONE, and Kusisto. *Pearman v. Norfolk & W. Ry. Co.*, 939 F.2d 521, 522 (7th Cir. 1991); *Norris v. Wirtz*, 719 F.2d 256, 258 (7th Cir. 1983).

Upon hearing that ONE had rejected WebChart, Horner, the President of MIE, contacted ONE to express his disappointment with MIE's loss of such a large and valuable customer. Numerous times thereafter, Horner requested additional meetings with various ONE physicians and managers to further express his disappointment.  Horner's meetings and communications, however, were to no avail, as ONE did not change its decision. As a result, Horner became increasingly upset. Apparently, Horner's discontent was fueled by his belief that ONE, or certain employees thereof, were plotting to compete with MIE in the telecommunications industry.

Ultimately Horner, on behalf of MIE, sent a letter on August 15, 2005, to each of ONE's physicians, which accused Kusisto, ONE's Chief Executive Officer, of having "misled" the physicians and being "deliberately deceptive" in his employment. (Countercl. & Third-Party Claim of Orthopedics Northeast, P.C. & Raymond Kusisto Against Medical Informatics Engineering, Inc. & Doug Horner ("ONE Countercl.") ¶ 9.) In addition to the letter, Horner allegedly made "threats" to ONE, stating that he "intended to keep ONE's technology employee Todd Plesko and his crew busy supporting WebChart rather than trying to steal MIE's customers." (Defs., Orthopedics Northeast, P.C. & Raymond Kusisto's, Answer & Affirmative Defenses to Pl.'s Compl. for Injunctive Relief & Damages & Orthopedics Northeast, P.C.'s Countercl. ("ONE Answer") 34.)

On November 1, 2005, MIE terminated the MSA effective November 30, 2005. In light of the MSA's termination and Horner's "threats," ONE installed a firewall to prevent MIE and others from entering its computer network.

On November 11, TPX was formed. TPX is owned by certain shareholders of ONE and Plesko, the Chief Executive Officer of TPX and former Chief Information Officer of ONE. Apparently, ONE promptly became a customer of TPX, as TPX reported to third parties that it had

transferred all of ONE's documents from WebChart to software that TPX was selling.

Eventually, Horner purportedly decided to make good on his "threats" to ONE. More specifically, between December 6, 2005, through January 16, 2006, MIE allegedly "undertook an unlawful campaign to access ONE's computer network for the purpose of disrupting ONE's network and business operations," which resulted in MIE allegedly accessing ONE's computer network on ten different occasions "without permission and without right to do so," causing deliberate damage on at least three of these occasions. (ONE Answer 34.) On each of these occasions, ONE secured TPX's assistance to remedy the computer network problems allegedly caused by MIE. These incidents ostensibly resulted in an FBI investigation of MIE.

Ultimately, MIE filed a complaint with this court against ONE, TPX, Plesko, and Kusisto on April 25, 2006, advancing claims of copyright infringement, breach of contract, criminal mischief, defamation, trade secret misappropriation, and tortious interference with a business relationship.   Four days later, *The Journal Gazette* published an article regarding the case. The article quoted the following statement made by Matthew Hohman, MIE's attorney: "the defendants caused the FBI investigation to be instituted under false pretense and for the defendants' own benefit . . . ." (ONE Countercl. Ex. B; First Am. Countercl. & Third-Party Claim of TriPRACTIX, LLC and Todd Plesko Against Medical Informatics Engineering, Inc. & Doug Horner ("TPX Countercl.") Ex. A.)

On June 14, 2006, ONE and Kusisto filed a counterclaim against MIE and a third party complaint against Horner, alleging that the August 15, 2005 letter penned by Horner and the

statements made by Hohman were defamatory.[2]  Specifically, ONE and Kusisto made the following

allegations:

8.      On or about August 15, 2005, Horner, on behalf of MIE, sent a letter to each
        of ONE's physicians, who were also Kusisto's employers ("Horner Letter").
        . . .

9.      In his letter to Kusisto's employers, Horner stated that Kusisto has "misled"
        his employers and has been "deliberately deceptive" in his employment.

10.     On or about April 29, 2006, Attorney Matthew Hohman, acting on behalf of
        MIE, told a reporter from the Fort Wayne *Journal Gazette*, Michael
        Schroeder, that ONE and Kusisto caused the FBI to begin an investigation
        under "false pretenses" and for ONE and Kusisto's "own benefit." . . .

11.     The statements made by Horner and Hohman were defamatory. . . .

14.     The statements made by Horner and Hohman identified Kusisto and ONE as
        the subject of their statements.

15.     The statements made by Horner and Hohman were of and concerning ONE
        and Kusisto. . . .

19.     The statements made by Horner and Hohman were known by them to be
        false and/or made with malice and in reckless disregard of the truth.

20.     Even if not made with actual malice, the statements made by Horner and
        Hohman were negligently made.

(ONE Countercl. 2-3.)

TPX and Plesko filed their counterclaim and third party complaint on June 21, 2006, which

they subsequently amended, claiming that Hohman's statements were defamatory and making the

following allegations:

---

[2] On that same day, ONE filed a separate counterclaim against MIE, asserting claims of criminal mischief, breach of contract, negligence, and violation of 18 U.S.C. § 1030. These claims are the subject of a separate motion to dismiss filed by MIE on July 17, 2006, and will be addressed in a separate order. In addition, TPX advanced a counterclaim of tortious interference against MIE, which is not subject to either of MIE's motions to dismiss.

8.    On or about April 29, 2006, Attorney Matthew Hohman, acting on behalf of MIE and Horner, told a reporter from the Fort Wayne *Journal Gazette*, Michael Schroeder, that TPX and Plesko had caused the FBI to begin an investigation under "false pretenses" and for TPX and Plesko's "own benefit." . . .

9.    The statements made by Horner and Hohman were known by them to be false and/or made with malice and a reckless disregard of the truth. . . .

12.   Horner and Hohman's statements were made with malice, oppression, and/or gross negligence.

(TPX Countercl. 2.)

On July 17, 2006, MIE and Horner filed the instant motion to dismiss all the defamation claims asserted against them.

## II. STANDARD OF REVIEW

A complaint should not be dismissed for failure to state a claim unless it appears that the plaintiff can prove no set of facts which would support his claim for relief. *Kelley v. Crosfield Catalysts*, 135 F.3d 1202, 1205 (7th Cir. 1998). In determining the propriety of dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must "accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences therefrom in favor of the plaintiff." *Perkins v. Silverstein*, 939 F.2d 463, 466 (7th Cir. 1991). The purpose of the motion to dismiss is to test the legal sufficiency of the complaint and not to decide the merits. *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989), *abrogated on other grounds by Bd. of County Comm'rs, Wabaunsee County, Kansas v. Umbehr*, 518 U.S. 668 (1996). "If it appears beyond doubt that plaintiffs can prove any set of facts consistent with the allegations in the complaint which would entitle them to relief, dismissal is inappropriate." *Perkins*, 939 F.2d at 466.

## III. DISCUSSION

The defamation claims in this case revolve around two events: (1) the statements made by Hohman to *The Journal Gazette*; and (2) the statements contained in the August 15 letter.  MIE and Horner generally contend that neither of the above events can support a defamation claim because they were inadequately pled and contain only conclusory allegations of malice. In addition to this broad assertion, MIE and Horner also make particularized arguments related to each event that is the subject of a defamation claim.  Each of these arguments shall be addressed in turn.

## A.  <u>General Pleading</u>

As noted above, MIE and Horner contend that all of the defamation claims against them should be dismissed because the Defendants "have done nothing more than conclude that MIE's counsel and Horner made the statements with malice."(MIE Brief at 14.) Their argument is ostensibly based on ONE and Kusisto's allegation that "[t]he statements made by Horner and Hohman were known by them to be false and/or made with malice and in reckless disregard of the truth" and TPX and Plesko's allegation that "[t]he statements made were known by Hohman, MIE, and Horner to be false and/or made with malice and a reckless disregard of the truth." (ONE Countercl. ¶ 19; TPX Countercl. ¶ 9.) Specifically, MIE and Horner contend that the Defendants' counterclaims fail because they do not allege any facts to support their contentions that Hohman's statement and Horner's August 15 letter were malicious.[3]

---

[3] MIE and Horner cite *Journal-Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 452 (Ind. 1999) for the proposition that *actual malice* is a required element of a defamation claim, attacking the pleadings' alternative allegations that Hohman's and Horner's statements were negligently made. Actual malice exists when a statement is published "with knowledge that it was false or with reckless disregard of whether it was false or not." *Shine v. Loomis*, 836 N.E.2d 952, 958 (Ind. Ct. App. 2005) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Bandido's*, 712 N.E.2d at 456). Actual malice, however, is required only when a public figure brings a defamation action or when a private individual brings a defamation action over a matter of public or general concern. *Id*. In the case of a private individual bringing a defamation action over a matter of private concern, only negligence with regard to the truth or falsity of the statement is required. *See Poyser v. Peerless*, 775 N.E.2d 1101, 1109 n.3 (Ind. App. 2002) (Baker, J., concurring); *Thompson v. Huntington*, 69 F. Supp. 2d 1071, 1076-77 (S.D. Ind. 1999) ("Although courts have discussed 'negligent defamation,' the term typically refers to negligence as to the truth or

Contrary to MIE and Horner's arguments, the notice-pleading system established by Federal Rule of Civil Procedure 8(a) only requires that a complaint (or in this case, a counterclaim and third party complaint) contain a "'short and plain statement of the claim' sufficient to notify [counterclaim] defendants of the allegations against them and enable them to file an answer." *Marshall v. Knight*, 445 F.3d 965, 968 (7th Cir. 2006) (quoting Fed. R. Civ. P. 8(a)). In that regard, Rule 8(a) does not require the parties to plead facts. *Id.* Furthermore, defamation claims are not subject to Rule 9's heightened pleading requirement. See *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 926 (7th Cir. 2003) (noting that federal law, not state law, governs pleading standards in federal court and that defamation claims do not fall under the special pleading regime of Rule 9). Here, both sets of counterclaims/third party complaints adequately put MIE and Horner on notice of the defamation claims against them; therefore, no additional factual allegations are necessary.[4]

Alternatively, MIE and Horner argue that even if the Defendants adequately pled malice, their good faith in making the statements negates the element of malice. For example, MIE and Horner claim that the August 15 letter was made "for the purpose of saving the relationship between ONE and MIE." (MIE Mem.14.) However, as noted above, at this stage the court cannot decide the merits and instead must "accept as true all well-pled factual allegations in the complaint . . . ." *Perkins*, 939 F.2d at 466. Here, the counterclaims/third party complaints simply allege that the

---

falsity of the statement . . . ."). Because parties are permitted to plead alternatively, *see* Fed. R. C iv. Pr. 8(e)(2), we need not decide at this stage of the proceedings what standard is appropriate, and in any event, defamation was adequately pled.

[4] MIE and Horner cite *Turner v. Int'l Bus. Machs. Corp.*, No. IP 78-631-C, 1981 U.S. Dist. LEXIS 18156, at *7 (S.D. Ind. Jan. 8, 1981) in support of its argument that "[d]efamation claims premised upon conclusory allegations of malice should be dismissed." (MIE Mem. 14.) *Turner*, however, is easily distinguishable, as the Court was ruling on a motion for summary judgment and was not testing the sufficiency of a complaint. *Compare Id.* at *6 ("Plaintiff must pierce the pleadings in defense of a motion for summary judgment. . . . Conclusory statements of malice will not suffice."), *with* Fed. R. Civ. P. 8(a).

8

statements were known to be false and/or made with malice and in reckless disregard of the truth.

Accepting the allegations as true, the court cannot conclude as a matter of law that the alleged

defamatory statements were made in good faith.

**B.      Defamation Claims arising from The Journal Gazette Article**

With respect to Hohman's statement to *The Journal Gazette,* MIE and Horner contend that

the defamation claim against them should be dismissed because the statements made were absolutely

privileged and, even if they were not privileged, the statement did not specifically refer to either

ONE or Kusisto. As for TPX and Plesko's claim arising from *The Journal Gazette* article, Horner

argues that this claim fails because there are no allegations that Horner made any defamatory

statements in connection with the article.

Turning first to the issue of absolute privilege, MIE and Horner argue that the statement

made by their attorney to the media is absolutely privileged pursuant to Restatement (Second) of

Torts § 586 (1977). Section 586 provides:

> An attorney at law is absolutely privileged to publish defamatory matter concerning
> another in communications preliminary to a proposed judicial proceeding, or in the
> institution of, or during the course and as a part of, a judicial proceeding in which he
> participates as counsel, if it has some relation to the proceeding.

When determining whether this privilege applies to the alleged defamatory statement, the court

looks to Indiana law. *See Raybestos Prods Co. v. Younger*, 54 F.3d 1234, 1246 (7th Cir. 1995).

Under Indiana law, whether a privilege applies is a question of law for the court. *See Biomet, Inc.*

*v. Smith*, 238 F. Supp. 2d 1036, 1047 (N.D. Ind. 2002).

Although Indiana Courts have not expressly adopted Section 586, they have cited to the

Section when recognizing that "[t]he prevailing rule [in Indiana] is that . . . counsel . . . [is]

absolutely privileged to publish defamatory matter in the course of judicial proceedings, with the

9

qualification that the statements must be pertinent and relevant to the case." *Briggs v. Clinton County Bank & Trust Co.*, 452 N.E.2d 989, 997 (Ind. Ct. App 1983); *see also Van Eaton v. Fink*, 697 N.E.2d 490, 495 (Ind. Ct. App. 1998) ("Absolute privilege provides . . . attorneys, . . . in connection with a judicial proceeding, immunity from liability even if they publish defamatory material with an improper motive.").  Here, all the parties agree that Indiana has adopted the absolute privilege as set forth in Section 586.

Under Section 586, an attorney's statements must meet two requirements in order for the privilege to apply. First, the communication must be "preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding." Restatement (Second) of Torts § 586 (1977). Second, the communication must be related to the judicial proceeding. *Id.*

The Defendants argue that the privilege does not apply here because an attorney's extra-judicial statement to a member of the news media does not meet the first requirement. Although Indiana Courts have not ruled directly on this issue, comment a to Section 586 is instructive:

> The publication of defamatory matter by an attorney is protected not only when made in the institution of the proceedings or in the conduct of litigation before a judicial tribunal, but in conferences and other communications preliminary to the proceeding. The institution of a judicial proceeding includes all pleadings and affidavits necessary to set the judicial machinery in motion. The conduct of the litigation includes the examination and cross-examination of witnesses, comments upon the evidence and arguments both oral and written upon the evidence, whether made to court or jury.

Restatement (Second) of Torts § 586 cmt a (1977).

The Defendants argue that comment a reveals that an attorney's communications to the news media are not covered under the absolute privilege set forth in Section 586. In support of their contention, they cite to a multitude of jurisdictions that have refused to apply the privilege to an

attorney's statements to the media. *See, e.g.*, *Davidson v. Cao*, 211 F. Supp. 2d 264, 275 (D. Mass. 2002); *Seidl v. Greentree Mortgage Co.*, 30 F. Supp. 2d 1292, 1313-14 (D. Colo. 1998); *Green Acres Trust v. London*, 688 P.2d 617, 622-23 (Ariz. 1984) (noting that the newspaper reporter "played no role in the actual litigation other than that of a concerned observer" and therefore "lacked sufficient connection to the proposed proceedings"); *Kennedy v. Zimmerman*, 601 N.W.2d 61, 64-65 (Iowa 1999); *Capello v. Scott*, 644 A.2d 102, 102-03 (N.J. Super. Ct. App. Div. 1994) (finding that absolute privilege did not apply even though the attorney apparently related a fair account of the complaint to the newspaper); *Kennedy v. Cannon*, 182 A.2d 54, 58-59 (Md. 1962); *Bochetto v. Gibson*, 860 A.2d 67, 72-73 (Pa. 2004) (finding that an attorney's transmission of a complaint to a reporter was not protected by absolute privilege because the transmission was "an extrajudicial act that occurred outside of the regular course of the judicial proceedings"). Indeed, "[c]ommunications made to newspapers and during press conferences 'have been almost universally found to be excluded from the protection of absolute privilege.'" *Williams v. Kenney*, 877 A.2d 277, 288 (N.J. Super. App. Div. 2005) (quoting *DeVivo v. v. Ascher*, 550 A.2d 163 (N.J. Super. App. Dist. 1988)).

Many of these Courts have premised their decisions, in part, on policy reasons. Specifically, the Courts note that "[t]he judicial proceedings privilege is based upon a public policy of giving attorneys, as officers of the court, the utmost freedom in their efforts to secure justice for their clients." *Kennedy*, 601 N.W.2d at 64 (citing Restatement (Second) of Torts § 586 cmt. a (1977)). However, these policy reasons are inapplicable in the context of an attorney's extra-judicial statements to the media because "the need for unbridled advocacy is diminished, and the need to

protect the intrusion upon a person's reputation is enhanced."[5] *Id.* at 65.

MIE and Horner argue that Section 586, comment a, does not contain an exhaustive list of circumstances in which the absolute privilege applies. Furthermore, they contend that the numerous cases the Defendants cite are not instructive here because Indiana Courts take a "liberal" approach to applying the absolute privilege. However, a review of Indiana case law reveals that Indiana Courts have employed the "liberal" rule only to questions regarding whether the content of an alleged defamatory statement is related to a judicial proceeding and have not spoken to whether the "liberal" rule applies to questions regarding whether a statement is connected to a judicial proceeding.[6] *See Miller v. Reinert*, 839 N.E.2d 731, 735 (Ind. Ct. App. 2005) ("In determining what

---

[5] The *Kennedy* Court also noted that within the confines of judicial proceedings there "is supervision and control by other authorities, such as courts of justice, where proceedings are under the able and controlling influence of a learned judge, who may reprimand, fine and punish as well as expunge from records statements of those who exceed proper bounds, and who may themselves be disciplined when necessary." *Id.* at 65. MIE and Horner argue that such a mechanism for supervision and control over attorneys' defamatory statements exists in Indiana even outside the confines of a judicial proceeding. Specifically, they argue that Indiana Rule of Professional Conduct 3.6, which generally prohibits lawyers from making "an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter," provides the mechanism to discipline attorneys who make defamatory comments to the press. Ind. R. Prof'l Conduct 3.6(a). Furthermore, Rule 3.6 provides exceptions for attorneys who state "the claim . . . involved and, except when prohibited by law, the identity of the persons involved" and who state "information contained in a public record." Ind. R. Prof'l Conduct 3.6(b)(1)-(2).

MIE and Horner argue that because Hohman merely let an interested party know the subject matter of MIE's claim against the Defendants, his conduct fell within Rule 3.6(b), and therefore his statement should be absolutely privileged. The court, however, does not find MIE and Horner's reliance upon Rule 3.6 persuasive, as Indiana Courts have found that the standards of professional conduct are "independent of the course of litigation from which acts of misconduct may arise." *In re Terry*, 394 N.E. 94, 95-96 (Ind. 1979) (noting that the societal interests protected by defamation law and the Indiana Rules of Professional Conduct are different and are therefore independent of each other); *see also In re Wilkins*, 394 N.E.2d 714, 720 (Ind. 2002) (Boehm, J., dissenting) (citing *In re Terry*, 394 N.E. at 95-96) ("[T]his Court has previously held that the law of defamation and the law of professional conduct do not overlap[.]").

[6] MIE and Horner contend that *Van Eaton*, 697 N.E.2d at 494-95, evinces the Indiana Court's willingness to extend the "liberal" approach to an attorney's extra-judicial statements. The *Van Eaton* Court found the statements of an attorney's legal assistant to opposing counsel absolutely privileged, even though the statement was made after trial (but before entry of final judgment). However, the statements made in *Van Eaton* bear an important distinction to the statement made here–the statements in *Van Eaton* were made between participants in the underlying litigation. Here, Hohman's statement was made to a member of the press who is not a participant in the litigation and is therefore not connected to the judicial proceedings. *See Brown v. Gatti*, 99 P.3d 299, 304-05 (Or. Ct. App.2004) ("We conclude that defendant's post-trial statements do not have that necessary connection. Defendant made his

is relevant and pertinent, the courts favor a liberal rule."); *Chrysler Motors Corp. v. Graham*, 631 N.E.2d 7, 9-10 (Ind. Ct. App. 1994); *Briggs*, 452 N.E.2d at 997 (citing *Stahl v. Kicaide*, 192 N.E.2d 493, 497 (Ind. Ct. App. 1963)) ("The question of relevancy or pertinency is a question of law. . . . The courts favor a liberal rule[.]") (internal citations omitted).

In that regard, at least one other jurisdiction that takes a similar "liberal" approach has determined that an attorney's extra-judicial statements to the press are not sufficiently connected to a judicial proceeding such that the absolute privilege is applicable. *See Brown*, 99 P.3d at 304 ("[T]he [Oregon] Supreme Court's instruction that the requirements for the privilege be interpreted liberally applies to the subject matter of the statement, not to the second component of a statement: its 'connection with a judicial proceeding.'"). Similarly, the Seventh Circuit Court of Appeals, when applying Indiana privilege law, cautioned that it "has consistently construed federal and state privilege laws narrowly, giving effect to federal evidentiary requirements that are designed to include, not exclude, probative evidence." *Raybestos*, 54 F.3d at 1245 (finding that a party's statements in trial preparation material was not made in the course of a judicial proceeding). Accordingly, in light of the overwhelming authority cited above, the Court declines to stretch Indiana's privilege law to cover the extra-judicial statements made here.[7]

Next, MIE and Horner argue that even if absolute privilege does not work in their favor,

---

statements to media personnel who played no participatory role in the trial.").

[7] In fact, MIE and Horner offer only two jurisdictions that have found an attorney's extra-judicial statement to the news media to be absolutely privileged. *See 50-Off Stores, Inc. v. Banque Paribas (Suisse) S.A.*, No. SA-95-CA-159, 1997 WL 790739, at *6-8 (W.D. Tex. May 20, 1997); *Propkop v. Cannon*, 583 N.W.2d 51 (Neb. Ct. App. 1998). However, this is not enough to tip the balance in favor of applying absolute privilege. Although "[a] few courts have held that statements made to the press can qualify for the privilege . . . the great weight of authority is to the contrary." *Brown*, 99 P.3d at 305 (quoting W. Page Keeton, et al., *Prosser & Keeton on Torts* § 114, 820 (5th ed. 984)) ("It is clear . . . that statements given to the newspapers concerning the case are not part of a judicial proceeding, and are not absolutely privileged.").

ONE and Kusisto are out of court on their defamation claims because they have not alleged that the statement to *The Journal Gazette* specifically named either ONE or Kusisto.

In their counterclaim and third party complaint, ONE and Kusisto allege that "[o]n or about April 29, 2006, Attorney Matthew Hohman, acting on behalf of MIE, told a reporter from *The Journal Gazette*, Michael Schroeder, that *ONE and Kusisto* caused the FBI to begin an investigation under 'false pretenses' and for ONE and Kusisto's 'own benefit.'" (ONE Countercl. ¶ 10 (emphasis added).) Ostensibly, this allegation is based on the following quote from the article which was attached to the counterclaim as an exhibit: "MIE believes that *the defendants* caused the FBI investigation to be instituted under false pretenses and for the defendant's own benefit."[8] (ONE Countercl. Ex. B. (emphasis added).)

MIE and Kusisto argue that ONE and Kusisto took the quote out of context, contending that an examination of the whole article reveals that Hohman was not referring to either ONE or Kusisto in his statement, but instead was only referring to Defendants TPX and Plesko. *See* Ind. Code § 34-15-1-1 ("In an action for libel or slander, it is sufficient to state generally that the defamatory matter published or spoken *was about the plaintiff*.") (emphasis added); *Rambo v. Cohen*, 587 N.E.2d 140, 145 (Ind. Ct. App. 1992) ("[T]he allegedly defamatory words are to be construed in light of the circumstances of their utterance.").[9]

_____

[8] The court can consider *The Journal Gazette* article and the August 15 letter when ruling on the motion to dismiss because they were attached to both sets of counterclaims and third party complaints. *See Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) ("Because the letter was attached to the complaint, it became a part of it for all purposes, and so the judge could consider it in deciding the motion to dismiss without having to convert the motion to one for summary judgment.") (internal citations omitted). Furthermore, the August 15 letter was attached to MIE's complaint.

[9] Specifically, MIE and Horner point to the paragraph immediately preceding Hohman's statement: "The suit went so far as allege that *triPRACTIX and Plesko* provided information regarding Medical Informatics that 'they knew to be false.'" (ONE Countercl. Ex. B (emphasis added).) In addition, MIE and Horner argue that the following statement from the article also supports their position: "In January the FBI began investigating [MIE] after

14

However, on a motion to dismiss the court must accept as true all well-pled facts in the counterclaim and third party complaint, *see Perkins*, 939 F.2d at 466, which alleges that "[t]he statements made by . . . Hohman identified *Kusisto and ONE* as the subject of their statements," and that "[t]he statements made by . . . Hohman were of and concerning *ONE and Kusisto*." (ONE Countercl. ¶¶ 14-15.) Indeed, upon examination of the article, it would be premature at this stage to conclude that Hohman's statements did not refer to ONE and Kusisto. The article begins by naming the four Defendants–ONE, Kusisto, Plesko, and TPX–and then consistently references the specific Defendants by name throughout the article, including references to ONE and Kusisto. Only at the end, in the disputed statement, is the generic term "defendants" used without reference to a specific defendant.[10] At this stage, giving ONE and Kusisto all inferences to which they are entitled, the court cannot conclude that the defamation allegations fail to state a claim for relief.

Finally, TPX and Plesko allege that Hohman made the purported defamatory statements in *The Journal Gazette* article while acting on behalf of Horner. Horner, however, argues that this allegation is insufficient to state a claim for relief because defamation law requires him to have actually made a defamatory statement. Because their third party complaint contains no allegations that Horner made any defamatory statement, Horner claims that TPX and Plesko's defamation claim against him in connection to *The Journal Gazette* article should be dismissed

Contrary to Horner's position, however, he could potentially be liable for Hohman's

---

*triPRACTIX* told the agency that its client [ONE's] software had been tampered with." (ONE Countercl. Ex. B (emphasis added).)

[10] The only other generic reference to the Defendants is a quote taken from a management statement to MIE's clients and partners: "During the course of our investigation, we have come to believe that these parties have violated MIE's rights, violated their agreements with MIE, and have been making defamatory statements against MIE." (ONE Countercl. Ex. B.)

statement if Hohman acted within the scope of his authority as Horner's agent. *See Smith v. Biomet, Inc.*, 384 F. Supp. 2d 1241, 1256 (N.D. Ind. 2005) (finding that a corporation can be held liable for its distributor's defamatory statement since the corporation vested the requisite agency authority with the distributor); *United Farm Bureau Mut. Ins.*, 486 N.E.2d 571, 573 (Ind. Ct. App.1985) (opining that clients can be liable to a third party for torts committed by their attorney); *Assocs. Fin. Servs. Co., Inc. v. Bowman, Heintz, Boscia, & Vician, P.C.*, No. IP 99-1725-C-M/S, 2004 WL 826088, at \*21 (S.D. Ind. March 31, 2004). At this stage of the proceedings, the court must accept as true TPX and Plesko's allegation that Hohman acted on behalf of Horner when speaking to *The Journal Gazette*, which suggests that Hohman acted within the scope of his agency authority.[11] Accordingly, this defamation claim asserted against Horner will not be dismissed.

## C.      Defamation Claims Arising from the August 15 Letter

In addition to the defamation claim regarding Hohman's statement to the press, ONE and Kusisto also assert a defamation claim against MIE and Horner in connection with the August 15, 2005, penned by Horner, which was sent to ONE's physicians. MIE and Horner contend that this claim should be dismissed because the absolute litigation privilege applies to the letter. Alternatively, they argue that the letter is protected by the qualified privilege of common interest. Finally, Horner contends that the defamation claim asserted against him individually should be dismissed because he wrote the letter within the scope of his corporate office. Again, these contentions shall be addressed individually.

---

[11] Ultimately, the question of whether such an agency relationship exited between Horner and Hohman and whether Hohman, as Horner's agent, acted within the scope of his authority is ultimately a question of fact for the jury. *See Smith*, 384 F. Supp. 2d at 1256 (citing *Coca-Cola Co. v. Babyback's Int'l, Inc.*, 806 N.E.2d 37, 46 (Ind. Ct. App. 2004), *trans. denied*; *Johnson v. Blankenship*, 679 N.E.2d 505, 507 (Ind. Ct. App.1997), *trans. granted and summarily aff'd*, 688 N.E.2d 1250 (Ind. 1997)).

MIE and Horner first argue that even though the August 15 letter was written eight months prior to the filing of their complaint, it is protected by the litigation privilege pursuant to Restatement (Second) of Torts § 587 (1977). Section 587 provides that "[a] party to a private litigation . . . is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding . . . if the matter has some relation to the proceeding." Restatement (Second) of Torts § 587 (1977).

Indiana Courts have not expressly adopted Section 587; however, the *Briggs* Court cited to Section 587 when recognizing that "[t]he prevailing rule is that . . . parties . . . are absolutely privileged to publish defamatory matter *in the course of judicial proceedings*, with the qualification that the statements must be pertinent and relevant to the case." *Briggs*, 452 N.E.2d at 997 (emphasis added); *see also Van Eaton*, 697 N.E.2d at 494 (citing *Chrysler Motors*, 631 N.E.2d at 9 ("Indiana law affords absolute privilege to statements made in the course of a judicial proceeding.") Although Indiana Courts recognize the litigation privilege in regards to communications made in the course of judicial proceedings, they have not extended the privilege to communications made preliminary to a proposed judicial proceeding. Indeed, the Seventh Circuit Court of Appeals declined to extend the privilege in such circumstances, noting that "the Indiana courts have never extended this privilege, as § 587 of the Restatements does, to statements made prior to a judicial proceeding . . . ." *Raybestos*, 54 F.3d at 1246. Accordingly, the court will decline to extend the litigation privilege here.[12]

---

[12] Furthermore, even if the court applied the privilege to statements made prior to judicial proceedings, neither the pleadings nor the attached August 15 letter indicate that the letter was written in good faith and under serious consideration of a judicial proceeding pursuant to Section 587. In that regard, comment e to Section 587 provides:

As to communications preliminary to a proposed judicial proceeding, the rule stated in this Section

17

MIE and Horner alternatively assert that they are shielded from liability regarding the August 15 letter pursuant to the qualified privilege of common interest, which applies "to communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Bd. of Sch. Comm'rs v. Pettigrew*, 851 N.E.2d 326, 330-31 (Ind. Ct. App. 2006) (citing *Schrader v. Eli Lilly & Co.*, 639 N.E.2d 256, 262 (Ind. 1994); *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992)). Accordingly, the elements of the common interest privilege are "(1) good faith; (2) an interest to be upheld; (3) a statement limited in its scope to this purpose (4) a proper occasion; and (5) publication in a proper manner to the appropriate parties only." *Id.* at 331. However, the common interest privilege is lost when: "(1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth." *Id.* "Absent a factual dispute, whether a statement is protected by a qualified privilege is a question of law." *Id.*

MIE and Horner argue that the common interest privilege applies here because MIE and Horner sent the letter to the ONE doctors in an attempt to "save the contractual relationship [pursuant to the Software License Agreement] from further deterioration." (MIE Mem. 13.) However, this argument is premature in that the court is merely assessing the case at the pleadings

---

applies only when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered.

Restatement (Second) of Torts § 587 cmt e (1977). At this stage of the proceedings, there are no facts alleged demonstrating that MIE was seriously considering filing the current litigation at the time Horner sent the letter. Accordingly, the absolute litigation privilege does not apply to the August 15 letter.

18

and discerning whether, under the well-pleaded facts, the pleader could be entitled to relief.

Here, ONE and Kusisto allege malice in their counterclaim and third party complaint. Indiana Courts have observed that the "ordinary" definition of malice is "'an evil intent or motive' arising from spite or *ill will*." *Shine*, 836 N.E.2d at 958 (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991)) (emphasis added). As noted above, the common interest privilege is lost when the speaker is motivated primarily by ill will. Additionally, ONE and Kusisto allege that Horner wrote the letter knowing that the alleged defamatory statements in it were false. In that regard, the common interest privilege is also lost when statements are made without belief or grounds for belief in their truth. Accordingly, accepting the allegations in the counterclaim and third party complaint as true, ONE and Kusisto have successfully defeated MIE and Horner's attempt at asserting the common interest privilege at this stage of the proceedings.

Furthermore, ONE and Kusisto dispute facts relevant to the application of the common interest privilege. Specifically, they assert that no common interest between MIE and ONE existed because Horner admitted in the letter that the contractual relationship was over and there was nothing left to salvage. (*See* ONE Countercl. Ex. A ("The purpose of this letter is to inform you that our collaborative relationship is ending. . . . I regret the loss of our relationship.").) Thus, they contend that the second element of the privilege is defeated. Because of this factual dispute, the court finds that the application of the privilege is not appropriate. *See Bd. of Sch. Comm'rs*, 851 N.E.2d at 331.         Finally, Horner asserts that even if the statements he made in the August 15 letter are not protected by a privilege, the claims of defamation against him individually should be dismissed because he wrote and sent the letter within the scope of his corporate position as President of MIE. Horner cites *Trail v. Boys & Girls Clubs*, 845 N.E.2d 130, 139 (Ind. 2006), in support of

the proposition that corporate officers must have acted outside the scope of their authority before they may be held liable in tort. However, *Trail*'s holding applies only when claims of tortious interference with the corporation's contract are asserted against a corporate officer, and does not apply generally to all torts.[13] *See Id.* at 138.

In the case of all other torts asserted against a corporate officer, Indiana law provides that although "an officer of a corporation is generally not personally liable for the torts of the corporation . . . merely because of her office['] . . . an officer is personally liable for the torts in which she has participated or which she has authorized or directed." *Civil Rights Comm'n v. County Line Park, Inc.*, 738 N.E. 2d 1044, 1049-50 (Ind. 2000); *see also ABN Amro Mortgage Group, Inc. v. Maximum Mortgage, Inc.*, 1:04cv492, 2006 WL 2598034, at *8 (N.D. Ind. Sept. 8, 2006); *Cantrell v. Morris*, 849 N.E. 2d 488, 493-94 (Ind. 2006) (citing *Comm'r Ind. Dep't of Envtl. Mgmt. v. RLG, Inc.*, 755 N.E.2d 556, 558 (Ind. 2001); *State of Ind. Civil Rights Comm'n*, 738 N.E.2d at 1050 (Ind.2000)) ("We have recognized that an officer of a private corporation may be personally liable for torts committed in the person's capacity as an officer or agent of the corporation.").

Accepting ONE and Kusisto's allegations as true, it is premature to conclude at this stage of the proceedings that ONE and Kusisto are suing Horner merely due to his position as a corporate

___

[13] That *Trail*'s holding is limited to claims of tortuous interference is revealed in the Court's explanation for providing immunity to a corporate officer:

>That an officer or director of a corporation possesses limited immunity from most charges of tortious interference with the corporation's contracts stems from both their role as agents of the corporation and the nature of the tort. A party cannot "interfere" with its own contracts, so the tort itself can be committed only by a third party. *See, e.g.*, *Martin v. Platt*, 179 Ind. App. 688, 690-91, 386 N.E.2d 1026, 1027 (1979). In the case of a corporation, the legal entity acts through its directors and officers. Thus, when officers or directors act in their official capacity as agents of the corporation, they act not as individuals but as the corporation itself. In doing so, they are not acting as a third party, but rather as a party to the contract and cannot be personally liable for tortious interference with the contract.

*Id.* at 138.

officer of MIE. In their counterclaim and third party complaint, ONE and Kusisto allege that "Horner, on behalf of MIE, sent a letter to each of ONE's physicians," and that in this letter, "Horner stated that Kusisto has 'misled' his employers and has been 'deliberately deceptive' in his employment." (ONE Countercl. ¶¶ 8-9.) Accordingly, at this stage it seems as though Horner played a crucial role in the perpetuating the alleged defamation and consequently is not shielded from tort liability.

## IV. CONCLUSION

For the reasons stated herein, MIE and Horner's Motion to Dismiss All Defamation Claims Against Medical Informatics Engineering, Inc. and Doug Horner (Docket # 43) is DENIED.

SO ORDERED.

Enter for this 17th day of October, 2006.

S/William C. Lee
William C. Lee,
United States District Judge