IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| MEDICAL INFORMATICS ENGINEERING, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| ORTHOPAEDICS NORTHEAST, P.C., triPRACTIX, LLC, RAYMOND KUSISTO, and TODD PLESKO, | ) ) ) ) | Cause No. 1:06 CV 173 |
| Defendants/Counterclaimants, and Third Party Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| DOUG HORNER, | ) ) | |
| Third Party Defendant. | ) | |

---

**DEFENDANTS' JOINT BRIEF IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Thomas A. Herr (#8444-02)
Cathleen M. Shrader (#18159-02)
BARRETT & MCNAGNY LLP
215 East Berry Street
Fort Wayne, Indiana 46802
Tel: (260) 423-9551
Fax: (260) 423-8920
E-mail: tah@barrettlaw.com
        cms@barrettlaw.com

*Attorneys for Defendants Orthopaedics
Northeast, P.C. and Raymond Kusisto*

James P. Fenton (#6808-02)
EILBACHER FLETCHER, LLP
803 S. Calhoun Street, Suite 400
Fort Wayne, IN  46802
(260) 425-9777; (260) 424-9177 (fax)
Email: fenton@eflawyers.com

Lonnie D Johnson (#16758-53)
Patrick B Omilian (#23973-53)
MALLOR CLENDENING GRODNER& BOHRER LLP
511 S. Woodscrest Drive
Bloomington, IN 47407
(812) 336-0200; (812) 333-0083 (fax)
Email: ljohnson@mcgb.com
        pomilian@mcgb.com

*Attorneys for triPRACTIX, LLC and Todd Plesko*

**TABLE OF CONTENTS**

<b>Page</b>

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    Defendants Are Entitled to Judgment as a Matter of Law on
            MIE's Claims for Copyright Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            1.   *Actions Authorized Under the SLA Cannot Constitute Infringement* . . . . 3

            2.   *Any Access to MIE's Software for the Purpose of Retrieving*
                *ONE's Data Constitutes Fair Use and Is Not Actionable.* . . . . . . . . . . . 4

            3.   *MIE Cannot Establish that triSCRIPT Infringes on its Copyright* . . . . . . 8

            4.   *ONE Is Not Liable for Any Alleged Infringement* . . . . . . . . . . . . . . . . . . 12

      C.    Even if it Had A Viable Infringement Claim, MIE's Claim is Barred by its Own
            Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            1.   *Enforcing the SLA Would Constitute Copyright Misuse* . . . . . . . . . . . . . 17

            2.   *MIE's Attempt to Prohibit its Customers from Extracting*
                *Their Own Data from WebChart Without MIE's Assistance*
                *Constitutes Copyright Misuse* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            3.   *MIE's Criminal Activities Bar it from Asserting*
                *an Infringement Claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      D.    Because MIE Committed the First Material Breach of Both the MSA and
            the SLA, Defendants Are Entitled to Judgment on MIE's Breach of
            Contract Claim and ONE's Counterclaims for Breach of Contract . . . . . . . . . . 25

i

**TABLE OF CONTENTS (cont.)**

                                                                          **Page**

E.   Even Absent a First Material Breach on MIE's Part, Its Contract
     Claims Are Nevertheless Unenforceable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     1.   The Covenant Not to Compete is Unenforceable . . . . . . . . . . . . . . . . . . 29

     2.   MIE's Breach of Contract Claim Related to the Retrieval of ONE's
          Data is Preempted by the Copyright Act. . . . . . . . . . . . . . . . . . . . . . . . 32

F.   MIE Has Shown No Criminal Conduct on the Part of Any Defendant . . . . . . . . 37

G.   MIE Has Failed to Assert Any Evidence to Support Its Defamation
     Claims Against Kusisto, Plesko, and TPX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

H.   MIE Has Failed to Show an Actionable Claim for Trade
     Secret Misappropriation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

I.   MIE's Claim for Interference With Business Relationships Fails Since
     It Cannot Show an Illegal Act on the Part of Any of the Defendants . . . . . . . . 45

J.   Several of the Damage Claims Sought By MIE Are Not
     Viable as a Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

     1.   "Value Impairment Due to NMC Timing" . . . . . . . . . . . . . . . . . . . . . . 46

     2.   "Unjust Enrichment Through Non-Compete Violation" . . . . . . . . . . . . 47

     3.   "Accelerated Market Entry" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# TABLE OF AUTHORITIES

*Cases*                                                                 **Page**

*4-D Bldgs., Inc. v. Palmore,*
    688 N.E.2d 918 (Ind. Ct. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*A&M Records, Inc. v. Napster, Inc.,*
    239 F.3d 1004 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*AMP Inc. v. Fleischhacker,*
    823 F.2d 1199 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Amoco Prod. Co. v. Laird,*
    622 N.E.2d 912 (Ind. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Apple Computer, Inc. v. Microsoft Corp.,*
    821 F. Supp. 616 (N.D. Cal. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Assessment Technologies of WI, LLC v. WIREdata, Inc.,*
    350 F.3d 640 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6, 15, 20, 36

*Atari, Inc. v. North Am. Philips Consumer Elecs. Corp.,*
    672 F.2d 607 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,*
    805 F.2d 663 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Beard v. Whitley County REMC,*
    840 F.2d 405 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Bennett v. Broderick,*
    858 N.E.2d 1044 (Ind. Ct. App. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Brazauskas v. Fort Wayne-South Bend Diocese, Inc.,* 796 N.E.2d 286 (Ind. 2003), *cert. denied,*
    541 U.S. 902, 124 S. Ct. 1602, 158 L. Ed. 2d 244 (2004) . . . . . . . . . . . . . . . . . . . . . . . . 45

*Burk v. Heritage Food Serv. Equip., Inc.,*
    737 N.E.2d 803, (Ind. Ct. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 31

*Capital Cities Cable, Inc. v. Crisp,*
    467 U.S. 691, 104 S. Ct. 2694, 81 L. Ed. 2d 580 (1984) . . . . . . . . . . . . . . . . . . . . . . . 32-33

iii

*Carell v. The Shubert Org., Inc.*,
      104 F. Supp. 2d 236 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Celotex Corp. v. Catrett*,
      477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Chamberlain Group, Inc. v. Skylink Techs., Inc.*,
      381 F.3d 1178 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Community for Creative Non-Violence v. Reid*,
      490 U.S. 730, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989) . . . . . . . . . . . . . . . . . . . . . . . . 9

*Composite Marine Propellers, Inc. v. Van Der Woude*,
      962 F.2d 1263 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Data East USA, Inc. v. Epyx, Inc.*,
      862 F.2d 204 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Dicen v. New Sesco, Inc.*, 839 N.E.2d 684 (Ind. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Evans Newton Inc. v. Chicago Systems Software*,
      793 F.2d 889 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

*Evolution, Inc. v. SunTrust Bank*,
      342 F. Supp. 2d 943 (D. Kan. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

*First Federal Savings Bank v. Key Markets*,
      559 N.E.2d 600 (Ind. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
      76 F.3d 259 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Franke v. Honeywell, Inc.*,
      516 N.E.2d 1090 (Ind. Ct. App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Gatto v. St. Richard School, Inc.*,
      774 N.E.2d 914 (Ind. Ct. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40-41

*Geier v. American Honda Motor Co.*,
      529 U.S. 861, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000) . . . . . . . . . . . . . . . . . . . . . . . . 34

*Government Payment Service, Inc. v. Ace Bail Bonds*,
      854 N.E.2d 1205 (Ind. Ct. App. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

iv

*Hadley v. Baxendale*,
    156 Eng. Rep. 145 (1854) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Harris Custom Builders, Inc. v. Hoffmeyer*, 92 F.3d 517 (7th Cir. 1996),
    *cert. denied*, 519 U.S. 1114, 117 S. Ct. 956, 136 L. Ed. 2d 842 (1997). . . . . . . . . . . . 12

*Heeb v. Smith*, 613 N.E.2d 416 (Ind. Ct. App. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Huthwaite, Inc. v. Randstad General Partner, LLC*,
    No. 06-C-1548, 2006 WL 3065470 (N.D. Ill. Oct. 24, 2006) . . . . . . . . . . . . . . . . . . . . 14

*IDX Systems Corp. v. Epic Systems Corp.*,
    285 F.3d 581 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Incredible Technologies, Inc. v. Virtual Technologies, Inc.*,
    400 F.3d 1007 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*JCW Investments, Inc. v. Novelty, Inc.*,
    482 F.3d 910 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Journal-Gazette Co., Inc. v. Bandido's, Inc.*,
    712 N.E.2d 446 (Ind. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39-40

*Kewanee Oil Co. v. Bicron Corp.*,
    416 U.S. 470, 94 S. Ct. 1879, 40 L. Ed. 2d 315 (1974) . . . . . . . . . . . . . . . . . . . . . . . . 34

*Lasercomb America, Inc. v. Reynolds*,
    911 F.2d 970 (4th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-17, 18, 20

*Levee v. Beeching*, 729 N.E.2d 215 (Ind. Ct. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*MPACT Const. Group, LLC v. Superior Concrete Constructors, Inc.*,
    802 N.E.2d 901 (Ind. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*MacGill v. Reid*,
    850 N.E.2d 926 (Ind. Ct. App. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 32

*Made2Manage Systems, Inc. v. ADS Information Systems, Inc.*,
    No. 1:02-cv-1405, 2003 WL 21508235 (S.D. Ind. June 24, 2003) . . . . . . . . . . . . . . . . 27

*Madison River Management Co. v. Business Management Software Corp.*,
    387 F. Supp. 2d 521 (M.D.N.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Marobie-FL, Inc. v. National Ass'n of Fire Equipment Distributors*,
    983 F. Supp. 1167 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*MiTek Holdings, Inc. v. Arce Engineering Co., Inc.,*
    89 F.3d 1548 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Morton Salt Co. v. G.S. Suppiger,*
    314 U.S. 488, 62 S. Ct. 402, 86 L. Ed. 363 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*NationsCredit Commercial Corp. v. Grauel Enterprises, Inc.,*
    703 N.E.2d 1072 (Ind. Ct. App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Nautical Solutions Marketing, Inc. v. Boats.com,*
    No. 8:02-CV-706, 2004 WL 783121 (M.D. Fla. April 1, 2004) . . . . . . . . . . . . . . . . . . . 7

*Norlund v. Faust,*
    675 N.E.2d 1142 (Ind. Ct. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 32

*Ortho Pharmaceutical Corp. v. Chapman,*
    180 Ind. App. 33, 388 N.E.2d 541 (1979)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Practice Mgmt. Information Corp. v. American Med. Ass'n,*
    121 F.3d 516 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15, 19-20

*ProCD, Inc. v. Zeidenberg,*
    86 F.3d 1455 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Raymundo v. Hammond Clinic Ass'n,*
    449 N.E.2d 276 (Ind. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-30

*Reed-Union Corp. v. Turtle Wax, Inc.,*
    77 F.3d 909 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Robinson v. Valladares,*
    738 N.E.2d 278 (Ind. Ct. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Ruder v. Ohio Valley Wholesale, Inc.,*
    736 N.E.2d 776 (Ind. Ct. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Sears, Roebuck & Co. v. Stiffel Co.,*
    376 U.S. 225, 84 S. Ct. 784, 789, 11 L. Ed. 2d 661 (1964) . . . . . . . . . . . . . . . . . . . . . . 34

*Sega Enterprises Ltd. v. Accolade, Inc.,*
    977 F.2d 1510 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Sharvelle v. Magnante,*
    836 N.E.2d 432 (Ind. Ct. App. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Steve Silveus Ins., Inc. v. Goshert,*
   873 N.E.2d 165 (Ind. Ct. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries,*
   272 F.3d 441 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ticketmaster Corp. v. Tickets.com. Inc.,*
   No. CV997654HLHVBKX, 2003 WL 21406289 (C.D. Cal. Mar. 7, 2003) . . . . . . . . . . 7

*Titus v. Rheitone, Inc.,* 758 N.E.2d 85 (Ind. Ct. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 28-29

*Toney v. L'Oreal USA, Inc.,*
   406 F.3d 905 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Trandes Corp. v. Guy F. Atkinson Co.,*
   996 F.2d 655 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Watson Rural Water Co., Inc. v. Indiana Cities Water Corp.,*
   540 N.E.2d 131 (Ind. Ct. App. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Wildlife Express Corp. v. Carol Wright Sales, Inc.,*
   18 F.3d 502 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

---

***Statutes and Legislative Materials***                                              **Page**

Ind. Code § 35-43-1-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Ind. Code § 35-43-2-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

17 U.S.C. § 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

17 U.S.C. § 107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

17 U.S.C. § 301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

H.R. Rep. No. 94-1476, at 130 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 . . . . . . . . . . . . . 33

***Other Authorities***                                                **Page**

Mark Lemley, *Beyond Preemption: The Law and Policy of Intellectual
    Property Licensing*, 87 CAL. L. REV. 111 (1999)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

Viva R. Moffat, *Super-Copyright: Contracts, Preemption, and the Structure
    of Copyright Policymaking*, 41 U.C. Davis L. Rev. 45 (2007)  . . . . . . . . . . . . . . . . . 34-35

MELVILLE B. NIMMER AND DAVID NIMMER,
    NIMMER ON COPYRIGHT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12, 15, 33-66

## I.      INTRODUCTION

Plaintiff, Medical Informatics Engineering, Inc. ("MIE"), filed a seven-count Complaint against Defendants seeking recovery for alleged Copyright Infringement, Breach of Contract (two counts), Recovery by Crime Victim, Defamation, Trade Secret Misappropriation, and Tortious Interference with Business Relationships [dkt#1].  Defendant Orthopaedics Northeast, P.C. ("ONE") filed a five-count Counterclaim against MIE seeking recovery for alleged Computer Fraud and Abuse, Trespass, Breach of Contract (two counts), and Negligence [dkt#27].  In addition, ONE and Defendant Raymond Kusisto filed a Counterclaim/Third Party Claim against MIE and its President, Third-Party Defendant Doug Horner, for Defamation [dkt#28].[1] Defendant triPRACTIX, LLC ("TPX") filed a one-count Counterclaim against MIE for Interference with Business Relationship [dkt#34].  In addition, TPX and Defendant Todd Plesko filed a Counterclaim/Third Party Claim against MIE and Third-Party Defendant Doug Horner, for Defamation [dkt#36].  For the reasons set forth herein, Defendants ONE, TPX, Kusisto, and Plesko are entitled to judgment as a matter of law on the vast majority of these claims.

## II.     STATEMENT OF MATERIAL FACTS

Pursuant to L.R. 56.1, Defendants have submitted in an Appendix to this Brief their Statement of Material Facts to which they contend there are no genuine issues.[2]  To the extent additional facts are necessary to this Court's review, they are set forth below in the Argument.

---

[1]On August 15, 2007, Defendants ONE and Kusisto filed their Motion to Amend Defendant ONE's Third Party Claim and Submit All Counterclaims and Third Party Claims, as Amended, in a Single Pleading" [dkt#88].  The motion was fully briefed as of September 14, 2007, but there has been no ruling.

[2]In addition to the Statement of Material Facts, copies of the evidence relied upon are contained in the Appendix to the Defendants' Joint Motion for Summary Judgment ("App.").

### III.   LEGAL ARGUMENT

### A.   Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988). Accordingly, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment is proper. *Celotex*, 477 U.S. at 323.

### B.   Defendants Are Entitled to Judgment as a Matter of Law on MIE's Claims for Copyright Infringement

When asked how the Defendants infringed on MIE's copyright, MIE stated that "ONE infringed upon MIE's copyright by reverse engineering WebChart to migrate data into Centricity EMR . . . [and] by providing copies of WebChart to [TPX]." MIE's Supplemental Responses to ONE's Interrogatories ("MIE Supp. Resp. to ONE") at 8-9 (App. Ex. BB). MIE also alleges that TPX provided copies of WebChart to third-party consultants Midwest Network Services Group ("Midwest") and MySQL and that TPX used MIE source code in developing its triSCRIPT software. *Id*. at 9. MIE claims ONE is liable for the actions of TPX in this respect. Taking the

facts in the light most favorable to MIE, none of these claims is actionable under the Copyright Act.

### 1.      *Actions Authorized Under the SLA Cannot Constitute Infringement*

MIE asserts that ONE infringed on its copyright both when it allowed its consultant, TPX to access MIE's software, and when consultants Midwest and MySQL accessed WebChart. *Id*. at 9. To assert that these actions constitute copyright infringement is a particularly outrageous claim since ONE called in consultants in order to address MIE's unjustified termination of the Maintenance and Support Service Agreement ("MSA"), Dep. Ex. 74 (App. Ex. S) and Doug Horner's intentional hacking into ONE's network. MIE admits that service and support are essential if WebChart is to remain functional, *see, e.g.*, Jones Dep. (7/12/07) at 23 (App. Ex. G), yet it unilaterally terminated its support of ONE. One may well ask whether MIE is suggesting that ONE was required to call MIE in to troubleshoot and repair the problems Horner himself had caused? Like the fireman who starts a fire in order to show up to save the day, Horner has admitted that one of the reasons he hacked into ONE's network was to prompt ONE to call MIE to fix the problems he himself created. *See, e.g.*, Horner Dep. (3/23/07) at 184 (App. Ex. C). It would be absurd to permit MIE to recover any "damages" whatsoever under these circumstances.

An even more complete impediment to MIE's claim is that access by persons who are consulted to provide service to, troubleshoot, or otherwise assist ONE in its use of the WebChart software is permitted under the Software License Agreement ("SLA"). *See* Dep. Ex. 15 (App. Ex. R). Section 14.1 of the SLA explicitly permits ONE to grant access to MIE's software to "employees or other persons acting on [ONE's] behalf" where disclosure is "necessary for

purposes related to Licensee's use of the Licensed System . . . ."[3]  *Id*.  The SLA was drafted by MIE, and therefore, to the extent there is any ambiguity as to whether such actions were outside the SLA, the language of the SLA must be construed against MIE.  *See, e.g.*, *MPACT Const. Group, LLC v. Superior Concrete Constructors, Inc*., 802 N.E.2d 901, 910 (Ind. 2004) (citations omitted).  However, under any reading of the SLA it is clear that the Agreement grants ONE a very broad right to disclose the software and grant access to it to third-party consultants where "necessary for purposes related" to ONE's use of the software.  Calling in consultants to troubleshoot software that was not functioning properly is unmistakably a purpose related to ONE's use of that software, and giving the consultants continued access for the purpose of determining why ONE was having problems when it used the software (and later determining that Horner was responsible) is also related to ONE's use of the software.  Moreover, TPX was servicing ONE's system and necessarily was granted access for a purpose related to ONE's use of the software.  It follows that the Defendants are entitled to judgment as a matter of law on any claims by MIE that providing access to WebChart to TPX, or to Midwest, or to MySQL constitutes copyright infringement.

     **2.**      **Any Access to MIE's Software for the Purpose of Retrieving ONE's Data Constitutes Fair Use and Is Not Actionable.**

In addition to its claim that allowing TPX, Midwest, and MySQL access to WebChart constitutes actionable infringement, MIE alleges that accessing its software for the purpose of removing ONE's data from WebChart constitutes infringement.  The Defendants are entitled to judgment on this aspect of MIE's claim since it is well-settled that such use is a fair use.

---

[3]Moreover, the prohibition against reverse engineering or decompiling contained in Section 11 of the SLA "does not restrict Licensee from observing, studying or testing the functioning of the Software solely in order to understand the ideas and principles that underlie the Software."  App. Ex. R.

4

Section 107 of the Copyright Act defines what is a fair use and therefore outside the scope of the Act:

> In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include–
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  In assessing these factors, courts have concluded that a user may access, reverse engineer, and even decompile another's copyrighted work in order to access *non-*copyrighted material.

In *Assessment Technologies of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640 (7th Cir. 2003), Assessment Technologies ("AT"), developed and copyrighted software known as Market Drive, which it licensed to municipalities.  When municipal tax assessors entered raw information into Market Drive, the program would automatically compile the raw data into 456 fields, grouped into 34 master categories known as tables.  The newly-compiled data was then saved in an electronic file as a database.  WIREdata sought access to the raw data (non-copyrighted) collected by tax assessors.  In response, AT sued to prevent WIREdata from acquiring the raw data from the software, claiming the data could not be extracted without infringing AT's copyright. The district court ruled in favor of AT.  *Id*. at 648.

In an opinion authored by Judge Posner, the Seventh Circuit reversed and held that although MarketDrive was protected by copyright, *id*. at 643, removing the raw data from it, *even*

5

*if it required copying the MarketDrive structure*, would be fair use, *id.* at 644-45.  Relying on

*Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992), the court stated:

> if the only way WIREdata could obtain public-domain data about properties in
> southeastern Wisconsin would be by copying the data in the municipalities'
> databases as embedded in Market Drive, so that it would be copying the
> compilation and not just the compiled data only because the data and the format in
> which they were organized could not be disentangled, it would be privileged to
> make such a copy, and likewise the municipalities.  *For the only purpose of the
> copying would be to extract noncopyrighted material.*

*Id.* at 644-45 (emphasis added). Moreover, the fact that at least *some* of the data could

alternatively be obtained from "analog" or written sources nevertheless did not cut against a

finding of fair use:

> what is more fundamental is that since AT has no ownership or other legal interest
> in the data collected by the assessor, *it has no legal ground for making the
> acquisition of that data more costly for WIREdata.* AT is trying to use its
> copyright to sequester uncopyrightable data, presumably in the hope of extracting
> a license fee from WIREdata.

*Id.* at 645 (emphasis added).  The court concluded that there were four different ways that

WIREdata could legally obtain the raw data without infringing on AT's copyright.  In one, the

municipalities themselves could use the copyrighted program to extract their own data.  *Id.* at

648.  Another was allowing a third party to extract the data.  *Id.*  Here, like AT, MIE had no

ownership interest in ONE's data.  As the data's owner, ONE was free to remove it from

WebChart or to allow a third party (TPX) to remove it, since any such use of MIE's copyrighted

software in that the process would be fair use.  *WIREdata* settles that question in this Circuit.

Following the Seventh Circuit's analysis in *WIREdata*, the Kansas District Court

determined whether a software licensee's conversion of its own data from copyrighted software

in order to use a new vendor's software constituted copyright infringement.  *See Evolution, Inc.

v. SunTrust Bank*, 342 F. Supp. 2d 943 (D. Kan. 2004).  In that case, not only did the customer

*access* the copyrighted software, it used the software's source code to write three computer programs in order to extract its data. Despite the use of the software's source code, the court concluded these actions were fair use under Section 107 of the Copyright Act:

> The court finds persuasive the Ninth Circuit's holding in *Sega*, and, in particular, the Seventh Circuit's application of *Sega* in *WIREdata*. In the present case, defendants copied portions of plaintiff's source code in order to write the [three] computer programs, *which extracted defendants' own data from plaintiff's program*. Defendants' situation is factually similar to that described by the *WIREdata* court, in that the present defendants wished to access and extract uncopyrightable data that was embedded in a copyrighted computer program. *Such use of plaintiff's source code falls well within the fair use doctrine as several federal circuit courts have articulated it.*

*Id.* at 956 (emphasis added); *see also Nautical Solutions Marketing, Inc. v. Boats.com*, No. 8:02-CV-706, 2004 WL 783121, at *2 (M.D. Fla. April 1, 2004) (finding the repeated copying of a competitor's website's copyrighted HTML in order to extract certain non-copyrighted facts regarding boats and yachts for sale to the public was a fair use) (citing *Ticketmaster Corp. v. Tickets.com. Inc.*, No. CV997654HLHVBKX, 2003 WL 21406289, at *5 (C.D. Cal. March 7, 2003) ("Taking the temporary copy of the electronic information for the limited purpose of extracting unprotected public facts leads to the conclusion that the temporary use of the electronic signals was 'fair use' and not actionable."); *Madison River Management Co. v. Business Management Software Corp.*, 387 F. Supp. 2d 521, 536, 536 (M.D.N.C. 2005) (noting that the nightly taking of a "snapshot picture" of the licensor's database would not constitute infringement if the only purpose was to extract the licensee's raw data)).

As in *Evolution*, the copying of certain portions of WebChart (described by MIE as "reverse engineering") in order to remove data that did not belong to MIE is well within the fair use doctrine of Section 107. MIE has admitted such actions were necessary in order for ONE to remove ONE's data without MIE's assistance. *See* Horner Dep. (11/19/07) at 71-72 (App. Ex.

F); Horner Dep. (3/23/07) at 145-48 (testifying that MIE would have to be involved in converting ONE data from WebChart to another EMR, since the only other way to remove the data would be through "reverse engineering" WebChart). If MIE's objection is that a customer's ability to remove its own data from WebChart affects the market for WebChart since that customer could chose to use another EMR software package[4] without incurring prohibitively high conversion costs,[5] such an objection is not legitimate. As discussed in more detail below, the law does not allow the holder of a copyright to parlay its copyright into a vehicle to stifle competition. Accordingly, any copying, access, or (as MIE terms it) "reverse engineering" of WebChart in order to extract ONE's data was a fair use and is not actionable infringement of MIE's copyright.

### 3.     *MIE Cannot Establish that triSCRIPT Infringes on its Copyright*

MIE also claims that in creating triSCRIPT TPX (and, "through TPX," ONE) infringed on WebChart by replicating "the functionality of WebChart in many ways" and that "[t]he source code for triSCRIPT is *in some aspects* identical to the source code of Webchart." MIE's Supplemental Responses to TPX's Interrogatories ("MIE Supp. Resp. to TPX" ) at 10 (App. Ex. CC). Copyright infringement is established by proof of "(1) ownership of the copyright in the complaining work; (2) originality of the work; (3) copying of the work by the defendant, and (4) a substantial degree of similarity between the two works." *Evans Newton Inc. v. Chicago Systems Software*, 793 F.2d 889, 893 (7th Cir. 1986) (citation omitted), *abrogated in part on*

---

[4]As Horner testified, there are several hundred providers of EMR software. *See, e.g.*, Horner Dep. (3/23/07) at 106. When ONE was considering switching its EMR software, it reviewed twenty-three different EMR software packages. *See* Kusisto Dep. (3/27/07) at 119 (App. Ex. I).

[5]Horner suggested that ONE would need to print out the information from the WebChart server and re-enter all the data into a new EMR system. *See* Horner Dep. (11/19/07) at 100. He further admitted that such a process would take considerably longer, but would still be "practical" even when dealing with the records of over 200,000 patients (and millions of medical records), as was the case with ONE. *See id.* at 93, 100-01; Plesko Dep. (5/23/07) at 178 (App. Ex. M).

*other grounds*, *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989). The Defendants are entitled to judgment as a matter of law since MIE has failed to produce evidence, whether through a textual analysis of the source code relevant to this action or otherwise, that triSCRIPT infringes on MIE's WebChart transcription program, because MIE cannot show the substantial similarity necessary to justify a finding of infringement.

Assuming for purposes of this motion that MIE has a valid copyright in the WebChart transcription program, it bears the burden of showing copying. It can show either direct evidence of copying or "copying may be inferred 'where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work.'" *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 915 (7th Cir. 2007) (citing *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 450 (7th Cir. 2001) (quoting *Atari, Inc. v. North Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982)). "The test for substantial similarity is an objective one." *Id*. at 916 (citing *Incredible Technologies, Inc. v. Virtual Technologies, Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005) (noting that court looks at "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value").

Assuming solely for purposes of the instant motion that the authors of triSCRIPT had access to the transcription portions of the WebChart software, the question remains whether triSCRIPT is "substantially similar" to the copyrightable portions of WebChart's transcription program. Any similarity to portions of the software that are not protected does not support a finding of infringement. *See, e.g.*, *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 208 (9th Cir. 1988) (substantial similarity of unprotected expression does not support finding of infringement).

9

In describing what triSCRIPT is, Plesko testified, "triScript is a modification of the GE program provided by GE to facilitate transcription.  It's a modified Word macro, based on GE software."  Plesko 30(b)(6) Dep. (8/17/07) at 132 (App. Ex. N).  Those involved in the creation of triSCRIPT, Todd Plesko, Steve Tyler, and Ken Johnson, have testified that no portion of MIE's WebChart was used in the creation of triSCRIPT.  *See id.* at 133; Tyler Dep. (8/17/07) at 75 (App. Ex. O) ("TriSCRIPT is based on a Word macro, as provided by GE, to customers who purchase Centricity EMR.  [Johnson's] role was to customize that macro, based on the requirements that [Tyler] had previously gathered . . . ."); *id.* at 76-77; *id.* at 81-83 (testifying that the triSCRIPT code contains code written by Ken Johnson, Steve Tyler, and code from the original GE macro); Ken Johnson Aff. ¶¶ 8-9[6], 12 (App. Ex. DD) ("At no time did I ever see, use, examine, copy, or possess MIE's transcription software.  At no time did I ever see, use, examine, copy, or possess the object code or source code to MIE's transcription software. . . . All of the codes that I wrote while at TPX were my own creation.").

MIE claims that triSCRIPT, which TPX asserts it developed by modifying code from GE, was actually developed by copying and modifying code from WebChart, since code that appears in WebChart also appears in part of the lines of the triSCRIPT code that handles "entry points" into particular documents.  *See* Horner Dep. (11/19/07) at 4-8, 13-17 & Dep. Exs. 179-80 thereto (App. Exs. X-Y)  MIE contends that this minute part of the triSCRIPT code, a portion dealing with entry points and consisting of no more than 71 lines in total (Dep. Ex. 180), was copied from WebChart, a program containing in excess of 917,000 lines of code.  *See* Horner Dep.

---

[6]TPX deposed Mr. Tyler, but did not depose Mr. Johnson (who no longer works for either ONE or TPX), although Plaintiff's counsel did interview Johnson.  *See* Johnson Aff. ¶¶ 4, 13; Tyler Dep. at 84.

10

(11/19/07) at 48-49, Ex.180.  Even if all 71 lines[7] contained in Exhibit 180 were not original and were not modifications of GE macro, but were taken from WebChart (an assertion triSCRIPT's creators have denied), such copying would amount to less than eight one-thousandths of one percent (0.00774%) of WebChart's code.  Moreover, even if the Court were simply to look at the transcription portion of WebChart, the lines of code compared in Exhibits 179 and 180 are only part of the code for the transcription module, which, Horner admits, contains "[q]uite a bit more actually."  Horner Dep. (11/19/07) at 49.

Where, as here, the amount allegedly copied is so small as to be *de minimis*, a finding of substantial similarity is not justified.  *See, e.g., MiTek Holdings, Inc. v. Arce Engineering Co., Inc.*, 89 F.3d 1548, 1560 (11th Cir. 1996) (finding that although four of five protectible elements of a computer program were copied, they "were not of such significance to the overall program to warrant an ultimate finding of substantial similarity and hence infringement" and noting that the plaintiff failed to carry its burden to demonstrate the significance of the copied features"); *Apple Computer, Inc. v. Microsoft Corp.*, 821 F. Supp. 616, 623 (N.D. Cal. 1993) (four infringing elements were "relatively minor") (citing 3 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT (hereinafter "NIMMER ON COPYRIGHT") § 13.03[F], at 13-102 (1992)).  Since the few lines contained in Exhibit 180 dealing with entry points are insufficient as a matter of law to show substantial similarity between triSCRIPT and WebChart, the Defendants are entitled to judgment in their favor on this claim.[8]

---

[7]Even Horner admits that some of the 71 lines of code contained in Exhibit 180 did not originate with WebChart.  *See* Horner Dep. (11/19/07) at 13-14.

[8]MIE's claims fail for yet another related reason, namely the fair use doctrine.  Where an alleged infringement consists of such a minuscule portion of the copyrighted work, and where there is no evidence that the alleged copying has any potential effect on the market for or value of WebChart, this is a fair use as a matter of law.  *See* 17 U.S.C. § 107; *see also* 2 NIMMER ON COPYRIGHT, *supra*, § 8.01[G]

11

### 4.     ONE Is Not Liable for Any Alleged Infringement

MIE claims that "ONE infringed upon MIE's copyright by reverse engineering Webchart to migrate data into Centricity EMR . . . [and] by providing copies of Webchart to [TPX]."  MIE Supp. Resp. to ONE at 8-9.  MIE also alleges that ONE "through TPX" supplied copies of WebChart to consultants Midwest and MySQL, and that ONE "through TPX," used MIE source code in developing triSCRIPT.  *Id*. at 9.

"In order to make out a valid claim of copyright infringement, [MIE] must show both ownership of a valid copyright and copying of constituent elements of the work that are original."  *Harris Custom Builders, Inc. v. Hoffmeyer*, 92 F.3d 517, 519 (7th Cir. 1996) (citing *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502 (7th Cir. 1994)), *cert. denied*, 519 U.S. 1114, 117 S. Ct. 956, 136 L. Ed. 2d 842 (1997).  As discussed elsewhere, MIE has failed to produce evidence of any actionable infringement by any Defendant, and accordingly, any infringement claim against ONE must fail.

However, even if there were evidence of an infringement, there is no evidence sufficient to impose liability *on ONE* for that infringement.  Infringement claims require allegations of acts of direct infringement, or supervision or control over the direct infringers, or contribution to the infringement.  *See, e.g.*, *Carell v. The Shubert Org., Inc.*, 104 F. Supp. 2d 236, 271 (S.D.N.Y. 2000).  Here, the allegations of "direct" infringement consist of the assertions that ONE permitted TPX to access WebChart and that ONE "reverse engineered" WebChart in order to migrate ONE data into new EMR software, GE Centricity.  As discussed elsewhere, ONE had a

---

(noting "courts have applied the doctrine of fair use to immunize from liability those instances in which the plaintiff has established a prima facie case, and yet the defendant's usage has been trivial") (footnotes omitted);  *see also id.* ("The legal maxim of *de minimis non curat lex* applies to copyright actions . . . .").

contractual right to provide access to WebChart to TPX.  Moreover, there is no evidence that ONE itself migrated any data.  *See* Plesko 30(b)(6) Dep. (8/17/07) at 113-14; Kusisto Dep. (3/27/07) at 43 (data migration by TPX occurred after TPX came into existence on January 2, 2006).

In the absence of a direct infringement by ONE, MIE must present evidence of either a contributory infringement or a vicarious infringement by ONE.  Presumably MIE means to assert one of these theories when it claims ONE infringed its copyright "through TPX."  MIE Supp. Resp. to ONE at 9.

"Liability for contributory infringement will be imposed when a defendant, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.  Participation by the defendant must be substantial."  *Marobie-FL, Inc. v. National Ass'n of Fire Equipment Distributors*, 983 F. Supp. 1167, 1178 (N.D. Ill. 1997) (citations omitted).  TPX's supplying of copies of WebChart to Midwest and MySQL is not infringing; nor is the triSCRIPT software developed by TPX infringing.  Furthermore, there is no evidence that ONE knowingly engaged in personal conduct that encouraged or assisted in any alleged infringement, as required to establish a contributory infringement.  *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001).

Additionally, there is no evidence of a vicarious infringement on the part of ONE.  This theory requires MIE to present evidence that ONE (1) had the right and ability to exercise control over a directly infringing party and its activities, and (2) obtained a direct financial benefit from the infringing activities.  *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996).  In the first place, TPX is neither an employee nor a "servant" of ONE; rather, it is a separate corporation that provides IT services to ONE and other companies.  Moreover, there is no

13

evidence that ONE, a corporation separate from TPX, obtained any direct financial benefit from TPX supplying copies of WebChart to Midwest or MySQL or from TPX's development of triSCRIPT.  As such, there is no basis to hold ONE liable for any alleged acts of infringement committed by TPX.

C.     **Even if it Had a Viable Infringement Claim, MIE's Claim is Barred by its Own Conduct**

Defendants are entitled to summary judgment on MIE's copyright infringement claim because MIE has engaged in, and continues to engage in, prohibited copyright misuse, which bars MIE from asserting a copyright infringement claim until MIE ceases the misuse. In the context of a copyright infringement suit, the affirmative defenses of copyright misuse and unclean hands are equitable doctrines with common origins and similar requirements.  *See, e.g.*, *Huthwaite, Inc. v. Randstad General Partner, LLC*, No. 06-C-1548, 2006 WL 3065470, at *8 (N.D. Ill. Oct. 24, 2006).

The defense of copyright misuse was first recognized and accepted by a federal Court of Appeals as a viable defense to a claim of copyright infringement in *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970 (4th Cir. 1990), which held that a person who misuses a copyright is barred from prevailing on an action for copyright infringement involving the misused copyright. *Id*. at 972.  "Copyright misuse does not invalidate a copyright, but precludes its enforcement during the period of misuse."  *Practice Mgmt. Information Corp. v. American Med. Ass'n*, 121 F.3d 516, 520 n.9 (9th Cir. 1997) (citing *Lasercomb*, 911 F.2d at 979 n.22).  In order to establish copyright misuse as a defense to an infringement action, the defendant must demonstrate that the plaintiff is using the copyright, "in a manner violative of the public policy embodied in the grant of a copyright." *Lasercomb*, 911 F.2d at 978.  Overreaching license agreements used in

conjunction with the licensing of copyrighted software have repeatedly been found to form a basis for a copyright misuse defense. *See, e.g.*, *id.* at 978-79 (misuse found where agreement prohibited licensee and all its employees from developing competitive software); *Practice Mgmt*, 121 F.3d at 521 (misuse found where license required licensee to agree not to use competitor's product).

Following *Lasercomb*, other circuits have adopted copyright misuse as a defense to copyright infringement. *See, e.g.*, 4 NIMMER ON COPYRIGHT § 13.09[a][2][b] (footnotes omitted). The Seventh Circuit also has recognized copyright misuse as a viable defense. *See WIREdata*, 350 F.3d at 646-47; *see also Reed-Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909, 913 (7th Cir. 1996) ("Misuse of copyright in pursuit of an anticompetitive end may be a defense to a suit for infringement, along the lines of the patent-misuse doctrine in antitrust.").

In *Lasercomb*, the plaintiff licensed four copies of a software program to the defendant, which later made three more unauthorized copies of the software and created its own software program (nearly identical to Lasercomb's software), and marketed it as its own. *Lasercomb*, 911 F.2d at 971. At trial, the defendant was found liable for copyright infringement. *Id.* at 972. Although it noted there was no doubt as to the defendant's unlawful actions and intent to deceive, the Fourth Circuit reversed, finding the defendant had raised a valid copyright misuse defense based on the following terms of the license agreement:

> D. Licensee agrees during the term of this Agreement [99 years] that it will not permit or suffer its directors, officers and employees, directly or indirectly, to write, develop, produce or sell computer assisted die making software.
>
> E. Licensee agrees during the term of this Agreement and for one (1) year after the termination of this Agreement, that it will not write, develop, produce or sell or assist others in the writing, developing, producing or selling computer assisted die making software, directly or indirectly without Lasercomb's written consent. Any such activity undertaken without Lasercomb's written consent shall nullify any

15

warranties or agreements of Lasercomb set forth herein.

*Id*. at 973.   Analogizing to the patent misuse defense, the Court determined,

> The grant to the [author] of the special privilege of a [copyright] carries out a
> public policy adopted by the Constitution and laws of the United States, "to
> promote the Progress of Science and useful Arts, by securing for limited Times to
> [Authors] . . . the exclusive Right . . . " to their ["original" works]. United States
> Constitution, Art. I, § 8, cl. 8, [17 U.S.C.A. § 102]. But the public policy which
> includes [original works] within the granted monopoly excludes from it all that is
> not embraced in the [original expression]. It equally forbids the use of the
> [copyright] to secure an exclusive right or limited monopoly not granted by the
> [Copyright] Office and which it is contrary to public policy to grant.

 *Id*. at 977 (quoting *Morton Salt Co. v. G.S. Suppiger*, 314 U.S. 488, 492, 62 S. Ct. 402, 405, 86

L. Ed. 363 (1942)); *see also id*. at 973 (The misuse defense is "inherent in the law of copyright

just as a misuse of patent defense is inherent in patent law.").

The question of whether a copyright misuse defense has been established is "whether the

copyright is being used in a manner violative of the public policy embodied in the grant of a

copyright."  *Id*. at 978.  The court determined Lasercomb had done just that:

> Lasercomb undoubtedly has the right to protect against copying of the Interact
> code. Its standard licensing agreement, however, goes much further and
> essentially attempts to suppress *any* attempt by the licensee to independently
> implement the idea which Interact expresses. . . .  The agreement forbids the
> licensee to develop or assist in developing any kind of computer-assisted
> die-making software. If the licensee is a business, it is to prevent all its directors,
> officers and employees from assisting in any manner to develop computer-assisted
> die-making software. Although one or another licensee might succeed in
> negotiating out the noncompete provisions, this does not negate the fact that
> Lasercomb is attempting to use its copyright in a manner adverse to the public
> policy embodied in copyright law, and that it has succeeded in doing so with at
> least one licensee.
>
> The language employed in the Lasercomb agreement is extremely broad. Each
> time Lasercomb sells its Interact program to a company and obtains that
> company's agreement to the noncompete language, the company is required to
> forego utilization of the creative abilities of all its officers, directors and
> employees in the area of CAD/CAM die-making software. Of yet greater concern,
> these creative abilities are withdrawn from the public.

16

*Id.* (citations omitted) (footnotes omitted) (emphasis in original).  Based on the anti-competitive impact of Lasercomb's agreement, the court found it had committed copyright misuse.  *Id.*  Here, MIE has engaged in misuse in a variety of ways: through the use of over broad, anti-competitive provisions in the SLA; through Doug Horner's unlawful, unauthorized digital trespass and alteration of WebChart located on ONE's network; and through MIE's attempt to use the SLA and its copyright to restrict ONE's extraction of its own data from the WebChart database.

### 1.    *Enforcing the SLA Would Constitute Copyright Misuse*

In *Lasercomb*, the court found copyright misuse where the terms of the license agreement amounted to an attempt by the copyright holder to use its copyright in a manner contrary to the public policy embodied in the Copyright Act.  Similarly, here the SLA contains a non-competition provision that is over broad, unduly restrictive to the licensee, and that goes beyond merely preventing the copying of protected expression. The SLA provides:

> Non-Compete. During the term of this Agreement and for one (1) year after termination of this Agreement, Licensee shall not engage in the business of selling or licensing to third parties any computer software that performs substantially the same functions as the Licensed System or is commercially competitive with the Licensed System or any part of it.

Here, MIE is using its copyright in the protectable expression of WebChart o limit competition in an area beyond its copyright—any software that is competitive with any part of the WebChart program.  Moreover, as discussed more fully below, this provision is grossly over broad in its scope.  Where, as here, a licensor uses anti-competitive provisions in a licensing agreement in order to restrict competition beyond the protectable expression embodied in the copyrighted material, the licensor commits copyright misuse relating to the licensed product. MIE has thus engaged in copyright misuse by forbidding ONE from competing with MIE with respect to the

17

selling or licensing of any software that is commercially competitive with WebChart.

In *Lasercomb*, the Court found copyright misuse where at least one of Lasercomb's customers was a party to anti-competitive licensing agreement.  Here, MIE has included the subject non-competition provision in licensing agreements with at least forty-four customers, thereby attempting to bar those customers (and all of their employees and officers, no matter how many and no matter what functions those persons have) from engaging in a business competitive with MIE.  *See* SLA § 28; Horner Dep. (11/19/07) at 93-98.  In so doing, MIE is engaging in anti-competitive conduct designed to stifle competition in excess of the limited rights granted to it under the Copyright Act.  *See Lasercomb*, 911 F.2d at 978.  As such, MIE is barred from asserting a copyright infringement claim against the Defendants.

###    2.    *MIE's Attempt to Prohibit its Customers from Extracting Their Own Data from WebChart Without MIE's Assistance Constitutes Copyright Misuse.*

 In addition to attempting to prohibit competition through its non-compete, MIE also contends that the SLA prohibits its customers from accessing and removing their own data from the database in WebChart, as well as prohibiting any third parties from assisting its licensees in accessing and removing their own data.  ONE and other MIE customers use WebChart as a database for managing and storing patients' medical records.  *See, e.g.*, Plesko Dep. (5/23/07) at 22-24; Plesko 30(b)(6) Dep. (8/17/07) at 47.  MIE concedes that the data stored within the WebChart database are entirely owned by and are the property of ONE, and that MIE has no ownership interest in that data.  *See* Horner Dep. (3/23/07) at 148.

Starting in May, 2005 and ending in the fall of that year, ONE decided to review whether to switch to different EMR software.  *See* Kusisto Dep. (3/27/07) at 118-19.  After reviewing 23 different EMR software packages, ONE decided it would stop using WebChart and use a

different EMR software, GE Centricity.  *See id.* at 119.  In order to transition from WebChart to

Centricity, it was necessary for the electronic medical records stored within WebChart to be

removed, or extracted, and migrated into the Centricity program.

      MIE claims that the necessary copying of portions of WebChart, as well as what it terms

"reverse engineering" of WebChart for the purpose of extracting ONE's data, constitutes

infringement.  According to Horner, the SLA required ONE to use MIE to perform the data

extraction process or else ONE had to manually print out and re-enter the data into a new system.

 Horner Dep. (3/23/07) at 145-47; Horner Dep. (11/19/07) at 100 (claiming that although it

would take considerably longer, it would still be practical for ONE to print out the records for

over 200,000 patients and manually enter those into a new EMR program).[9]

      As more fully briefed above, it is a fair use and not infringement for ONE or a third party

to access, copy, or even reverse engineer WebChart in order to extract ONE's own data from the

WebChart database.  MIE's attempt nonetheless to assert its copyright in this instance is akin to

holding ONE's data hostage and using its copyright to extort additional money from ONE.  *See

also Practice Mgmt*, 121 F.3d at 520-21 (defense of copyright misuse forbids the use of the

copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office)

(citation omitted).  In *Practice Mgmt*, the attempt to condition granting a license on a licensee's

promise not to use a competitor's products was the "controlling fact" that precluded the licensor

from enforcing its copyright.  *Id*.  The court held that the licensor's actions need not rise to the

level of an antitrust violation in order to support a finding of copyright misuse.  *Id*.  It was

---

     [9]Despite his assertion that manually printing out the records for 200,000 patients would be
"practical," Horner admits that his January 15, 2006 foray into ONE's system wherein he altered the
WebChart print function was done specifically to disable ONE's ability to print large batches of medical
records.  *See* Horner Dep. (3/23/07) at 194-95.

sufficient that the terms of the licensing agreement gave the licensor an "unfair advantage over its competitors" and constituted use of a copyright "in a manner violative of the public policy embodied in the grant of a copyright." *Id*. (citing *Lasercomb*, 911 F.2d at 977).

Here, MIE has engaged in the same type of misuse that barred the infringement claim in *Practice Mgmt.* According to Horner, the SLA requires either that ONE employ MIE to perform a conversion from WebChart to Centricity or that ONE print out and transfer the data manually. By foreclosing competition for data migration services and by attempting to make migration prohibitively expensive by requiring records to be converted manually, MIE is attempting to use its copyright to limit or eliminate competition. While these actions do not invalidate its WebChart copyright, they preclude any enforcement of MIE's copyright as asserted in the present lawsuit. *See, e.g.*, *Practice Mgmt.*,121 F.3d at 520 n.9; *Lasercomb* 911 F.2d at 979 n.22.

In *WIREdata*, the Seventh Circuit, if not explicitly recognizing the copyright misuse defense, intimated strong acceptance of the copyright misuse defense under similar circumstances:

> The argument for applying copyright misuse beyond the bounds of antitrust, besides the fact that confined to antitrust the doctrine would be redundant, is that for the copyright owner to use an infringement suit to obtain property protection, here in data, that copyright law clearly does not confer, hoping to force a settlement or even achieve an outright victory over an opponent that may lack the resources or the legal sophistication to resist effectively, is an abuse of process.

*WIREdata*, 350 F. 3d. at 647. As discussed above, MIE is using its copyright to attempt to deprive ONE of the right it has to retrieve its own data. MIE's misuse of its copyright should bar its infringement claim.

### 3.   *MIE's Criminal Activities Bar it from Asserting an Infringement Claim.*

The criminal actions of MIE's President and CEO, Doug Horner, with respect to ONE's

computer network, also supports the Defendants' defenses of unclean hands and copyright misuse, precluding MIE from asserting a copyright claim against Defendants.

By letter of November 1, 2005, MIE informed ONE that, effective December 1, 2005, MIE would terminate the Maintenance and Support Services Agreement ("MSA") that obligated MIE to support the WebChart software licensed to ONE.  *See* Dep. Ex. 9 (App. Ex. T).  Upon its unilateral (and unjustified) termination of the MSA, MIE no longer had any right, reason, or obligation to access ONE's computer network or systems.  *See* SLA § 9.3 (providing the in the event the MSA is terminated "MIE shall have no obligation to provide further maintenance and support services for the Licensed System").  Accordingly, as of the effective date of the termination of the MSA, December 1, 2005, MIE had no right to access ONE's network.  Horner 30(b)(6) Dep. (5/30/07) at 202 (App. Ex. D).

Absent permission from ONE, MIE then stood on equal footing with any other person or entity that may have desired access to ONE's computers.  Accordingly, absent ONE's consent, Indiana tort and criminal laws regarding trespass, conversion and computer tampering prohibited any unauthorized access of ONE's computer systems.  It is undisputed that without requesting permission and without notice to or any permission from ONE, on at least ten occasions, commencing on December 31, 2005 through January 16, 2006, Horner remotely accessed the server on ONE's computer network on which ONE's licensed version of WebChart was stored, and on at least three of these occasions Horner altered the WebChart software with the specific intent of disabling certain functions of WebChart and slowing WebChart's performance.  *See, e.g.*, Horner Dep. (3/23/07) at 171-72, 175-77, 182-86, 197-200.

Indiana Code § 35-43-1-4 provides, "a person who knowingly or intentionally alters or damages a computer program or data, which comprises a part of a computer system or computer

network without the consent of the owner of the computer system or computer network commits

computer tampering, a Class D felony." Further, Ind. Code § 35-43-2-3 criminalizes "Computer

trespass," a misdemeanor, which is committed by a person who,

> knowing or intentionally accesses:
> (1) a computer system;
> (2) a computer network; or
> (3) any part of a computer system or computer network;
> without the consent of the owner of the computer system or computer network, or the
> consent of the owner's licensee.

While there may be a question as to his true motives, it is undisputed that Doug Horner

admitted to actions that fall squarely within the definitions of both computer trespass and

computer tampering. Horner admits that on December 1, 2005, MIE terminated the MSA, and,

with it, terminated MIE's right to access ONE's network. *See* Horner 30(b)(6) Dep. (5/30/07) at

202; Horner Dep. (3/23/07) at 177. On December 1, 2005, ONE and its consultants installed a

firewall in an effort to block MIE's access to ONE's computer network. Plesko Dep. (5/23/07) at

137-40; Plesko 30(b)(6) Dep. (8/17/07) at 117. MIE and Horner became aware, on December 1,

2005, that MIE's ability to access ONE's network had been blocked by the installation of the

firewall. Horner Dep. (3/23/07) at 125.

Undaunted, Horner has admitted that in the early morning hours of December 31, 2006,

he surreptitiously gained access to the version of WebChart stored on ONE's server. *Id.* at

170-71; ONE Network Intrusion Investigation Report ("ONE Report") (Dep. Ex. 182) at 37

(App. Ex. Z). Circumventing the firewall installed by ONE to prevent MIE's access,[10] Horner

gained access to ONE's server by going through another customer's WebChart server. *Id.*;

---

[10]Technically, a firewall was not installed. A different security measure was employed to restrict
MIE's access to the ONE network, but it had the same effect as a firewall and could, in layman's terms,
be called a firewall. *See* Kessler Dep. (5/29/07) at 56-57 (App Ex. H).

Horner Dep. (3/23/07) at 167-68, 205-06.  After gaining access, Horner altered the version of WebChart stored on ONE's server.  Specifically, without any notice to or permission from anyone at ONE, Horner renamed a translate table in an attempt to prevent ONE from adding any additional WebChart users.  *See id.* at 170, 172, 177-78.

As it turns out, Horner surreptitiously accessed and utilized ONE's computer systems on numerous occasions after it terminated the MSA, supposedly to monitor ONE's activities.  *Id.* On January 6, 2006, Horner accessed the server on ONE's network and removed an index from WebChart, supposedly to prevent ONE from performing a mass export of its own data from the WebChart database.  *Id.* at 183-85; ONE Report at 45-51.  According to Horner, he wanted to make sure that ONE's deconversion of its data from WebChart onto its new EMR system would be slowed down by the removal of the index, and hoped that by doing so, ONE would call MIE for help.  *Id.* Horner admits that his actions impaired WebChart's actual performance.  *See id.* at 185 ("Yeah.  This would've slowed it down.  You know, made it much slower to retrieve mass records.  It would've had an effect on the performance of WebChart as well in terms of the user interface.").

On January 16, 2006, Horner again entered ONE's system and made a change to the batch printing function of WebChart such that ONE was unable to print documents in large batches. Horner Dep. (3/23/07) at 194; ONE Report at 87-91.  This action caused ONE's system to become entirely inoperable.  Plesko Dep. (5/23/07) at 145-46; Plesko 30(b)(6) Dep. (8/17/07) at 21-22.  In all, Horner admitted to accessing ONE's computer system more than ten (10) times between December 1, 2005 and January 16, 2006, including his logging on using a user name set up for Todd Plesko. Horner Dep. (3/23/07) at 194-205.

These admissions establish the elements of both computer trespass and computer

tampering under Indiana law, as well as a violation of the federal wire fraud statute, 18 U.S.C. § 1343, in that Mr. Horner, as part of a scheme to defraud ONE, utilized the networks of other MIE customers to surreptitiously access ONE's system for the admitted purpose of creating problems with WebChart's functionality in an effort to get ONE to return to MIE as a customer for support or deconversion.  *See, e.g.*, Horner Dep. (3/23/07) at 194-205.  Horner's conduct, criminal by definition and reprehensible by its very nature, cannot be condoned, but must be condemned outright.  Horner's illicit, dastardly efforts to disrupt ONE's network and slow down its performance, rise far above and beyond what may be the typical *Lasercomb* copyright misuse, and constitute unclean hands.

MIE knowingly and intentionally caused performance problems for ONE after ONE decided to cease using WebChart in favor of a competitor's software.  Having been spurned by ONE, MIE resorted to surreptitious and illegal conduct designed to get ONE's "attention" and "get them to the table."  Horner Dep. (3/23/07) at 119.  When that effort failed, MIE then attempted to assert its copyright in retaliation for ONE's daring to reject MIE's services.

Resort to self-help instead of a legal remedy to satisfy a claim is disfavored.  *See Robinson v. Valladares*, 738 N.E.2d 278, 282 (Ind. Ct. App. 2000).  Instead of resorting to self-help, *i.e.*, surreptitiously accessing and altering ONE's network, if Horner believed ONE was in breach of the SLA, MIE should have filed suit or sought an injunction, seeking redress properly through the courts.  By taking matters into his own (unclean) hands and maliciously making alterations to the software that ONE was using with the full knowledge and intent that it would negatively impact the software's performance, Horner created the very conditions that required ONE to hire the outside consultants MIE now claims infringed on its copyright.  Under these extreme conditions, MIE should be barred from pursuing any copyright infringement claim

24

whatsoever against the Defendants.  *See, e.g.*, *Ruder v. Ohio Valley Wholesale, Inc.*, 736 N.E.2d 776, 781 (Ind. Ct. App. 2000) ("The purpose of the unclean hands doctrine is so that a party does not reap the benefit from his misconduct.") (citation omitted).  Whatever remedies may be available to MIE, copyright infringement is not one of them.

> **D.    Because MIE Committed the First Material Breach of Both the MSA and the SLA, Defendants Are Entitled to Judgment on MIE's Breach of Contract Claim and ONE's Counterclaims for Breach of Contract.**

Under the terms of the Software License Agreement ("SLA"), MIE was obligated to offer a Maintenance and Support Services Agreement ("MSA") to ONE.  SLA § 9.1.  Once ONE entered into the MSA and paid an annual fee, MIE was obligated to "provide maintenance and support services for the Licensed System" as set out in the MSA.  *Id*.  On October 29, 2004, ONE and MIE entered into the MSA.  The Initial Term of the MSA was one year.  MSA § 3.1.  The MSA specifically provided that after the end of the Initial Term it would "auto-renew for one-month terms, up to a limit of twenty-four (24) months from the conclusion of the Initial Term." *Id*.  Despite this provision, it is undisputed that MIE unilaterally terminated the MSA and refused to service ONE as it was required to do under the MSA.  As Defendants will demonstrate, this was a material breach of both the MSA and the SLA as a matter of law, and this breach requires that judgment be entered in favor of the Defendants on the contract claims.

MIE's termination was a severe blow to ONE.  MIE has admitted that support for the software was an absolute necessity.  *See* Jones Dep. (7/12/07) at 23 ("I think, that the customer would have to have [maintenance and support from MIE].  They, they really, uh, they really wouldn't able to, you know, use the system without it, without our support.").  Moreover, WebChart was vital to ONE's operations since it contained and managed ONE's patient records, leaving ONE especially vulnerable if there were any problems accessing those records.  *See, e.g.*,

Kusisto Dep. (3/27/07) at 213 (noting MIE's hacking left ONE in "tremendous turmoil").

Termination of the MSA was permitted only if "the other party is in material breach of its obligations under this Agreement *and has failed to remedy such breach within thirty (30) days after being requested in writing by the non-breaching party to do so*." MSA § 14.2 (emphasis added). Despite this, and without any effort to comply with these contract terms, on November 1, 2005, MIE sent a letter to ONE's Dr. Mike Lee purporting to terminate the MSA effective November 30, 2005. *See* Dep. Ex. 9. In that letter, MIE President Doug Horner stated the reasons for terminating the MSA: "Since I have been unable to discuss the status of the support contract, or my concerns with the status of our relationship, with reluctance I have decided to terminate the support license." *Id.*; *see also* Horner Dep. (3/23/07) at 116 (regarding the reasons for terminating the MSA, "I think I spell that out [in the November 1, 2005 letter]"). At no point in this purported termination letter did MIE claim ONE was in material breach of any of *its* obligations under the MSA (or any other agreement). *See* Horner 30(b)(6) Dep. (5/30/07) at 192 (As to the letter, Horner admits, "No. *I didn't label anything a breach*, but I do talk about, you know, that we have made repeated attempts to, to begin a dialogue and have been unsuccessful in obtaining that.").

MIE's failure to assert any breach by ONE was a critical omission, since under the MSA, even if ONE had been in material breach, it had the absolute right to cure within 30 days any breach *identified in writing* by MIE. MSA § 14.2; *see also* SLA § 21.1(c) (permitting termination by one party where "the other party is in material breach of its obligations under this Agreement and has failed to remedy such breach within thirty (30) days after being requested in writing by the non-breaching party to do so"). Given that MIE failed to notify ONE in writing of how MIE believed ONE was in material breach of either the MSA or the SLA, and given that

26

MIE thereby deprived ONE of its right to cure any such alleged breach, as a matter of law MIE had no right to terminate the MSA.

In his first deposition, Horner was specifically asked why he terminated the MSA, and he at no time asserted that it was because ONE was in breach of (or even had threatened to breach) either the SLA or the MSA.  *See* Horner Dep. (3/23/07) at 113-20; *id*. at 119 ("Frankly [the November 1, 2005 letter] was an attempt to get their attention, because I was being ignored.  I was completely being ignored.  And I needed something to get them to the table.").  Two months later, in another deposition, Horner for the very first time claimed that the reason ONE terminated the MSA was because "ONE was in material breach of several different paragraphs of the Maintenance Agre . . . of both the Maintenance Agreement and the License Agreement." Horner 30(b)(6) Dep. (5/30/07) at 191.  Even if this belated and conveniently modified testimony were credible given Horner's earlier testimony, nevertheless these several claimed material breaches cannot justify MIE's termination of the MSA, since the MSA could be terminated *only after* MIE identified the material breach to ONE in writing, *only after* MIE gave ONE thirty days to cure the identified material breach, and *only after* ONE then failed to cure the material breach. Having failed to provide ONE with that required written notice of the alleged breach and having failed to give ONE the opportunity to cure, MIE had no power to terminate the MSA at will.  *See, e.g.*, *Made2Manage Systems, Inc. v. ADS Information Systems, Inc.*, No. 1:02-cv-1405, 2003 WL 21508235, at *6-*7 (S.D. Ind. June 24, 2003) (finding party could not terminate at will even given other party's breach where contract required that it give written notice and a cure period).

Turning to the two reasons Horner actually did identify to ONE in the November 1, 2005 letter (expiration of the contract term and his concerns over MIE's and ONE's "relationship"), as a matter of law these constitute neither a breach nor notice of any breach on ONE's part, let alone

notice of a material breach.  Even if Horner had identified those actions to ONE as a claimed

material breach and had given ONE thirty days to cure, neither of Horner's articulated concerns

(even if true) constitutes a material breach of either the SLA or the MSA.  As set out in the MSA

itself, after the Initial Term of the MSA expired, it *automatically* renewed.[11]  Accordingly, the

fact that the initial contract term expired on October 29, 2005 is of no moment, since by

November 1, 2005, it had already automatically renewed itself.

Horner's second reason for termination fares no better.  Nothing in the Agreement

required the two contracting parties to maintain a healthy "relationship"; nor did Indiana law

impose such a requirement on the parties.  *See, e.g.*, *First Federal Savings Bank v. Key Markets*,

559 N.E.2d 600, 604 (Ind. 1990) ("It is not the province of courts to require a party acting

pursuant to such a contract to be "reasonable," "fair," or show "good faith" cooperation").  It

follows that MIE had no right to terminate the MSA, and its termination constitutes a material

breach of that Agreement.  Moreover, by failing to "provide maintenance and support services

for the Licensed System" as set out in the MSA, MIE also committed a material breach of

Section 9.1 of the SLA.

Once MIE materially breached the MSA and the SLA on November 1, 2005, ONE's

further performance under each of those agreements is excused, and accordingly MIE cannot

enforce the SLA's non-compete provision.  *See, e.g.*, *Steve Silveus Ins., Inc. v. Goshert*, 873

N.E.2d 165, 176 (Ind. Ct. App. 2007) (first party to materially breach agreement cannot

subsequently enforce a covenant not to compete in the same agreement) (citation omitted); *Titus*

*v. Rheitone, Inc.*, 758 N.E.2d 85, 94 (Ind. Ct. App. 2001) ("'A party first guilty of a material

---

[11]The SLA contains a similar provision, which MIE itself specifically asserts "automatically renewed" the SLA after its initial term ended.  *See* Complaint ¶ 26 (Dep. Ex. 7) (App. Ex. Q).

breach of contract may not maintain an action against the other party or seek to enforce the

contract against the other party should that party subsequently breach the contract.' This rule

applies to covenants not to compete.") (citation omitted).  Accordingly, ONE is entitled to a

partial summary judgment in its favor on liability on its Counterclaims alleging MIE's breach of

the MSA and the SLA, and the Court should also enter judgment in favor of the Defendants on

MIE's claims alleging breach of the SLA.

> **E.**     **Even Absent a First Material Breach on MIE's Part, Its Contract Claims Are Nevertheless Unenforceable**

> ***1.***     ***The Covenant Not to Compete is Unenforceable***

MIE and Horner allege that Kusisto, Plesko, ONE, and TPX breached the SLA by

allegedly violating the non-competition agreement contained therein:

> During the term of this Agreement and for one (1) year after termination of this Agreement, *Licensee* shall not *engage in the business* of selling or licensing to third parties any computer software that performs substantially the same functions as the Licensed System or is commercially competitive with the Licensed System or any part of it.

SLA § 28 (emphasis added).  This clause is unreasonable and unenforceable as a matter of law.

Covenants not to compete are agreements in restraint of trade, and as such, are disfavored

and narrowly construed by courts.  *See, e.g.*, *Norlund v. Faust*, 675 N.E.2d 1142, 1153 (Ind. Ct.

App. 1997).  They will only be enforced to the extent their terms are reasonable as to time, place

and scope, are "always strictly construed against the covenantee, and will never be extended

beyond the express terms of the agreement." *Franke v. Honeywell, Inc.*, 516 N.E.2d 1090, 1092-

93 (Ind. Ct. App. 1987) (citation omitted).  "The ultimate determination of whether a

noncompetition covenant is reasonable is a question of law."  *Sharvelle v. Magnante*, 836 N.E.2d

432, 437 (Ind. Ct. App. 2005) (citing *Raymundo v. Hammond Clinic Ass'n*, 449 N.E.2d 276, 280

(Ind. 1983)).

In this case, the covenant not to compete is unreasonable as to its scope, and is therefore unenforceable. First, the covenant seeks to prohibit actions by the "Licensee." The term "Licensee" is defined as "the entity named in this Agreement as the 'Licensee' [Orthopaedics Northeast, P.C.], the User Entities, and the employees and officers thereof." SLA § 1.1(g). The term "User Entities" is defined as "the entities that are specified in the Scope of Use as authorized to use the Licensed System." *Id*. § 1.1(j). The term "Scope of Use" is defined as "the specifications in Supplement B of this Agreement . . . ." *Id*. § 1.1(h). In Supplement B, the only User Entity identified is "Orthopaedics Northeast, P.C." Accordingly, the covenant seeks to limit, without limitation, all officers and employees of ONE without regard to any particular person's access to WebChart or even whether his or her function is computer-related, and MIE also seeks to enforce the covenant against non-signatories. Simply put, to enforce the non-compete would bar the ONE janitor from sweeping the floors at the offices of one of MIE's competitors. This is grossly overbroad. *See, e.g.*, *MacGill v. Reid*, 850 N.E.2d 926, 930-32 (Ind. Ct. App. 2006) (recognizing that covenants not to compete must be narrowly tailored to "coincide" with the purported legitimate "interests" to be served, and the covenants which "restrict an employee from working in any capacity for an employer's competitor or from working within portions of the business with which the employee was never associated [are] unreasonable because such restrictions extend beyond the scope of the employer's legitimate interest").

Second, the covenant purports to restrain any employee or officer should he or she "engage in the business." This is grossly over broad since it would limit a person from doing *any* job at a company, regardless of whether it has anything to do with the subject of the noncompete.

30

*See, e.g.*, *Burk v. Heritage Food Serv. Equip., Inc.*, 737 N.E.2d 803, 812 (Ind. Ct. App. 2000) (holding covenant's clause prohibiting employee from being "employed . . . with any corporation . . . which competes with, or otherwise *engages in any business* of the [employer]" overbroad since it prohibited employee from working for a competitor in any capacity) (emphasis added).

Moreover, the noncompete also fails to define the prohibited activity with any specificity, instead employing a blanket prohibition on any business that engages in "selling or licensing to third parties any computer software that performs *substantially the same functions* as the Licensed System or is commercially competitive with the Licensed System *or any part of it*." (emphasis added). Within the Licensed System are PDA sync capabilities, print server functionality, a scheduler, a scanning solution, a transcription module, and many other parts. *Id*. Supp. A. Given this extremely broad scope, an ONE employee could theoretically be barred from working at any store with an electronics department.

The covenant not to compete is also not limited as to geographic scope. As such, it seeks to bar ONE employees and officers from engaging in any business that does anything similar to or competitive with anything any part of the Licensed System might do *anywhere in the world*. This is clearly unreasonable, since MIE can point to no interest it can legitimately protect to the extent the non-compete seeks to restrict all of ONE's employees and officers. *See Dicen v. New Sesco, Inc.*, 839 N.E.2d 684, 689 (Ind. 2005) (holding that a covenant not to compete, negotiated as part of business purchase, was overbroad and unenforceable, stating that "[r]estricting [employee] from working in the land remediation business anywhere in the United States for two years after he left [his employer] exceeds the bounds of reasonableness, especially when [employee's] contacts were in a limited number of states").

These deficiencies are fatal to MIE's claim because nothing in the non-compete can be

31

edited out or "blue-pencilled" to make the non-compete reasonable.  Under Indiana law, a court may only strike offensive terms; it may not add any terms.  *See, e.g.*, *Burk*, 737 N.E.2d at 811. Since it is impossible to strike terms from the MIE covenant that would make it reasonable as to time, scope, and prohibited activity, the non-competition provision is unreasonable as a matter of law and is unenforceable.  *See, e.g.*, *MacGill*, 850 N.E.2d at 932.

Moreover, MIE has shown no basis to recover any damages for breach of contract from Kusisto, Plesko, or TPX. A fundamental principal of contract law is that, in order to assert a breach of contract claim and seek damages against another, there must be a meeting of the minds, that is, a manifestation of mutual assent on all essential contract terms, in order for a contract to be enforceable.  *See, e.g.*, *Bennett v. Broderick*, 858 N.E.2d 1044, 1048 (Ind. Ct. App. 2006).  Put simply, there must be a contract between the plaintiff and defendant in order for plaintiff to seek damages for an alleged contractual breach.  Here, neither Kusisto, TPX, nor Plesko was a party to any contract with MIE.  The only party to any contract with MIE in the present case was ONE. Although some courts have awarded *injunctive relief* against a non-signatory for breach of a non-compete agreement, *see, e.g.*, *Norlund*, 675 N.E.2d at 1153, MIE can point to no authority to support an award of damages against a non-signatory.  For this additional reason, Kusisto, Plesko, and TPX are entitled to judgment in their favor on MIE's breach of contract claim.

### 2.    MIE's Breach of Contract Claim Relating to the Retrieval of ONE's Data Is Preempted by the Copyright Act

Under the Constitution's Supremacy Clause, the enforcement of a state laws and regulation may be pre-empted by federal law in several circumstances:

> first, when Congress, in enacting a federal statute, has expressed a clear intent to pre-empt state law; second, when it is clear, despite the absence of explicit preemptive language, that Congress has intended, by legislating comprehensively, to occupy an entire field of regulation and has thereby "left no room for the States

to supplement" federal law; and, finally, when compliance with both state and federal law is impossible, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698-99, 104 S. Ct. 2694, 81 L. Ed. 2d 580

(1984) (citations omitted).

Section 301(a) of the Copyright Act preempts any "legal or equitable rights" under state law if they "are *equivalent to* any of the exclusive rights within the general scope of copyright."

17 U.S.C. § 301(a) (emphasis added). The scope of this preemption is extremely broad:

> The intention of section 301 is to preempt and abolish any rights under the common law or statutes of a State that are equivalent to copyright and that extend to works coming within the scope of the Federal copyright law. The declaration of this principle in section 301 is intended to be stated in the clearest and most unequivocal language possible, so as to foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively, and to avoid the development of any vague borderline areas between State and Federal protection.

H.R. Rep. No. 94-1476, at 130 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5746.

Whether a state law claim is preempted by Section 301 by the Copyright Act is a matter of law, subject to a two-pronged test. *See, e.g.*, *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 674 (7th Cir. 1986). First, a court must determine whether the work in question falls within the subject matter of copyright, fixed in a tangible medium of expression. *Id.* Second, the rights granted under state law must be equivalent to the exclusive rights established by federal copyright law in Section 106 of the Act. *Id.* "[T]o avoid preemption, a state law must regulate conduct that is qualitatively distinguishable from that governed by federal copyright law—*i.e.*, conduct other than reproduction, adaptation, publication, performance, and display." *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 910 (7th Cir. 2005) (citing *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659-60 (4th Cir. 1993); 1

33

NIMMER ON COPYRIGHT, *supra,* § 1.01[B] [1] (1999)) (footnote omitted). Even if a state law requires additional elements other than those found in copyright, it is still equivalent (and thus preempted) if those additional elements do not differ in kind from those necessary for copyright infringement. *Baltimore Orioles*, 805 F.2d at 678.

In addition to statutory preemption, a claim may also be impliedly preempted either where it appears Congress has intended to occupy the field (field preemption) or where the enforcement of the state law right is inconsistent with the purposes and objectives of the Copyright Act (conflict or obstacle preemption).[12]  *See, e.g.*, *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869-74, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000); *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S. Ct. 1879, 40 L. Ed. 2d 315 (1974) ("[I]f the scheme of protection developed by [a state] 'clashes with the objectives of the federal [laws]' then the state law must fall'") (quoting *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231, 84 S. Ct. 784, 789, 11 L. Ed. 2d 661 (1964)).

MIE claims that "triPractix and/or ONE breached the License Agreement by reverse engineering and copying Webchart."  MIE's Supplemental Responses to ONE's First Set of Interrogatories at 7.  Even assuming the term "reverse engineering" correctly describes how ONE's data was migrated out of WebChart,[13] as discussed above, such actions are fair use and are not actionable under the Copyright Act.  Despite this, MIE seeks to use the SLA to repeal the

[12]*See generally* Viva R. Moffat, *Super-Copyright: Contracts, Preemption, and the Structure of Copyright Policymaking*, 41 U.C. Davis L. Rev. 45, 80-82 (2007) (discussing implied preemption in the copyright context and concluding that the relevant question is whether enforcement of the state law right "stands as an obstacle to" federal purposes or objectives).

[13]*See, e.g.*, Tyler Dep. (8/17/07) at 14-25, 38, 49-56 (describing the process of migration and testifying in order to extract ONE's data he had to look at WebChart's database schema and copy a couple of the WebChart tables).

34

fair use doctrine, asserting that it can prevent conduct constituting "reverse engineering" under the SLA, even if that conduct would constitute fair use under the Copyright Act. However, in such a circumstance, the preemption doctrine bars the assertion of a conflicting contract right.

Although some courts have construed the Seventh Circuit's decision in *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996), as prohibiting the preemption of breach of contract claims,[14] in the decision itself the Seventh Circuit explicitly stopped short of formulating such a per se rule, stating instead that "we think it prudent to refrain from adopting a rule that anything with the label 'contract' is necessarily outside the preemption clause: the variations and possibilities are too numerous to foresee." *ProCD*, 86 F.3d at 1455; *see also* 1 NIMMER ON COPYRIGHT, *supra,* § 1.01[B] [1][a], at 1-22 ("[P]re-emption should continue to strike down claims that, though denominated 'contract,' nonetheless complain directly about the reproduction of expressive materials.").

In the more recent *WIREdata* case, the Seventh Circuit appears to have taken a step back from the conclusions reached in *ProCD*.[15] As discussed above, in *WIREdata*, the court permitted reverse engineering to obtain non-copyright data as a fair use. *WIREdata*, 350 F.3d at 645. It noted that the license agreements between AT and the municipalities "might be interpreted to forbid the licensees to release the raw data . . . ." *Id.* at 646. "[T]he court's order [in *WIREdata*]

---

[14]Moffat, *supra* note 12, at 74 ("Virtually all decisions since then addressing contracting around the Copyright Act have cited *ProCD*, often with no analysis or discussion, for the general proposition that § 301 does not preempt state contract law.").

[15]The preemption analysis contained in *ProCD* has generated both controversy and criticism. *See, e.g.*, 1 NIMMER ON COPYRIGHT, *supra*, § 1.01 [B][1][a][iii]; Moffat, *supra* note 12, at 76 (footnote omitted). Moreover, in *ProCD*, the Seventh Circuit discussed only statutory preemption and did not consider non-statutory preemption, although both issues were briefed, thus leaving the question of non-statutory preemption in such a case untouched in this Circuit. *See id.* at 77 & n.133 (citing Mark Lemley, *Beyond Preemption: The Law and Policy of Intellectual Property Licensing*, 87 CAL. L. REV. 111, 143 n.138 (1999)).

envisions the appropriate remedy as the licensees undertaking precisely that forbidden conduct. By ruling that the doctrine of reverse engineering gives contracting parties (the municipalities) a *privilege* to make a copy in derogation of their contractual undertakings, this decision signals a marked retreat from *ProCD*'s deference to contract law."  1 Nimmer on Copyright, *supra*, § 1.01[B][1][a][iii] (emphasis in original) (footnotes omitted).

Were this Court to determine that although ONE had a privilege under copyright law to reverse engineer in order to extract its data, but then allow a contract to impose liability for the exercise of that same privilege, it would amount to the same "absurd result" the Seventh Circuit commented on with "profound skepticism."  *See WIREdata*, 350 F.3d at 647 ("If [AT's interpretation of the licenses] were accepted, it would forbid municipalities licensed by AT to share the data in their tax assessment databases with each other . . . though all the data they would be exchanging would be data that their assessors had collected and inputted into the databases.  That seems an absurd result."); *see also Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1202 (Fed. Cir. 2004) (dismissing the notion that parties may unilaterally invoke "a combination of contractual terms and technological measures, to repeal the fair use doctrine with respect to an individual copyrighted work"), *cert. denied*, 544 U.S. 923, 125 S. Ct. 1669, 161 L. Ed. 2d 481 (2005).

Absurd result or not, and even leaving aside express preemption under Section 301, MIE's breach of contract claim based on alleged "reverse engineering" is impliedly preempted (a matter not discussed at all in the *ProCD* decision, see *supra* note 15), since restricting the fair use of a copyrighted work is simply inconsistent with the purposes and objectives of the Copyright Act.  As one commentator has observed, "fair use is designed precisely to allow nonconsensual uses, and 'contracting around' fair use thus presents a conflict with the goals of the doctrine. . . .

36

[M]any software contracts purport to prohibit reverse engineering of the licensed software. These terms may conflict with a user's apparent right under copyright law to reverse engineer copyrighted works for certain purposes. *This is perhaps the most common example in the software industry of a conflict between contractual terms and copyright policy*." Lemley, *supra* note 15, at 129-30 (footnotes omitted) (emphasis added). Accordingly, since MIE's attempts to use its license agreement to impose liability for a fair use necessarily conflict with the goals of the Copyright Act, and, in the words of *WIREdata*, would lead to an "absurd result," MIE's claim for breach of contract should be held to be preempted, and the Court should enter judgment in the Defendants' favor on this claim.

### F.     MIE Has Shown No Criminal Conduct on the Part of Any Defendant

Count IV of MIE's Complaint alleges that Defendants, collectively, committed criminal mischief and criminal deception under Indiana law by entering into the SLA "with the intent of gaining knowledge of the software so that ONE could compete with MIE despite the non-competition clause" in the SLA, as well as by informing MIE's current and prospective customers that MIE's network is not safe, with the specific intent "to induce reliance on the part of the third parties" in retaining Defendants' services rather than MIE's. *See* Complaint ¶ 69. Defendants are entitled to summary judgment on Count IV because MIE has produced no evidence that any of the Defendants committed the alleged "crimes" or even possessed the requisite *mens rea* to commit the alleged "crimes." To the contrary, the designated evidence shows Defendants entered into the SLA legitimately and raised only genuine and true concerns about MIE's network with third parties, based on Doug Horner's own unauthorized illegal tampering with the software on ONE's system.

In a criminal mischief or criminal deception case, *criminal* intent is an essential element

which must be proven.  *NationsCredit Commercial Corp. v. Grauel Enterprises, Inc*., 703

N.E.2d 1072, 1078 (Ind. Ct. App. 1998).  It is the criminal intent that differentiates an innocent

breach of contract from criminal activity.  *Id*.  Culpability, as a basis of criminal liability is

defined as a person engaging in conduct "intentionally" if, when he engages in the conduct, it is

his conscious objective to do so, and a person engages in conduct "knowingly" if he is aware of a

high probability that he is doing so.  *Id*. (citing Ind. Code § 35-41-2-2).  As *NationsCredit* made

clear, in enacting the statute for criminal conversion the legislature did not intend to criminalize

bona fide contract disputes. *Id*. at 1079.

Here, MIE has produced no evidence that Defendants possessed the *mens rea* to commit

either criminal mischief or criminal conversion. The claim that Defendants entered into the SLA

with the intent of gaining knowledge of WebChart for the purpose of competing with MIE is

ridiculous, considering the timeline of events, and is completely unsupported by any evidence

whatsoever.  In fact, ONE began using WebChart in 1999, *five years before* it signed the SLA.

Kusisto Dep. (3/27/07) at 19, 21; Horner 30(b)(6) Dep. (5/30/07) at 179-81; Plesko Dep.

(5/23/07) at 16-17.  To claim the SLA was part and parcel of an elaborate deception to gain

access to WebChart (access it already had) defies all logic.  Moreover, MIE can point to no

evidence of any plan to compete with MIE prior to the date of the SLA.  As such, the Defendants

are entitled to judgment as a matter of law on MIE's claims as a "crime victim."

Moreover, MIE cannot point to any evidence that the statements made by the Defendants

to third parties regarding MIE's network were criminal.  MIE has admitted to no less than ten

intrusions into ONE's computer system, three of which caused significant performance problems

requiring ONE to enlist the services of computer consultants.  Defendants' statements about MIE

arose from their own experience and belief regarding MIE's activities.  Defendants had

substantial evidence (and personal experience) of MIE's rather bizarre behavior at the time they

informed others that they believed MIE's network was not safe or secure. They were also entitled

to voice their reasonable opinion, based on the evidence before this court, that MIE's network

was not safe or secure. *Webster's Dictionary* defines "safe" as "free from harm from risk, or . . .

secure from threat of danger, harm, or loss."  Given ONE's own experience at the hands of MIE

and Horner, the Defendants' statements can hardly rise to the level of *criminal* culpability.

Remarkably, Horner has even testified that he still believes that he has a right, without prior

permission, to enter and tamper with into *any* system that contains WebChart software, and may

even go so far as to prevent customers from reviewing their own records and performing basic

functions.  *See, e.g.*, Horner Dep. (3/23/07) at 170, 172, 177-78, 183-86, 194-205; Horner Dep.

(8/1/07) at 69, 150-51;  Horner 30(b)(6) Dep. (5/30/07) at 205-06; Jones Dep. (7/12/07) at 63-64,

72, 84-85.  Thus, based on Horner's actions and the damage they caused to ONE, the

Defendants' statements about the security of MIE's system were reasonably well-founded and

accurate, and provide no basis for a claim of criminal deception or other criminal conduct on the

part of Defendants.

### G.     MIE Has Failed to Assert Any Evidence to Support Its Defamation Claims Against Kusisto, Plesko, and TPX.

Truth is a complete defense to a defamation suit.  *See, e.g.*, *Gatto v. St. Richard School,*

*Inc.*, 774 N.E.2d 914, 924 (Ind. Ct. App. 2002).  Statements that may somehow be construed as

defamatory, if true, cannot form the basis of liability in defamation.  *Id.*  In order to establish a

prima facie case of defamation against any of the Defendants, MIE must prove, *inter alia*, that a

false and defamatory statement of fact was made of and concerning MIE.  *See, e.g.*,

*Journal-Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 457 (Ind. 1999) (citations omitted)

("In order to impose liability for defamation, the United States Constitution requires a false statement of fact.").  "[A] statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Bandido's*, 712 N.E.2d at 457 (citations omitted); *see also Heeb v. Smith*, 613 N.E.2d 416, 421 (Ind. Ct. App. 1993) (citation omitted) ("The test for determining whether a statement is substantially true is whether any inaccuracies caused the statement to produce a different effect on the audience than would have been produced had the literal truth been spoken.").

In its supplemental discovery responses relating to its defamation claim against Kusisto, MIE asserts that Kusisto made "derogatory statements" regarding MIE in communications with various medical practice groups.  MIE Supp. Resp. to ONE at 10-11.  The only competent evidence of any statements made by Kusisto to any medical practice groups is Kusisto's testimony that he made a scripted presentation to the CEOs of several medical groups concerning MIE's hacking of ONE's computer system.  *See* Kusisto Dep. (3/28/07) at 227-32 (App. Ex. J). Kusisto testified that he could not recall exactly what he said, but it would have been similar to the statements he made at an internal ONE physician meeting, which statements were reflected in the agenda for that ONE meeting.  *See id*. at 228, 232, Dep. Ex. 43, ¶ 11 (App. Ex. W).

An examination of the statements contained in the agenda will reveal no defamation whatsoever concerning MIE.  *See* Dep. Ex. 43 (ONE 1885-87).  These statements are simply a factual chronology of events relating to the difficulties caused by the hacking of ONE's computer system and the FBI's investigation of that conduct, none of which is actionable as defamation.

Even if MIE could establish that any of the statements made by Kusisto were false (and MIE has never presented any evidence of that), not one of his statements is defamatory.  "A statement is defamatory if it tends to harm the reputation of another so as to lower him in the

40

estimation of the community or to deter third persons from associating or dealing with him."
*Gatto*, 774 N.E.2d at 923 (citation omitted).  Whether a statement is defamatory is typically a question of law.  *Id*. (citation omitted).  As a matter of law, none of the statements made by Kusisto concerning the hacking incidents or the FBI investigation meets this test, *i.e.*, not one of Kusisto's statements is both false *and* defamatory.  It follows that MIE's defamation claims against Kusisto are without merit and Kusisto is entitled to judgment on that Count as a matter of law.

As to Plesko and TPX, MIE alleges the Defendants defamed MIE by providing false information to the FBI regarding the hacking incidents on ONE's network.  However, as with the statements allegedly made by Kusisto, there is no evidence of falsity.  Horner has provided detailed testimony regarding his intrusions into ONE's computer system.  These were without notice to or authorization from ONE and were accomplished through covert means employed to avoid detection.  Horner's alterations to ONE's version of WebChart were designed expressly to interfere with and slow the performance of WebChart, to prevent ONE from printing and exporting its patients records, and to cause ONE to seek MIE's assistance with such performance problems, thereby causing extensive system slow-downs and a full system crash.  Given these remarkable actions, the Defendants were absolutely justified in reporting their suspicions and findings to the FBI.  Horner even admitted that given ONE's network problems it was reasonable for it to contact the FBI.  *See* Horner 30(b)(6) Dep. (8/1/07) at 175 (App. Ex. E).

Moreover, the substantial truth of Defendants' statements to the FBI and others concerning the unauthorized, illicit, and damaging intrusions into ONE's network is verified by Horner's testimony about the nature, extent and purpose of his intrusions on ONE's network. *See* Horner Dep. (3/23/07) at 170-78, 194-205; Horner 30(b)(6) Dep. (8/1/07) at 150-51.

41

Further, MIE asserts that Plesko and TPX made statements that "implied" MIE's network was not HIPAA compliant.  *See* Complaint ¶ 74.  MIE has identified no actual statements of Plesko or TPX that are either false or defamatory regarding MIE and HIPAA compliance.  Its vague assertion that Plesko and TPX "implied" non-compliance is an insufficient basis on which to find defamation.  Further, considering the mind-set of MIE's officers, directors and primary shareholders, that MIE may access a customer's network and tamper with physicians' medical records management systems simply because MIE owns WebChart, any statement that implied HIPAA non-compliance or insecurity with respect to the integrity of medical records was well-founded.  *See* Jones Dep. (7/12/07) at 63-64, 72, 84-85; Horner Dep. (3/23/07) at 170-78, 194-205; Horner 30(b)(6) Dep. (8/1/07) at 150-51.  It follows that, like its claim against Kusisto, MIE's defamation claims against TPX and Plesko are without merit and they are entitled to judgment on that Count as a matter of law.

**H.    MIE Has Failed to Show an Actionable Claim for Trade Secret Misappropriation**

In its "Supplemental Responses to the First Set of Interrogatories of Orthopaedics Northeast," MIE purports to identify, *inter alia*, "each trade secret MIE alleges was misappropriated" as well as all evidence of misappropriation, and the documents that support such claim.  MIE Supp. Resp. to ONE at 8-9. In its original response, MIE merely incorporated its response to another interrogatory that requested information as to how the Defendants infringed MIE's copyright.  *Id*. In its Supplemental Response, MIE still does not venture beyond its answer regarding the alleged copyright infringement, stating only that its trade secrets are located in some unidentified "portions of the code [that] are confidential." *Id*. at 10.  MIE goes no further in identifying exactly what these portions are.  This is wholly insufficient to establish a

trade secret claim.

"[A] plaintiff who seeks relief for misappropriation of trade secrets *must identify the trade secrets* and carry the burden of showing they exist." *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 920 (Ind. 1993) (emphasis added) (citations omitted).  In a case arising under Wisconsin's version of the Uniform Trade Secrets Act, the Seventh Circuit left no room for doubt that a plaintiff will have to "engage[] in a serious effort to pin down the secrets" for a court to determine whether there was a misappropriation.  *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581, 583 (7th Cir. 2002).  In *IDX*, far more substantial efforts to identify the alleged trade secrets contained in software were held to be insufficient as a matter of law:

> According to IDX, "a 43-page description of the methods and processes underlying and the inter-relationships among various features making up IDX's software package" is specific enough. No, it isn't. These 43 pages describe the software; although the document was created for this litigation, it does not separate the trade secrets from the other information that goes into any software package. Which aspects are known to the trade, and which are not? That's vital under the statutory definition. Likewise, IDX's tender of the complete documentation for the software leaves mysterious exactly which pieces of information are the trade secrets. As we remarked in *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir.1992), a plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition.

*Id*. at 583-84 (citing *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1203 (7th Cir. 1987)).  Here, MIE has done nothing more than claim that *some* portion of its software (and its more than 917,000 lines of code, Horner Dep. (11/19/07) at 48-49) is not generally known and is thus a trade secret, but MIE never identifies what that portion is, let alone demonstrates how that particular portion of the software meets the definition of a "trade secret" under Indiana law.

Yet another hurdle MIE has failed to surmount is to show that one or more of the Defendants misappropriated that *particular* part of the software and its actions in doing so were

not otherwise authorized under the SLA.  And even if MIE's claim did not fail as a matter of law for those two reasons, MIE has also failed to allege any particular damages arising out of the alleged misappropriation that are not hopelessly speculative.  In MIE's damages report (the "Pellegrino Report"), the only discussion of trade secret misappropriation comes in a section relating to future litigation MIE claims it may have to *bring against third parties* for those parties' misappropriation of trade secrets.  Dep. Ex. 183, at 2 (App. Ex. AA.  In the report, Pellegrino notes he was told to *presume* that Midwest Network Services Group of Fort Wayne, Indiana and MySQL of Denver, Colorado had access to trade secrets and copyrighted materials, including source codes.  Pellegrino Dep. (12/21/07) at 15 (App. Ex. L).  But Pellegrino was given no evidence to support this assumption other than MIE's say-so.  *See id.* at 25-27.  It is also undisputed that MIE has sued neither Midwest nor MySQL.  Nor is there evidence that any of these parties did anything other than assist ONE and TPX in supporting WebChart after MIE unilaterally terminated the support necessary for ONE to use WebChart and then affirmatively took secret and unlawful actions to interfere with WebChart's performance.  *See, e.g.*, Plesko 30(b)(6) Dep. (8/17/07) at 21-26; Plesko Dep. (5/23/07) at 78-79, 145-47, 156-57; Kessler Dep. (5/29/07) at 28-34, 45-46; Kusisto Dep. (3/27/07) at 36-37.  As noted above, granting access to Midwest and MySQL, as well as TPX, was permissible under the SLA.  Accordingly, granting such access cannot form the basis of a misappropriation action.  *See, e.g.*, *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 178 (Ind. Ct. App. 2007) (no misappropriation during period of employment since employee had the right to use employer's trade secrets).

Since the only conduct MIE can point to is conduct authorized under the SLA, it cannot show misappropriation, even assuming it had shown the other elements of a prima face case.

44

Accordingly, the Defendants are entitled to judgment as a matter of law on all of MIE's claims of trade secret misappropriation.

> **I.     MIE's Claim for Interference With Business Relationships Fails Since It Cannot Show an Illegal Act on the Part of Any of the Defendants.**

Although MIE's Complaint asserts the four Defendants intentionally interfered with MIE's business relationships and that such conduct was "illegal," Complaint ¶ 90, MIE has failed to come forward with any evidence of an *illegal* act on the part of any of the Defendants. Accordingly, the Court should enter judgment on MIE's interference claim.

Under Indiana law, the elements of tortious interference with a business relationship are: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Government Payment Service, Inc. v. Ace Bail Bonds*, 854 N.E.2d 1205, 1209 (Ind. Ct. App. 2006) (citations omitted).  In addition, Indiana requires "some independent illegal action" on the part of the defendant.  *Id*. (citing *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286, 291 (Ind. 2003), *cert. denied*, 541 U.S. 902, 124 S. Ct. 1602, 158 L. Ed. 2d 244 (2004); *Watson Rural Water Co., Inc. v. Indiana Cities Water Corp.*, 540 N.E.2d 131, 139 (Ind. Ct. App. 1989), *trans. denied* ("In the State of Indiana, an element necessary to prove this cause of action is that a defendant acted illegally in achieving his end.")).

The only evidence MIE has pointed to in support of this claim is that Kusisto allegedly tortiously interfered with its business relationships by engaging in discussions with other practice group managers.  *See* MIE to ONE at 10-11.  Such actions simply do not rise to the level of an independent illegal act.  Even if MIE could show that it was defamed during those meetings

45

(which it cannot), it is well settled under Indiana law that defamation does not satisfy the requirement to show an independent illegal act. *See Levee v. Beeching*, 729 N.E.2d 215, 222 (Ind. Ct. App. 2000). Since MIE has come forth with no evidence of an independent illegal act to support its claim for interference against the Defendants, all of the Defendants are entitled to judgment in their favor as a matter of law.

**J.      Several of the Damage Claims Sought By MIE Are Not Viable as a Matter of Law**

MIE's damage computations in this case are set forth in a Valuation Report prepared by Michael Pellegrino ("Report"). Pellegrino Dep. (12/21/07) (Dep. Ex. 183) (App. Ex. AA). This Report contains highly questionable methodologies and unjustifiable assumptions. However, this Motion is not addressed to those failings. Instead, the Defendants here focus on the fact that several of the damage claims set forth by Pellegrino are simply not recoverable as a matter of law, and the Court should grant Defendants judgment in their favor on those claims.

*1.      "Value Impairment Due to NMC Timing"*

Pellegrino asserts that MIE is entitled to recover $475,376 representing the "value impairment" cause by "delaying the NoMoreClipboard, LLC [("NMC")] launch." *See* Report at 35. The purported basis for this damage claim is that "[w]ere it not for the actions of the Defendants, MIE representatives allege that they would have been nine months further along in the launch" of a subsidiary company, NMC. *Id*. at 34. However, it is apparent that this alleged delay was the result of a decision by MIE: "MIE delayed the launch of [NMC] due to the timing of the media accounts surrounding the FBI investigation and MIE's need to protect its intellectual property through the lawsuit." *Id*. The FBI investigation of MIE arose out of Horner's hacking of ONE's computer system; and the lawsuit filed by MIE was of its own choosing. But even

46

assuming that it could be said that MIE did not cause the FBI to investigate it, and did not cause the filing of its own lawsuit, neither of these events nor any conduct of the Defendants giving rise to these events could rationally be considered the proximate cause of any decision by MIE to delay the launch of a separate company, namely NMC.

In order to give rise to recoverable damages, an injury must arising from "a cause which, in natural and continuous sequence, unbroken by any efficient intervening cause," produces the injury, and the injury must also have been "of a class reasonably foreseeable at the time" of the alleged wrongful act. *Ortho Pharmaceutical Corp. v. Chapman*, 180 Ind. App. 33, 388 N.E.2d 541, 555 (1979) (citations omitted); *see also Hadley v. Baxendale*, 156 Eng. Rep. 145 (1854) (contract damages require foreseeability). Since this part of MIE's damage claims cannot meet these standards as a matter of law, any loss allegedly caused by MIE's own decision to delay NMC cannot be laid at the feet of the Defendants.[16]

### 2.    *"Unjust Enrichment Through Non-Compete Violation"*

As one component of damages for the alleged violation of the non-compete, MIE claims that it can recover "unjust enrichment damages," namely the profits the *Defendants* earned or *will earn* and that the Defendants allegedly would not otherwise have earned. *See* Report at 35. Primarily, this consists of a discount ONE obtained from GE Healthcare after ONE severed its ties to MIE. According to Pellegrino, the discount has an estimated value of $171,000. *Id.* at 35-36. No assertion is made that MIE could have obtained this GE discount under any circumstances. *Id.* (Pellegrino also admitted in his deposition that he had not considered the

---

[16] Pellegrino had projected that NMC would have net revenues of $615,883 during its first year of its existence; however, the actual revenue during NMC's first year were $19,000. See Pellegrino Dep. at 114-17. Pellegrino allowed him to "rethink" his opinion. *Id.* at 117.

possibility that ONE would have obtained the same discount at the end of the non-compete period.  (Pellegrino Dep. at 120-23)

Under Indiana law, the remedies in damages for breach of contract do not include simply confiscating the revenues of the party allegedly in breach.  It is axiomatic that a party injured by a breach of contract may recover the benefit of his bargain, but his recovery is limited to the loss actually suffered; he is not entitled to be put in a better position than he would have enjoyed absent the breach.  *See, e.g.*, *4-D Bldgs., Inc. v. Palmore*, 68s8 N.E.2d 918, 921 (Ind. Ct. App. 1997) (citation omitted).  Since MIE's "unjust enrichment" claim contravenes all of these contract damage principles, it fails as a matter of law.

### 3.      *"Accelerated Market Entry"*

MIE's damage claims include yet another illegitimate attempt to recover "unjust enrichment" damages from the Defendants.  *See* Report at 38.  Pellegrino relates that because of the alleged breach of the non-compete, the Defendants were able to accelerate TPX's entry into the market by one year and that the Defendants therefore allegedly gained an "unjust economic benefit" in the sum of $939,456.19.  *Id.* at 38-40.  Once again, there is no assertion and no demonstration that MIE would have gained these net revenues but for the alleged breach of contract by the Defendants.  *Id*.  Under the principles set forth in *4-D Bldg*, it is fundamental that MIE cannot recover the *Defendants'* profits as contract damages, and this claim fails as matter of law.  *See 4-D Bldg*, 688 N.E.2d at 921.

## IV.    CONCLUSION

For the above and foregoing reasons, the Defendants are entitled to the following relief: (a) Defendants ONE and TPX are entitled to judgment as a matter of law on Count I of Plaintiff's Complaint (Copyright Infringement); (b) Defendant ONE is entitled to judgment a matter of law

on Count II of Plaintiff's Complaint (Breach of Contract); Defendants Kusisto, Plesko, and TPX are entitled to judgment as a matter of law on Count III of Plaintiff's Complaint (Breach of Contract) and Count V of the Plaintiff's Complaint (Defamation); and (c) Defendants ONE, Kusisto, Plesko, and TPX are entitled to judgment as a matter of law on Count IV (Recovery by Crime Victim), Count VI (Trade Secret Misappropriation), and Count VII (Tortious Interference) of Plaintiff's Complaint.  In addition, Defendant ONE is entitled to judgment as a matter of law on the issue of liability on Count III (Breach of the MSA) and Count IV (Breach of the SLA) of its Counterclaim against MIE.

Respectfully submitted,

BARRETT & MCNAGNY LLP

By /s/ Cathleen M. Shrader
    Thomas A. Herr (#8444-02)
    Cathleen M. Shrader (#18159-02)
    215 East Berry Street
    Fort Wayne, Indiana 46802
    Tel: (260) 423-9551
    Fax: (260) 423-8920
    E-mail: tah@barrettlaw.com
           cms@barrettlaw.com

*Attorneys for Defendants Orthopaedics Northeast, P.C. and Raymond Kusisto*

EILBACHER FLETCHER, LLP

By  /s/James P. Fenton (per consent)
    James P. Fenton (#6808-02)
    803 S. Calhoun Street, Suite 400
    Fort Wayne, IN  46802
    Tel:  (260) 425-9777
    Fax: (260) 424-9177
     Email: fenton@eflawyers.com

and

MALLOR CLENDENING GRODNER & BOHRER LLP

By /s/ Lonnie D. Johnson (per consent)
    Lonnie D Johnson (#16758-53)
    Patrick B Omilian (#23973-53)
    511 S. Woodscrest Drive
    P.O. Box 5787
    Bloomington, IN 47407-5787
    Tel: (812) 336-0200
    Fax: (812) 333-0083
    Email: ljohnson@mcgb.com
          pomilian@mcgb.com

*Attorneys for triPRACTIX, LLC and Todd Plesko*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that the foregoing was filed electronically using the CM/ECF system, which sent notification of such filing to the following parties or counsel, this 7th day of January, 2008, to the following counsel of record:

Matthew M. Hohman
D. Randall Brown
BARNES & THORNBURG LLP
600 One Summit Square
Fort Wayne, IN 46802-3119
Email: mhohman@btlaw.com
     rbrown@btlaw.com                          /s/ Cathleen M. Shrader