IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| MEDICAL INFORMATICS ENGINEERING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ORTHOPAEDICS NORTHEAST, P.C., triPRACTIX, LLC, RAYMOND KUSISTO, and TODD PLESKO, | ) | Cause No. 1:06 CV 173 |
| | ) | |
| Defendants/Counterclaimants, and Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DOUG HORNER, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

---

## DEFENDANTS' JOINT BRIEF IN OPPOSITION TO PLAINTIFF'S AND THIRD-PARTY DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Thomas A. Herr (#8444-02)
Cathleen M. Shrader (#18159-02)
BARRETT & MCNAGNY LLP
215 East Berry Street
Fort Wayne, Indiana 46802
Tel: (260) 423-9551
Fax: (260) 423-8920
E-mail: tah@barrettlaw.com
        cms@barrettlaw.com

*Attorneys for Defendants Orthopaedics Northeast, P.C. and Raymond Kusisto*

James P. Fenton (#6808-02)
EILBACHER FLETCHER, LLP
803 S. Calhoun Street, Suite 400
Fort Wayne, IN 46802
(260) 425-9777; (260) 424-9177 (fax)
Email: fenton@eflawyers.com

Lonnie D Johnson (#16758-53)
Patrick B Omilian (#23973-53)
MALLOR CLENDENING GRODNER& BOHRER LLP
511 S. Woodscrest Drive
Bloomington, IN 47407
(812) 336-0200; (812) 333-0083 (fax)
Email: ljohnson@mcgb.com
        pomilian@mcgb.com

*Attorneys for triPRACTIX, LLC and Todd Plesko*

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................1

II.  STATEMENT OF GENUINE ISSUES...........................................................1

III.  FACTUAL SUMMARY ....................................................................................2

IV.  INCORPORATION OF PRIOR ARGUMENTS ...........................................2

V.  LEGAL ARGUMENT........................................................................................2

  A.  Summary Judgment Standard ................................................................2

  B.  MIE Is Not Entitled To Summary Judgment on its Breach of Contract Claims
      Against Any of the Defendants..................................................................3

      1.  The Non-Competition Provision in the SLA is Unenforceable ....................4

      2.  At the Very Least, a Question of Fact Exists As to Which Party
          Committed the First Material Breach .............................................................5

      3.  MIE's Contracts with ONE Are Unenforceable Against Kusisto, Plesko,
          and TPX ...........................................................................................................6

          a.  Kusisto, Plesko, and TPX were not parties to any contract with
              MIE .......................................................................................................7

          b.  ONE and TPX are not alter egos of one another .............................12

      4.  MIE's request for injunctive relief is moot due to the passage of time ..........16

      5.  A genuine issue exists as to whether the SLA is an illegal tying
          arrangement....................................................................................................17

  C.  The Defendants Are Entitled to Judgment In Their Favor as a
      Matter of Law on MIE's Claims for Copyright Infringement ....................................19

      1.  The Copying of WebChart Incidental To ONE's
          Migration of Its Own Data out of WebChart
          and into Another EMR Program Is Fair Use ..................................................19

      2.  The "Access to and Possession of" Copyrighted

Work Does Not Constitute Infringement as a
Matter of Law ....................................................................20

3.  As a Matter of Law, Any Alleged Infringement
of WebChart's Transcription Program Is *De
Minimis* and Not Actionable ......................................... 21

D.  Genuine Issues of Material Fact Bar Judgment in MIE's Favor on ONE's and
TPX's Claims under 18 U.S.C. § 1030....................................................................28

E.  Genuine Issues of Material Fact Preclude Judgment in MIE's
Favor on the Defendants' Claims for Defamation ......................................................33

1.  Kusisto's Claim of Defamation Based on the August 15 Letter.....................33

2.  As this Court Has Previously Determined, Attorney
Hohman's Statements to the Media Are Not
Absolutely Privileged under the *Restatement.* ...............................................37

3.  MIE Has Shown No Basis for Summary Judgment
on ONE's and Kusisto's Defamation Claims Based
on the Newspaper Article.................................................................................39

a.  MIE cannot show as a matter of law that the
statement published in the *Journal Gazette* was
not "of and concerning" Kusisto and ONE........................................40

b.  MIE cannot show as a matter of law that the
statement published in the *Journal Gazette*
about Kusisto and ONE was true .......................................................41

4.  MIE Has Shown No Grounds for Summary
Judgment  on Plesko's and TPX's Claims Based
upon the Newspaper Article.............................................................................43

V.  CONCLUSION.......................................................................................................48

# TABLE OF AUTHORITIES

*Cases*                                                                                                  **Page**

*Atari Games Corp. v. Nintendo of America, Inc.,*
    C 88-4805 FMS, C 89-0027 FMS, 1993 WL 214886,
    30 U.S.P.Q.2d 1401 (N.D. Cal. April 15, 1993)................................................................... 24

*Atari, Inc. v. North Am. Philips Consumer Elec. Corp.,*
    672 F.2d 607 (7th Cir.), 459 U.S. 880, 103 S. Ct. 176, 74 L. Ed. 2d 145 (1982).................25

*Aronson v. Price,*
    644 N.E.2d 864 (Ind. 1994) ...........................................................................................12, 13

*Assessment Technologies of WI, LLC v. WIREdata, Inc.,*
    350 F.3d 640 (7th Cir. 2003) ...........................................................................................19

*Automobile Mechanics Local 701 Welfare and Pension Funds v.*
*Vanguard Car Rental USA, Inc.,*
    502 F.3d 740 (7th Cir. 2007) ...........................................................................................2

*Banff Ltd. v. Express, Inc.,*
    921 F. Supp. 1065 (S.D.N.Y. 1995).................................................................................27

*Board of Regents v. Roth,*
    408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).......................................................37

*Brandt v. Board of Co-op. Educ. Servs.,*
    820 F.2d 41 (2d Cir. 1987) ...........................................................................................37

*Briggs v. Clinton Co. Bank & Trust Co. of Frankfort, Ind.,*
    452 N.E.2d 989 (Ind. Ct. App. 1983)...............................................................................38

*Brown v. Gatti,*
    99 P.3d 299 (Or. Ct. App. 2004) ...................................................................................38

*Business Trends Analysts v. Freedonia Group, Inc.,*
    650 F. Supp. 1452 (S.D.N.Y. 1987)................................................................................22

*CP Solutions PTE, Ltd. v. General Electric Co.,*
    244 F.R.D. 137 (D. Conn. 2007)................................................................................15-16

*Carlson Wagonlit Travel, Inc. v. Moss,*
    788 N.E.2d 501 (Ind. Ct. App. 2003) ...............................................................................7

| *Cases* | **Page** |
|---------|----------|

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)......................................................2

*Church of Scientology Intern. v. Time Warner, Inc.*,
  806 F. Supp. 1157 (S.D.N.Y. 1992)......................................................40

*Chrysler Motors Corp. v. Graham*,
  631 N.E.2d 7 (Ind. Ct. App. 1994) ......................................................38

*Columbia Club, Inc. v. American Fletcher Realty Corp.*,
  720 N.E.2d 411 (Ind. Ct. App. 1999) ......................................................7

*Copiers Typewriters Calculators, Inc. v. Toshiba Corp.*,
  576 F. Supp. 312 (D. Md. 1983) ......................................................7

*Data General Corporation v. Grumman Systems Support Corp.*,
  36 F.3d 1147 (1st Cir. 1994)......................................................27

*DiMizio v. Romo*,
  756 N.E.2d 1018 (Ind. Ct. App. 2001) ......................................................7, 8

*Escobedo v. BHM Health Assoc., Inc.*,
  818 N.E.2d 930 (Ind. 2004) ......................................................12-13

*Evansville & Southern Indiana Traction Co. v. Evansville Belt Railway Co.*,
  44 Ind. App. 155, 87 N.E. 21 (1909) ......................................................7

*Exide Corp. v. Millwright Riggers, Inc.*,
  727 N.E.2d 473 (Ind. Ct. App. 2000) ......................................................9

*Feist Pubs., Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991)......................................................21

*Filippo v. Lee Publications, Inc.*,
  485 F. Supp. 2d 969 (N.D. Ind. 2007) ......................................................35

*In re Energy Co-op. Inc.*,
  832 F.2d 997 (7th Cir. 1987) ......................................................3

*Incredible Technologies, Inc. v. Virtual Technologies, Inc.*,
  400 F.3d 1007 (7th Cir. 2005) ......................................................22-23

*JCW Investments, Inc. v. Novelty, Inc.*,
  482 F.3d 910 (7th Cir. 2007) ......................................................24

| *Cases* | **Page** |
|---|---|

*Jamerson v. Anderson Newspapers, Inc.*,
    469 N.E.2d 1243 (Ind. Ct. App. 1984) ......................................................35

*Jarvis v. A & M Records*,
    827 F. Supp. 282 (D.N.J. 1993) ...............................................................27

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2, 12, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984)......................................17

*Litchfield v. Spielberg*,
    736 F.2d 1352 (9th Cir. 1984) ................................................................24

*Levin & Sons, Inc. v. Mathys*,
    409 N.E.2d 1195 (Ind. Ct. App. 1980)  .........................................................16

*Lewis v. Benedict Coal Corp.*,
    361 U.S. 459, 80 S. Ct. 489, 4 L. Ed. 2d 442 (1960)...........................................11

*Lotus Dev. Corp. v. Borland Int'l, Inc.*,
    49 F.3d 807 (1st Cir. 1995) ...................................................................23

*McQueen v. Fayette County Sch. Corp.*,
    711 N.E.2d 62 (Ind. Ct. App. 1999)............................................................35

*McGraw-Hill, Inc. v. Worth Publishers, Inc.*,
    335 F. Supp. 415 (S.D.N.Y. 1971)..............................................................22

*Massey v. Conseco Servs., LLC*,
    879 N.E.2d 605 (Ind. Ct. App. 2008) .......................................................12, 15

*Microsoft Corp. v. Computer Serv. & Repair Inc.*,
    312 F. Supp. 2d 779 (E.D.N.C. 2004) ..........................................................20

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990).......................................34-35

*Miller v. Reinert*,
    839 N.E.2d 731 (Ind. Ct. App. 2005)..........................................................38

*MiTek Holdings, Inc. v. Arce Engineering Co., Inc.*,
    89 F.3d 1548 (11th Cir. 1996) ................................................................27

*Money Matters Mgmt. v. Niche Mktg., Inc.*,
    No. 07-cv-0591 IEG CAB, 2007 WL 3052996, (S.D. Cal.  Oct. 19, 2007)........................7

*Cases*             **Page**

*Near East Side Community Organization v. Hair*,
    555 N.E.2d 1324 (Ind. Ct. App. 1990) ...............................................................35, 36

*Niccum v. Niccum*,
    734 N.E.2d 637 (Ind. Ct. App. 2000) ...................................................................8-9

*Northern P.R. Co. v. United States*,
    356 U.S. 1, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958) ................................................17

*Oliver v. Pinnacle Homes, Inc.*,
    769 N.E.2d 1188 (Ind. Ct. App. 2002) .....................................................12, 13-14, 15

*Ollman v. Evans*,
    750 F.2d 970 (D.C. Cir. 1984), *cert. denied*, 471 U.S. 1127,
    105 S. Ct. 2662, 86 L. Ed. 2d 278 (1985) .........................................................35-36, 37

*OmniSource Corp. v. NCM Americas, Inc.*,
    313 F. Supp. 2d 880 n.14 (N.D. Ind. 2004) .........................................................47

*Power Marketing Direct, Inc. v. Clark*,
    No. 2:05-CV-767, 2006 WL 2583342 (S.D. Ohio Sept. 6, 2006) ........................11-12

*Qian v. Kautz*,
    168 F.3d 949 (7th Cir. 1999) ..............................................................................33

*Quinn v. City of Detroit*,
    23 F. Supp. 2d 741 (E.D. Mich. 1998)..................................................................26

*Raymundo v. Hammond Clinic Assoc.*,
    449 N.E.2d 276 (Ind. 1983) ................................................................................16

*Robert R. Jones Associates, Inc. v. Nino Homes*,
    858 F.2d 274 (6th Cir. 1988) ..............................................................................27

*Rodriguez v. Tech Credit Union Corp.*,
    824 N.E.2d 442 (Ind. Ct. App. 2005)....................................................................7

*Rogier v. American Testing and Engineering Corp.*,
    734 N.E.2d 606 (Ind. Ct. App. 2000)....................................................................6

*Rosado v. Taylor*,
    324 F. Supp. 2d 917 (N.D. Ind. 2004) ..................................................................3

*Cases*                                                                                           **Page**

*S.C. Nestel, Inc. v. Future Const., Inc.*,
    836 N.E.2d 445 (Ind. Ct. App. 2005) ...............................................................8, 9

*Schutz v. Rose*,
    136 Ind. App. 165, 196 N.E. 2d 285 (1964) ........................................................29

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
    473 U.S. 479, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985).......................................33

*Smith v. McCleod Distributing, Inc.*,
    744 N.E.2d 459 (Ind. Ct. App. 2000)..................................................................14

*Stahl v. Kincaide*,
    192 N.E.2d 493 (Ind. Ct. App. 1963)..................................................................38

*Steaks Unlimited, Inc. v. Deaner*,
    623 F.2d 264 (3d Cir. 1980)................................................................................36

*Thurmond v. Compaq Computer Corp.*,
    171 F. Supp. 2d 667 (E.D. Tex. 2001) ...............................................................33

*Titus v. Rheitone, Inc.*,
    758 N.E.2d 85 (Ind. Ct. App. 2001).....................................................................6

*United Consumers Club, Inc. v. Bledsoe*,
    441 F. Supp. 2d 967 (N.D. Ind. 2006) ...............................................................35

*Washington v. Haupert*,
    481 F.3d 543 (7th Cir. 2007) ...........................................................................3, 29

*Wilcom Pty Ltd. v. Endless Visions*,
    128 F. Supp. 2d 1027 (E.D. Mich. 1998)........................................................23-24

*Williamson v. Ind. Univ.*,
    345 F.3d 459 (7th Cir. 2003) ..............................................................................2

*Winkler v. V.G. Reed & Sons*,
    638 N.E.2d 1228 (Ind. 1994) ...........................................................................7-8

*Worth v. Selchow & Righter Co.*,
    827 F.2d 569 n.1 (9th Cir. 1987) .......................................................................25

| *Statutes and Legislative Materials* | **Page** |
|---|---|
| 17 U.S.C. § 102(b) | 23 |
| 17 U.S.C. § 106 | 20 |
| 17 U.S.C. § 501 | 20 |
| 18 U.S.C. § 1030 | 28-33 |

---

| *Other Authorities* | **Page** |
|---|---|
| 2 WILLISTON ON CONTRACTS §§ 273, 347 (3d ed. 1959 & 1983 Supp.) | 7 |
| 21B CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE & PROCEDURE EVIDENCE 2d § 5106.4 | 39-40 |
| 31A C.J.S. *Evidence* § 209 | 33 |
| BLACK'S LAW DICTIONARY | 6, 10-11, 36 |
| CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2720 (2d ed. 1983) | 3 |
| MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT | 21, 22, 25, 26 |
| WEBSTER'S THIRD NEW INT'L DICTIONARY (1986) | 36 |
| W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 111, at 783 (5th ed. 1984) | 40-41 |

# I.  INTRODUCTION

Defendants, Orthopedics Northeast, P.C., TriPRACTIX, LLC, Raymond Kusisto, and Todd Plesko (the "Defendants") submit this Joint Brief in Opposition to MIE's and Horner's Motion for Partial Summary Judgment.  In their previously filed Joint Brief in Support of their own Motion for Partial Summary Judgment, the Defendants established that they are entitled to Summary Judgment on all of MIE's claims for breach of contract and copyright infringement. Plaintiff, MIE, has now moved for partial summary judgment in its favor as to several of its claims against the Defendants.  The arguments previously made by the Defendants establish that MIE's claims are all barred as a matter of law.  However, in the event that the Court denies the Defendants' Motion for Partial Summary Judgment as to MIE's claims, there are, at the very least, numerous disputed material issues of fact which require that MIE's Motion for Partial Summary Judgment be denied.

In addition, MIE and Horner have moved for Partial Summary Judgment as to several of the Defendants' Counterclaims.  With one exception,[1] the Defendants oppose MIE's and Horner's Motion, and as set forth herein and in their L.R. 56.1 Statement of Genuine Issues, there are genuine issues of material fact which require that the Court deny MIE's Motion as to the Defendants' Counterclaims.

# II.  STATEMENT OF GENUINE ISSUES

Pursuant to L.R. 56.1, the Defendants have submitted their Statement of Genuine Issues as Exhibit "EE" to their Appendix to this Brief in Opposition.[2]

---

[1] TPX concedes that the monetary damages caused by MIE's tortious interference with TPX's and ONE's relationship were incurred by ONE, and thus TPX does not contest MIE's request for judgment on this point.

[2] The Defendants have previously submitted an Appendix to the Defendants' Joint Motion for Summary Judgment.  To avoid any confusion, the Defendants are consecutively marking their Exhibits.  Hence Exhibits "A" through "DD" are contained in the Appendix to the Defendants' Opening Brief, and

## III.  FACTUAL SUMMARY

To avoid repetition, Defendants incorporate the facts set out in their Opening Brief and their Joint L.R. 56.1 Statement of Material Facts, filed January 7, 2008 [dkt#111-12].  As necessary, additional facts will be presented below.

## IV.  INCORPORATION OF PRIOR ARGUMENTS

MIE and Horner have moved for judgment in their favor on several issues which are also the subject of a Joint Motion for Partial Summary Judgment filed by the Defendants on January 7, 2008.  On order to minimize the repetition of arguments previously made, the Defendants hereby incorporate by reference the evidence and arguments contained in their Joint Motion for Partial Summary Judgment, Appendix, and supporting Brief [dkt#110-12].

## V.  LEGAL ARGUMENT

### A.     Summary Judgment Standard

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  In making that determination, the Court must "draw all reasonable inferences from the evidence in the light most favorable to the nonmoving party," here the Defendants.  *Williamson v. Ind. Univ.*, 345 F.3d 459, 462 (7th Cir. 2003).  This standard is the same even where cross-motions for summary judgment have been filed.  *See, e.g.*, *Automobile Mechanics Local 701 Welfare and Pension Funds v. Vanguard Car Rental USA, Inc*., 502 F.3d 740, 748 (7th Cir. 2007) (citation omitted).

---

Exhibits "EE" through "SS" are contained in the Appendix to this Brief.  The references to both of these appendices will be "Def. App."

It is not enough for the moving party to show that its version of events is more plausible. "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) (citations omitted) (noting that "[h]owever implausible [a party's] account might seem, it is not our place to decide who is telling the truth").

It is fundamental that to be entitled to summary judgment, the moving party must show it is *legally* entitled to judgment in its favor. Fed. R. Civ. P. 56. Even in the absence of any factual dispute, if the law is not with the moving parties, here MIE and Horner, neither is entitled to judgment as a matter of law. Indeed, under such circumstances, the Court should enter judgment for the non-moving Defendants. *See, e.g.*, *Rosado v. Taylor*, 324 F. Supp. 2d 917, 923 (N.D. Ind. 2004); *see also In re Energy Co-op. Inc*., 832 F.2d 997, 1004 (7th Cir. 1987) (citing CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2720, at 28-35 (2d ed. 1983) (appellate court may order district court to enter summary judgment for nonmoving party on an issue if no issue of material fact exists, moving party had an opportunity to meet the issue in the district court, and nonmoving party is entitled to judgment as a matter of law)).

### B.   MIE Is Not Entitled To Summary Judgment on its Breach of Contract Claims Against Any of the Defendants.

MIE has identified two contracts, the Software License Agreement ("SLA") (Defendant's Appendix ("Def.App.") Ex. R) and the Maintenance and Support Agreement ("MSA") (Def. App. Ex. S) (together, the "Agreements") which it claims all four Defendants breached[3] by violating the non-compete agreement contained in the SLA. But MIE's entire argument begs the question. As set out in the Opening Brief in Support of the Defendants' Motion for Summary

---

[3] The alleged breach of the MSA is premised solely on the fact that the MSA provides that "all the provisions of the License Agreement apply" to the MSA and MIE contends the SLA was breached. *See* MIE Opening Brief at 5.

Judgment, the covenant not to compete contained in the SLA is unenforceable as a matter of law. *See* Defendants' Joint Brief in Support of Joint Motion for Partial Summary Judgment ("Defendants' Opening Brief") at 29-37.  Even if the covenant were enforceable, genuine issues of fact exist as to which party was the first to breach.  Moreover, since the non-competition period has expired, MIE's request for injunctive relief is moot.

### 1.       The Non-Competition Provision in the SLA Is Unenforceable.

The Defendants have moved for summary judgment on MIE's breach of contract claims arising out of the non-compete contained in the SLA.  The Defendants' Opening Brief sets forth the relevant undisputed facts and cites extensive authority all of which is equally applicable and incorporated here by reference in response to MIE's Motion.  *See* Defendants' Opening Brief at 29-37.  Nonetheless, certain issues raised by MIE are of sufficient import so as to require further comment and analysis.  Specifically, Defendants assert that the non-compete is impermissibly overbroad as to its scope and subject matter such that it is unenforceable.

MIE's interpretation of the SLA and its assertion that the non-compete prohibits ONE from engaging in basic business activities which are not identified, described, or defined in the provision, illustrates the non-compete's unreasonableness as well as the unreasonableness of MIE's claim against ONE.  The non-compete prohibits ONE from "engag[ing] in the business of selling or licensing" EMR software for a period of one year.  SLA § 28 (Def. App. Ex. R).  MIE interprets this provision to encompass activities that include "creation of a business plan, marketing, contacting prospective customers in addition to the actual sale or leasing of software." MIE's Opening Brief at 9.  MIE alleges that all Defendants breached the non-compete throughout 2005 merely by discussing and/or later creating a business plan for a prospective business.  Such an expansive prohibition is clearly unreasonable and untenable.  By such logic,

4

any activity that may amount to even the most preliminary step for pursuing a prospective business opportunity, even where any actual competition itself does not occur until after the expiration of the prohibition against competition, would constitute a breach of the non-compete and would, in effect, extend the reach of the non-compete beyond its own terms. Such an expansive non-competition agreement is overbroad, unreasonable, and unenforceable.

The actual language of the non-compete prohibits the Licensee from "engag[ing] in the business of selling or licensing any computer software that performs *substantially the same functions as* the Licensed System or is commercially competitive with it *or any part of it*." SLA § 28 (emphasis added) (Def. App. Ext R). Considering the fact that WebChart performs over 173 different functions, including but not limited to scheduling, billing, printing, scanning, transcription, and numerous others, virtually any software program of any kind, no matter how unrelated to EMR software or the medical profession, would fall within the reach of this provision. *See* Horner Dep. (3/23/07) at 33, 41, 47-48 (Def. App. Ex. C); Horner Dep. (5/30/07) at 22 (Plaintiff's Appendix ("Pl. App.") Ex. 2). MIE has articulated no protectible interest sufficient to justify such a far-reaching prohibition. For this reason and the other reasons cited in the Defendants' Opening Brief, MIE's all-encompassing non-compete is unreasonable in scope and is thus unenforceable.

> 2. **At the Very Least, a Question of Fact Exists as to Which Party Committed the First Material Breach.**

In its Opening Brief, the Defendants argue that the Court should find as a matter of law that MIE committed the first material breach of the MSA and SLA. *See* Defendants' Opening Brief at 25-29. As a result, the Court should deny MIE's claims for breach of contract at the outset. Alternatively, at the very least, the evidence cited in the Defendants' Opening Brief is sufficient to create a genuine issue of material fact as to whether MIE was the first party to

breach the SLA.  A plaintiff may not recover for breach of contract where the plaintiff is the first party to breach the subject contract.  *See, e.g.*, *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 94 (Ind. Ct. App. 2001).  MIE's unilateral decision to terminate the MSA during the period in which the SLA was in effect was without just cause, and it is undisputed that the MSA was terminated for the purpose of "getting [ONE's] attention."  *See* Horner Dep. (3/23/07) at 113-20 (Def. App. Ex. C); *id*. at 119 ("Frankly [the November 1, 2005 letter] was an attempt to get their attention, because I was being ignored.  I was completely being ignored.  And I needed something to get them to the table.").  If this does not, as the Defendants assert, establish MIE's first material breach, at the very least it creates a genuine issue of fact as to whether MIE was the first party to breach the Agreements, and would therefore preclude summary judgment in favor of MIE on its breach of contract claims against all Defendants.

**3.      MIE's Agreements with ONE Are Unenforceable Against Kusisto, Plesko, and TPX.**

Regardless of whether MIE was the first party to breach the Agreements, and regardless of the enforceability of the non-compete in general, MIE is nevertheless prohibited from recovering against Kusisto, Plesko, and TPX for any alleged breach of contract because none of these Defendants was a party to either agreement.  "The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *Rogier v. American Testing and Eng'g Corp*., 734 N.E.2d 606, 614 (Ind. Ct. App. 2000) (citation omitted), *reh'g denied, trans. denied.*  A "contractual duty" is "a duty arising under a particular contract."  BLACK'S LAW DICTIONARY 522 (7th ed. 1999).  Here, MIE asserts that Kusisto, Plesko, and TPX breached contractual duties arising from the Agreements. Whether the SLA imposes any contractual duty upon Kusisto, Plesko, and TPX is a matter of contract formation.

6

### a.      *Kusisto, Plesko, and TPX were not parties to any contract with MIE*.

It is a universally recognized, fundamental principle of contract law that "[g]enerally, only a party to the contract cay be held liable for its breach because contractual obligations are personal in nature." *Rodriguez v. Tech Credit Union Corp*., 824 N.E.2d 442, 447 (Ind. Ct. App. 2005); *Carlson Wagonlit Travel, Inc. v. Moss*, 788 N.E.2d 501, 503 (Ind. Ct. App. 2003) (agent of a disclosed principal not a party to his principal's contract cannot be liable for its breach); *DiMizio v. Romo*, 756 N.E.2d 1018, 1021-22 (Ind. Ct. App. 2001), *trans. denied*; *Columbia Club, Inc. v. American Fletcher Realty Corp*., 720 N.E.2d 411, 417 (Ind. Ct. App. 1999) ("A person typically cannot be held liable for breach of contract unless it is shown that he was a party to the contract."); *Evansville & S. Ind. Traction Co. v. Evansville Belt Ry. Co*., 44 Ind. App. 155, 87 N.E. 21, 23 (1909) ("[T]he obligations of a contract are ordinarily limited to the parties by whom they are made, and those who stand in privity with them."), *trans. denied*; *cf. also Money Matters Mgmt. v. Niche Mktg., Inc*., No. 07-cv-0591 IEG CAB, 2007 WL 3052996, at *3 (S.D. Cal. Oct. 19, 2007) (citations omitted) (finding agent who signed contract on behalf of corporation not individually liable for breach of contract since it is well-settled in California that "only a signatory to a contract may be liable for any breach"); *Copiers Typewriters Calculators, Inc. v. Toshiba Corp*., 576 F. Supp. 312, 322 (D. Md. 1983) ("Absent some recognized exception, it is hornbook law that only the parties to a contract can enforce it and that they may enforce it against only the parties to the contract.") (citing 2 WILLISTON ON CONTRACTS §§ 273, 347, at 178-80, 793 (3d ed. 1959 & 1983 Supp.)).

Moreover, shareholders, directors, officers and employees of a corporation generally cannot be held personally liable for the corporation's contractual breaches. *See Winkler v. V.G. Reed & Sons*, 638 N.E.2d 1228, 1231 (Ind. 1994) (citation omitted) (employee of corporation

who signs contract on behalf of company cannot be personally liable for breach thereof).

"Although a corporation acts only through its agents, officers, shareholders, and employees, it is

the corporate entity that is legally responsible for those acts." *Id*. (citation omitted).  Thus, MIE

may not enforce the Agreements against any person or entity not a party to the Agreements.

The rule that a contract is only enforceable against parties to the contract is illustrated in

*DiMizio v. Romo*.  There, the plaintiffs sued the purchaser of their restaurant and his wife for

breach of contract.  *DiMizio v. Romo*, 756 N.E.2d at 1020-21.  In affirming the lower court's

finding that the wife was not a proper party to the action, the Indiana Court of Appeals found that

because the wife had signed neither contract at issue, "no right of action could accrue in favor of

the [seller] against [her]." *Id*. at 1022.  Moreover, the Court found that the suit against the wife

was frivolous and justified the trial court's awarding her attorney's fees.  *Id*.  Similarly, here the

only parties to either Agreement were ONE and MIE.  Thus, the only proper party to MIE's

breach of contract claims is ONE.  As the Court held in *DiMizio*, suit against those who were not

a party to the contact is "frivolous." *Id*.

Despite the fact that they are not contracting parties, MIE asserts that Kusisto and Plesko

are liable for breach of the Agreements because they fall within the definition of "Licensees" in

the SLA.  However, MIE's attempt to bind Kusisto and Plesko relies upon a narrow and flawed

interpretation of the SLA that omits key provisions of the SLA in violation of well-established

maxims of contract interpretation.  A plain reading of the SLA yields the indisputable conclusion

that only ONE and MIE are parties to the contract and that the SLA was never intended to

impose contractually-binding obligations on Kusisto or Plesko personally.

The construction of a contract is a pure question of law.  *See, e.g.*, *S.C. Nestel, Inc. v.*

*Future Const., Inc*., 836 N.E.2d 445, 449 (Ind. Ct. App. 2005) (citation omitted).  "Unless the

terms of a contract are ambiguous, they will be given their plain and ordinary meaning." *Niccum v. Niccum*, 734 N.E.2d 637, 639 (Ind. Ct. App. 2000) (citation omitted), *trans. denied*. In interpreting a contract, a court should attempt to determine the intent of the parties at the time the contract was made by examining the language used to express their rights and duties. *See, e.g.*, *Exide Corp. v. Millwright Riggers, Inc.*, 727 N.E.2d 473, 478 (Ind. Ct. App. 2000). The court must attempt to construe the language so as not to render any words, phrases, or terms ineffective or meaningless. *S.C. Nestel*, 836 N.E.2d at 450.

The initial heading on the first page of the SLA defines the parties as "MEDICAL INFORMATICS ENGINEERING, INC. . . . ('MIE') and Orthopaedics Northeast, P.C. . . . ('Licensee')" and provides that "[f]or and in consideration of the mutual promises and obligations set forth below and intending to be legally bound, MIE and Licensee affirm and agree as follows . . . ." SLA, at 1. (Def. App. Ex. R). The signature page of the SLA contains the following additional language:

> IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in duplicate by their duly authorized officers effective as of the date first written above.
>
> MEDICAL INFORMATICS ENGINEERING, INC.
> By: [signed Peter J. Norder]
> Title: [Vice President]
>
> ORTHOPAEDICS NORTHEAST, P.C.
> By: [signed Raymond Kusisto]
> Title: [CEO]

The first page of the SLA defines the parties to the contract as MIE and ONE and defines ONE as the "Licensee."[4] Section 1.2(g) of the SLA contains an additional definition of "Licensee" as "the entity named in the Agreement as the "Licensee", the User Entities, and the

---

[4] The MSA contains virtually identical headings and signature lines. *See* Def. App. Ex. S.

9

employees and officers thereof." This subsequent definition of an already defined term, "Licensee," creates an ambiguity that requires interpretation, because, given MIE's interpretation of the SLA, the two definitions are in conflict.

Taken as a whole, the plain language of the Agreements demonstrates that the only parties are MIE and ONE. The SLA was executed by only MIE and ONE through their respective representatives. There is nothing in the Agreements that would indicate Kusisto or Plesko ever personally agreed to be bound by the contracts. Thus, the only reasonable interpretation of the Agreements is that there were but two parties to the contract, ONE and MIE. Moreover, it is undisputed that Plesko was never an officer of ONE. *See, e.g.*, Kusisto Dep. (3/27/07) at 24 (Def. App. Ex. I); Plesko Dep. (5/23/07) at 13 (Def. App. Ex. M).

Interpreting each Agreement as a whole, and considering the purpose of the contracts and the intent of the parties, the subsequent definition of Licensees should be interpreted as defining the class of individuals who become permissive users of the Licensed System. In this regard, it is helpful to consider ONE's employees and officers third party beneficiaries of the SLA. The Licensees identified by the SLA, including ONE's employees and officers, receive the benefit of being able to use the Licensed System by permission of MIE; however these individuals made no promises and were assigned no personal duties under the contract.

Moreover, definitions of basic contract terms and principles elucidate why the "Licensees" cannot be liable for breach of the Agreements. A contract is, "an agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law." BLACK'S LAW DICTIONARY 318 (7th ed. 1999). A promisee is "one to whom a promise is made," while a promisor is "one who makes a promise, especially one who undertakes a contractual obligation." *Id*. at 1230. Further, *Black's* defines "promise" as, "the manifestation of

10

an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made; a person's assurance that the person will or will not do something." *Id*. at 1228-29.

Interpreted as such, each Agreement is a classic two-party contract between a promisor and promisee that identifies beneficiaries of the contract, here the employees and officers of ONE. The individuals identified by the SLA as having permission to use WebChart cannot be held liable for breach of either Agreement. *See, e.g., Lewis v. Benedict Coal Corp*., 361 U.S. 459, 467, 80 S. Ct. 489, 4 L. Ed. 2d 442 (1960) (finding employer could not offset damages for breach of contract by employees' union by withholding benefits owing to third party beneficiary, the employees' pension fund, since "a third party beneficiary has made no promises and therefore has breached no duty to the promisor").

Thus, the only reasonable interpretation of each Agreement is that there were but two parties to each contract: ONE and MIE. Because only parties to a contract may be sued for its breach, MIE's breach of contract claims against Kusisto, Plesko and TPX are frivolous. Kusisto, Plesko, and TPX are therefore entitled to summary judgment against MIE's breach of contract claim against them.

By attempting to hold Kusisto, Plesko, and TPX liable for an alleged breach of the Agreements where none of them was a party to either contract, MIE is seeking a contractual benefit for which it did not bargain when it entered into the Agreements with ONE. Had MIE wished to bind any of ONE's employees or officers to a personal non-competition provision, it could easily have provided consideration in exchange for their agreement to be bound personally and required them to sign the Agreement. *See, e.g., Power Marketing Direct, Inc. v. Clark*, No. 2:05-CV-767, 2006 WL 2583342, at *2-*3 (S.D. Ohio Sept. 6, 2006) (contract included separate

signature lines for each of licensee's employees to sign so as to be bound to covenant not to compete but not bound to other terms of contract such as provisions regarding payment and performance).  MIE did not do so and cannot now expand the benefits of the Agreements to bind Kusisto, Plesko, or TPX to any of its obligations, including the covenant not to compete.  Thus, Kusisto, Plesko, and TPX are entitled to judgment in their favor as a matter of law.  In the alternative, at the very least, genuine issues exist as to the identity of the parties to each Agreement precluding summary judgment in favor of MIE.

> ### b.      ONE and TPX are not alter egos of one another.

MIE also asserts that TPX can be liable for breach of contract as an "alter ego" or instrumentality of ONE.  MIE's alter ego theory is flawed as a matter of law because MIE cannot meet the stringent standard required to "pierce the corporate veil" and hold TPX liable as an alter ego or instrumentality of ONE.

Although sometimes fact-sensitive, in cases such as this, summary judgment on an "alter ego" theory is appropriate.  *See, e.g.*, *Massey v. Conseco Servs., LLC*, 879 N.E.2d 605, 609 (Ind. Ct. App. 2008) (no designated evidence showing "corporations abused the corporate form or that such abuse would result in a fraud or injustice to [plaintiff]"); *see also Oliver v. Pinnacle Homes, Inc.*, 769 N.E.2d 1188, 1194-95 (Ind. Ct. App. 2002) (affirming summary judgment in favor of manufacturer for breach of contract).  A plaintiff seeking to pierce the corporate veil in reliance upon the "alter ego" theory bears the burden of proving that "the corporate form was so ignored, controlled or manipulated that it was a mere instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice."  *See Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994).

Indiana courts look harshly on attempts to pierce the corporate veil, imposing a "severe" burden on plaintiffs to establish their entitlement to pierce the corporate veil.  *See Escobedo v.*

*BHM Health Assoc., Inc.*, 818 N.E.2d 930, 933 (Ind. 2004).  While no one "talismanic fact" will justify piercing the corporate veil, a court must conduct a careful review of "the entire relationship between various corporate entities, their directors, and officers."  *Oliver*, 769 N.E.2d at 1191.

> The legal fiction of a corporation may be disregarded "where one corporation is so organized and controlled and its affairs so conducted that it is the mere instrumentality or adjunct of another corporation. Indiana courts refuse to recognize corporations as separate entities where the facts establish that several corporations are acting as the same entity.

*Id.* (citations omitted).  The Indiana Supreme Court set forth a number of factors that serve as a guidepost for determining whether a particular case merits piercing the corporate veil:

> (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice, or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.

*Aronson*, 644 N.E.2d at 867 (citations omitted).  In addition, in a case where a plaintiff attempts to hold one corporation liable for the contractual liability of another closely related corporation, the eight *Aronson* factors are not exclusive.  *See Oliver*, 769 N.E.2d 1192.  In such a case, a court may consider additional factors, including whether

> (1) similar corporate names were used; (2) the corporations shared common principal corporate officers, directors, and employees; (3) the business purposes of the corporations were similar; and (4) the corporations were located in the same offices and used the same telephone numbers and business cards. Additionally, [the court] may disregard the separateness of affiliated corporations when the corporations are not operated as separate entities but are manipulated or controlled as one enterprise through their interrelationship to cause illegality, fraud, or injustice or to permit one economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise. The indicia of common "identity," "excessive fragmentation," or "single business enterprise" corporations may include, among other factors, the

intermingling of business transactions, functions, property, employees, funds, records, and corporate names in dealing with the public.

*Id.* (citing *Smith v. McCleod Distrib., Inc*., 744 N.E.2d 459, 462 (Ind. Ct. App. 2000)).

Recognizing the "severe" burden plaintiffs bear in piercing the corporate veil and considering all of the relevant factors, the Court of Appeals in *Oliver* determined that the plaintiff's evidence was insufficient to create a genuine issue of fact so as to defeat summary judgment. *Id*. at 1193-95. The court viewed the evidence most favorably to the plaintiff, but could not look past the differences in the two corporations. First, apart from a common president and shareholder, the corporations shared no other common officers or directors. *Id*. at 1194. Second, the business purposes of the related entities were not similar. *Id*. On this point, the court noted that interrelationship between two businesses is insufficient to establish that the two entities' business purposes are similar. *Id*. Further, the plaintiff presented no evidence that the entities intermingled their assets or that one entity paid the debts of the other. *Id*. Moreover, the fact that records of one entity were stored in the warehouse of the other was insufficient to establish intermingling of corporate records. *Id*. Considering all of the evidence, the plaintiff failed even to create a genuine issue of fact as to whether, in dealing with the public, the two corporations were "adjunct corporations, mere alter egos, or instrumentalities of each other that shared a common identity." *Id*. at 1195.

Similarly, MIE has failed here to establish as a matter of law that ONE and TPX are alter egos of one another. In fact, under *Oliver*, MIE has failed even to raise a disputed genuine issue of material fact on this point. At most, the evidence shows the two entities are related. MIE's designated evidence falls well short of the mark required to create a genuine issue of fact. MIE has produced no evidence that ONE and TPX share any mutual employees or officers. Kusisto is the CEO of ONE. Kusisto Dep. (3/27/07) at 7 (Def. App. Ex. I). Plesko's

14

employment with ONE terminated and he became, and remains, the CEO of TPX. *Id*. at 8. ONE and TPX have fundamentally different business purposes. ONE is a group of physicians providing primarily surgical and medical services to patients with respect to bones, muscles, and joints. *Id*. at 7-8, 15. TPX is a business that provides IT services to medical providers, including medical software, support services, advanced telephone systems, and data networking. *Id*. at 8. ONE and TPX have no similarity in name and are separate, legal distinct entities. Plesko 30(b)(6) Dep. (8/17/07) at 127-28 (Def. App. Ex. N). The ownership of ONE and TPX do not share unity of ownership: Plesko owns 25% of TPX, but owns no share of ONE. *Id*. ¶ 25 (Def. App. Ex. PP). ONE and TPX have different business addresses, phone numbers, websites, and corporate insignia. *Id*. ¶ 24. Finally, MIE has produced no evidence that ONE and TPX intermingle corporate records or assets.

The alter ego theory of recovery to pierce the corporate veil is invoked in situations where an original contracting party attempts to commit a fraud or avoid liability by diverting, hiding or attempting to shield its assets in the name of a different entity, or has simply ceased operating altogether. *See, e.g.*, *Oliver*, 769 N.E.2d at 1190 (original contracting party ceased operating); *Massey*, 879 N.E.2d at 608 (original contracting party went bankrupt); *Escobedo*, 818 N.E.2d at 931 (original contracting party now defunct). Alter ego simply does not apply here where the original contracting party, ONE, is a viable, fully operating entity, capable of answering for any alleged contractual breach.

Similarly, MIE cannot rely upon alter ego theory to impose joint and several liability on TPX, because joint and several liability is unavailable in a contract action unless such individual responsibility is specifically provided by the contract at issue. *See, e.g.*, *CP Solutions PTE, Ltd. v. General Electric Co.*, 244 F.R.D. 137, 143 (D. Conn. 2007) (individual responsibility of each

co-obligor is defined by the contract).  TPX was not a party to any contract with MIE.  ONE was the sole contracting party and is thus the only person or entity that may be deemed liable for any alleged breach of contract with MIE.  MIE has presented insufficient evidence to meet its "severe" burden on its alter ego theory to pierce the corporate veil.  MIE's evidence is insufficient even to avoid summary judgment against it; however, at the very least, there are genuine issues of material fact that preclude summary judgment in MIE's favor on its alter ego theory.[5]

**4.      MIE's request for injunctive relief is moot due to the passage of time.**

In its breach of contract claim against Defendants, MIE seeks damages and injunctive relief. However, MIE's request for injunctive relief is moot because the one (1) year period set out in the non-competition provision has passed since the filing of MIE's Complaint.  A request for injunctive relief to enjoin a defendant's alleged breach of a non-competition agreement is rendered moot when the passage of time has exceeded the term of the non-competition agreement.  *See Levin & Sons, Inc. v. Mathys*, 409 N.E.2d 1195, 1198 (Ind. Ct. App. 1980) (request for injunction as to breach of non-compete agreement moot after expiration of five years specified by non-competition clause); *see also Raymundo v. Hammond Clinic Assoc*., 449 N.E.2d 276, 278-79 (Ind. 1983) (request to enjoin competition in violation of non-compete agreement mooted by passage of time).

The non-competition provision of the SLA, Section 28, provides that the Licensee shall not compete with MIE for one year after termination of the SLA.  The SLA was terminated

---

[5] Indeed, MIE's own brief creates a genuine issue on its alter ego theory since MIE necessarily treats ONE and TPX as separate entities in its Opening Brief when it argues that TPX violated the non-compete agreement by selling software *to ONE*.  *See* MIE Opening Brief at 11 n.4.  Although a party is permitted to plead in the alternative, at this stage of the proceedings, MIE should be required to choose one theory or the other.

effective March 23, 2006.  Kusisto Dep. (3/28/07) at 188-90 (Def. App Ex. J).  Thus, pursuant to the SLA, ONE was prohibited from competing with MIE for a period of one year, that is, through March 23, 2007.  That one-year non-competition period has expired.  Consequently, due to the passage of time, MIE is precluded from seeking injunctive relief to enjoin the alleged breach of the non-competition provision.  MIE asserts that non-parties to a covenant not to compete may be enjoined from assisting a signatory to breach the contract.  However, MIE is precluded from seeking injunctive relief against any of the Defendants in the present case because the one-year time period of the non-competition agreement has expired and MIE's request for injunctive relief is therefore moot.

> **5.    A Genuine Issue Exists as to Whether the SLA is an Illegal Tying Arrangement.**

MIE asserts that ONE breached the SLA by not hiring MIE to extract ONE's data from WebChart, as required by Section 11 of the SLA.  However, MIE may not recover for breach of contract because such a contractual agreement amounts to an illegal tying arrangement. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product . . ."  *See Northern P.R. Co. v. United States*, 356 U.S. 1, 5, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958).  Tying occurs where a seller "exploit[s] its control over the tying product to force the buyer into the purchase of a tied product."  *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984), *overruled on other grounds*, *Illinois Tool Works, Inc. v. Independent Ink., Inc*.,  547 U.S. 28, 29, 126 S. Ct. 1281, 164 L. Ed. 2d 26 (2006).

An illegal tying arrangement exists where: (1) a seller markets two products; (2) an agreement conditioning purchase of the tying product upon purchase of the tied product or upon agreement not to purchase; (3) seller's possession of sufficient economic power in the tying

product market to restrain competition in tied product market; and (4) a not insubstantial impact on interstate commerce. *See id*. at 12-16.

In its Opening Brief, MIE asserts that the Defendants breached the SLA by allowing third party contractors to access WebChart for the purpose of extracting ONE's data from WebChart. Horner testified that ONE was not allowed to hire anyone but MIE to extract ONE's data from WebChart. According to Horner, Section 11 of the SLA required ONE to hire MIE to perform the data extraction and migration service, at an additional cost above and beyond the licensing fees paid pursuant to the SLA. *See* Horner Dep. (3/23/07) at 145 (Def. App. Ex. C); Horner Dep. (8/1/07) at 20-23 (Def. App. Ex. FF).

The Defendants contend that MIE's interpretation of the SLA as requiring MIE to be the entity that extracted ONE's own data from WebChart and imported it into any new EMR software amounts to an illegal tying arrangement as prohibited by Section 1 of the Sherman Act, 15 U.S.C. § 1. By attempting to enforce an illegal tying arrangement where MIE requires its customers to purchase MIE's data extraction and migration services whenever a customer licenses WebChart for managing its medical records, MIE has engaged in anticompetitive behavior which would preclude enforcement of such a requirement, as well as provide an additional basis for finding copyright misuse by MIE. *See* Defendants' Opening Brief at 14-20.

Thus, a genuine issue exists as to whether such a contractual requirement violates Section 1 of the Sherman Act, precluding summary judgment for MIE on its breach of contract claim as well as its copyright infringement claim, since such an illegal agreement also amounts to copyright misuse.

**C.     The Defendants Are Entitled to Judgment In Their Favor as a Matter of Law on MIE's Claims for Copyright Infringement.**

MIE generally asserts that both ONE and TPX infringed on MIE's copyright: ONE by extracting its own data out of WebChart, and TPX by creating triSCRIPT.  (MIE and Horner's Motion for Partial Summary Judgment ("MIE Opening Brief") at 18-19).  Neither is actionable as a matter of law.

**1.     The Copying of WebChart Incidental To ONE's Migration of Its Own Data out of WebChart and into Another EMR Program Is Fair Use.**

MIE claims ONE infringed its copyright "in at least four ways" in the course of migrating ONE's own data out of WebChart.  MIE Opening Brief at 18.  The first was copying WebChart onto a backup server.  *Id.* (citing, *inter alia*, MIE's Statement of Material Facts ("SMF") ¶ 48).  The second was allowing PhysCal access to WebChart to copy portions of WebChart.  *Id.* at 19 (citing SMF ¶¶ 49, 51).  The third alleged infringement was ONE's allowing PhysCal to write a "data migration script" to move ONE's data out of WebChart.  *Id.* (citing SMF ¶ 51).  And the final way ONE is alleged to have infringed on MIE's copyright was ONE's providing the data migration script to TPX for use in extracting ONE's data from WebChart.  *Id.* (citing SMF ¶ 51).

It is undisputed that the purpose of each of these four instances of alleged infringement was to facilitate the extraction of ONE's own data from WebChart.  *See* SMF ¶¶ 48-49 (noting the copy of WebChart onto the backup server was used to allow ONE to migrate information from WebChart to GE Centricity EMR); *id.* ¶ 51 (noting the WebChart tables and schema were used to develop and test the data migration script).  As set out in the Defendants' Opening Brief, the entirety of the incidental accessing or copying of WebChart for the purpose of extracting ONE's own data is fair use.  *See* Defendants' Opening Brief at 4-8 (citing, *inter alia*, *Assessment Techs. of WI, LLC v. WIREdata, Inc*., 350 F.3d 640, 644-45 (7th Cir. 2003)).  The use about

19

which MIE complains falls well within the bounds of fair use.  As such, MIE is not entitled to judgment in its favor.  To the contrary, since ONE's use was fair, the Court should enter judgment in ONE's favor on MIE's claim that ONE infringed its copyright.

**2.      The "Access to and Possession of" Copyrighted Work Does Not Constitute Infringement as a Matter of Law.**

Next, MIE contends that TPX infringed on its copyright in WebChart because of its "access to and possession of WebChart," and its "possession of the data migration script." MIE's Opening Brief at 19 (citing SMF ¶¶ 51,[6] 62, 83; 17 U.S.C. § 501; *Microsoft Corp. v. Computer Serv. & Repair Inc.*, 312 F. Supp. 2d 779, 784 (E.D.N.C. 2004)).  Section 501 of the Copyright Act defines an "infringer" as one who "violates any of the exclusive rights of the copyright owner." 17 U.S.C. § 501.  But neither access to nor possession of the copyrighted work is among the "exclusive rights" granted to holders of a copyright.  *See* 17 U.S.C. § 106 (In short, these exclusive rights are "to reproduce,"  "to prepare derivative works," "to distribute," "to display," and "to perform.").

In the only case MIE cites in support of its claim of infringement by possession or access, the issue was not "access to" or "possession of" the copyrighted work.  There, the defendant distributed counterfeit copies of Microsoft software.  *Microsoft*, 312 F. Supp. 2d at 782, 784. This action interfered with Microsoft's "exclusive right to reproduce and distribute copies of the copyrighted work."  *Id.* at 784 (citing 17 U.S.C. § 106(1), (3)).  Since neither TPX's access to nor possession of WebChart constitutes infringement on TPX's part, MIE is not entitled to judgment in its favor on this allegation.  Indeed, TPX would be entitled to judgment in its favor.

---

[6] In yet another instance of MIE's blurring the distinction between ONE and TPX, paragraph 51 of MIE's Statement of Material Facts is cited as support for MIE's claim that TPX infringed its copyright, but that paragraph concerns only the actions of ONE, and is, in fact, cited in support of MIE's claim that *ONE* infringed.  *See* MIE Opening Brief at 19.

**3**.     **As A Matter of Law, Any Alleged Infringement of WebChart's Transcription Program Is *De Minimis* and Not Actionable.**

MIE also contends that TPX "copied portions of WebChart source code directly into triScript." MIE's Opening Brief at 19 (citing MIE SMF ¶ 85-86[7]). A plaintiff asserting copyright infringement has the burden of showing: "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991). The mere fact that a work is copyrighted does not mean that every element of the work may be protected. *Id.* at 348. Although MIE provides evidence that it owns a valid copyright in WebChart, it has not shown that the particular portion of WebChart that TPX is alleged to have copied is original and protectible. As Professor Nimmer points out,

> before evaluating substantial similarity, it is necessary to eliminate from consideration those elements of a program that are not protected by copyright.
>
> To accomplish this task, an allegedly infringed [computer] program should be analyzed on several different levels. A different copyright doctrine is applied at each level, and material that is unprotected under that doctrine is excluded from further consideration in analyzing substantial similarity. By successively filtering out unprotected material, a core of protected material remains, against which the court can compare the allegedly infringing program.

4 NIMMER ON COPYRIGHT § 13.03[F] (footnotes omitted). MIE makes no specific assertion in its Motion for Partial Summary Judgment or supporting documents that the lines of code TPX is alleged to have copied are themselves original and protectible.

---

[7] It is not clear why a reference is made to paragraph 86 of MIE's Statement of Facts. Paragraph 86 states "TPX also licensed Kryptic EMR software to ONE for $155,000." MIE SMF ¶ 86 (citing Pl. App. Ex. 4, at 30, Pl. App. Ex. 33). In MIE's Statement of Facts, paragraph 86 is part of the section titled "TPX's Copying of MIE's Source Code to use in its Own Software." *Id.* Exhibit 4 is the May 23, 2007 deposition of Todd Plesko. But page 30 of that deposition has nothing to do with the Kryptic software, which is not even mentioned in that deposition. Plesko does testify in a later deposition that it sold ONE "Kryptic Suite," software complimentary to an EMR. Plesko 30(b)(6) Dep. (8/17/07) at 34-35 (Def. App. Ex. GG). Of course, TPX's sale of a completely separate software program created by a third party has no bearing on whether TPX's own creation infringed on any of MIE's protectible expression.

21

Far from showing they are original and protectible, the most MIE does to carry its burden is to characterize what the lines of code do as "describ[ing] how both WebChart and triScript handle 'entry points,' which are a part of a template that allows a transcriptionist to seek a point in a document into which she wishes to type." MIE SMF ¶ 85. TriSCRIPT's creators testified that the entry points used were a function of the requirements of the end users, the ONE transcriptionists, who were interviewed and consulted in the course of creating the program. *See* Tyler Dep. (8/17/07) at 41-44 (Def. App. Ex. OO); Affidavit of Ken Johnson ¶ 7 (Def. App. Ex. DD). "Similarities resulting from such factors [as business practices and technical requirements of the end user] should play no role in determining whether the structure and organization of two programs are substantially similar." 4 NIMMER ON COPYRIGHT § 13.03[F][3][d] (citing *Business Trends Analysts v. Freedonia Group, Inc.*, 650 F. Supp. 1452, 1460 (S.D.N.Y. 1987) (denying injunction for industry analysis reports, apparently accepting defendant's argument that "similarities result from common parlance in the field of robotics or can be accounted for by the definitional or factual nature of the subjects of the passages"); *McGraw-Hill, Inc. v. Worth Publishers, Inc.*, 335 F. Supp. 415 (S.D.N.Y. 1971) (holding that the structure of an introductory economics textbook was not protected, because all such textbooks had to conform to a certain structure in order to be saleable)).

Moreover, "the Copyright Act provides that copyright protection does not extend to any 'method of operation . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work.' The Court of Appeals for the First Circuit has declined to extend copyright protection to a set of commands for a computer program. Even if there are multiple methods by which an operation can be performed, a plaintiff's choice of a particular method of operation is not eligible for protection." *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d

1007, 1012 (7th Cir. 2005) (quoting 17 U.S.C. § 102(b) and citing *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807 (1st Cir. 1995)).  Since MIE makes no attempt to show that the code in question is original enough to be entitled to copyright protection, MIE has not carried its burden to show that it is legally entitled to judgment in its favor on its claim for copyright infringement.  Accordingly, the Court's inquiry as to MIE's claim can end here.

Even assuming that the portion of the WebChart source code at issue is protectible, and even if the Court were to assume there was copying,[8] as set out in the Defendants' Opening Brief, the amount of code at issue is both quantitatively and qualitatively insignificant, and is therefore *de minimis* and not actionable as a matter of law.  *See* Defendants' Opening Brief at 8-12.

MIE claims this Court can determine as a matter of law that TPX's triSCRIPT software infringes on MIE's copyright because "[a] significant portion of triScript is not merely 'substantially similar' to WebChart, it is wholly identical such that 'there is no possibility of independent creation.'"  MIE Opening Brief at 19 (emphasis added) (quoting *Wilcom Pty Ltd. v. Endless Visions*, 128 F. Supp. 2d 1027 (E.D. Mich. 1998) (citation omitted).  MIE provides no analysis whatsoever of how the portion of code it claims is "substantially similar" is "significant" to the whole of the work.

Notwithstanding this fact, MIE asserts that this Court must enter judgment as a matter of law in its favor.  In *Wilcom*, a case on which MIE heavily relies, the district court observed

> Summary judgment is proper in favor of the plaintiff in a copyright infringement case where the similarity between the copy and the original is so similar that reasonable minds could not differ.  In this case the Defendants' patches are nearly exact copies of the relevant program files, with only a small variation in code. For

---

[8] Since they are in MIE's favor, such assumptions must be made in considering whether ONE and TPX would be entitled to judgment in *their* favor on MIE's copyright infringement claim.

example, the Defendants patch for the ES-65 program <u>duplicated 926,586 of the 926,720 bytes of information</u>. Only 134 bytes are different. <u>The possibility of independent creation is virtually impossible</u>. Therefore, Plaintiffs are entitled to judgment as a matter of law on the copyright infringement claim.

*Wilcom*, 128 F. Supp. 2d at 1032 (footnotes omitted) (emphasis added) (citing, *inter alia*, *Litchfield v. Spielberg*, 736 F.2d 1352, 1355-56 (9th Cir. 1984); *Atari Games Corp. v. Nintendo of Am., Inc*., Nos. C 88-4805 FMS, C 89-0027 FMS, 1993 WL 214886, 30 U.S.P.Q.2d 1401 (N.D. Cal. April 15, 1993)).  In *Wilcom*, the allegedly infringing software contained 99.98554% of the same code as Wilcom's software.  In that instance, the district court felt compelled to grant judgment in the plaintiff's favor.

The only other case cited by MIE in support of its argument that this Court should find the triSCRIPT code infringes on WebChart as a matter of law, *JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910 (7th Cir. 2007), does not involve software, but rather two novelty dolls.  There, both were dolls of "middle-aged men sitting in armchairs that fart and tell jokes.  Both have crooked smiles that show their teeth, balding heads with a fringe of black hair, a rather large protruding nose, blue pants that are identical colors, and white tank tops."  *Id*. at 916.  Aside from their names, the only differences between the dolls were that one has his name emblazoned in red across his chest, wore a hat, and had different colored shoes and a different colored chair.  *Id.*  Looking at the works as a whole, the court characterized the differences as only "cosmetic."  *Id.*  Indeed, of the specific features identified by the court, about two-thirds of them were the same.

Here, on the other hand, the portion of the triSCRIPT code at issue (contained in Deposition Ex. 180, Def. App. Ex. Y) is only a very small part of the entire triSCRIPT code, less

24

than 1%. Richard Hart Aff. ¶¶ 12, 14 (Def. App. Ex. QQ).[9]  Of course the relevant inquiry is

not how much of the triSCRIPT code is alleged to have been derived from WebChart (less than

1%), but how much of the WebChart code is alleged to have been infringed.  *See, e.g.*, *Worth v.*

*Selchow & Righter Co*., 827 F.2d 569, 570 n.1 (9th Cir. 1987) ("[T]he relevant inquiry is

whether a substantial portion of the protectible material in the plaintiff's work was appropriated

– not whether a substantial portion of defendant's work was derived from plaintiff's work.")

(citing *Atari, Inc. v. North Am. Philips Consumer Elec. Corp*., 672 F.2d 607, 619 (7th Cir.), *cert.*

*denied*, 459 U.S. 880, 103 S. Ct. 176, 74 L. Ed. 2d 145 (1982); 3 NIMMER, NIMMER ON

COPYRIGHT § 13.03[A], at 13-36 & n.54 (1986)).  The number of lines of code represented in all

of Deposition Exhibit 180, 69 lines,[10] represents less than 0.0026% of the total number of lines

of WebChart's source code.[11]  *See* Richard Hart Aff. ¶ 11 (Def. App. Ex. QQ).  Even if one were

to look just at WebChart's transcription module, MIEWord, the number of lines of code

represented in Deposition Exhibit 180 is less than 0.0534% of the total number of lines of

MIEWord.  *See id*.  Less than six one-hundredths of a percent of MIEWord (and less than three

one-thousandths of a percent of WebChart as a whole) can hardly be considered "significant" as

a matter of law.

   Undeterred by the minimal amount of the alleged copying, MIE contends that there is "no

possibility" that the code contained in Deposition Exhibit 180 could have been independently

---

[9] Hart based his calculations on line counts generated by a computer program.  *See* Richard Hart Aff. ¶¶
7-8 (Def. App. Ex. QQ).  Earlier calculations were based on the line count MIE's expert, Mr. Pellegrino,
used in his report.  Horner admitted Pellegrino's number did not include certain parts of the WebChart
code.  *See* Horner Dep. (11/19/07) at 47-49 (Def. App. Ex. F).

[10] In their opening brief, the Defendants erroneously overstated the number of lines in Deposition Exhibit
180 as 71 lines of code.  *See* Defendants' Opening Brief at 10-11.  Of the actual 69 lines, MIE does not
assert that all of them originated with WebChart.  *See* Horner Dep. (11/19/07) at 13-14 (Def. App. Ex. F).

[11] Indeed, the number here is so small, it is probably easier to conceive of it in a unit of measure more
often seen in quantifying radioactive material or other contaminants:  26 parts per million.

created, and therefore summary judgment for MIE is appropriate.  This argument ignores the testimony of the person who wrote the code in Exhibit 180 that he never saw, used, possessed, examined, or copied WebChart's transcription module.  *See* Ken Johnson Aff. ¶¶ 8-9 (Def. App. Ex. DD).  It also ignores the testimony of the software's authors that triSCRIPT was developed in part by consulting with ONE and its transcribers to create software that contained the features and functionality ONE and its transcribers wanted.  *See* Tyler Dep. (8/17/07) at 41-44 (Def. App. Ex. RR); Ken Johnson Aff. ¶ 7 (Def. App. Ex. DD).  The allegedly infringing lines of code concern managing "entry points" into particular documents.  *See* Horner Dep. (11/19/07) at 4-8, 13-17 (Def. App. Ex. F); Dep. Exs. 179-80 (Def. App. Exs. X-Y); Steve Tyler Aff. ¶ 7 (Def. App. Ex. RR).  Taking the evidence in the light most favorable to the Defendants, any similarity is explainable, since it was the transcribers who helped TPX develop the software.  As Professor Nimmer has observed, "[i]n many areas of the computer software market, programs are intended to compete directly with each other and perform the same task in much the same way.  Thus, even two programs that have been created independently may appear similar in many respects."  4 NIMMER ON COPYRIGHT § 13.03[F] (footnotes omitted); *see also id.* § 13.03[F][3][d] ("Perhaps the most significant external factors influencing program design are the business practices and technical requirements of the end user.") (footnotes omitted).  Even assuming the number of lines at issue were not *de minimis* as a matter of law, at the very least, whether Deposition Exhibit 180 contains code copied from WebChart would be a question of fact for the jury to decide.  Moreover, given the failure of the software, its limited use by only ONE, the fact that it has been discontinued, and the fact the TPX never sold it or made any money off it,[12] *see* Plesko

---

[12] Even if MIE could show infringement, it can show no actual damages, given ONE's unsuccessful free trial of the software, the discontinuation of the software, and the fact that TPX made no money from it. *See, e.g.*, *Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 751 (E.D. Mich. 1998) ("[The plaintiff] must prove the existence of a causal connection between the [defendant's] alleged infringement and some loss of

Aff. ¶¶ 22-24 (Def. App. Ex. PP); Tyler Aff. ¶ 8 (Def. App. Ex. RR), a jury would likely question why, if TPX were simply going to copy the WebChart transcription program, it did not copy the part of the program that was commercially functional.

In asserting substantial similarity, "[t]he burden is on the copyright owner to demonstrate the significance of the copied features . . . ." *MiTek Holdings, Inc. v. Arce Eng'g Co.,* 89 F.3d 1548, 1560 (11th Cir. 1996). MIE makes no assertions in its Motion or Brief that the allegedly infringing code is at all important to WebChart as a whole, or even its transcription module. In fact, the code contained in Exhibit 180 is neither essential nor integral to the operation of triSCRIPT. *See* Steve Tyler Aff. ¶¶ 6-7 (Def. App. Ex. RR) ("The portion of triSCRIPT code identified by MIE in Exhibit 180 contains source code for a component of triSCRIPT that is not critical or even necessary to the functionality of triSCRIPT" and "was added to the program to create an entry point function that made certain aspects of triSCRIPT more convenient for its users."). If the program's functionality would not be impacted if the lines of code at issue were eliminated from the program, the code should not be considered qualitatively significant.

MIE has not shown that triSCRIPT borrowed protectible, original expression, and even if it did, the code contained in Deposition Exhibit 180 is neither quantitatively nor qualitatively significant. Accordingly, MIE is not entitled to judgment on its claim for infringement relating to TPX's triSCRIPT software. On the contrary, the Defendants are entitled to judgment in their favor on MIE's claim for copyright infringement.

---

anticipated revenue. The plaintiff must show that the infringement was the cause-in-fact of its loss by showing with reasonable probability that 'but for' the defendant's infringement, the plaintiff would not have suffered the loss. 'Actual damages are only available where there is a causal connection between the infringement and the copyright owner's losses.'") (quoting *Banff Ltd. v. Express, Inc*., 921 F. Supp. 1065, 1068 (S.D.N.Y. 1995), and citing *Jarvis v. A & M Records*, 827 F. Supp. 282, 293 (D.N.J. 1993); *Data General Corporation v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1171 (1st Cir. 1994); *Robert R. Jones Associates, Inc. v. Nino Homes*, 858 F.2d 274, 280-81 (6th Cir. 1988)).

**D.      Genuine Issues of Material Fact Bar Judgment in MIE's Favor on ONE's and TPX's Claims under 18 U.S.C. § 1030.**

The sole challenge MIE[13] makes to ONE's and TPX's claims under 18 U.S.C. § 1030 is that neither has presented evidence of a monetary loss of at least $5,000.  *See* MIE Opening Brief at 21 ("Neither ONE nor TPX can present <u>any evidence</u> to support these allegations [regarding damages], and cannot merely rest upon their allegations in their counterclaims.")  (emphasis added).  MIE makes this incredible claim in spite of the fact that it admits in its opening brief the following: (1) ONE and TPX both produced an invoice for $104,665 they contend evidences the amount ONE paid TPX for the extraordinary time TPX spent addressing the problems caused by Horner's actions, *id.* at 22; (2) Plesko testified that TPX spent "many hours" addressing the WebChart issues, including periods of inaccessibility, *id.* at 21-22; (3) TPX eventually had to consult an outside vendor to work on one of the problems caused by Horner's actions, *id.* at 22; and (4) that ONE retained a consultant to investigate fully the attacks on ONE's network and who prepared a 446-page report detailing the changes that had been made covertly to the WebChart software, *id*. at 23.  Ignoring the evidence it admits exists, MIE asserts that "[a]t best, ONE can point to a documented charge of under $2,000 by a consultant to make a change to the WebChart software."  *Id*. at 21.  Solely because this one "documented charge" is less than $5,000, MIE claims it is entitled to judgment as a matter of law on ONE's and TPX's claims.

As to the other evidence ONE and TPX have put forth, MIE's real quibble is not that there is no evidence, but that this Court should conclude the evidence is not credible.  This is not a determination for either MIE or this Court to make on summary judgment; it is to be left to the jury.  "On summary judgment a court may not make credibility determinations, weigh the

---

[13] At the time MIE filed its Motion for Summary Judgment, the Court had not yet ruled on the Motion to Amend ONE's Counterclaims.  Since then, the Court has permitted amendment to add Horner as a

evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."
*Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) (citations omitted) (noting that
"[h]owever implausible [a party's] account might seem, it is not our place to decide who is
telling the truth"); *see also Schutz v. Rose*, 136 Ind. App. 165, 169, 196 N.E. 2d 285, 287 (1964)
(question of damages is essentially a question of fact).

As MIE admits, both ONE and TPX have produced in discovery the bill for services
ONE paid to TPX which both companies have testified were incurred as a result of the
extraordinary time TPX spent addressing the problems Horner created by making covert
modifications to the WebChart software licensed to ONE.[14]  *See* Dep. Ex. 166 (Pl. App. Ex. 33).
Moreover, both ONE and TPX testified that the damages caused by Horner's actions were
substantial and consumed a large amount of resources.  *See, e.g.*, Kusisto Dep. (3/28/07) at 213
(Def. App. Ex. J) (noting MIE's hacking left ONE in "tremendous turmoil"); Plesko 30(b)(6)
Dep. (8/17/07) at 9-17 (Def. App. Ex. N); Plesko Dep. (5/23/07) at 145-46, 171-75 (Def. App.
Ex. M); Plesko Aff. ¶¶ 4-17 & attached exhibit (Def. App. Ex. PP).

MIE attempts to discount the impact of what it did by euphemistically characterizing
Horner's actions as nothing more than "access[ing] the WebChart software at ONE through the
MIE-owned MedWeb on a limited number of occasions in January 2006."  MIE Opening Brief at

---

Defendant to ONE's claims under 18 U.S.C. § 1030.  The same argument against MIE would apply to
ONE's claim against Horner.

[14] In claiming there is no evidence of damages other than the MySQL invoice, MIE necessarily claims
that ONE never paid the TPX invoice for services (otherwise, MIE could not claim that ONE's damages
were less than $5,000).  Despite this fact, MIE argues that TPX can show no loss and MIE is therefore
entitled to judgment on TPX's claim.  *See* MIE Opening Brief at 21 n.7.  MIE cannot have it both ways.
ONE's and TPX's representatives have testified to the significant problems and outages with WebChart
caused by Horner's actions.  TPX has testified that it spent an extraordinary amount of time addressing
these issues.  If the TPX invoice was never paid (as MIE contends in claiming ONE suffered no
damages), the inference arises that TPX was therefore damaged by having to address the significant
problems caused by MIE and Horner without any compensation for the extra work.  As a result, MIE
would not be entitled to summary judgment on TPX's claim.

20.  Moreover, MIE claims the attacks and alterations to WebChart were designed to "cause a slight performance problem," *id.*, "to slow ONE's and TPX's unauthorized attempts to extract data from WebChart," *id.* at 21, and to "slow[] ONE's ability to print multiple patients' records in batches," *id.*  This entire argument assumes that the Court will accept as true MIE's characterization of the facts – all of which MIE would draw in its favor on its own Motion for Summary Judgment.  Even if MIE were entitled to have this Court ignore the standard under Rule 56 and interpret the evidence in *its own* favor, such evidence nonetheless cannot be dispositive in light of the contrary evidence offered by TPX and ONE and the testimony of Ben Kessler, who investigated and prepared a report detailing Horner's intrusions into ONE's network and the modifications he made to WebChart.

        For instance, the ONE physicians who have been deposed in this matter all testified regarding the pervasive and persistent problems they experienced with WebChart at the time Horner was "accessing" the system.  *See, e.g.*, McGee Dep. (6/11/07) at 23 (Def. App. Ex. JJ) (describing the problems as "[o]n several occasions, just a total breakdown of the system, inability to access charts with patient information in them . . ."); *id.* at 25 ("I remember many times not having information that I wanted to have, or not being able to get additional information that I needed."); Lee Dep. (6/7/07) at 34 (Def. App. Ex. KK) ("[I]t was a significant disruption with regard to seeing, evaluating, and gathering information that we typically, with a normally operational system, have no difficulty with.  We didn't have access normally that is speed wise, or sometimes no access at all to some of the patient records  . . . ."); Karr Dep. (3/27/07) at 55 (Def. App. Ex. LL) (describing times in January where "information was not available because of problems with the WebChart" and where "we had the inability to access data from time to time"); LaSalle Dep. (6/7/07) at 53 (Def. App. Ex. MM) ("Functionally, we

could not get [patient records]. If a web page takes a minute to go through each time you click on something different, it's functionally worthless. . . . It would take hours. . . . It would take days."). In light of this just this testimony alone, MIE's assertion that this Court <u>must</u> find as a matter of law that neither ONE nor TPX needed to go to any special efforts to address the problems the physicians were having, and/or that MIE's actions did no more than $1,995 worth of damage is patently absurd. More pertinently, MIE's assertion simply cannot stand as an undisputed fact.

Much of MIE's argument is centered around Plesko's deposition testimony as to a three-day period where WebChart was inaccessible. MIE points to the fact that MySQL's invoice was dated the same date as Horner's January 16th intrusion, which it claims belies Plesko's testimony regarding a three-day outage. Even if this were at all material to the issue of damages given the other evidence, as Plesko testified, and as discussed in more detail below, his best recollection was that there was a three-day period where the system was down. *See* Plesko Dep. (8/17/07) at 25 (Def. App. Ex. O); Plesko Dep. (5/23/07) at 172-74 (Def. App. Ex. M). Indeed this is consistent with the physicians' testimony, including Dr. LaSalle's testimony that sometimes information was not available for "days." LaSalle Dep. (6/7/07) at 53 (Def. App. Ex. MM). It is also consistent with contemporaneous e-mail correspondence produced by TPX in discovery that shows near round-the-clock work by TPX in the days just prior to and after Horner's last hacking. *See* Plesko Aff. ¶¶ 4-17 & attached exhibit (Def. App. Ex. PP). Given the number of patients and the number of physicians, MIE's quibble over whether WebChart was unavailable in one instance for one day, two days, or three days is not material as to whether there is evidence of damages of at least $5,000.00.

MIE also points to the fact that during his August 17, 2007 deposition Plesko stated that TPX conducted an audit of the time it spent on the MIE-caused problems. When asked whether he "could get that [document] to [his] attorney," Plesko responded, "I could." Plesko 30(b)(6) Dep. (8/17/07) at 19 (Def. App. Ex. N). MIE points to the fact that this document was not thereafter produced to MIE's counsel[15] as evidence that ONE's and TPX's testimony regarding damages is not credible. *See* MIE Opening Brief at 23. Again, credibility questions cannot be resolved on a Motion for Summary Judgment. Contemporaneous e-mail communications regarding the continuing problems ONE was experiencing, coupled with the testimony of the those who both experienced the problems and who worked on them, including the testimony (whether MIE believes it or not) regarding the costs associated with continually having to address WebChart issues is certainly sufficient to raise a triable issue of fact as to whether an additional $3,005 in damages can be shown over and above the $1,995 MySQL invoice MIE concedes for purposes of its Motion were damages caused by Horner's changes to WebChart.

MIE also appears to claim that it is entitled to judgment in its favor as a matter on law on the Section 1030 damage claims simply because the U.S. Attorney did not institute a *criminal* prosecution against either MIE or Horner. MIE Opening Brief at 23-24. MIE provides no authority for this argument whatsoever. In rejecting the identical argument, the Eastern District of Texas quickly disposed of the argument now advanced by MIE:

> Obviously, proof of an indictment or conviction would conclusively establish the elements of section 1030(a)(5)(A); however, neither has occurred in this case. Moreover, Plaintiffs are not required to make such a showing. The purpose of § 1030(g) "would be largely defeated, and the need for [civil] damages as an incentive to litigate unjustified, if private suits could be maintained only against those already brought to justice."

---

[15]Although it appears that the actual "audit" document was not part of the original production, it has since been produced to MIE and Horner on February 18, 2007. *See* Def. App. Ex. SS. Included in the original production were documents that referenced TPX's preparation of the audit document in May, 2006. *See* Plesko Aff. Ex. A (79522-23) (Def. App. Ex. PP) (correspondence).

*Thurmond v. Compaq Computer Corp.*, 171 F. Supp. 2d 667, 676 n.16 (E.D. Tex. 2001) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 493, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985) (interpreting statutory elements of a civil claim under 18 U.S.C. § 1964(c)).  Indeed, one inference that must be drawn in favor of the non-movants is that the fact that the matter was the subject of a pending civil suit, may have factored into the government's decision not to devote limited prosecutorial resources to it.  *See also* 31A C.J.S. *Evidence* § 209 ("Evidence of failure to prosecute is <u>inadmissible</u> in a civil action arising out of the same circumstances.") (emphasis added) (citation omitted).

Summary judgment should be entered only "when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them."  *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999).  As set forth in MIE's own brief, there are clear differences of opinion regarding the impact of Horner's hacking, the time TPX and ONE spent addressing the problems, and what ONE paid to TPX.  As such MIE is not entitled to summary judgment on the claims under 18 U.S.C. § 1030.

**E.      Genuine Issues of Material Fact Preclude Judgment in MIE's favor on the Defendants' Claims for Defamation.**

**1.      Kusisto's Claim of Defamation Based on the August 15 Letter**

MIE and Horner assert that the statements Horner made in the August 15, 2007 letter regarding Ray Kusisto are not actionable as a matter of law.  *See* MIE Opening Brief at 24-25. Among other things, Horner made the following specific statements about Kusisto in a letter he sent to all of the ONE physicians:

- "I honestly do not understand [Kusisto's] motives, but over the past two years he has misled MIE and I believe you too."

- "I am surprised to learn that while we worked very hard to save the [Milbrook] project, Ray may have unjustly used MIE as a scapegoat."

- "Only recently through discussions with other community physicians, have I been made aware of how deliberately deceptive Ray has been."

- "I fear that Ray has misled you as he has misled me."

Dep. Ex. 9 (Def. App. Ex. T); *see also* Horner Dep. (3/23/07) at 77-78 (Def. App. Ex. C).

In addressing the statements in the letter that Horner believed and/or feared that Kusisto had misled his employer, ONE, MIE and Horner contend that they are entitled to summary judgment since such a statement is "undoubtedly a statement of opinion based upon actual facts known to Horner." MIE Opening Brief at 25. This argument is supported by neither the law nor the facts.

First, MIE's Brief fails to set out the "actual facts" that supposedly formed the basis of Horner's "opinion" regarding Kusisto's duplicity toward ONE or its physicians. The *only* facts MIE and Horner cite are assertions as to how Kusisto treated Horner and MIE, a vendor that ONE had decided to stop using, but whose cooperation ONE critically needed for a time. *See* MIE Opening Brief at 25. MIE invites the Court to determine as a matter of law that Horner could take what he perceived as deception toward MIE (an entity to which ONE owed no duty of candor or good faith) and conclude from his perception that Kusisto was breaching his fiduciary duty and was *lying to his employer*, ONE. This is especially clear where Horner's letter also asserts that he had been given information from unidentified members of the medical community regarding "how deliberately deceptive Ray has been."

As the U.S. Supreme Court made clear in *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990), simply dressing up a statement with "I believe" or calling it an "opinion" will not insulate it from the defamatory implication it conveys:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.' "

*Id*. at 18-19.  Moreover, Horner's claim that Kusisto's lying to *him* (a vendor ONE had decided to drop) is a sufficient basis upon which to assume that Kusisto was actively deceiving *his own employer* does not rise to the quantum of evidence necessary for this Court to conclude that the statements are, as a matter of law, Horner's reasonable belief and therefore not actionable.

It is the province of the Court to determine whether a statement is one of fact or one of opinion.  *Near East Side Community Org. v. Hair*, 555 N.E.2d 1324, 1328 (Ind. Ct. App. 1990) (citing *Jamerson v. Anderson Newspapers, Inc.*, 469 N.E.2d 1243 (Ind. Ct. App. 1984)).  "Under Indiana law, a statement that on first blush appears to constitute an 'opinion' may still be legally defamatory if 'a reasonable fact finder could conclude that the statement implies facts which may be proven true or false.'"  *Filippo v. Lee Publications, Inc*., 485 F. Supp. 2d 969, 980 (N.D. Ind. 2007) (quoting *McQueen v. Fayette County Sch. Corp*., 711 N.E.2d 62, 66 (Ind. Ct. App. 1999), and citing *United Consumers Club, Inc. v. Bledsoe*, 441 F. Supp. 2d 967, 980 (N.D. Ind. 2006) (test is whether content is objectively verifiable and, when read in context, would be understood as statement of fact by reasonable reader)).

In making the often-difficult distinction between opinion and fact, Indiana has employed the standard set out in *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984), *cert. denied*, 471 U.S. 1127, 105 S. Ct. 2662, 86 L. Ed. 2d 278 (1985):

(1) The court should analyze the common usage or meaning of the alleged defamatory statement; and (2) consider the statement's verifiability-whether the statement is capable of being objectively characterized as true or false; (3) the statement should be considered in context, in connection with other unchallenged language, and (4) in the broader context in which the statement appears.

*Id*. at 1330; *see Near East Side Community*, 555 N.E.2d at 1330 (applying *Ollman* factors).

The accusation that an employee has misled his employer would commonly be understood as having a negative connotation.  To "mislead" means "to lead in a wrong direction or into a mistaken action or belief: deceive." WEBSTER'S THIRD NEW INT'L DICTIONARY 1444 (1986); *see also* BLACK'S LAW DICTIONARY (8th ed. 2004) (defining "misleading" as "delusive; calculated to be misunderstood"); *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 271 (3d Cir. 1980) (news report that plaintiff corporation deceived customers as to both price and quality of its product capable of defamatory meaning under Pennsylvania law).  Moreover, in his letter Horner remarks that through discussions with other community physicians he has learned how "deliberately deceptive" Kusisto is.  A "deceptive" act is one that "tend[s] to deceive" or "ha[s] power to mislead." WEBSTER'S THIRD NEW INT'L DICTIONARY at 58.  Given the common sense (negative) understanding of the terms "mislead"  and "deceptive," the first *Ollman* factor weighs against MIE's and Horner's claim that Horner's statements are protected opinion.

The second *Ollman* factor also weighs against MIE and Horner since whether Kusisto was misleading or deceptive with respect to his employer is capable of being characterized objectively as true or false. Namely, did Kusisto lie to ONE?  Neither MIE nor Horner has presented any evidence to substantiate the claim that Kusisto lied to ONE.

As to the last two factors (the narrow and broader context of the statements), the statement was made in a letter, the overall impact of which was to call into question both Kusisto's character as well as how he did his job, both in his dealings with ONE and in his

interactions with the broader medical community. *See, e.g.*, *Brandt v. Board of Co-op. Educ. Servs.*, 820 F.2d 41, 43 (2d Cir. 1987) ("[C]harges that the employee is guilty of dishonesty or immorality are stigmatizing because they call into question the person's 'good name, reputation, honor, or integrity.'") (quoting *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S. Ct. 2701, 2707, 33 L. Ed. 2d 548 (1972)). Moreover, during the time the letter was sent, Horner was desperately attempting to arrange a face-to-face meeting with ONE's physicians.[16] How better to accomplish his goal to get past the middle man (Kusisto) and convince the ONE physicians to meet directly with him, than for Horner to call into question whether the physicians were getting accurate information from their trusted employee? It follows that all four *Ollman* factors weigh against a finding that Horner's statements regarding Kusisto were privileged as an expression of opinion. Moreover, since neither MIE nor Horner has argued that they can negate any other element of Kusisto's libel claim, there is no basis to grant summary judgment on the statements made about Kusisto in the August 15th letter.

### 2. As this Court Has Previously Determined, Attorney Hohman's Statements to the Media Are Not Absolutely Privileged under the *Restatement*.

MIE and Horner ask this Court to revisit its earlier ruling and determine that the statements their attorney made to the *Journal Gazette* are absolutely privileged under Section 586 of the *Restatement (Second) of Torts*. MIE Opening Brief at 26. But in so doing, MIE does not directly take issue with the logical or reasoning behind the five pages of the Court's earlier

---

[16]*See, e.g.*, Pl. App. Ex. 22 (transcript of mid-November, 2005 conversation between Horner and Kusisto that Horner surreptitiously recorded ("Tr.") at 10) ("I'd like to get an audience with the physicians of ONE to discuss the issue if it's possible to get fifteen minutes in a Board meeting or something of that nature."); *id*. at 11. ("In other words, if I can contact the physicians and talk through a couple of issues, then I'd be happy to write a letter after that time explaining our position on support."); *id*. at 13-14. (What I'd like to do is say if you give me the names of the guys, I could talk to them – just get the sense of where they are at, and then I can

decision on this particular issue, specifically its reliance on Comment "a" to Section 586 and the

compelling policy arguments in favor of drawing a distinction between comments made to the

press and those made as part of the actual judicial proceedings.

MIE cites *Chrysler Motors Corp. v. Graham*, 631 N.E.2d 7 (Ind. Ct. App. 1994), for the

proposition that Indiana favors a liberal application of section 586.  MIE has made this argument

before.  As this Court points out in its previous order, in distinguishing *Chrysler*,

> a review of Indiana case law reveals that Indiana Courts have employed the
> "liberal" rule only to questions regarding whether the content of an alleged
> defamatory statement is related to a judicial proceeding and have not spoken to
> whether the "liberal" rule applies to questions regarding whether a statement is
> connected to a judicial proceeding.

Order at 12-13 (citing *Miller v. Reinert*, 839 N.E.2d 731, 735 (Ind. Ct. App. 2005) ("In

determining what is relevant and pertinent, the courts favor a liberal rule."); *Chrysler*, 631

N.E.2d at 9-10; *Briggs v. Clinton Co. Bank & Trust Co. of Frankfort, Ind.*, 452 N.E.2d 989, 997

(Ind. Ct. App. 1983) (citing *Stahl v. Kincaide*, 192 N.E.2d 493, 497 (Ind. Ct. App. 1963)) ("The

question of relevancy or pertinency is a question of law. . . . The courts favor a liberal rule[.]")

(internal citations omitted)).  This Court also noted that another "liberal" jurisdiction, when faced

with the precise question before this Court, refused to extend the absolute privilege to statements

made to the press.  *Id*. at 13 (citing *Brown v. Gatti*, 99 P.3d 299, 304 (Or. Ct. App. 2004)).  MIE

has provided no new authority to refute the Court's previous conclusion on this point.

Even more significant is the fact that MIE does not address any of the policy arguments

this Court discussed in predicting that Indiana would not extend an absolute privilege to

statements made to the media.  *See id.* at 11-12 & n.5.  For example, although a person may not

be subject to a defamation action for statements made in a formal judicial proceeding, it is also

---

write a letter.  I would even work very hard to make sure that those conversations happen within
the next week, so that . . . ."); Horner Dep. (3/23/07) at 120, 135 (Def. App. Ex. NN).

the case that such statements can be the subject of court control through sanctions and disciplinary proceedings.  However, once the statements are made beyond the confines of the judicial proceeding, an injured person's only redress lies in the law of defamation.  Hence extending the privilege beyond a judicial proceeding, where "the need for unbridled advocacy is diminished, and the need to protect the intrusion upon a person's reputation is enhanced," *id*. at 11 (citation omitted), serves no particular function.  Certainly MIE has directed the Court to no compelling reason why it should be as free to try the matter in the court of public opinion as it does in the actual courtroom.  The Defendants suggest there are no such reasons.  Since this Court properly determined that Section 586 does not apply to statements made to the press, there is no reason to disturb its earlier ruling.

### 3. MIE Has Shown No Basis for Summary Judgment on ONE's and Kusisto's Defamation Claims Based on the Newspaper Article

In addition to their argument that the statements made by Attorney Hohman were absolutely privileged, MIE and Horner claim summary judgment is appropriate on ONE's and Kusisto's defamation claims arising out of Hohman's statement published by the *Journal Gazette* that "MIE believes that the defendants caused the FBI investigation to be instituted under false pretenses and for the defendants' own benefit" because, they assert, the statement is true.  In support of its claim that the court should find Hohman's statement to be true as a matter of law, MIE argues that "[c]learly MIE had the belief that this statement was accurate because it filed a federal lawsuit based upon that belief."  MIE Opening Brief at 28.  But this argument is a logical fallacy.  If the mere filing of an unverified lawsuit were sufficient to establish the truth of the matters asserted therein, there would be no reason for Rule 11 or similar provisions.  *Cf*. 21B CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE & PROCEDURE

EVIDENCE 2d § 5106.4 ("It seems clear that a court cannot [judicially] notice pleadings or testimony as true simply because these statements are filed with the court.").

In addition to what it claimed it believed, MIE points to "the undisputed facts . . . that TPX started the FBI investigation based upon false information."  MIE Opening Brief at 28. Leaving aside for the moment the absurdity of MIE's claim that it is undisputed that TPX lied to the FBI and thereby committed a federal crime punishable by fines and up to five years in prison, *see* 18 U.S.C. § 1001, it cannot claim the defense of truth as to Kusisto or ONE based on something TPX is alleged to have done.

> **a.  MIE cannot show as a matter of law that the statement published in the *Journal Gazette* was not "of and concerning" Kusisto and ONE.**

MIE argues that it is entitled to judgment on Kusisto's and ONE's claims for defamation based on MIE's assertion that as a matter of law no one reading the entire article would conclude that the phrase "defendants" included defendants ONE and Kusisto, but rather that it only referred to defendants Plesko and TPX.  MIE's Opening Brief at 29-30.

As ONE and Kusisto argued in response to MIE's and Horner's Motion to Dismiss, whether a given statement is "of and concerning" the plaintiff is "generally an issue of fact, which the jury alone may decide . . . ." *Church of Scientology Intern. v. Time Warner, Inc.*, 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992).  Attorney Hohman's statements to the newspaper refer to "[t]he defendants" and, elsewhere, the article quotes a letter MIE wrote to its clients in which it is stated "[d]uring the course of our investigation, we have come to believe that these parties have violated MIE's rights, violated their agreements with MIE, and have been making defamatory statements against MIE."  Counterclaim Ex. B [dkt #28] (emphasis added).

It is not necessary for a victim of defamation to be identified by name.  It is sufficient if it is reasonable to conclude that the publication refers to him or her.  *See, e.g.*, W. PAGE KEETON ET

AL., PROSSER AND KEETON ON THE LAW OF TORTS § 111, at 783 (5th ed. 1984).  ONE and

Kusisto are "defendants" in this action and "parties" involved in the dispute.  Moreover, the *only*

defendant that had an agreement with MIE was *ONE*.  In addition, a person reading the *entire*

article would learn the following: (1) that MIE has sued ONE and Kusisto (*i.e.* ONE and Kusisto

are "defendants"); (2) that among the allegations are that ONE's CEO, Kusisto, defamed MIE

and that all parties have tortiously interfered with MIE's business relationships; (3) that the FBI

was investigating software tampering at ONE; (4) that MIE stated that "these parties" have made

defamatory statements about MIE; (5) that the details of the FBI's investigation are not public;

and (6) that MIE's attorney stated that "the defendants" caused the FBI investigation to take

place under false pretenses.  Moreover, in the body of the article, it states "Kusisto would not

speculate about whether [MIE] was involved in the reported hacking incidences."  Given the

entire context of the newspaper article and this information, and viewing such information in the

light most favorable to Kusisto and ONE, there is abundant evidence from which a jury could

conclude that the statement is "of and concerning" defendants Kusisto and ONE.

> **b.** **MIE cannot show as a matter of law that the statement published in the *Journal Gazette* about Kusisto and ONE was true.**

In a footnote, MIE and Horner claim that even if the statement was "of and concerning"

ONE and Kusisto, summary judgment is still appropriate since the statement that the defendants

caused the FBI investigation to be instituted under false pretenses for their own benefit was true.

MIE Opening Brief at 30 n.15 (citing SMF ¶ 76).  However, the fact is that the evidence MIE

cites in support of what it claims is the "undisputed" fact that Kusisto and ONE committed a

federal crime in lying to the FBI not only does not support MIE's claims, it refutes them instead.

In the deposition testimony cited by MIE,[17] Kusisto states that he had several discussions with FBI investigators commencing in mid-January.  Kusisto Dep. (3/28/08) at 203 (Def. App. Ex. J).  First, the FBI "ask[ed Kusisto] about [the] hacking incident that had occurred a few days before."  *Id.*  When asked specifically what occurred at that meeting, Kusisto testified "I don't remember the -- what we talked about.  I was answering the questions they were asking me."  When Kusisto was asked specifically how the FBI became involved he testified, "I was told it was Ben Kessler on the direction of Todd Plesko, but I was – I was away that time, that day.  *Id.* at 214.[18]

In the other testimony MIE cites for the proposition that it is indisputably true that ONE and Kusisto instituted the FBI investigation under false premises and for their own benefit, MIE's counsel asked Kusisto what Plesko (not Kusisto or ONE) told the FBI.  In response, Kusisto stated "I was in a passive role with the FBI.  I was answering their questions as they asked them.  I was not driving the investigation.  They were."  Kusisto Dep. (5/25/07) at 35 (Pl. App. Ex. 55).  None of this establishes that either Kusisto or ONE "instituted" the FBI investigation, especially in light of Kusisto's statement that he was not even there at the time the FBI was contacted.  More importantly, none of the evidence cited by MIE identifies just what were the "false pretenses" under which Kusisto or ONE supposedly "instituted" the FBI

_____

[17] Paragraph 76 of MIE's SMF refers to pages 203-10 in "Exh. 3," but these pages are not contained in Exhibit 3.  Although the deposition transcript contained in MIE's Exhibit 3 is for the March 27 Kusisto deposition, that transcript ends at page 133.  The Defendants believe MIE intended to cite to the second day of that consecutively paginated deposition and will address the evidence that appears on those pages of Kusisto's deposition.  *See* Kusisto Dep. (3/28/08) at 203-10 (Def. App. Ex. HH).

[18] As to any other contacts with the FBI, Kusisto testified about "two or three phone calls" over the next few months, Kusisto Dep. (3/28/07) at 204 (Def. App. Ex. HH), and a meeting in perhaps the summer of 2006 when Kusisto met with the FBI at the U.S. Attorney's office about what the steps would be taken in any proceeding against MIE.  *Id.* at 209-10.  Kusisto also talked about the last meeting he had with the FBI in late 2006 which included both Kusisto and some of the ONE physicians.  *Id.*; *see also id.* at 205 ("[The FBI official] asked questions about damages, and [the physicians] described from their individual perspectives what those damages were.").

investigation, and MIE does not even posit why the FBI investigation would be of any *personal* benefit to Kusisto.

Accordingly, MIE is not entitled to judgment on Kusisto's and ONE's defamation claims arising out of the *Journal Gazette* article since (1) the defamatory statement was not privileged; (2) there is at least a question of fact as to whether the statement was "of and concerning" ONE and Kusisto; and (3) there are genuine issues of material fact on MIE's defense of truth since MIE can point to no evidence that Kusisto or ONE instituted the FBI investigation, and does not even identify the "false pretenses" that Kusisto or ONE supposedly manufactured.

### 4.     MIE Has Shown No Grounds for Summary Judgment on Plesko's and TPX's Claims Based upon the Newspaper Article

MIE argues that it is also entitled to judgment on Plesko's and TPX's claims for defamation arising out of the *Journal Gazette* article because it claims it is "undisputed" that "TPX started the FBI investigation based on false information."  MIE Opening Brief at 28.  But MIE makes this incredible claim (*i.e.*, that it is *undisputed* that TPX committed a federal crime) only through a tortured misreading of the record.

The fact is that when Plesko had evidence that ONE's system had been breached and its software deliberately altered, he asked third-party computer consultant Ben Kessler to contact the FBI and report what was happening.  *See* Plesko Dep. (5/23/07) at 170-71 (Def. App. Ex. M). When Plesko was asked in his deposition what he told the FBI, he responded:

> I said, you know, here are my two technical resources.  They seem to have found something that you may be interested in.  Please work with them on the technical side.  If you have any more largely administrative questions or relationship questions, happy to answer them for you.

Plesko Dep (5/23/07) at 171 (Def. App. Ex. M).  Plesko also testified that he told the FBI that

ONE's WebChart system had crashed and that it had been inaccessible at times in the preceding

weeks.  *Id*. at 171-72.  As to ONE's medical records, Plesko testified as follows:

> Q.     Did you tell the FBI that medical records may be compromised?
>
> A.     Yes, probably.  Once we realized that someone from the outside
>        was purposely and maliciously bringing the system down, that was
>        certainly a possibility.  So when you say may have been
>        compromised, absolutely.
>
> Q.     Did you tell them medical records were compromised?
>
> A.     No.
>        . . . .
>
> Q.     Ultimately no medical records were compromised, correct?
>
> A.     I can't state that for a fact.

*Id.* at 177.  Disregarding this clear statement by Plesko that he did not tell the FBI that ONE's

medical records were compromised, only that they *may* have been compromised, MIE

nevertheless asserts at one point in its brief that Plesko *did* tell the FBI that medical records were

compromised.  MIE Opening Brief at 28 ("In addition to telling the FBI that medical records

were compromised, TPX  . . . .") (emphasis added).  Obviously, a motion for summary judgment

based on alleged "undisputed facts" cannot be premised on misstating the record.

MIE also claims this Court should find as a matter of law that telling the FBI that ONE's

medical records *might* have been compromised was a "false" statement.  But MIE provides no

evidence that at the time the FBI was contacted it was determined *conclusively* that none of

ONE's medical records had been compromised.  Indeed, even when he was deposed, Plesko

stated that he still did not know this for sure.  Plesko Dep (5/23/07) at 177 (Def. App. Ex. M).

More importantly, as revealed by Kessler's analysis of the hacking, Horner accessed at least one

patient's medical record and viewed the chart.  *See* Dep. Ex. 182 (Def. App. Ex. Z), at 64.  Given

this evidence, not only can the Court *not* find as a matter of law that TPX and Plesko were lying

to the FBI when they told them medical records may have been compromised, the opposite

conclusion is compelled.

MIE also appears to assert that unless TPX can come forward with evidence of a specific

three-day period of time where WebChart was unavailable, this Court must conclude as a matter

of law that TPX provided false information to the FBI.  But Plesko's testimony concerning the

problems with WebChart simply cannot be boiled down to the simplistic terms MIE uses:

Q.      How long was [WebChart] not accessible?

A.      It underperformed for – <u>I think </u>the first attack occurred on December 31.
        And the last most viscous [*sic*] one, the one that downed it completely was
        on the 16th.  <u>I don't think we got it fixed until the 19</u><sup>th</sup>.  So for about 19 to
        20 days it underperformed.  There were <u>various spots during those 19 to
        20 days where it was completely out</u>. . . .
        . . . .

Q.      What do you mean by "downed it completely"?

A.      I mean that there were numbers appended to a query by design maliciously
        that brought the system completely down and rendered it completely
        unusable for a series of days.  Inaccessible.

Q.      There were a period of days at ONE when physicians could not access
        medical records?

A.      That's correct.
        . . . .

Q.      <u>And is this what you told the FBI, underperformed for a number of days
        and completely down for three days</u>, I think?

A.      <u>I think we gave them much more granular information</u>.

Q.      What do you mean by "granular"?

A.      Much more detailed information.  On this date this occurred.  On this date
        this occurred.  On this date this occurred because anyone who reviews
        either the FBI's logs or Ben[ Kessler]'s logs or his report each attack was

> different, had a different purpose, had a different design, and had a
> different effect.

Plesko Dep. (5/23/07) at 172-74 (Def. App. Ex. M); *see also* Plesko Dep. (8/17/07) at 25 (Def.

App. Ex. N) (On the assertion that there was no three-day shutdown: "To my knowledge, there

was, Matt. I mean, I'm telling you as I recall it.").  Moreover, as discussed above and as

evidenced by contemporaneous e-mails during the relevant time, WebChart had been down on

the Saturday before the last attack, had continued problems culminating in that Monday's

inaccessibility, and even though MySQL diagnosed one of the problems caused by MIE which

was then corrected, problems persisted for several more days.  *See* Plesko Aff. ¶¶ 16 and

attached exhibit (Def. App. Ex. PP).

In its Brief, MIE asserts "[i]n sum, TPX and Plesko informed the FBI that medical

records could have been breached and that WebChart (a medical records program) was rendered

inaccessible for three days.  Both of these statements were false."  As set out above, Plesko's

testimony on WebChart's functionality does not support the conclusion that when the FBI's

investigation was commenced Plesko told the FBI that WebChart was completely down for three

days.  *See also* Kessler Dep. (5/29/07) at 45 (Def. App. Ex. H) (noting that he gave the FBI a

preliminary report on the WebChart issues based on the logs).  Moreover, there is no evidence or

indication that the FBI would not have investigated the matter but for someone asserting that

there had been a "three-day outage."  Hence even if Plesko, TPX, or anyone else used the phrase

"three-day outage," there is no indication that the phrase was the catalyst for the FBI's

investigation, especially where Kessler provided the FBI with the actual logs, the "granular"

information.

At the very least, this raises the inference in TPX's and Plesko's favor that the FBI was

brought in to put an end to the hours and hours of "busy" work that Horner was intentionally

creating.  *See, e.g.*, Pl. App. Ex. 22 (Tr. at 6) (Horner's threatened "ace in the hole" to keep

Plesko and TPX "scrambling").  Putting an end to illegally caused "busy work" is a motive

Horner and MIE would be hard-pressed to criticize as self-serving on TPX's part.

 MIE also implies that there was something untoward in the fact that after the media reported

Kusisto's statement that no medical records were compromised, TPX did not, *independently of*

*the media report*, inform the FBI of this fact.  MIE Opening Brief at 28.  But, there is simply no

evidence that the FBI, in the midst of its investigation, were not aware of the media accounts.

Moreover, Kessler's report, completed a few months later, showed Horner actually did access a

patient's file.  *See* Dep. Ex. 182 (Def. App. Ex. Z), at 64.  Hence, MIE's argument on this point

is without merit.

 Yet another claimed "undisputed" fact[19] is that the FBI investigation was initiated for

*TPX's* benefit.  *See* MIE Opening Brief at 28.  Without engaging in a discourse on civic virtue,

the Defendants would suggest that groups benefiting from the investigation of a crime include

the victim, the general public, and other members of the public particularly impacted (in this

case, ONE's patients).  Given the evidence regarding the serious disruptions caused by Horner's

attacks on ONE's system, MIE's claim that it is undisputed that the sole reason the FBI was

called in was to benefit TPX lacks credibility, and is certainly not an "undisputed" fact.

 Indeed, in a conversation with Kusisto that was secretly taped by Horner, Horner admits

that one of the few things he could do to interfere with TPX was to keep Plesko busy:

> **Horner:** Well, I think your Board should vote to terminate support services with
> TPX. At this point, I need [Plesko] scrambling to do whatever he needs to do and

---

[19] Throughout their brief, MIE and Horner claim matters are "undisputed" where the evidence clearly indicates that the facts are disputed.  This Court has remarked before that such actions appear "designed to confuse rather than enlighten the Court."  *OmniSource Corp. v. NCM Americas, Inc.*, 313 F. Supp. 2d 880, 891 n.14 (N.D. Ind. 2004) (commenting on party's "annoying tendency to claim that [defendant] 'concedes' or 'does not dispute' propositions which obviously are disputed").

not doing other things, frankly. The more he's scrambling and doing those kinds
of things while I'm doing other things to, you know, set up and defend against the
situation, the better off I am. So that's the only card I've got in the deck right now,
to play. That's the only card. I mean, I've got other cards, but that's probably the
best card. That's my ace in the hole. And the more he's scrambling to try to
prepare to get this thing going – you know, we're not going to do anything to
seriously affect patient care, let's put it that way.

Pl. App. Ex. 22 (Tr. at 6) (emphasis added); *see also* Kusisto Dep. (3/27/07) (Pl. App. Ex. I) at

117.

MIE also contends that it is "clear" that TPX and Plesko "told the FBI a 'great story' about

how medical records have been unavailable and potentially breached," MIE Opening Brief at 29,

and then publicized the FBI's investigation. But construing the evidence in the light most

favorable to the non-movants, the only thing that is "clear" is that when the FBI was called in

ONE's medical records *had* been unavailable[20] and *had* been potentially breached. Accordingly,

there is no basis whatsoever upon which this Court could determine as a matter of law that

MIE's statement that TPX and Plesko started the FBI information on false pretenses for their

own benefit is a true statement. It follows that MIE's motion must be denied.

## VI.  CONCLUSION

For the above and foregoing reasons, the Defendants request the following relief: (a) that

the Court deny MIE's Motion for Summary Judgment on its claims for breach of contract and

grant judgment to ONE on Count II of Plaintiff's Complaint (Breach of Contract) and grant

judgment to Defendants Kusisto, Plesko, and TPX on Count III of Plaintiff's Complaint (Breach

of Contract); (b) that the Court deny MIE's Motion for Summary Judgment on its claims for

---

[20] *See, e.g.*, McGee Dep. (6/11/07) (Def. App. Ex. JJ) at 23 (describing the "inability to access charts with
patient information in them"); Lee Dep. (6/7/07) (Def. App. Ex. KK) at 34 (testifying that there was
"sometimes no access at all to some of the patient records"); Karr Dep. (3/27/07) (Def. App. Ex. LL) at
55 (noting inability to access data); LaSalle Dep. (7/7/07) (Def. App. Ex. MM) at 53 ("Functionally, we
could not get [patient records]. If a web page takes a minute to go through each time you click on
something different, it's functionally worthless. . . . It would take hours. . . .  It would take days.").

copyright infringement and grant judgment to Defendants ONE and TPX on Count I of

Plaintiff's Complaint (Copyright Infringement); (c) that the Court deny MIE's and Horner's

Motion for Summary Judgment on Count I of ONE's and Kusisto's Amended Counterclaim and

Count I of TPX's Counterclaim (Claims under 18 U.S.C. § 1030); (d) that the Court deny MIE's

and Horner's Motion for Summary Judgment on Count II of ONE's and Kusisto's Amended

Counterclaim and TPX's and Plesko's Amended Counterclaim (Defamation); and (e) grant to the

Defendants all other just and proper relief.

Respectfully submitted,


BARRETT & MCNAGNY LLP

By /s/ Cathleen M. Shrader
    Thomas A. Herr (#8444-02)
    Cathleen M. Shrader (#18159-02)
    215 East Berry Street
    Fort Wayne, Indiana 46802
    Tel: (260) 423-9551
    Fax: (260) 423-8920
    E-mail: tah@barrettlaw.com
           cms@barrettlaw.com

*Attorneys for Defendants Orthopaedics*
*Northeast, P.C. and Raymond Kusisto*


EILBACHER FLETCHER, LLP


By /s/James P. Fenton (per consent)
    James P. Fenton (#6808-02)
    803 S. Calhoun Street, Suite 400
    Fort Wayne, IN 46802
    Tel: (260) 425-9777
    Fax: (260) 424-9177
    Email: fenton@eflawyers.com

and

MALLOR CLENDENING GRODNER & BOHRER
LLP

By /s/ Lonnie D. Johnson (per consent)
    Lonnie D Johnson (#16758-53)
    Patrick B Omilian (#23973-53)
    511 S. Woodscrest Drive
    P.O. Box 5787
    Bloomington, IN 47407-5787
    Tel: (812) 336-0200
    Fax: (812) 333-0083
    Email: ljohnson@mcgb.com
           pomilian@mcgb.com

*Attorneys for triPRACTIX, LLC and Todd*
*Plesko*

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that the foregoing was filed electronically using the CM/ECF system, which sent notification of such filing to the following parties or counsel, this  25th  day of February, 2008, to the following counsel of record:

Matthew M Hohman
D. Randall Brown
Barnes & Thornburg LLP
600 One Summit Square
Fort Wayne, IN 46802-3119
Email: mhohman@btlaw.com
       rbrown@btlaw.com

                              /s/ Cathleen M. Shrader
                            Cathleen M. Shrader