**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| MEDICAL INFORMATICS ENGINEERING, INC. ) | |
| ) | |
|      Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.:1:06-CV-0173 |
| ) | |
| ORTHOPEDICS NORTHEAST, P.C., TriPRACTIX, ) | |
| LLC, RAYMOND KUSISTO, and TODD PLESKO, ) | |
| ) | |
|      Defendants. ) | |
| ) | |
| ORTHOPEDICS NORTHEAST, P.C., and ) | |
| RAYMOND KUSISTO, ) | |
| ) | |
|      Defendants/Counterclaim Plaintiffs and ) | |
|      Third-Party Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| MEDICAL INFORMATICS ENGINEERING, INC., ) | |
| ) | |
|      Plaintiff/Counterclaim Defendant, ) | |
| ) | |
| DOUG HORNER, ) | |
| ) | |
|      Third-Party Defendant. ) | |

**MIE'S AND HORNER'S REPLY IN SUPPORT OF THEIR**
**JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT**

Medical Informatics Engineering, Inc. ("MIE") and Doug Horner hereby submit this reply in support of their joint motion for partial summary judgment.

## I.      ARGUMENT AND AUTHORITY

### A.      Incorporation of Prior Argument

Many of the arguments set forth by Orthopaedics Northeast, P.C. ("ONE") in its response to MIE's and Horner's summary judgment motion were also made in ONE's and triPractix's ("TPX") Joint Motion for Partial Summary Judgment.  To avoid extensive repetition of MIE's previous arguments, MIE hereby incorporates by reference the evidence and arguments contained in its response to Defendants' Joint Motion for Partial Summary Judgment [Dkt. # 124].

### B.      MIE is Entitled to Summary Judgment on it Breach of Contract Claims

#### 1.      *The Non-Competition Provision in the SLA is Enforceable*

One of MIE's breach of contract claims against ONE, Kusisto, and Plesko is based upon a violation of a non-competition provision (the "Non-Competition Provision") in the Software License Agreement between MIE and ONE (the "SLA").  The Non-Competition Provision provides:

> During the term of the Agreement and for one (1) year after termination of this Agreement, Licensee shall not engage in the business of selling or licensing to third parties any computer software that performs substantially the same functions of the License System or is commercially competitive with the License System or any part of it.

(SMF § 9).[1]

The Defendants argue that the Non-competition Provision is "impermissibly overbroad as to its scope and subject matter such that it is unenforceable" (D. Rsp. at 4).  According to

---

[1] Citations to SMF are citations to the MIE's Statement of Material Facts [Dkt. # 109].

Defendants, this is the case because MIE contends that the Non-Competition Provision was breached in "2005 merely by discussing and/or later creating a business plan for a prospective business."[2] This statement is factually wrong and a misstatement of MIE's position.

Defendants did not "merely" discuss and create a business plan. While ONE spent much of 2005 planning for and discussing the formation of a business that would directly compete with MIE, at a November 1, 2005 ONE shareholders' meeting, Plesko presented the doctor owners of ONE with a formal business plan for TPX. (SMF § 24). This plan included the purchase of MIE's competitor, PhysCal. (Id.). The ONE shareholders approved the formation of TPX at this meeting, and decided to contribute $1.8 million in exchange for a 75% ownership in TPX. (SMF § 26). One day later, the shareholders of ONE made an offer to purchase PhysCal, and NEO[3] formed TPX on November 11, 2005 by filing articles of incorporation with the Indiana Secretary of State. (SMF § 27). TPX purchased PhysCal's assets on January 2, 2006, and the assets purchased by TPX included contracts for the license and maintenance of EMR software. (SMF § 29). As of January 2, 2006, ONE's Chief Information Officer became the Chief Executive Officer of TPX. On January 2, 2006, ONE transferred its entire information technology staff to TPX. As of January 2, 2006 (months before the SLA was terminated), ONE (through its shareholders) had formed an entity to engage in direct competition with MIE in violation of the Non-Competition Provision.

Further, Defendants' argument is based upon its misstatement of MIE's interpretation of the phrase "engaging in business" of selling or licensing EMR software is overly broad. MIE's

---

[2] Defendants also argued in their original brief that the Non-Competition Provision was unenforceable. At that time, Defendants' argument was based upon application of case law relating to non-competition agreements between employer and an employee. (See D. SJ Brief, 29). Application of case law relating to non-competition agreements between parties of equal bargaining power, like the parties in the present case, results in the conclusion that the Non-Competition Provision is enforceable. (See MIE's Rsp., 38-42).

[3] NEO, Northeast Orthopaedics, LLC, is a limited liability company owned by the same doctors who own ONE.

(or any other entity's) "interpretation" of any phrase is irrelevant to the enforceability of the Non-Competition Provision. The Non-Competition Provision is either reasonable and enforceable or it is not. In any event, MIE does not contend that Defendants breached the Non-Competition provision by "merely" discussing and creating a business plan. While such discussions are a part of engaging in a business, even Defendants admit that TPX was owned by ONE's shareholders, and that TPX was directly competing with MIE regarding the sale and licensing of EMR software while the SLA was in effect. (SMF §§ 27-29).

Defendants' next argue that the Non-Competition Provision is overly broad because it prohibits one from engaging in the business of selling or licensing any computer software that performs "substantially the same functions as the License System or is commercially competitive with it or any part of it."[4]  (D. Rsp. at 5). Defendants claim that because WebChart performs "over 173 different functions," "any software program of any kind, no matter how unrelated EMR software or the medical profession, would fall within the reach of this provision."  (Id.). This is nonsense. Any computer software that performs "substantially the same functions" as WebChart (which is an electronic medical records ("EMR") program) would be an EMR program. In fact, ONE and TPX have admitted that WebChart and the EMR program sold and licensed by TPX performs substantially the same functions as WebChart. (SMF §15). In addition, the only way that a product is "commercially competitive" with an EMR system is if the product is an EMR system. Thus, the Non-Competition Provision is extremely specific in that it prohibits engaging in the business of selling or licensing EMR software that is

_____

[4] Defendants more fully addressed this argument in their initial summary judgment brief. (D. SJ Br. at 30-31). MIE fully addressed this argument on pages 38-42 of its response and incorporates that argument herein by reference.

3

commercially competitive with or performs the same functions as WebChart. Thus, the Non-Competition Provision is enforceable.

### C.      Defendants' First to Breach Argument Fails as a Matter of Fact and Law

Defendants claim that there is a question of fact as to whether MIE or ONE committed the first material breach of the agreements at issue in this case. While Defendants do not develop this argument, the undisputed facts show that MIE could not have breached the License Agreement, which contained the Non-Competition Provision.[5] The "first" alleged breach of the SLA identified by Defendants is MIE's termination of the maintenance and support agreement between MIE and ONE (the "MSA"). However, Defendants' fail to inform the Court the SLA explicitly provides that "termination of the maintenance and support services agreement shall not otherwise affect this Agreement or the license granted hereunder." Thus, termination of the MSA could never be a breach of the SLA, as that termination had no effect on the SLA. Accordingly, MIE cannot be found to have breached the SLA, and there is no dispute as to which party "first breached" the SLA.[6]

### D.      The SLA is Enforceable against Kusisto, Plesko, and TPX

Defendants' spend over nine (9) pages of their response brief arguing that Kusisto, Plesko, and TPX cannot be liable for breaching the Non-Competition Provision; first because they were not signatories to the SLA or MSA, and second because TPX is allegedly not an alter ego of ONE. Defendants' arguments ignore clear Indiana case law that allows a covenant not to compete to be enforced against a party who did not sign the covenant when there is evidence that the non-party is aiding or operating in concert with the covenantor to breach the covenant or

---

[5] This argument is more fully developed and addressed in MIE's Response to Defendants' Summary Judgment Motion. (See MIE Rsp. at 30-31).

[6] Defendants' "first to breach" argument also fails because MIE did not breach the MSA, and even if it did, MIE was entitled to cause the MSA to end by its own terms. (See MIE Rsp. at 30-37).

when the non-party is the "alter ego" of the covenantor.  See Norlund v. Faust, 675 N.E.2d 1142, 1155-58 (Ind. Ct. App. 1997).  In explaining the rationale for this principle, the Southern District of Indiana stated that it is a "fundamental principle in Indiana that the law will not permit [a party] to do indirectly, or through others, what [that party] could not do directly, by [itself]." HAS, Inc. v. Bridgeton, Inc., 1999 WL 1893209, * 12-15 (So. Dist. Ind. 1999) (quoting Norlund, 675 N.E.2d at 1158).  Thus, whether Kusisto, Plesko, and TPX signed the SLA or MSA is irrelevant as to whether they breached the Non-Competition Provision.[7]

Defendants also assert that TPX and ONE cannot be an "alter ego" of one another because "MIE cannot meet the stringent standard required to 'pierce the corporate veil' of ONE." The Defendants correctly note that an alter ego may be found to exist "where one corporation is so organized and controlled and its affairs so conducted that it is the mere instrumentality or adjunct of another corporation."  (D. Rsp. at 13) (quoting Oliver v. Pinnacle Homes, Inc., 769 N.E.2d at 1191 (Ind. Ct. App. 2002).  Defendants also correctly state that no one "talismanic

---

[7] Defendants state:

interpreting each Agreement as a whole, and considering the purpose of the contract and the intent of the parties, the subsequent definition of Licensees [contained in the agreements] should be interpreted as defining the class of individuals who become permissive users of the License System.  In this regard, it is helpful to consider ONE's employees and officers third party beneficiaries of the SLA.  The Licensees identified by the SLA, including ONE's employees and officers, receive the benefit of being able to use the Licensed System by permission of MIE; however these individuals made no promises and were assigned no personal duties under the contract.

(D. Rsp. at 10).  To establish a third party beneficiary status under Indiana law, one must show (1) a clear intent by the actual parties to the contract to benefit the third party, (2) a duty imposed on one of the contracting parties in favor of the third party, and (3) the necessity of performance of the terms of the contract in order to render a direct benefit to that third party.  Advance Ground System Engineering, Inc. v. ARW Industries, Inc., 388 F.3d. 1036 (7th Cir. 2004).  Becoming an intended third party beneficiary allows a claimant to enforce a contract to which it is not a signatory.  Daimler-Chrysler Corp. v. Franklin, 814 N.E.2d 281 (Ind. Ct. App. 2004).  In the present case, ONE's employees, including Plesko and Kusisto, are not really seeking third party beneficiary status under the SLA or MSA because they are not seeking to enforce the agreements.  Instead, they are seeking to avoid liability under these agreements.  Further, if Defendants' argument is correct, then none of ONE's employees who were granted the right to use WebChart were precluded from copying WebChart, from providing confidential information regarding WebChart to third parties, from reverse engineering WebChart and from modifying WebChart, as all of these actions were prohibited by the SLA.  This clearly is not the law or the intent of the parties.

fact" justifies piercing the corporate veil, and that the court should conduct a careful review of the entire relationship between corporate entities and their directors and their officers. <u>Id.</u> Defendants then list a number of factors that serve as "guide posts" in determining whether a corporate veil should be pierced, such as undercapitalization and absence of corporate records, the use of a corporation to promote fraud, and the commingling of assets and affairs.

Defendants assert that MIE had not presented evidence of many of these factors insulating TPX and ONE from being alter egos of one another. What Defendants ignore, however, is that the entire purpose for treating corporations as alter egos is to avoid one corporation organizing and controlling the affairs of another so that a fraud or injustice is worked upon a third party. <u>Massey v. Conseco Services, LLC</u>, 879 N.E.2d 605, 609 (Ind. Ct. App. 2008).

In the present case, ONE planned for the formation of an ancillary business that would compete with MIE with respect to the sale and licensing of EMR software. When ONE understood that forming such an ancillary would violate the SLA, ONE's shareholders used another entity owned by them, Northeast Orthopedics ("NEO") to own 75% of the new entity, TPX. (SMF § 18-27).[8] ONE's plan for the formation of TPX included "spinning off" all of ONE's IT staff and making them employees of TPX. (SMF § 22). ONE provided Plesko with the services of ONE's director of finance to assist in creating a financial plan for TPX, and Kusisto continued to help Plesko "shape" the TPX project to be profitable. (SMF § 22). ONE's shareholders voted to form TPX and ONE's shareholders contributed $1.8 million in exchange for their ownership of TPX. ONE took all of these actions before TPX was even formed as a legal entity.

---

[8] ONE's Chief Information Officer, Plesko, owned the remaining 25% of TPX and became its Chief Executive Officer.

Once TPX was formed as a legal entity, ONE engaged in discussions at board meetings as to whether TPX could "legally disengage itself from ONE's commitment not to sell EMR software." (SMF § 28). In fact, in January 2006, the ONE board of directors asked Kusisto "to consult our attorneys to see if we could get around the non-compete if TPX were owned individually by the physicians rather then by NEO." (SMF § 30).

If the entire purpose of the alter ego doctrine is to keep a corporation from controlling another so that it can work a fraud or injustice on a third party, the purpose of the doctrine is fulfilled in this case. ONE knew it could not compete with MIE, so its owners used a separate entity (NEO) to form yet another entity (TPX) that would compete with MIE. ONE then transferred all of its employees to the new entity (TPX), and that entity (TPX) immediately began competing with MIE in violation of the SLA. In other words, ONE formed TPX for the specific purpose of attempting to deprive MIE of its ability to enforce the Non-Competition Provision. Under these circumstances, TPX and ONE were clearly alter egos.

### E.      Defendants do not Address Numerous breaches of the SLA

In their Response, Defendants do not even address many of the breaches of the SLA upon which MIE has moved for summary judgment. MIE has presented the Court with undisputed facts establishing that ONE breached the SLA by (i) disclosing information regarding WebChart to third parties, (ii) reverse engineering WebChart, (iii) making unauthorized copies of WebChart, (iv) modifying WebChart, failing to keep WebChart and all copies of WebChart safe, and failing to take reasonable actions to protect WebChart from unauthorized use, access, or copying, (v) failing to take appropriate action by instruction, agreement, or otherwise to cause any parties working for ONE to comply with the SLA, and failing to cease all use of WebChart and to return WebChart to MIE upon termination of the SLA. (MIE SJ Br. at 12-13). ONE has not disputed any of the facts supporting these breach of contract claims and has made no

argument directly in response to these claims.[9]   Accordingly, MIE is entitled to summary judgment upon the above-referenced breach of contract claims.

### F.   Defendants' "Tying" Defense has been Waived and is Unavailing

In their response brief, Defendants claim that "MIE may not recover for breach of contract because such a contractual agreement amounts to an illegal tying arrangement."  (D. Rsp. at 17).   Defendants' Response brief is the first time Defendants raised the affirmative defense that the SLA constitutes an illegal tying arrangement pursuant to § 1 of the Sherman Act. None of the Defendants raised a "tying" affirmative defense in their answer, and, accordingly, have waived the right to maintain such a defense.  Fed. R. Civ. P. 8(c).  See also Curtis v. Timberlake, 436 F.3d 709, 711 (7th Cir. 2005).[10]  In fact, Defendants do not even present any authority to the Court to support their claim that a tying arrangement is a defense to a breach of contract action.[11]

Even if Defendants had properly raised a tying defense, MIE would be entitled to summary judgment on that defense.  Defendants correctly note that an illegal tying arrangement exists where (1) a seller markets two products; (2) an agreement conditions the purchase of the

---

[9] The only potential argument made by Defendants in this regard is that all of MIE's contract claims are preempted by the Copyright Act.  However, this argument has absolutely no legal support.  (See MIE Rsp. at 43-44).

[10] While a court may allow an affirmative defense to be added at a later time, the party against whom the defense is asserted must be provided an opportunity to adequately meet that defense.  In the present case, discovery has been closed for quite some time.  MIE did not conduct any discovery regarding Defendants' allegations with respect to the SLA constituting a tying arrangement because no such allegations existed.

[11] Defendants did allege that MIE's copyright claim should fail because MIE's allegedly misusing its copyright "by preventing ONE from using a competing product, and by attempting to prevent ONE from using MIE's product to convert to a competing product."  (ONE Answer, Aff. Defense, ¶5; TPX Answer, Aff. Defense ¶5).  Defendants allegations as to copyright misuse specifically provided that MIE was attempting to keep ONE from using a competing product (which is ridiculous given the fact that ONE admittedly used a competing product even while the SLA was in effect) and that MIE was attempting to prevent ONE from using MIE's product to convert to a competing product.  (See id.).  Defendants' belated tying argument is the exact opposite claim.  In their copyright misuse defense, Defendants specifically pled that MIE is prohibiting ONE from using MIE's product, while in its tying argument Defendants state that MIE is requiring ONE to use MIE's product.

tying product upon the purchase of a tied product; (3) seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market; and (4) the result is a not insubstantial impact on interstate commerce. (D. Rsp. at 17-18). However, Defendants have presented absolutely no evidence regarding MIE's alleged economic power in the EMR software industry or the amount of impact on interstate commerce the alleged tying agreement has. While Defendants claim an issue of fact exists as to whether the SLA is an illegal tying agreement, Defendants' summary judgment response was the "put up or shut up moment" in this lawsuit, when Defendants were required to show what evidence they have that would convince a trier of fact to accept their version of events. Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005). Defendants have chosen not to present the Court with any evidence regarding at least two of the elements of their belated tying affirmative defense. Without any evidence, summary judgment in favor of MIE with respect to this defense is appropriate.

Not only do Defendants fail to present any evidence of MIE's economic power in the market or the SLA's impact upon interstate commerce, Defendants affirmatively misrepresent MIE's testimony regarding the products and services that ONE contends are tied together within the SLA. Defendants' claim that MIE's president, Doug Horner, testified that the SLA "required ONE to hire MIE to perform the data extraction and migration service, at an additional cost above and beyond the licensing fees paid pursuant to the SLA." (D. Rsp. at 18). Defendants further contend that "requiring MIE to be the entity that extracted ONE's own data from WebChart and import it into any new EMR software amounts to an illegal tying arrangement." (Id.). What Horner actually stated was:

> We believe that in the contract it clearly states that MIE is, you know, needs to be involved in that process. It's important, in terms of de-converting our

9

> application, that a third party not be given access to the schem[a] and to the design of WebChart, and, therefore, I believe it says, you know, things, you're not allowed to reverse-engineer the software unless MIE is unwilling or unable, and we were very willing and able, to assist in that de-conversion process, as this letter also points out dated February 20th.

(D. App., Ex. C at 145). Horner further testified that the only way to remove ONE's data from the WebChart database schema, which is copyright protected, was to have an understanding of the way that the data was stored within the database schema. (D. App., Ex. C at 21-22). Unlike some software programs, WebChart does not have an "export utility" that allows a user to save data to a standard format and then import it into another system. Accordingly, the only manner in which data can be removed by a party that did not have knowledge of the database schema is to reverse engineer the database schema. Such reverse engineering was prohibited by the SLA and was potentially an infringement of MIE's copyright. Thus, MIE prohibited ONE from reversing engineering the database schema unless MIE was unwilling to provide ONE with its data.

In other words, if ONE wished to have its data taken out of WebChart (i.e. de-converted), it was required to use MIE to obtain that data. While Defendants engaged in hyperbole regarding the financial impact of this process, Defendants fail to inform the Court that MIE does not charge any customer for data, but assesses a fee at least equal to the time and materials required to provide the data. (Ex. 58; Norder Dep. at 27-28). In fact, MIE charged a prior customer only $200 to provide a copy of its data in a format that the customer could use.[12] Further, Defendants cite no evidence to support their claim that the SLA required ONE to use MIE to "migrate" its data to a new EMR system. In fact, there would be no reason for MIE to do

---

[12] It is difficult to understand how the charge of $200 would have a substantial impact on interstate commerce. Further, given the fact that MIE's customers are primarily located within the state of Indiana, it is further difficult to see how any impact on interstate commerce could be shown by Defendants.

so.  Once ONE received its data from MIE, it could use any method it chose to "migrate" that data into a new EMR system.  In other words, the SLA did not require ONE to use MIE to migrate the data and Defendants' statements to the contrary are pure fiction.

      **G.**      **ONE Does not have a "Fair Use" Defense under 17 U.S.C. § 107**

In its Response, ONE claims that all of the actions that it took with respect to (i) copying WebChart, (ii) allowing a third party, PhysCal, access to WebChart to copy portions of it, (iii) allowing PhysCal to write a data migration script based upon WebChart, and (iv) providing the data migration script to TPX constitute fair uses under 17 U.S.C. § 107.  (D. Rsp. at 19).  Defendants' extensively briefed their fair issue argument in their opening brief, (see D. SJ Br. at 4-8), and MIE fully responded to Defendants' fair use argument in its response brief.  (MIE Rsp. at 5-13).  In sum, Defendants assert that the only purpose for ONE's actions was to extract ONE's own data from WebChart.  (D. Rsp. at 19).  The undisputed facts show otherwise.  PhysCal was provided access to WebChart to create a data migration script, which was given by ONE to TPX and used by TPX in marketing attempts to sell or license EMR software that competed with MIE's software, WebChart.  (MIE Rsp. at 5-13).  It is ONE's and TPX's use of WebChart and its database schema to compete with MIE that removes any fair use defense from Defendants.[13]  See e.g., DSMC, Inc. v. Convera Corp., 479 F. Supp. 2d 68 (D.D.C. 2007).

      **H.**      **Defendants' *De Minimis* Defense is Frivolous**

After its formation in January 2006, TPX created a transcription software product known as "triScript."  (SMF § 84).  TPX copied portions of WebChart source code directly into

---

[13] Defendants' similarly contend that TPX could not have infringed upon MIE's copyright because "access to and possession of WebChart" and TPX's "possession of the data migration script" cannot constitute copyright infringement.  However, TPX did not just have access to or possession of software; it used a derivative work created from WebChart, the data migration script, to compete with MIE.  In addition, TPX used source code from WebChart to create a new software program, triScript.  (SMF §§ 84-85).  Thus, TPX had far more than have access to or possession of WebChart.

triScript.  In fact, at least 58 lines of source code from WebChart is identical to, and in the identical order as, source code located within triScript.  (SMF § 85; MIE Rsp. at 13-16). Defendants spend seven (7) pages of their Response, and submit two (2) affidavits in support of a claim, arguing that TPX's copying of MIE's source code is "*de minimis*" and not actionable. (D. Rsp. at 21-27).  As set forth in MIE's response, the *de minimis* defense does not apply to the copying of a computer program's literal elements, including source code.  See Jamison Business Sys. v. Unique Software Support Corp., 2005 U.S. Dist. LEXIS 45480, *29 (E. Dist. NY May, 2005.  (See also, MIE Rsp. at 19-21).  Thus, Defendants' reliance upon a *de minimis* defense is frivolous.

Defendants also argue that triScript is not "substantially similar" to WebChart and that it was possible for TPX to create triScript independently and without use of MIE's source code.[14] An argument similar to Defendants' was rejected in Jamison Business Sys.  2005 U.S. Dist. LEXIS 45480, *29.  In Jamison, the Court reviewed two software programs that contain identical source code.  The Jamison court did not require the plaintiff to show that the defendant had access to plaintiff's source code because portions of the source code were identical.  Id. at *25-26.  In other words, when direct evidence of copying exists, such as when multiple lines of source code are identical, a plaintiff need not show access or substantial similarity.  The fact of

---

[14] Defendants also argue that MIE has not shown that the source code that appears in both WebChart and triScript is "original enough to be entitled to copyright protection," and that as a result MIE has not met its burden to show it is entitled to summary judgment.  (D. Rsp. at 23).  This argument is completely unsupported and wrong. MIE's copyright is presumed to be valid.  See 17 U.S.C. § 410(c).  As set forth by Nimer on Copyright, a source repeatedly cited by Defendants, the originality of a work, the copyrightability of a work's subject matter, the citizenship status of a work's author, and the work's compliance with applicable statutory formalities is presumed if the alleged owner of the copyright has presented a valid copyright registration.  3 Nimer, NIMER ON COPYRIGHT §13.01 [A], at 13-5, 6 (1991).  MIE has presented the Court with a valid copyright registration.  (SMF § 1; Exh. 49). Thus, it is Defendants' burden to present evidence to overcome this presumption.  Id. (citations and footnotes omitted).  Defendants have presented no evidence whatsoever that would even suggest that MIE does not own WebChart or that the WebChart software was not entitled to copyright protection.

the matter is, source code from WebChart is in triScript, which shows that TPX copied WebChart's source code.

Defendants' argument that any similarity between triScript and WebChart is "explainable, since it was the transcribers who helped TPX develop the software," is nonsense. (D. Rsp. at 26). Although the TPX programmer who wrote triScript submitted an affidavit in which he testified that he never saw, used, possessed, examined, or copied WebChart transcription module, that testimony is verifiably false. E-mails between Johnson and others at TPX, which were produced by TPX to MIE, establish that TPX provided Johnson with a password to WebChart, and that Johnson had access to WebChart.[15]  (MIE Rsp. at 19; SDF § 19). Even assuming that the TPX programmer never saw WebChart (which he did), his conversations with ONE transcriptionists alone would not cause MIE's source code to appear in triScript. Although transcriptionists may be able to discuss WebChart's functionality with the TPX programmer, the transcriptionists would have no way of knowing what source code MIE used to create that functionality unless they had seen MIE's source code. The idea that TPX's programmer could never see WebChart, meet with transcriptionists who had never seen WebChart's source code, write at least 58 lines of source code that are identical to MIE source code, and place that source code in the exact same order as it existed in MIE's source code is beyond any reasonable belief.

I.     **MIE is Entitled to Summary Judgment on ONE's Claim under 18 U.S.C. §1030**

ONE does not dispute that it cannot maintain a private cause of action under 18 U.S.C. §1030 unless it has suffered a monetary loss of at least $5,000. 18 U.S.C. §1030(a)(5)(B)(i). Under §1030, "loss" means any reasonable cost to any victim, including the cost of responding to

---

[15] MIE has filed a motion to strike Johnson's affidavit, and these issues are more fully discussed in the brief in support of that motion.

an offense, conducting a damages assessment, and restoring the data, program, system, or information to its condition prior to the offense . . .." 18 U.S.C. §1030(e)(11). Defendants cite four (4) items of evidence to show that ONE suffered a loss due to MIE's alleged unauthorized entry into ONE's computer system.[16] This evidence is as follows:

1. An invoice for $104,665 that Defendants "contend evidences the amount ONE paid TPX for the extraordinary time TPX spent addressing the problems caused by Horner's actions."

2. Plesko's testimony that TPX spent "many hours" addressing the WebChart issues, including periods of inaccessibility and ONE doctors' testimony regarding the same.

3. TPX eventually had to consult an outside vendor to work on one of the problems caused by Horner's actions.

4. "ONE retained a consultant to investigate fully the hacks on ONE's network and who prepared a 446 page report detailing the changes that had been made" to the WebChart software.

(D. Rsp. at 28). As a matter of law, none of this evidence establishes that ONE suffered a loss of more than $5,000 so as to allow ONE to maintain a private cause of action under 18 U.S.C. §1030.

### a.    The $104,665 invoice.

Plesko testified that TPX conducted an "audit of exactly how much time" TPX staff spent on problems allegedly caused by MIE, reviewed the "audit" with Kusisto, and "agreed on a fair price" of $104,665 for the time spent by TPX. (SMF §§ 65-66). Plesko's testimony is verifiably false. Despite MIE's repeated requests, Defendants did not produce the alleged "audit" until

---

[16] Defendants contend that "MIE necessarily claims that ONE never paid the TPX invoice," and if the "invoice was never paid . . ., the inference arises that TPX was therefore damaged. . . ." and "MIE would not be entitled to summary judgment on TPX's claims." (D. Rsp. at 29, n.14). This argument is misleading and frivolous. TPX is now asserting that it has a §1030 claim against MIE. However, in response to MIE's motion to dismiss TPX's §1030 claim, TPX stated that it had "not asserted [a §1030] claim against MIE or any other party in this case." [Dkt # 54 at p. 2]. In fact, TPX stated that "the only claims asserted by" TPX were a tortious interference and a defamation claim. (Id.). TPX further stated that MIE's motion to dismiss its §1030 claim "should be denied due to mootness." (Id.). For TPX to now claim it is maintaining a §1030 claim is disingenuous and borders on bad faith.

February 18, 2007, approximately one (1) month after MIE filed its motion for summary judgment.   When MIE finally received the "audit," its metadata revealed that the document was not created until May 26, 2006.  (See Exh. 59, p. 8).  Thus, the alleged "audit" that Plesko claims to have shown ONE to determine the amount invoiced to be to ONE in January 2006 was not even created until four months after the invoice date and approximately one month after this lawsuit was filed.   In other words, Defendants have produced no evidence to show how the amount charged to ONE was calculated or if it was reasonable as required by §1030.

Presumably, Defendants could have provided the Court with evidence of how the $104,665 amount was calculated, but they have failed to do so.  In fact, Plesko testified that there was no hourly rate charged by TPX to ONE, so the Court cannot even take a number of hours allegedly spent by TPX and multiply it by an hourly rate.  However, even if TPX had provided an hourly rate for its services, it has failed to inform the Court as to the number of hours it allegedly spent on issues allegedly caused by MIE's action.  Although the "audit" that TPX created after this litigation started lists time spent by TPX working on WebChart during January 2006, it does not identify which of those hours were spent dealing with normal maintenance and which were spent dealing with the alleged problems.  (See Exh. 59).  As a result, the "audit" is not probative of the number of hours spent by TPX on issues allegedly caused by MIE's actions.

ONE and TPX have had almost two (2) years since this lawsuit started to determine how the $104,665 figure was calculated and to state why that amount is reasonable.  Defendants have failed to do so.  Without any underlying evidence to even suggest how the $104,665 charge was calculated or why the charge was reasonable, there can be no basis upon which the Court can determine whether that amount was a "reasonable cost" that may be used to show that Defendants suffered more than $5,000 of a loss from MIE's alleged actions.  See Southwest

Airlines Co. v. Boardfirst, 2007 U.S. Dist. LEXIS 96230, *47-49 (Sept. 12, 2007 N.D. Tx. 2007) (holding that conclusory testimony, taken alone, is insufficient to prove as a matter of law that a party has sustained the "loss" required under §1030(a)(5)(B)(i), and that without such evidence a court cannot conclude whether any costs incurred were "reasonable."). See also, 18 U.S.C. §1030(e)(11) (stating that "loss" means "any reasonable cost to any victim. . . .") (emphasis added).

Summary judgment was the time for Defendants to "put up or shut up," and Defendants have not even attempted to put up any evidence to support a claim that the $104,665 figure is reasonable. Accordingly, the $104,665 invoice cannot be considered as part of the "loss" allegedly suffered by ONE.

### b.     Plesko's and ONE doctors' testimony

Defendants also rely upon testimony from Plesko and ONE doctors in an attempt to show that ONE has suffered more than a $5,000 loss. Plesko submitted an affidavit in which he testified that TPX spent "many hours" addressing problems caused by MIE's alleged actions, and attached a stack of emails allegedly establishing these "many hours" of work. ONE's doctors testified that there was a "tremendous turmoil" at ONE allegedly due to MIE's actions. The sufficiency of this type of evidence has been explicitly rejected when determining if a party has suffered more than $5,000 loss for the purposes of a §1030 claim.

In Hasan v. Foley & Lardner, LLP, a §1030 plaintiff argued that its "partners and technical staff were diverted from their normal duties to investigate [the defendants] tampering with a laptop computer . . .." 2007 U.S. Dist. LEXIS 54930, *17-18 (July 26, 2007, N.D. Ill.). The Hasan court found that this testimony, with no evidence to back up its claims that the value of the time spent surpassed the required $5,000 threshold, was insufficient to show that the

16

plaintiff's damages exceed $5,000.  Id. at *17-18.  The Hasan court noted the Seventh Circuit's admonishment that, "[w]here a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial."  Id., citing Hammons v. Aramark Unif. Services, 368 F.3d 809, 817 (7th Cir. 2004).

In the present case, Defendants have utterly failed to present any evidence that would show the actual, or even estimated, time spent by TPX or ONE addressing problems allegedly caused by MIE.  Defendants have also not even attempted to quantify what the value of that time would be.  Instead, Defendants ask the Court to believe their self-serving and unsupported testimony that TPX spent many hours and those hours must be worth more than $5,000.  Unfortunately for Defendants, it was ONE's burden to cite to some admissible evidence as to what the value of this time actually was.

While Defendants attach 153 pages of emails to Plesko's affidavit, they do not specifically cite to any email.  Presumably, these emails from January 2006 are an attempt to show how much time TPX spent addressing issues with ONE's WebChart software that were allegedly caused by MIE.  However, none of these emails show how much time TPX spent, and many of these emails are wholly unrelated to MIE.[17]  In fact, one email consists of Plesko's request to hire a developer that would create a program that has the same functionality as WebChart.  (See Pl. Aff: D. Exh. PP, Dkt # 127-4, 3 of 30).  Further, more than half of the

---

[17] Plesko testified that ONE's WebChart software experienced a slowdown after January 16, 2006 and that this slowdown was due to MIE.  (D. App. Exh. PP, ¶ 16).  However, one of the emails attached to Plesko's affidavit provides that on January 17, 2006, TPX's chief technical officer, Steve Tyler, informed Plesko that "Tapeware is taking up a bunch of CPU on orthoone.orthone.com, that's probably why things have slowed down."  (See id. at Dkt #127-5, 28 of 30).  In other words, TPX's own documents show that the slowdown was caused not by MIE, but by a program on ONE's computer system.

emails were created after January 16, 2006, the date when Plesko testified that problems with WebChart were repaired.

It is clear that Defendants have done nothing other than provide the Court with 153 pages of emails, provide no explanation of them, and ask the Court to speculate that the emails show that ONE has been damaged. Like Plesko's and the ONE doctors' testimony, these emails are not probative of the amount or value of time spent by TPX and cannot count toward the $5,000 statutory threshold under §1030.

### c. The MySQL invoice.

The third item of "evidence" cited by Defendants consists of a payment made by ONE to MySQL in the amount of $1,995. This payment was made by MySQL in exchange for MySQL's services in repairing a problem with the WebChart software. MIE has already agreed that this is evidence of a potential loss suffered by ONE.

### d. The Kessler Report.

The final item of evidence presented by Defendants is the fact that ONE retained a consultant, Ben Kessler of Midwest Network Services, to "investigate fully" the alleged attacks on ONE's computer network and to prepare a report detailing changes that had been made to the WebChart software. However, Defendants fail to tell the Court what amount was even paid to Kessler or to present any evidence as to the value of Kessler's services to allow the Court to decide if the amount allegedly paid to him was "reasonable."

Moreover, even if Defendants had informed the Court how much Kessler was paid, any amounts paid to Kessler would not constitute a "loss" that could be counted toward the $5,000 threshold. Section 1030(e)(11) defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data,

program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). While courts have allowed recovery for losses beyond physical damage to property, they have consistently limited such losses, as well as damages to be recovered, under Section 1030, to "those costs necessary to assess the damage caused to the plaintiff's computer system or to resecure the system in the wake of a hacking attack." See Tyco Int'l Inc. v. John Does, 2003 U.S. Dist. LEXIS 11800, No. 01 Civ. 3856 (S.D.N.Y. July 11, 2003). See also In re Doubleclick, Inc. Privacy Litigation, 154 F. Supp. 2d 497, 524-25 (S.D.N.Y 2001)(limiting recovery to only costs incurred in remedying damage): Nexans Wires S.A. v. Sarkuysan Elektrolitik Bakir Sanayii Ve Ticaret A.S., 319 F. Supp. 2d 468, 476 (S.D.N.Y. 2004)(noting that recoverable costs were only those incurred to remedy damage to the computer).

In the present case, ONE retained Kessler on approximately March 3, 2006 to prepare a "formal and detailed report outlining as much as we can" about MIE's alleged activities.[18] (Exh. 60, Kessler Dep., 44-45). The MySQL invoice to ONE shows that its work for ONE was performed on January 16, 2007, and Plesko testified that MySQL repaired any problem with ONE's WebChart software prior to any Defendants contacting the FBI. (SMF § 69; Exh. 61, Plesko 5/23/07 Dep., 177). Thus, Kessler was not retained to perform any remedial work on ONE's computers, but was instead retained solely to allow ONE to provide a forensic report to the FBI regarding MIE's alleged actions.[19] In fact, Kessler admitted that his report was "forensic in nature, [and] not remedial." (Exh. 60, Kessler Dep., 45-46).

---

[18] Kessler testified that he did prepare a "preliminary" report in the January 20, 2006 time frame, but that document has not been produced by Defendants, Defendants have not stated what amount, if any, was paid to Kessler for that preliminary report, and Defendants do not identify that alleged "preliminary" report as evidence of ONE's "loss."

[19] ONE was obviously interested in providing such a report to the FBI because it implicated MIE, which was now a competitor with ONE's "ancillary," TPX. In addition, ONE has identified Kessler's report as a Rule 26

Because Kessler's "investigation" and report was not remedial, it cannot be counted as a "loss" in determining whether ONE can reach the $5,000 threshold set forth in §1030.  See In re Doubleclick, Inc. Privacy Litigation, 154 F. Supp. 2d 497, 524-25 (S.D.N.Y 2001) (limiting recovery to only costs incurred in remedying damage).[20]

### J.        Horner is entitled to summary judgment on Kusisto's claim of defamation.

Kusisto claims he was defamed by Horner's statements in an August 15, 2005 letter.  The allegedly defamatory statements consist of Horner informing the ONE doctors that Kusisto had been "deliberately deceptive" and "I fear Ray [Kusisto] has misled you as he has misled me." Defendants do not argue that Horner's statements regarding Kusisto's deception of Horner are not supported by actual facts, presumably because Kusisto testified that "Doug [Horner] rightfully thought he was misled."  (See SMF § 87).

---

expert report in this case.  (See Exh. 63).  Thus, ONE is seeking to recover as "loss" the cost it incurred to report a competitor to the FBI and the cost of preparing an expert report for use in litigation.  These are not the types of costs that are to be included in determining whether a party has suffered a $5,000 loss under §1030.  If they were, every plaintiff with a §1030 claim could meet the statutory loss minimum by paying more than $5,000 for the preparation of an expert report to be used in the litigation.

[20] Defendants also make two arguments that are easily disposed of.  First, Defendants claim that even though they have no evidence to support Plesko's testimony that there was a three-day shut down of ONE's WebChart software from January 16 through January 19, 2006 (and TPX's own documents conclusively rebut his testimony), Plesko's testimony is still accurate because it was based upon "his best recollection." (D. Rsp. at 31).  However, Plesko's testimony regarding the three day shutdown was given as the 30(b)(6) representative of TPX.  Accordingly, TPX was charged with preparing Plesko to present accurate testimony regarding TPX's claims.  His "best recollection" was insufficient and obviously false.  Second, Defendants argue that "MIE also appears to claim that it is entitled to judgment in its favor as a matter of law on the §1030 claim because the U.S. Attorney's office did not institute a criminal prosecution of MIE or Horner." (D. Rsp. at 32).  This argument is a red herring.  MIE has never argued that the lack of a criminal prosecution entitles it to summary judgment on the §1030 claim.  MIE informed the Court of the United States Attorney's Office "closing its file" in regard to the FBI investigation of MIE, because that information is relevant to the issue of whether ONE suffered more than $5,000 loss.  Throughout 2006 and into 2007, Kessler and Plesko had multiple discussions with the FBI regarding changes to the WebChart system.  (SMF § 76).  The FBI also interviewed numerous ONE physicians and Kusisto, seeking information about what damages, if any, ONE suffered from the changes to WebChart.  (SMF §§ 72, 77).  In the end, the U.S. Attorney's Office decided not to pursue any claims against MIE or Horner.  Ironically, Defendants assert that "one inference that must be drawn" in their favor "is that the fact that the matter was the subject of a pending civil suit, may have factored into the government's decision not" to prosecute MIE or Horner.  (D. Rsp. 33).  Defendants offer no explanation supporting the existence of this "inference," and their argument directly contradicts their claim that evidence of a failure to prosecute should be inadmissible in this case.

Instead, Defendants claim that Horner failed to present the "actual facts" that would support Horner's "fear" that Kusisto had misled the ONE doctors.  (D. Rsp. 34).  Horner clearly had sufficient facts to support his "fear" that Kusisto could be misleading ONE, as Kusisto admits that Horner "rightfully thought he was misled" by Kusisto.[21]

Horner's statement, "I fear Ray [Kusisto] has misled you as he has misled you" contains not just Horner's protected opinion, but also contains the factual support for that opinion. Horner was misled by Kusisto, Kusisto admits that Horner was justified in feeling misled, and because of Kusisto's actions in misleading Horner, Horner was justified in fearing that Kusisto was misleading ONE.[22]

### K.      MIE is entitled to Summary Judgment on Defendants' defamation claims based upon the Newspaper article.

All Defendants have brought claims of defamation against MIE based upon a statement by MIE's counsel in a newspaper article.   That statement, which accurately reflects the allegations in paragraphs 71 and 73 of MIE's Complaint, was, "MIE believes that the defendants caused the FBI investigation to be instituted under false pretenses and for the defendants' own benefit."  (SMF §88).

### 1.      *The Statement in the News Article Does Not Refer to ONE or Kusisto*

Reading the statement in the entire context of the news article reveals that the statement in the news article does not refer to ONE or Kusisto as providing any information to the FBI.  In

---

[21] Defendants apply numerous factors to determine if Horner's statement was protected opinion or actionable fact.  However, Defendants contend that Horner actually accused Kusisto of misleading ONE.  (D. Rsp., 35-37). This is not accurate.  Horner stated that he was in "fear" that Kusisto could be misleading ONE, and truthfully told ONE that his fear was based upon Kusisto's misleading of Horner.

[22] Certain statements are defamatory per se due to their nature, such as calling someone a liar, a whore, or a cheater.  However, once it is established that one is a liar, it cannot be actionable for another to truthfully state that one is a liar.  In other words, Kusisto is complaining about Horner telling ONE that Kusisto was misleading, while at the same time admitting that he was misleading.

21

fact, the article explicitly provides that MIE claims that "triPractix and Plesko provided information regarding [MIE] that 'they knew to be false.'"  Thus, any reasonable reading of the article would result in a conclusion that triPractix and Plesko, not Kusisto and ONE, were alleged to have provided false information to the FBI.

ONE and Kusisto argue that additional facts in the article would cause a reader to believe that MIE was referring to them in their attorneys' statement.  These facts are that (i) MIE sued ONE and Kusisto; (ii) that MIE claims Kusisto defamed MIE; (iii) that the FBI was investigation software tampering at ONE; (iv) that MIE claims that Kusisto made defamatory statements about MIE; (v) that the details of the FBI investigation is not public; and (vi) that Kusisto stated he would not speculate as to whether MIE was involved in "reported hacking incidences."  (D. Rsp. 41).  ONE and Kusisto do not explain why these facts would cause a reader to believe that Kusisto and ONE were the subject of the statement of MIE's counsel.  This is presumably because none of these statements would cause a reader to do so.  For example, whether or not the FBI investigation is public has no bearing whatsoever on whether ONE and Kusisto are the parties being referred to.  This is especially true in light of the specific statement in the article that "triPractix and Plesko" were the parties who instituted the FBI investigation.[23]

In sum, the statement by MIE's counsel was not concerning ONE or Kusisto, and cannot form the basis of a defamation claim by either party.

---

[23] In yet another unsupported "red-herring" argument, ONE and Kusisto argue that MIE cited evidence to show that "ONE and Kusistio instituted the FBI investigation."  (D. Rsp. 42).  MIE has never contended that ONE or Kusisto instituted the FBI investigation.  In fact, in MIE's Complaint, as well as all other documents filed by MIE in this case, MIE has consistently alleged that TPX and Plesko provided information to the FBI.

### 2.    *The Statements in the News Article Were True*

### a.    **TPX and Plesko provided false information to the FBI**

TPX and Plesko contend that TPX and Plesko did not provide the FBI with false information.  (D. Rsp. 43-48).  However, it is undisputed that Plesko informed the FBI that ONE's WebChart software was "inaccessible" during a three days period from January 16-19, 2006, when no such shutdown occurred.  (SMF § 72).  In response to the question, "Did you tell the FBI that ONE's WebChart software system had crashed?" Plesko responded, "Yes." (Id.).  In response to the question, "Did you tell them that it was inaccessible?" Plesko responded, "Yes." (Id.).  When asked if he told the FBI that ONE's WebChart system "underperformed for a number of days and [was] completely down for three days," Plesko testified he provided the FBI with "much more detailed information," such as "on this date this occurred, on this date this occurred.  On this date this occurred because anyone who reviews either the FBI's logs or Ben[Kessler]'s logs or his report" would see this information.  (Id.).[24]

TPX and Plesko argue that Plesko also told the FBI that there were shutdowns other than the fabricated 3-day shutdown.  Plesko did testify that "There were various spots during those 19 or 20 days where [WebChart] was inaccessible," however, Defendants claim that Kessler's expert report, which was provided to the FBI, sets forth all of the "effects" suffered ONE's WebChart software.  D. Rsp. 46-47.  Indeed, the Kessler methodically lists each alleged intrusion into ONE's WebChart software, and at the end of the discussion of each intrusion lists the "System impact of this attack incident."  (D. App. Tab Z: pp. 36, 43, 45, 53, 58, 70, 72, 83, 86, 91).  Only one such "System impact," on January 16, 2006, provides that the WebChart software

---

[24] Plesko admitted to telling the FBI that there was a shutdown of WebChart from January 16-19, even though TPX's own documents establish that no such shutdown ever occurred.  Thus, Plesko provided false information to the FBI.  TPX and Plesko argue that there is no evidence that Plesko noting the three day shutdown was what caused the FBI to investigate.  However, the fact that Plesko may have also provided some statements to the FBI that were not false does not change the fact that he provided false information.

was "unusable."  (See id., p. 91).  Thus, Defendants own 446 page expert report provides that there was never a shutdown of WebChart software other than on January 16, 2006, which was repaired by MySQL on that same day.  In other words, not only was there never a three day shutdown, there was never any shutdown other than for a part of January 16, 2006.  If Plesko told the FBI that there were additional shutdowns, which he did, Plesko and TPX's own evidence establishes that he provided false information to the FBI.

TPX and Plesko next allege that ONE's WebChart software "had been down on the Saturday before" the January 16, 2006 shutdown, and point to "contemporaneous e-mails during the relevant time" to establish that shutdown.  (D. Rsp. 46).   Tellingly, TPX and Plesko fail to specifically identify the emails to which they refer.  This is because those emails, which were thrown in the middle of 153 pages of emails attached to Plesko's affidavit, show that on Friday January 13, 2006  at 10:37 p.m. TPX began a "WC Update," which was completed on January 14, 2006.  (MIE has attached the relevant emails as Exhibit 62).  Upon hearing of the update, Plesko said, "Let me know when I can announce Webchart is back on-line . . .."  (Id.).  Plesko was then informed that some cables did not "fit right. Therefore, we need another outage and it will be shorter than this one because of the amount of data."  (Id.).  Thus, TPX's own documents establish any shutdown on January 14, 2006 was specifically caused by TPX to perform an "update."   TPX's claim regarding a January 14 shutdown due to the actions of MIE is disingenuous.

### b.    TPX and Plesko provided information to the FBI for their own Benefit

TPX and Plesko state "MIE's claim that it is undisputed that the sole reason the FBI was called in was to benefit TPX lacks credibility."  (D. Rsp. 47).  This is a blatant misrepresentation of MIE's position.  MIE has never contended that the "sole reason" TPX called the FBI was to

benefit TPX.  While TPX contends it performed a "civic virtue" by calling the FBI, those who engage in civic virtues do not typically call a radio station and newspaper to report that its competitor was being investigated by the FBI, let alone forward a magazine article regarding the FBI investigation to individuals outside of TPX and encourage them to share it with their friends. (SMF §§ 73).  In sum, TPX does not dispute that it immediately used the existence of the FBI investigation of MIE to its benefit in the marketplace.

**L.**    **MIE is entitled to Summary Judgment on TPX's claim of Tortious Interference Claim**

MIE moved for summary judgment on TPX's claim of tortious interference, noting that TPX had failed to put forth any evidence that it suffered damage from any action taken by MIE, which is an element of TPX's claim.  (MIE Rsp., 31).  TPX has failed to even respond to MIE's assertion, and MIE is therefore entitled to summary judgment on that claim.

**II.    CONCLUSION**

For the foregoing reasons, MIE and Horner respectfully request that the Court award MIE's summary judgment motion on its breach of contract and copyright infringement claims and on Defendants' breach of contract claims, tortuous interference defamation claims, and claim under 18 U.S.C. §1030 in all respects and award MIE and Horner all just and proper relief.

Respectfully submitted,

*s/ Matthew M. Hohman*
D. Randall Brown, Esq. (15127-49)
Matthew M. Hohman, Esq. (20926-02)
**BARNES & THORNBURG LLP**
600 One Summit Square
Fort Wayne, Indiana  46802
Telephone:  (260) 423-9440
Fax:  (260) 424-8316

ATTORNEYS FOR PLAINTIFF AND
THIRD PARTY DEFENDANT

25

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 14th day of April, 2008, electronically with

the Clerk of the Court using the CM/ECF system and by depositing the same in the United States

mail, first class postage prepaid, addressed to the following counsel of record:

Thomas A. Herr, Esq.
Cathleen M. Shrader, Esq.
Michael H. Michmerhuizen, Esq.
Barrett & McNagny LLP
215 East Berry Street
Post Office Box 2263
Fort Wayne, IN  46801

James P. Fenton, Esq.
Eilbacher Fletcher LLP
803 S. Calhoun Street, Suite 400
Fort Wayne, IN  46802

Lonnie D. Johnson, Esq.
Patrick B. Omilian, Esq.
Mallor Clendening Grodner & Bohrer LLP
511 Woodscrest Drive
Post Office Box 5787
Bloomington, IN 47407-5787

*s/ Matthew M. Hohman*
Matthew M. Hohman