IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| MEDICAL INFORMATICS ENGINEERING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ORTHOPAEDICS NORTHEAST, P.C., triPRACTIX, LLC, RAYMOND KUSISTO, and TODD PLESKO, | ) ) ) | Cause No. 1:06 CV 173 |
| | ) | |
| Defendants/Counterclaimants, and Third-Party Plaintiffs, | ) ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DOUG HORNER, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

---

## DEFENDANTS' JOINT REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Thomas A. Herr (#8444-02)
Cathleen M. Shrader (#18159-02)
BARRETT & MCNAGNY LLP
215 East Berry Street
Fort Wayne, Indiana 46802
Tel: (260) 423-9551
Fax: (260) 423-8920
E-mail: tah@barrettlaw.com
    cms@barrettlaw.com

*Attorneys for Defendants Orthopaedics Northeast, P.C. and Raymond Kusisto*

James P. Fenton (#6808-02)
EILBACHER FLETCHER, LLP
803 S. Calhoun Street, Suite 400
Fort Wayne, IN 46802
(260) 425-9777; (260) 424-9177 (fax)
Email: fenton@eflawyers.com

Lonnie D Johnson (#16758-53)
Patrick B Omilian (#23973-53)
MALLOR CLENDENING GRODNER& BOHRER LLP
511 S. Woodscrest Drive
Bloomington, IN 47407
(812) 336-0200; (812) 333-0083 (fax)
Email: ljohnson@mcgb.com
    pomilian@mcgb.com

*Attorneys for triPRACTIX, LLC and Todd Plesko*

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................................................1

II.  INCORPORATION OF PRIOR ARGUMENTS .........................................1

III. ARGUMENT IN REPLY ........................................................................2

    A.   The Defendants Are Entitled to Judgment in Their Favor on MIE's Copyright Infringement Claims ........................................................................2

        1.   The Copying of Web Chart and Provision of Access to PhysCal ...........2

        2.   ONE's Actions Constitute a Fair Use .....................................2

        3.   The Defendants Are Entitled to a Summary Judgment on MIE's Allegation that triSCRIPT Infringes on MIE's Copyright in WebChart .7

        4.   Even if MIE Could Show that Code Owned by It Was Copied, Literal Elements of Computer Programs are Not Insulated from the De Minimis Defense, Which Defeats MIE's Claim in Any Event .............................9

        5.   MIE Cannot Enforce Its Copyright Since Its Various Actions Constitute Copyright Misuse....................................................................11

        6.   MIE's Claims Are Subject to the Defense of Unclean Hands................13

        7.   ONE Is Not Liable for Others' Alleged Acts of Infringement ...............16

    B.   The Defendants Are Entitled to Judgment on MIE's Contract Claims. ..............17

        1.   The Undisputed Evidence Demonstrates that MIE Committed the First Material Breach of Contract...................................................................17

        2.   The SLA's Non-Compete is Overly Broad and Unenforceable .............19

        3.   MIE's Breach of Contract Claim Relating to Data Migration Is Preempted .................................................................................20

    C.   Defamation Claims Are Entitled to Judgment on the Defamation Claims..........21

        1.   Kusisto's Alleged Statements ....................................................21

        2.   Plesko's Alleged Statements.......................................................23

i

D.      MIE Has Not Stated a Claim for Misappropriation of Trade Secrets.................24

E.      Several of MIE's Damages Theories are Fatally Flawed ....................................25

    1.      MIE Has Failed to Justify Its Claim for "Value Impairment Due to NMC Timing" and Cannot Be Permitted to Change its Damages Theory at This Late Date...............................................................................................25

    2.      MIE's Claim for Damages for "Unjust Enrichment Through Non-Compete Violation" Fails as a Matter of Law .........................................27

    3.      MIE's Damages Claim for "Accelerated Market Entry" Is Without Merit.............................................................................................28

IV.     CONCLUSION .....................................................................................................29

# TABLE OF AUTHORITIES

*Cases*                                                   **Page**

*4-D Bldgs., Inc. v. Palmore*,
688 N.E.2d 918 (Ind. Ct. App. 1997)……………………………………………………..28

*Assessment Technologies of WI, LLC v. WIREdata, Inc.*,
350 F.3d 640 (7th Cir. 2003)……………………………………………………3-6, 12, 21

*Bandido's, Inc.  v. Journal-Gazette Co., Inc.*,
712 N.E.2d 446 (Ind. 1999)…………………………………………………………21-22, 23

*Chamberlain Group, Inc. v. Skylink Techs., Inc.*,
381 F.3d 1178 (Fed. Cir. 2004)………………………………………………………………13

*Computer Assoc. Int'l v. Altai, Inc.*,
775 F. Supp. 544 (E.D.N.Y. 1991) ..........................................................................10

*Computer Associates Intern. v. Quest Software, Inc.*,
333 F. Supp. 2d 688 (N.D. Ill. 2004) ....................................................................25

*Creative Demos, Inc. v. Wal-Mart Stores, Inc.*,
142 F. 3d 367 (7th Cir. 1998) ..............................................................................28

*DSMC, Inc. v. Convera Corp.*,
479 F. Supp. 2d 68 (D.D.C. 2007) ......................................................................4-5

*Data Gen'l Corp. v. Grumman Sys. Support Corp.*,
36 F.3d 1147 (1st Cir. 1994).................................................................................13

*Dicen v. New Sesco, Inc.*,
839 N.E.2d 684 (Ind. 2005) ................................................................................20

*Do It Best Corp. v. Passport Software, Inc.*,
No. 01 C-7674, 2005 WL 743083 (N.D. Ill. May 31, 2005) ...........................................25

*Dun & Bradstreet Software Services, Inc. v. Grace Consulting, Inc.*,
307 F.3d 197 (3d Cir. 2002)...............................................................................10

*E.E.O.C. v. Aon Consulting, Inc.*,
149 F. Supp. 2d 601 (S.D. Ind. 2001) ....................................................................24

*Enreach Technology, Inc. v. Embedded Internet Solutions, Inc.*,
403 F. Supp. 2d 968 (N.D. Cal. 2005) ........................................................................11

*Evolution, Inc.  v. Sun Trust Bank*,
    342 F. Supp. 2d 943 (D. Kan. 2004) ............................................................5-6

*Feist Pubs., Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991) ............................................8

*Huthwaite, Inc. v. Randstad General Partner, LLC*,
    No. 06-C-1548, 2006 WL 3065470, (N.D. Ill. 2006 Oct. 24, 2006) ..............................13

*IDX Systems Corp. v. Epic Systems Corp.*,
    285 F.3d 581 (7th Cir. 2002) .......................................................................25

*In re Aimster Copyright Litig.*,
    334 F.3d 643 (7th Cir. 2003) .......................................................................17

*Jamison Business Systems, Inc. v. Unique Software Support Corp.*,
    No. CC 02-4887 (ETB), 2005 WL 1262095 (E.D.N.Y. May 26, 2005)……………….9-10

*Keystone Driller Co. v. General Excavator Co.*,
    290 U.S. 240, 54 S. Ct. 146, 78 L. Ed. 293, 297 (1933)…………………………14-15, 16

*Lasercomb America, Inc. v. Reynolds*,
    911 F.2d 970 (4th Cir.1990) ........................................................................12

*Mitchell Bros. Film Group v. Cinema Adult Theater*,
    604 F.2d 852 (5th Cir. 1979) .......................................................................14

*MiTek Holdings, Inc. v. Arce Engineering Co., Inc.*,
    89 F.3d 1548 (11th Cir. 1996) ......................................................................10

*QAD, Inc. v. ALN Associates, Inc.*,
    770 F. Supp. 1261(N.D. Ill. 1991)……………………………………………………12-13

*Ringgold v. Black Entertainment Television, Inc.*,
    126 F.3d 70 (2d Cir. 1997)..........................................................................11

*Rokeach v. Avco Embassy Pictures Corp.*,
    197 U.S.P.Q. 155, 1978 WL 23519 (S.D.N.Y. Jan 17, 1978) .........................................11

*Sega Enterprises, Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) .......................................................................4

*Toulmin v. Rike-Kumler Co.*,
    316 F.2d 232 (6th Cir. 1963) .......................................................................10

*Vault Corp. v. Quaid Software Ltd.*,
    847 N.E.2d 255 (5th Cir. 1988) ..................................................................................11

**Other Authorities**                                                                                    **Page**

3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT ………………………...10-11

*Standards for Professional Conduct Within the Seventh Federal Judicial Circuit* ....................1

# I.  INTRODUCTION

As this Court has previously recognized, abiding by the Seventh Circuit's *Standards for Professional Conduct* is essential for a just and efficient resolution of complex cases.  *See Active Products Corp. v. A.H. Choitz & Co. Inc.*, 163 F.R.D. 274, 285 (N.D. Ind. 1995) Indeed, the *Standards* recognize that uncivil, abrasive, or hostile conduct "impedes the fundamental goal of resolving disputes rationally, peacefully, and efficiently."  *Standards*, preamble.

The tone and tenor of MIE's and Horner's briefs in this matter, and their frequent resort to attacks on the character and motivation of the Defendants' counsel (whether by accusing them of intentionally misleading the Court, bringing a frivolous motion, or by accusing them of suborning perjury), make addressing the actual arguments (complex themselves) even more difficult.  *See Standards* (Lawyers Duties to Other Counsel ¶ 4) ("We will not, absent good cause, attribute bad motives or improper conduct to other counsel or bring the profession into disrepute by unfounded accusations of impropriety.").  While zealous advocacy is both worthy and required of counsel, MIE's and Horner's vituperative attacks cloud and unnecessarily complicate the Court's already difficult task in deciding the complex matters before it.[1]

# II.  INCORPORATION OF PRIOR ARGUMENTS

All parties have filed Motions for Partial Summary Judgment.  In order to minimize the repetition of arguments previously made, the Defendants hereby incorporate by reference the evidence and arguments contained in their Joint Motion for Partial Summary Judgment, Appendix, and supporting Brief [dkt#110-12] and their Joint Opposition to MIE's and Horner's Motion for Partial Summary Judgment and Appendix [dkt#126-27].

---

[1] MIE does not respond to, and presumably has abandoned its claim for intentional interference with business relationships.  *See* Defendants' Opening Brief at 45.  So at least for that issue the Defendants' argument was not meritless "caus[ing] MIE to incur needless fees responding and wast[ing] the Court's time," as MIE has described

### III.  ARGUMENT IN REPLY

A.    **The Defendants Are Entitled to Judgment in their Favor on MIE'S Copyright Infringement Claims.**

1.    **The Copying of WebChart and Provision of Access to PhysCal**

MIE claims that the Defendants have not addressed ONE's copying of WebChart and the access to WebChart it provided to PhysCal.  MIE Response Brief at 4-5.   However, the Defendants' opening brief was based specifically on MIE's contentions as set out in its discovery responses.  See Defendants' Opening Brief at 2 (citing MIE's Supplemental Responses to ONE's Interrogatories at 8-9 (App. Ex. BB)).  MIE's discovery responses were not as detailed as MIE's own Motion to Partial Summary Judgment in which it contended the Defendants infringed its copyright in "at least four ways."  *See* MIE Opening Brief at 18.  These four bases, including the "copying of WebChart and ONE's provision of that copy to PhysCal," are specifically addressed in the response to MIE's Motion for Partial Summary Judgment.  *See* Defendants' Response Brief at 19-20.   Since these issues were raised in MIE's Motion and are opposed by the Defendants, any failure to address them in the Defendants' Motion cannot be grounds to deny the Defendants' relief on MIE's copyright infringement claims.

2.    **ONE's Actions Constitute a Fair Use.**

In claiming that the creation of a data migration script to remove ONE's data violates the Copyright Act, MIE's sole response to the Defendants' fair use defense is its contention that ONE did not create or contract to create a migration script in order just to remove its own data, but "so that it could compete with MIE."  MIE's argument is premised on an assumption that licensees are at the mercy of software licensors and can never remove their own data if the

---

the remainder of the Defendants' arguments.  *See* MIE Response Brief at 4.  There are also other contentions, noted below, which the Plaintiffs have abandoned in the face of the Defendants' supposedly "meritless" arguments.

means by which the data is removed could also be used by anyone else to remove data.  The case law simply does not support such a conclusion.

MIE argues that Judge Posner's analysis in *Assessment Technologies of WI, LLC v. WIREdata, Inc*., 350 F.3d 640 (7th Cir. 2003) (concluding that an unauthorized use in conjunction with migrating one's own data out of a copyrighted program is a fair use), is not applicable to the removal of ONE's data from WebChart, since TPX expected eventually to migrate data for other entities that wanted to remove their own data.  However, the fact that TPX expected it might perform the same service for other entities does not render the removal of ONE's data (or any other entities' data) an *un*fair use.

The unfair competition Judge Posner discusses in *WIREdata* was the use of code obtained in migration to create and/or sell the product that housed the data.  In *WIREdata*, while the court found it was a fair use to extract data from Market Drive, it noted that it would be *un*fair to use that code "to go into competition with AT by selling copies of Market Drive."  *Id.* at 645 (emphasis added).  It is undisputed that none of the Defendants has even been accused of going into competition with MIE by selling copies of WebChart.  Although TPX has the ability to license GE Centricity EMR software, there is no contention whatsoever that GE Centricity infringes on WebChart.  Hence MIE's response to the fair use doctrine is simply inapplicable.

Consistent with the uncivil tone throughout its entire brief, MIE claims no less than eight times in its Response that opposing counsel, in an attempt to deceive the Court,  intentionally omitted ellipses from a quote from *WIREdata*.[2]  However, as set out above, the text that would have been indicated by ellipses is not even relevant here, since it dealt with a hypothetical

---

[2] In fact, the omission was nothing more sinister than a typographical error, for which counsel apologizes.  Although unfortunate, such errors occur, quite apart from any intention to mislead the Court.

situation in which WIREdata used the access it gained to migrating data and went "into competition with AT <u>by selling copies of Market Drive</u>."  *Id.* at 645 (emphasis added).

MIE claims the creation of the migration script was because "ONE wanted to use MIE's copyrighted information to compete against MIE."  MIE Response at 7.  But MIE's argument necessarily assumes that the Copyright Act gives it the *right* to prohibit ONE and other licensees from extracting their own data without MIE having exclusive control of that process.  Apparently recognizing this fatal flaw in its argument, MIE claims in its Introduction that "TPX used WebChart and the [data migration] program to compete with MIE <u>in the sale and licensing of EMR software</u>."  *Id.*  at 1 (emphasis added).  But this argument fares no better, since it necessarily assumes that MIE had the right to bar every other WebChart licensee from retrieving its own data as ONE did.  This is not the kind of competition the Copyright Act was designed to protect against.  What MIE would have this Court sanction is a system that stifled creativity by making it prohibitively costly to change software vendors.  A copyright does not give the holder the right to make data migration more costly in the hope of obtaining some financial advantage. *See WIREdata*, 350 F.3d at 645.

MIE heavily relies on *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68 (D.D.C. 2007), as "strikingly similar" to the case at bar.  MIE Response at 13.  In *DSMC*, the district court found both *WIREdata* and *Sega Enterprises, Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992), inapplicable, because in those cases the copying was not for the purposes of creating the software or product allegedly infringed.  *DSMC*, 479 F. Supp. 2d at 83 (citing *WIREdata*, 350 F.3d at 645; *Sega*, 977 F.2d at 1520-28).  But as set out above, MIE does not even allege that anyone accessed WebChart to copy and sell "WebChart" or even that they used access to WebChart in order to create another EMR.  What was fatal to the defendant in *DSMC* was not that it created a

migration program, but because the defendant "<u>wanted to create a product similar to DMAS that contained many of the same features as DMAS</u>." *Id.* (emphasis added). Simply put, the *use* to which the licensed software was being put was no longer *fair*.

The impermissible competition referenced in *WIREdata* and *DSMC* was not competition in <u>migrating</u>, but using access to the licensed software to create a <u>program to compete with the licensed software</u>. Here, the only software competitive with WebChart was Centricity, which none of the parties had any hand in creating. If MIE's analysis were correct, a third party could *never* migrate data for a client since it is always a potential competitior with the copyright holder for migrating data. This result is untenable since *WIREdata* itself sanctioned a third-party's data migration. Moreover, under MIE's theory, even the licensee could never migrate its own data, since the program it created would be capable of migrating another licensee's data, and thus arguably "competitive" with MIE. Accordingly, MIE's attempts to distinguish *WIREdata* are unavailing.

In discussing *Evolution, Inc. v. Sun Trust Bank*, 342 F. Supp. 2d 943 (D. Kan. 2004), MIE again claims the Defendants are engaging in intentional misrepresentations to the Court. *See* MIE Response Brief at 11 (asserting Defendants "blatantly misrepresent the facts"); *id.* ("Defendants also intentionally omit from their discussion of *Evolution* the fact that the court also relied on a lack of competition . . . ."); *id.* at 12 ("The law is clear, even if Defendants' version of it is not."). In short, MIE asserts the case is distinguishable.

The bases on which MIE would distinguish *Evolution* are not persuasive. MIE admits that the Defendants provided "a technically correct recitation" of the case's holding, MIE Response Brief at 11, but claims the case is distinguishable since "the license agreement at issue in <u>Evolution</u> specifically allowed the licensee to modify and enhance the plaintiff's source code."

*Id.* (citing *Evolution*, 342 F. Supp. 2d at 954).  An examination of the *Evolution* decision reveals that the licensee's limited contractual right to modify or enhance the software[3] was applicable only where files were being modified "to correct bugs in the software's operation."  *See id.* at 958.  Moreover, the *Evolution* court found that the propriety of such modifications was not dependent on whether the license agreement gave the defendants the right to modify or enhance the software, since 17 U.S.C. § 117 "permits a licensee to modify licensed software in order to enhance its functionality or make it useable to the licensee."  *Id.*  Accordingly, MIE's first attempt to distinguish *Evolution* is unavailing.

MIE also argues that *Evolution* is distinguishable because "Defendants also intentionally omit from their discussion of Evolution the fact that the court also relied on a lack of competition between the parties in finding a fair use."  MIE Response Brief at 11.   Again, the only relevant competition was competition against the underlying software.  *See Evolution*, 342 F. Supp. 2d at 97 (noting "no effect on the potential market for plaintiff's source code") (quoting *WIREdata*, 350 F.3d at 645)).  Merely having the ability to migrate data from WebChart will not affect the market for EMR software – unless of course MIE relies on nothing more than prohibitively high transfer costs to keep its customers.  This is not an interest the law protects.

**3.    The Defendants Are Entitled to Summary Judgment on MIE's Allegation that triSCRIPT infringes on MIE's Copyright in WebChart.**

---

[3]This "right" was strictly limited, and required the licensee to "request the assistance of Evolution to modify the Licensed Software."  *Evolution*, 342 F. Supp. 2d at 947.  Moreover, "any and all enhancements or modifications to the Licensed Software [were required to] remain the sole property of Evolution and [were] subject to all the terms and conditions of [the] Source License."  *Id.*  It was only if Evolution was not capable of assisting in the modifications that the licensee was permitted to make a modification or enhancement to the software, but even then it could make only "de minimis changes" which thereafter had to be submitted to Evolution.  *Id.*  MIE contends that the failure of the Defendants to discuss this "right" constitutes a misrepresentation of the facts of the case to the Court.  MIE Response at 11.  Had the very same right existed in the MIE License Agreement, it would not have controlled the issue of whether the migration script was a fair use, and was not even discussed by the *Evolution* court in its findings relating to data migration.  *See Evolution*, 342 F. Supp. 2d at 955-56.

MIE contends that there is clear evidence that triSCRIPT infringes on WebChart because each contains 58 identical lines of code.  However, as set forth in detail in the Response the MIE's Motion to Strike, the 58 lines of code did not come from WebChart, but came from an ONE Microsoft Word Master Template.  *See* Defendant's Response to Motion to Strike at 8 (citing Weicker Aff. ¶¶ 10-14 (Ex. 7); Tyler Supp. Aff. ¶6-7 (Ex. 6); Johnson Supp. Aff. ¶ 12 (Ex. 4))[4].  The evidence regarding ONE's use of templates establishes the following:  (1) ONE used templates well before and after it started using computerized transcription programs; (2) for more than ten years, ONE used its templates in conjunction with two other software packages before using MIE's transcription software; (3) ONE provided its templates to MIE when it started using MIE's software; (4) ONE continued to use templates after it ceased using MIE's software, and continues to use templates with its current transcription software, MedRite; (5) the operation of the templates in the <u>five</u> different transcription packages ONE has used, including how entry points function, has been substantially similar; (6) at no time until it filed the Motion to Strike has MIE claimed it owned ONE's templates; and (7) at no time has MIE ever demanded that ONE cease using the templates.  *See* Weicker Aff. ¶¶ 4-14.

Despite this overwhelming evidence, MIE baldly asserts that it owns ONE's Master Template, through MIE's clever use of brackets.  MIE Brief in Support of Motion to Strike at 4; MIE Statement of Genuine Issues at 15 ("A January 23, 2006 email reveals that Johnson told Tyler that he 'looked through this [WebChart] master template' . . . .").  In fact, the template being referred to in the e-mail exchange was the <u>ONE</u> master template.  *See* Johnson Supp. Aff. ¶¶  8; Tyler Supp. Aff. ¶ 11.  It should go without saying that MIE cannot substitute interpolation

---

[4] Rule 56(e) permits affidavits submitted in support of summary judgment motions to be supplemented by further affidavits.  Rule 56(c) allows an adverse party to submit affidavits "prior to the day of hearing."  Supplemental affidavits may clarify prior testimony.  *See Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1171-72 (7th Cir. 1996).

for real evidence where it has failed to establish both (1) the ownership of a valid copyright in the template macros; and (2) copying of constituent elements of the template macros that are original. *See Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

An examination of the Software License Agreement (SLA) demonstrates that the template macros do not fall within its purview. The SLA specifically defines the "Licensed System" as "the Software and the Documentation[5] and any modifications to the Software and the Documentation." SLA § 1.2(f). "'Software' means the object code form of the computer software products listed as licensed products in Supplement A of this Agreement." SLA § 1.2(i). Supplement A mentions a "Transcription Module (per-station license, installation and configuration fees apply), but not any templates.

Leaving aside the incontrovertible evidence that ONE owns the templates, any claim to the entry point macros contained in those Microsoft Word templates, is subject to Microsoft's End-User License Agreement (EULA), which provides in pertinent part:

> 1.7     License Grant for Templates. The Software may include document templates. <u>You may copy and modify the document templates</u> available as part of the Microsoft software that accompanies this EULA and distribute such templates along with your modifications for use by other licensees of the Software. You also may copy, modify and distribute the templates available through related Internet-based services along with your modifications for use by other licensees of the Software, but only for personal or commercial correspondence involving person-to-person communication. <u>You are not licensed to do any of the following</u>:
>     •     <u>You may not sell, resell, license, rent, lease, lend, or otherwise transfer for value, the templates</u>.

*See* Tyler Supp. Aff. Ex. I (emphasis added). Accordingly, even if MIE were to contend that it wrote all the macros contained in the ONE master template relating to entry points and that the

---

[5] "'Documentation' means the user manuals, computer-based help text and related technical documents that describe the operation of the Software and the procedures required to install and operate the Software." SLA § 1.2(d).

SLA somehow applied to macros contained in word processing templates, the Microsoft Word EULA expressly prohibits the selling or licensing of modifications made to Word templates. Given this restriction, MIE cannot show that the 58 lines of code it asserts was copied and infringed is even protectable, let alone that it owns the code. Accordingly, it is undeniable the Defendants are entitled to judgment in their favor for several independent reasons on MIE's claim that the triSCRIPT program infringes on MIE's copyright in WebChart.

4.      **Even if MIE Could Show that Its Code Was Copied,  the *De Minimis* Defense Defeats MIE's Claim in Any Event.**

As set out above and in the response to the Motion to Strike, there is no evidence that the 58 lines of code MIE claims to own were copied from WebChart. Indeed, the evidence MIE itself submits shows that Johnson obtained the entry points macro from ONE's Master template well before the time MIE claims Johnson even had access to "the [WebChart][6] database." *See* Response to Motion to Strike at 8. However, even if MIE could make a colorable claim of infringement, that claim is still defeated by the *de minimis* defense.

In response, MIE does not even attempt to show either that the 58 lines allegedly taken from WebChart constitute more than a tiny fraction of that program or that these lines are critical to the operation of the program, both inapplicable objections to the defense. *See* Defendants' Opening Brief at 8-12 and Response Brief at 23-27. Instead, MIE claims that asserting the *de minimis* defense is "frivolous" since "[t]he *de minimis* defense does not apply to copying of a computer program's literal elements." MIE Response Brief at 20 (citing *Jamison Business Systems, Inc. v. Unique Software Support Corp.*, No. CC 02-4887 (ETB), 2005 WL 1262095, at *10 (E.D.N.Y. May 26, 2005). MIE's argument is without merit.

---

[6] This is yet another example of MIE interpolating "WebChart" into a quote. The original text reads "Note that this is a backup copy of the database, but is actually missing three tables." Brief in Support of Motion to Strike Ex. F.

First, MIE appears to confuse whether a defense has *prevailed* in a case with whether a defense is *available*. As the *Jamison* court notes, in the first case it cites, *Computer Assoc. Int'l v. Altai, Inc.*, 775 F. Supp. 544 (E.D.N.Y. 1991), it was undisputed that the defendant had copied 30% of its code from the plaintiff's program, and that the district court there found this was infringement. *Id.* Thirty percent can hardly be considered quantitatively insignificant. The second case cited by *Jamison* was *Dun & Bradstreet Software Services, Inc. v. Grace Consulting, Inc.*, 307 F.3d 197 (3d Cir. 2002). In *D&B*, it was undisputed that one of the allegedly infringing programs, through the use of copy and call commands, "actually consists of 62% Geac code," and the other program "possesses approximately 43% of Geac's code." *Id.* at 208. These quantitative numbers alone defeats any *de minimis* defense. Moreover, it was undisputed that what was copied was "highly critical." *Id.*

While the *Jamison* court was correct that the *de minimis* defense failed in both those cases, this observation cannot be stretched to support MIE's claim that the defense is inapplicable where source code is involved.[7] If MIE were correct, it would exalt literal elements of computer programs over all other copyrightable media in terms of the level of protection afforded to it under the law. In short, what MIE argues is that while *de minimis* copying of books, music, or other works[8] is not infringement as a matter of law, *de minimis* copying of source code is. MIE provides no authority for this astounding proposition. In fact, the opposite

---

[7] MIE also claims a case cited by the Defendants, *MiTek Holdings, Inc. v. Arce Engineering Co., Inc.*, 89 F.3d 1548 (11th Cir. 1996), makes it clear that the *de minimis* defense is only available where non-literal elements are allegedly infringed. *See* MIE Response Brief at 2, 20. In *MiTek* the works allegedly infringed were non-literal elements, *MiTek*, 89 F.3d at 1556 n.15, but *MiTek*'s discussion of the *de minimis* defense was not limited to non-literal elements and would be applicable to any alleged copyright violation, *id.* at 1560 (speaking generally of the defense in relation to "copied material" (citing 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.03[F][5] at 13-146 (1996)).

[8] The word-for-word lifting of the text of a book can be *de minimis*. *See, e.g.*, *Toulmin v. Rike-Kumler Co.*, 316 F.2d 232, 232 (6th Cir. 1963) (deliberate lifting of a sentence and a half from a 142-page out-of-print book is de minimis and not actionable); *Rokeach v. Avco Embassy Pictures Corp.*, 197 U.S.P.Q. 155, 162, 1978 WL 23519

is true. *See, e.g.*, *Vault Corp. v. Quaid Software Ltd.*, 847 N.E.2d 255 (5th Cir. 1988) (copying

approximately 30 characters of source code out of 50 pages not significant enough to constitute

infringement);[9] *Enreach Technology, Inc. v. Embedded Internet Solutions, Inc*., 403 F. Supp. 2d

968, 977 (N.D. Cal. 2005) (discussing *de minimis* doctrine's application to question of whether

copied source code constituted infringement); *see also* 2 NIMMER ON COPYRIGHT § 801[G] (The

legal maxim of *de minimis non curat lex* applies to copyright actions no less than to other

branches of the law."). Accordingly, since MIE's infringement claims relating to triSCRIPT is

subject to the *de minimis* defense, and since MIE has failed to offer any valid argument that the

defense does not apply, the Court should grant judgment on this claim.

### 5.     MIE Cannot Enforce Its Copyright Since Its Various Actions Constitute Copyright Misuse.

Defendants have asserted that MIE is prohibited from recovering on its copyright

infringement claim because of MIE's copyright misuse. Defendants have shown three different

courses of conduct by MIE that constitute copyright misuse: (1) enforcement of the overbroad,

unduly restrictive non-competition provision in the SLA; (2) MIE's attempt to use its copyright

to prohibit ONE from extracting its own data from WebChart; and (3) Doug Horner's admitted

computer trespassing on and tampering with ONE's computer network. Standing alone, each of

these grounds constitutes copyright misuse by MIE sufficient to preclude its infringement claims.

In response, MIE advances an erroneously narrow interpretation of the copyright misuse

defense as applied in this Circuit. Although the Seventh Circuit has not squarely addressed the

---

(S.D.N.Y. Jan 17, 1978) (copying less than 100 words from plaintiff's 70,000-word book *de minimis*). MIE proffers no argument as to why the alleged word-for-word lifting of source code would not be subject to the same defense.
[9]Although the precise issue was not before it, the Second Circuit cited *Vault* to illustrate the *de minimis* doctrine and specifically referenced its application to a claim that source code had been infringed. *See, e.g.*, *Ringgold v. Black Entertainment Television, Inc*., 126 F.3d 70, 75 (2d Cir. 1997) ("[T]he concept of *de minimis* is useful in insulating trivial types of copying from liability (the photocopied cartoon on the refrigerator) and in marking the quantitative threshold for actionable copying, *see, e.g.*, *Vault Corp. v.Quaid Software, Ltd*., 847 F.2d 255, 267 (5th Cir. 1988) (30 characters out of 50 pages of source code held *de minimis*) . . . .").

proper application of this evolving defense, it has indicated its agreement with the Fourth

Circuit's interpretation of copyright misuse in *Lasercomb America, Inc. v. Reynolds*, 911 F.2d

970 (4th Cir.1990), despite early case law that intimated skepticism:

> No effort has been made by WIREdata to show that AT has market power merely by virtue of its having a copyright on one system for compiling valuation data for real estate tax assessment purposes.  Cases such as *Lasercomb*, however, cut misuse free from antitrust, pointing out that the cognate doctrine of patent misuse is not so limited, though a difference is that patents tend to confer greater market power on their owners than copyrights do, since patents protect ideas and copyrights, as we have noted, do not. The argument for applying copyright misuse beyond the bounds of antitrust, besides the fact that confined to antitrust the doctrine would be redundant, is that <u>for a copyright owner to use an infringement suit to obtain property protection, here in data, that copyright law clearly does not confer, hoping to force settlement or even achieve an outright victory over an opponent that may lack the resources or the legal sophistication to resist effectively, is an abuse of process</u>.

*WIREdata*, 350 F.3d at 647 (emphasis added). Thus, the Seventh Circuit opined that a copyright

holder's attempt to use a copyright to obtain rights not conferred by copyright law, as MIE is

doing here, is an abuse of process that also may also constitute copyright misuse.

That copyright misuse may arise apart from antitrust has been accepted by district courts

in this Circuit.  In *QAD, Inc. v. ALN Associates, Inc*., 770 F. Supp. 1261(N.D. Ill. 1991), the

court found copyright misuse absent any antitrust analysis, where a plaintiff prosecuted a

copyright infringement action for material that was not subject to copyright protection:

> While it is true that <u>if</u> ALN's defense were framed as an antitrust violation this Court would have to apply antitrust analysis, <u>a copyright misuse defense can be framed in other terms</u>.  As *Lasercomb* points out: The question is not whether the copyright is being used in a manner violative of antitrust law (such as whether the licensing agreement is "reasonable"), but whether the copyright is being used in a manner violative of the public policy embodied in the grant of the copyright.

*Id*. at 1266 (emphasis added) (citations omitted).  Applying this standard, the Court found

QAD's action to "sue ALN and restrain it from the use of material over which QAD itself had no

rights" was "even more egregious" than the misuse in *Lasercomb*.  *Id.* at 1267; *see also*

*Huthwaite, Inc. v. Randstad General Partner, LLC*, No. 06-C-1548, 2006 WL 3065470, at *9 (N.D. Ill. 2006 Oct. 24, 2006) (copyright misuse defense properly raised where plaintiff is "attempting to use its copyrighted books to cover the unprotectible ideas within those books by filing copyright infringement lawsuits and forcing companies such as [the defendant] to either settle or incur litigation expenses").  Such misuse was "a complete bar to QAD's prosecution of its copyright infringement case."  *QAD*, 770 F. Supp. at 1266.

MIE cites *Chamberlain Group, Inc. v. Skylink Techs., Inc*., 381 F.3d 1178 (Fed. Cir. 2004) and *Data Gen'l Corp. v. Grumman Sys. Support Corp*., 36 F.3d 1147 (1st Cir. 1994) for the proposition that the Seventh Circuit would "require" an antitrust violation.  *See* MIE Response Brief at 22.  However, MIE's reliance upon these cases misses the mark. *Chamberlain* and *Data Gen'l* stand for the limited proposition that *if* a defendant alleges that the plaintiff committed copyright misuse by engaging in anticompetitive conduct, then the misuse defense is analyzed using antitrust principles.  *See Chamberlain*, 381 F.3d at 1201-02, *Data Gen'l*, 36 F.3d at 1169-70 ("[Defendant] does not claim that [Plaintiff] misused its copyright or acted inequitably in any fashion *other than* through its alleged violations of the Sherman Act.") (emphasis added).  These cases do not support MIE's contention that copyright misuse *requires* an antitrust violation in every instance. Here, Defendants have shown egregious conduct by MIE (apart from antitrust violations) in which MIE has used its copyright to attempt to secure rights not conferred by the copyright laws.  This constitutes copyright misuse.

### 6.    MIE's Claims Are Subject to the Defense of Unclean Hands

Defendants have established that MIE comes to the court with unclean hands, barring it from recovery on its copyright and related claims.  The doctrine of unclean hands, as MIE concedes, is available as a defense to a copyright action.  *See* MIE Response Brief at 26-27.

MIE asserts that the unclean hands defense is not available in the present action because the alleged misconduct by MIE is not "directly related" to MIE's copyright claims against the Defendants.[10] Not only has MIE misstated the true scope of the unclean hands defense, it has engaged in an illogical cherry-picking of the facts in an attempt to separate its copyright claim from the nefarious conduct MIE's President and CEO engaged in, conduct MIE has benignly characterized as MIE's "seek[ing] to protect its copyrighted material," MIE's SMF at 20.

The unclean hands defense broadly encompasses any conduct by the plaintiff regarding the controversy before the court. In asserting the defense is narrow, MIE cites *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852 (5th Cir. 1979), but omits significant language from the opinion (shown here, underlined):

> The maxim of unclean hands is not applied where plaintiff's misconduct is not directly related to the merits of the controversy between the parties, but only where the wrongful acts "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication."

*Id*. at 863 (quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S. Ct. 146, 148, 78 L. Ed. 293, 297 (1933)). *Keystone Driller* more fully explains the breadth of a plaintiff's improper conduct that may properly form the basis of the unclean hands defense:

> It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have a standing in court he must first show that not only has he a good and meritorious cause of action, but he must come into court with clean hands. He must be frank and fair with the court, nothing about the case under consideration should be guarded, but everything that tends to a full and fair determination of the matters in controversy should be placed before the court . . .
>
> But courts of equity do not make the quality of suitors the test. They apply the maxim requiring clean hands only where some unconscionable act of

---

[10] In so arguing, MIE has engaged in the very transgression of misstating and selectively stating case law for which MIE so harshly condemns the Defendants in its Response Brief. The defense is substantially broader in its application than MIE represents it to be.

one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. They do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication. They apply the maxim, not by way of punishment for extraneous transgressions, but upon considerations that make for the advancement of right and justice. They are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.

*Keystone Driller* at 290 U.S. at 244-46 (citations omitted). In that case, the U.S. Supreme Court explained that the unclean hands defense encompasses any conduct by the plaintiff that "in some measure" affects the relations of the parties with respect to "something brought before the court." *Id.* MIE contends that because Horner's actions began on December 31, 2005 and its lawsuit involves actions that occurred before December 30, 2005, Horner's conduct is "wholly unrelated" to MIE's copyright infringement claim. The facts belie MIE's assertion.

MIE's copyright infringement claim is based in part on ONE's extraction of its own data from WebChart, which began in December 2005 and continued at least into January 2006. MIE's Opening Brief at 20-21. Horner admitted that his unauthorized access of ONE's network from December 31, 2005 to January 16, 2006, was done with the specific purpose of interfering with ONE's ability to extract its data from WebChart and migrate it to a new software vendor, actions which MIE claim infringed on its copyright. *See* Horner Dep. (3/23/07) at 171-72, 175-77, 182-86, 197-200. Moreover, the very evidence MIE claims proves infringement in the creation of triSCRIPT occurred in January, 2006. *See* Brief in Support of Motion to Strike Exs. F-G. Given this, MIE's assertion that Horner's illegal computer tampering and trespass is "wholly unrelated" to MIE's copyright infringement claim is both absurd and nonsensical. Perhaps to avoid its own unclean hands, MIE has decided to abandon its claims for infringement that arise both out of the creation of the data migration script, which MIE claims is "a derivative

work from WebChart's database schema," and from the provision of that "derivative work to TPX, who used it in its contractual relationship with ONE." *See* MIE's Opening Brief at 19.[11]

Horner admits that at least one of his motives for trespassing and tampering with ONE's computer network and system was to disrupt ONE's data migration process. Thus, the course of conduct that forms the unclean hands defense is inseparably intertwined with the alleged copyright infringement at the heart of the lawsuit. The doctrine of unclean hands requires only that the alleged misconduct bear some relation to Plaintiff's claims before the court or, "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." *Keystone Driller*, 290 U.S. at 245.  MIE's misconduct, including Horner's attempts to prevent ONE from migrating its own data from WebChart, is a more than sufficient basis for invoking the unclean hands defense here.

### 7.    ONE Is Not Liable for Others' Alleged Acts of Infringement.

MIE concedes in principle that to be liable for copyright infringement a party must be a direct participant in or contribute to the infringement, or supervise or control the infringers. Despite this, MIE claims ONE is liable for each instance it claims constitutes infringement.  As to any copying that was either incidental to the migration of ONE's data from WebChart or the actions taken preventatively and in response to MIE's and Horner's threats and their actual attack on ONE's system,[12] including the hiring of PhysCal,[13] ONE has previously argued that these acts cannot constitute actionable infringement.  *See* Defendants' Opening Brief at 3-8; and Response

---

[11] In a baffling twist of logic, MIE contends that "MIE's and Horner's alleged misconduct was taken against ONE, and not TPX," while on the very same page of its brief states:  "In fact, TPX is ONE. Or more precisely, ONE is TPX."  *See* MIE Response Brief at 27 n.17. According to MIE, the unclean hands defense would be available to ONE, but not TPX, even though, according to MIE, ONE is TPX.

[12] MIE appears to claim there were two instances of copying onto a back-up server at ONE.  *See* MIE Response Brief at 28 (citing SMF § 48).  However, an examination of "SMF § 48" reveals no evidence for the "two copy" theory. Nor in MIE's opening brief is any such assertion made.  *See* MIE Opening Brief at 18.

[13] MIE provides no support for its claim that ONE had the "right and ability to control the [activities] of PhysCal."

Brief at 19-20.  Further, MIE's continued attempts to blur any distinction whatsoever between ONE and TPX is both contrary to the law and the facts.  The case cited by MIE, *In re Aimster Copyright Litig.*, 334 F.3d 643, 654 (7th Cir. 2003), MIE Response Brief at 29, is also inapposite, since that case applies where "the only effective relief is obtainable from someone who bears a relation to the direct infringers that is analogous to the relation of a principal to an agent."  *Id.* Here, there is no showing of a principal-agent relationship or anything analogous thereto.  More importantly, there is no evidence whatsoever that MIE would have to recover against another party (ONE) to obtain "effective relief."  Accordingly, absent any showing ONE directly participated in acts of infringement, ONE is entitled to judgment in its favor.

> **B.** **The Defendants Are Entitled to Judgment on MIE's Contract Claims.**
>
> > **1.** **The Undisputed Evidence Demonstrates that MIE Committed the First Material Breach of Contract**

MIE does not dispute the well-settled principles of contract interpretation that a court may not construe a contract so as to render terms meaningless and defeat the contract's true meaning.  *See* Defendants' Response Brief at 8-9 (citing cases).  Yet, in effect, this is what MIE asks the Court to do.

Section 9.1 of the SLA required MIE to offer ONE the opportunity to enter into a Maintenance and Support Services Agreement.  ONE asserts that MIE breached this particular contractual provision when it unilaterally terminated the MSA effective December 1, 2005, while the SLA itself remained in effect subject to a monthly auto-renewal after expiration of the original one-year term, set forth in Section 6.1 of the SLA.  MIE claims it did not breach Section 9.1 of the SLA because it originally offered ONE the MSA and simply terminated the MSA as it was allowed to do.  However, MIE relies on a technical interpretation of one section (9.3) while failing to consider the larger context of the SLA.  Indeed, MIE's interpretation of the SLA as

permitting MIE to terminate the MSA at any time it chose would render Section 9.1 of the SLA entirely illusory, since it would allow MIE to terminate vital maintenance and support services unilaterally while the SLA was in effect, precisely as it did here.[14]

The required "offer" of maintenance and support services was necessary to fulfill the purpose of the SLA.  Further, when the SLA auto-renewed for one month terms following expiration of the initial one-year term, MIE's obligation to offer maintenance and support services itself auto-renewed for each successive term, pursuant to provisions 9.1 and 6.2 of the SLA.  Consequently, by refusing to reinstate the MSA or even to offer a new MSA, MIE was in material breach of the SLA during each and every subsequent one-month renewal term.  The vital nature of MIE's maintenance and support services is evident, given that MIE, with forty to fifty physician practices, of over 400 physicians, and thousands of users licensed to use WebChart just in Allen County, has never terminated an MSA with any client other than ONE.  *See* Norder Dep. (7/13/07) at 35-37, 65.  Further, in deciding to terminate the MSA, MIE gave no thought to how ONE would then support WebChart.  Jones Dep. (7/12/07) at 133.  MIE hoped its conduct would force ONE to the table and would convince ONE to "stick with WebChart."  *See* Horner Dep. (3/23/07) at 118-20.

MIE also contends that it properly terminated the MSA effective December 1, 2005 because at the time, ONE was planning to breach the SLA by competing with MIE after the formation and spin-off of TPX. Although MIE claims ONE was the first to breach the SLA, MIE identifies no alleged actual breach of the SLA by ONE prior to MIE's unilateral termination of the MSA. MIE admitted that the MSA was not terminated for cause, (*i.e.* based on a prior breach by ONE), but because MIE decided it was a "bad business practice" to continue the relationship with ONE.

---

[14] Under MIE's reading of Section 9.1, MIE could have entered in to the MSA at the same time the parties executed the SLA, and then terminated the MSA immediately thereafter, a construction which would effectively render

*See* Jones Dep. (7/12/07) at 129-131 (attached as Ex. 2).  MIE sought to "get ONE's attention" and "to get them to the table." Horner Dep. (3/23/07) at 119; Horner Dep. (5/30/07) 191-96. MIE was the first to breach the SLA, as amply supported by the undisputed evidence.

### 2.      The SLA's Non-Compete is Overly Broad and Unenforceable

The Defendants contend that the non-competition provision of the SLA is overly broad and unenforceable.  Attempting to salvage this provision, MIE advances an interpretation of the non-compete quite different from that advanced in support of its own motion seeking summary judgment. This provision reads, in pertinent part:

>  . . . Licensee <u>shall not engage in the business</u> of selling or licensing to third parties any computer software that performs substantially the same functions as the Licensed System or is commercially competitive with the Licensed System or any part of it.

SLA ¶ 28 (emphasis added).  In its own Motion, MIE asserted that the Defendants violated this provision simply by "creating a formal business plan" for the launch of TPX.  *See* MIE Opening Brief at 9.  Advancing a sweepingly broad interpretation of the non-compete that prohibited the creation of a business plan, marketing, [or] contacting prospective customers in addition to the actual sale or leasing of software").

Now that ONE has established that the non-compete is unenforceable, MIE attacks its own definition, advancing an absurdly restrictive interpretation of the provision:  "'[e]ngaging in the business' . . . means operating a business that sells or licenses EMR software, <u>i.e.</u> getting money directly because you sold or licensed software."  MIE Response Brief at 40.  The contradiction between MIE's two positions is irreconcilable, and the contract cannot be rewritten to suit MIE's whim.  Clearly, merely creating a business plan for a future business is not selling

---

Section 9.1 completely meaningless.

or licensing software.  No Defendant sold or licensed software at the time MIE claims the non-competition provision was breached "throughout 2005."  *See* MIE's Opening Brief at 9.

Irrespective of the parties' relationship, Indiana applies a reasonableness standard to non-compete agreements "measured in terms of time, space, and prohibited activity." *Dicen v. New Sesco, Inc*., 839 N.E.2d 684, 687 (Ind. 2005) (citation omitted).  In *Dicen*, a non-compete that restricted the defendant from engaging in the subject business "anywhere in the United States" was unreasonable where the plaintiff's contacts were limited to a few states, and the non-compete was therefore unenforceable, *Id*. at 689.  Here, applying the reasonableness test and a fair reading of the MIE non-compete yields but one conclusion—the provision is unreasonable given the scope of prohibited activities and the lack of a geographic limitation.  *See* Defendants' Opening Brief at 30-32 and Response Brief at 4-5.

### 3.      MIE's Breach of Contract Claim Relating to Data Migration Is Preempted.

MIE's characterizes the Defendants' argument as an assertion that *all* of MIE's breach of contract claims are preempted.  MIE Response Brief at 43-44.  In fact, the Defendants assert preemption only as to MIE's claim that removing ONE's own data from WebChart was a breach of contract, since contractually restricting a licensee's access to the licensee's own data simply because it is housed within a copyrighted program is inconsistent with the purposes and objectives of the Copyright Act.  *See* Defendant's Opening Brief at 32-37.

While reducing Professor Nimmer to the status of a mere "commentator" on copyright law, MIE Response Brief at 44 n.30, MIE makes no real response to the "profound skepticism" the *WIREdata* court had for MIE's position that through the SLA MIE can restrict access to data *that does not even belong to* it, *see WIREdata*, 350 F.3d at 647.  While MIE concedes that it would have been an "absurd result" to bar the tax assessors in *WIREdata* from exchanging their

own data though a license agreement, MIE does not see the absurdity in its own position: that pursuant to the SLA, MIE can control (and presumably make prohibitively expensive) ONE's ability to remove its own data from WebChart. MIE also fails to recognize that its position would bar ONE from removing its own data, but would *not* bar a third party from removing the same data for ONE. This is precisely what occurred in this case: it was TPX that migrated ONE's data. Since denying ONE the ability to migrate its data is fundamentally inconsistent with the Copyright Act, and since MIE claims ONE breached the SLA by migrating its own data, this Court should hold that claim is preempted.

### C.       Defendants Are Entitled to Judgment on the Defamation Claims.

An analysis of MIE's arguments demonstrates that it does not raise even a disputed issue of material fact as to its defamation claims against Kusisto and Plesko.

### 1.       Kusisto's Alleged Statements

As evidence that Kusisto uttered false statements, MIE and Horner take issue with the phrase "intentional hacking," that appeared in an outline Kusisto admitted using. But neither MIE nor Horner cites any evidence that the word "hacking" is "extremely negative." *See* MIE Response Brief at 46-47.[15] More fundamentally, MIE and Horner ignore the defense of substantial truth, which this Court may find as a matter of law. *See, e.g.*, *Bandido's, Inc. v. Journal-Gazette Co., Inc*., 712 N.E.2d 446, 457 (Ind. 1999). "[A] statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Id.* (citation omitted). Horner admitted to:

- Making changes to the copy of WebChart "on ONE's network," without anyone's permission or prior notice, Horner Dep. (3/23/07) at 171-72;
- "[R]emov[ing] an index from WebChart," *id*. at 183;
- Disabling WebChart's batch printing function, *id*. at 194-95;

---

[15] Merriam-Webster's on-line dictionary, www.m-w.com, contains two definitions relating to computers. The first is "to write computer programs for enjoyment." The second is "to gain access to a computer illegally."

- Using at times the login "TPLESKO," *id*. at 197-99;
- Knowing that one change he made would have "made it much slower to retrieve mass records . . . [and] would've had an effect on the performance of WebChart as well in terms of the user interface," *id*. at 184; and
- Knowing that a possible consequence of his actions was to slow down individual physician's use of the system, *id*. at 185.

Of course, the Defendants believe that Horner's actions were in fact far more malicious.[16] But substantial truth provides a complete defense, since Horner's admitted conduct has the same sting, for the average listener, as the statement that Horner "intentionally hacked."

MIE also asserts that Kusisto's agenda contains a "false statement" because Kusisto related his recollection that Horner told him that he wanted to keep Plesko's team "busy" supporting WebChart instead of competing with MIE. MIE's criticism is particularly unfair, since Kusisto had nothing more than his recollection to go on, while Horner had surreptitiously taped the same meeting. Yet Kusisto's memory recorded the substantial truth.

MIE quotes one part of Horner's transcript and claims there is a "significant" difference between what was in the agenda and what Horner actually said, since Horner at one point said that he wanted to keep Plesko busy with "the EMR selection process." MIE Response Brief at 47. However, MIE omits the following exchange:

> **Horner:** Well, I think your Board should vote to terminate support services with TPX. At this point, I need [Plesko] scrambling to do whatever he needs to do and not doing other things, frankly. The more he's scrambling and doing those kinds of things while I'm doing other things to, you know, set up and defend against the situation, the better off I am. So that's the only card I've got in the deck right now, to play. That's the only card. I mean, I've got other cards, but that's probably the best card. That's my ace in the hole. And the more he's scrambling to try to prepare to get this thing going – you know, we're not going to do anything to seriously affect patient care, let's put it that way.

> **Kusisto:** But if you quit supporting WebChart, that would seriously affect patient care.

---

[16] Had all this been as innocent as Horner claims it was, it raises the question why Horner kept his activities secret from everyone, including his closest business associates, until his deposition. *See* Horner Dep. (3/23/07) at 203.

>**Horner:**  I understand that.  And what I'm telling you is . . . .
>
>**Kusisto:**  Are you telling me you're not going to quit supporting WebChart?
>
>**Horner**:  I'm telling you that if there's an ultimate catastrophic disaster with WebChart, we'll be there.  <u>But when there are weird little silly-shit stuff that we're getting called on , we're not going to deal with it</u>.

Pl. App. Ex. 22 (Tr. at 6) (emphasis added).  Given this exchange, Kusisto's recollection that Horner wanted Plesko "busy" handling WebChart support issues is substantially true since it is difficult to imagine any other way to interpret what Horner described as his "ace in the hole."

Finally, Horner and MIE seek to attribute to Kusisto statements *Plesko* made in a magazine article, a copy of which Kusisto forwarded by e-mail, but they cite no authority.  Moreover, given that Horner's malicious conduct respecting ONE's network was a matter of public concern, MIE and Horner would have to show by clear and convincing evidence that when Kusisto forwarded the magazine article he knew or strongly suspected there was no "backdoor" and was recklessly indifferent to that <u>fact</u>.  *See, e.g.*, *Bandido's*, 712 N.E.2d at 451.  MIE's own submission shows there was no false statement of fact.  MIE Response Brief at 48 (noting there is a difference of <u>opinion</u> as to whether MIE used a backdoor).

### 2.    Plesko's Alleged Statements

MIE now concedes that "Plesko's informing the FBI regarding MIE's alleged 'hacking'" is not defamatory.  MIE Brief at 48.  However, MIE asserts that Defendants' summary judgment motion addresses only this one alleged defamatory statement.  MIE also points to a list of several other statements for which contends it still has a viable defamation claim.[17]  In fact, Defendants challenged the defamation claim relating to whether the MIE's network was HIPAA compliant.  *See* Defendants' Opening Brief at 42.  MIE has failed to respond to this argument.  MIE also

fails to address the substantial truth defense raised as to statements Plesko made "concerning the unauthorized, illicit, and damaging intrusions into ONE's network [since these are] verified by Horner's testimony about the nature, extent and purpose of his intrusions on ONE's network." *Id*. at 41 (citing Horner Dep. (3/23/07) at 170-78, 194-205; Horner 30(b)(6) Dep. (8/1/07) at 150-51). The precise language used is not critical where the "sting" of the admitted truth is the same, and since Horner's testimony establishes the substantial truth of the remaining statements he allegedly made, Plesko is entitled to judgment on all of them.

### D.   MIE Has Not Stated a Claim for Misappropriation of Trade Secrets

In response to the contention that it failed to identify specifically what it claims is a trade secret, MIE takes the position that its *entire* source code is a trade secret, an assertion that fails as a matter of law. First, Horner readily admits that some of the WebChart code was borrowed from other sources. *See, e.g.*, Horner 30(b)(6) Dep. (5/30/07) at 154-59 (attached as Ex. 1). Moreover, as set forth in detail in Defendants' Response to the Motion to Strike, the code MIE claims is code from WebChart is also contained in *ONE's* MS Word Template, MASTER.dot. Furthermore, regardless of the origin of the code, it is contained in a template used by ONE containing no restrictions whatsoever on its use or dissemination by MIE. Such a failure to require confidentiality destroys any secret that might have once existed in the code. *See, e.g.*, *E.E.O.C. v. Aon Consulting, Inc.*, 149 F. Supp. 2d 601, 608 (S.D. Ind. 2001) ("Disclosure of a trade secret to a person who has no obligation to keep it secret destroys the trade secret . . . ."). This bars any trade secret claim as to that code.

With no way of telling what code is actually protectible, this case is on all fours with *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581, 583 (7th Cir. 2002), and MIE's blanket

---

[17] MIE appears to provide only a partial list of what it claims Plesko said. MIE Response Brief at 48 ("These statements <u>include</u> . . . ."). One can only speculate what these *other* claims are. Of course, the Rules do not permit

designation fails.  Indeed, in *Do It Best Corp. v. Passport Software, Inc.*, No. 01 C 7674, 2005 WL 743083 (N.D.Ill. May 31, 2005), cited by MIE for the proposition that a plaintiff's entire source code may be designated, the court specifically noted that it

> harbors some doubt as to whether PSI's identification of every line of code it developed for DIB is sufficiently specific as a description of its trade secrets. The court does recognize, however, that PSI's submissions differ from those criticized in some of the case law. PSI did identify specific lines of code and specific software features for which it claims protection. This differs markedly from *Lynchval Sys. Inc. v. Chicago Consulting Actuaries, Inc.*, No. 95 C 1490, 1998 WL 151814 (N.D. Ill. Mar.27, 1998), which DIB argues supports its position here. In *Lynchval*, the plaintiff was unable to identify any "computer printouts, formulae, memoranda, or any other tangible technical data," identifying its trade secrets, nor to show "how, when and by whom" its purportedly protected programs were developed.

*Id.* at *13.  MIE does not even come close to the specificity the *Do It Best* Court described as questionable.  Indeed, the case MIE cites for the proposition "that the identification of entire source code of software can qualify as a trade secret," MIE Response Brief at 50, does not even discuss the specificity requirement for trade secrets, *see Computer Associates Intern. v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 695-96 (N.D. Ill. 2004).  Absent such basic information regarding its alleged trade secrets, MIE's claim fails as a matter of law.

### E.   Several of MIE's Damages Theories Are Fatally Flawed

### 1.   MIE Has Failed to Justify Its Claim for "Value Impairment Due to NMC Timing" and Cannot Be Permitted to Change its Damages Theory at this Late Date.

MIE's claim for "Value Impairment Due to NMC Timing" fails as a matter of law because MIE fails to establish that the Defendants proximately caused the underlying injury.  *See* Defendants' Opening Brief at 46-47.  MIE's claim fares no better in its latest Brief.

---

trial by ambush.  Any claims concerning as yet undisclosed statements shall be barred.

MIE's damages expert, Mr. Pellegrino, stated in his damages report that "MIE delayed the launch of a subsidiary company, NoMoreClipboard, LLC (NMC), due to the timing of the media accounts surrounding the FBI investigation and MIE's need to protect its intellectual property through the lawsuit." Pellegrino Report at 34 (Dep. Ex. 183). However, the FBI investigation arose out of Horner's hacking of ONE's computer system, not out of any wrongful conduct by Defendants. Defendants' Opening Brief at 46-47. MIE does not even attempt to establish that it can blame the Defendants for the FBI investigation.

As to Pellegrino's statement that the NMC launch was delayed by "MIE's need to protect its intellectual property through the lawsuit," Pellegrino Report at 34, MIE's lawsuit was of its own choosing. That it was MIE and not the Defendants that caused the filing of the present lawsuit is so self-evident that once again MIE does not contest it in its response.

Instead, MIE now disowns the theory of damages in Pellegrino's report:

Defendant's [*sic*] improperly [*sic*] tie MIE's damages to the FBI investigation, rather than to Kusisto's and Plesko's statements made in their capacity as officers of ONE and TPX. These statements directly impacted MIE in negative ways that precluded a successful launch of NMC. It was MIE's "choice" to delay the launch of NMC, but Defendants' actions that forced MIE to delay that launch.

*Id*. at 51. MIE asserts that it is improper for the Defendants to tie the damages allegedly resulting from the delayed launch "to the FBI investigation," although Pellegrino himself did so. MIE now submits the brand new theory that the delay of the NMC launch was caused by the Defendants' "negative statements" that allegedly "directly impacted MIE in negative ways that precluded a successful launch," MIE Response at 51.

The Defendants object that MIE cannot submit an expert damages report on August 6, 2007, and then disown this report and submit an entirely different theory of damages more than six months later in opposing summary judgment. Pellegrino's Report was a required disclosure

under Rules 26(a)(2)(B), 26(a)(2)(d) and 26(e)(1)(A).  MIE was required in pertinent part to "supplement or correct its disclosure . . . in a timely manner if [MIE learned] that in some material respect the disclosure is incomplete or incorrect . . . ."  Fed. R. Civ. P. 26.  Furthermore, under Rule 37(c)(1), if a party fails to supplement a required disclosure, that party "is not allowed to use that information . . . on  motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Under these provisions, MIE is precluded at this late date from changing its theory of damages relating to the launch of NMC.  Furthermore, since the theory which <u>is</u> contained in the Pellegrino Report fails as a matter of law (MIE makes no attempt to defend it), the Defendants are entitled to summary judgment on this claim.

### 2. MIE's Claim for Damages for "Unjust Enrichment Through Non-Compete Violation" Fails as a Matter of Law.

The Defendants previously established that the unjust enrichment claim in the Pellegrino Report seeking the discount the Defendants enjoyed from G.E. Healthcare, is without merit. Defendants' Opening Brief at 47-48.  MIE does not even attempt to defend Pellegrino's theory that this item of damages arises from the Defendants' "setting up a competing operation and the purchase of Physcal," allegedly in violation of the non-compete.  Pellegrino Report at 35. Instead, MIE now asserts that this claim arises out of the Defendants' "access to MIE's software, database schema, and 'know how'" as well as Defendants' conduct in taking "MIE's software and source code . . . inappropriately and illegally."  MIE Response Brief at 52.  Once again, this Court should not permit MIE to ignore the pretrial disclosure rules and change its damages theory at this late date, and the Court should grant judgment to the Defendants.

### 3. MIE's Damages Claim for "Accelerated Market Entry" Is Without Merit.

In the Pellegrino Report, MIE also disclosed an unjust enrichment claim asserting that as a result of their breach of the non-compete, the Defendants were able to accelerate TPX's entry into the market, thereby gaining an "unjust economic benefit." Pellegrino Report at 38-40. However, "unjust enrichment" is not a remedy for such a breach of contract. *See* Defendants' Opening Brief at 48 (citations omitted).

MIE has two responses. First, MIE attempts to introduce alleged "false statements" and "using MIE source code" as new bases supporting this claim. MIE Response Brief at 53, contentions not contained in the Pellegrino Report. This Court should not reward MIE's failure to supplement its pretrial disclosures. MIE's second response is to confuse the concept of the "benefit of the bargain." MIE points to Pellegrino's estimate that TPX obtained a benefit because of its early entry into the marketplace. *Id*. at 52. MIE then asserts that this benefit <u>to TPX</u> is the "benefit of the bargain" <u>to MIE</u>. *Id.* at 53. MIE cites no authority whatsoever for this proposition, which stands the law of contract damages on its head. The Defendants previously demonstrated that contract damages are limited to the loss of the bargain actually suffered by the non-breaching party. *See, e.g.*, *4-D Bldgs., Inc. v. Palmore*, 688 N.E.2d 918, 921 (Ind. Ct. App. 1997) (citation omitted). MIE's assertion that the benefit of the bargain also includes any gain made by the <u>breaching</u> party is contrary to long-settled law. [18] Accordingly, judgment on this point should be entered for the Defendants.

## IV.  <u>CONCLUSION</u>

For the above and foregoing reasons, the Defendants request the following relief: (a) that the Court deny MIE's Motion for Summary Judgment on its claims for breach of contract and

---

[18] MIE cites *Creative Demos, Inc. v. Wal-Mart Stores, Inc.*, 142 F. 3d 367 (7th Cir. 1998), as support for its "unjust enrichment" theory. However, that case involved a fraud and estoppel claim. *Id*. at 371-72. Here, there is no fraud or estoppel claim, and all that MIE disclosed on this damages theory was a contract claim for breach of the non-compete. It follows that *Creative Demos* does not apply.

grant judgment to ONE on Count II of Plaintiff's Complaint (Breach of Contract) and grant judgment to Defendants Kusisto, Plesko, and TPX on Count III of Plaintiff's Complaint (Breach of Contract); (b) that the Court deny MIE's Motion for Summary Judgment on its claims for copyright infringement and grant judgment to  Defendants ONE and TPX on Count I of Plaintiff's Complaint (Copyright Infringement); (c) that the Court deny MIE's and Horner's Motion for Summary Judgment on Count I of ONE's and Kusisto's Amended Counterclaim and Count I of TPX's Counterclaim (Claims under 18 U.S.C. § 1030); (d) that the Court deny MIE's and Horner's Motion for Summary Judgment on Count II of ONE's and Kusisto's Amended Counterclaim and TPX's and Plesko's Amended Counterclaim (Defamation); and (e) grant to the Defendants all other just and proper relief.

Respectfully submitted,

BARRETT & MCNAGNY LLP

By /s/ Cathleen M. Shrader
    Thomas A. Herr (#8444-02)
    Cathleen M. Shrader (#18159-02)
    215 East Berry Street
    Fort Wayne, Indiana 46802
    Tel: (260) 423-9551
    Fax: (260) 423-8920
    E-mail: tah@barrettlaw.com
         cms@barrettlaw.com

*Attorneys for Defendants Orthopaedics
Northeast, P.C. and Raymond Kusisto*

EILBACHER FLETCHER, LLP

By /s/James P. Fenton (per consent)
    James P. Fenton (#6808-02)
    803 S. Calhoun Street, Suite 400
    Fort Wayne, IN  46802
    Tel:  (260) 425-9777
    Fax: (260) 424-9177
    Email: fenton@eflawyers.com

and

MALLOR CLENDENING GRODNER& BOHRER
LLP

By /s/ Lonnie D. Johnson (per consent)
    Lonnie D Johnson (#16758-53)
    Patrick B Omilian (#23973-53)
    511 S. Woodscrest Drive
    P.O. Box 5787
    Bloomington, IN 47407-5787
    Tel: (812) 336-0200
    Fax: (812) 333-0083
    Email: ljohnson@mcgb.com
         pomilian@mcgb.com

*Attorneys for triPRACTIX, LLC and Todd
Plesko*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that this 14th day of April, 2008,the foregoing was filed using the CM/ECF system, which sent notification to the following counsel:

Matthew M Hohman, mhohman@btlaw.com
D. Randall Brown, rbrown@btlaw.com
BARNES & THORNBURG LLP
600 One Summit Square
Fort Wayne, IN 46802-3119

                 /s/ Cathleen M. Shrader