# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| MEDICAL INFORMATICS ENGINEERING, INC.,       ) | |
|       ) | |
|     **Plaintiff,**      ) | |
|       ) | |
| **v.**      ) | **Cause No.: 1:06-CV-173** |
|       ) | |
| ORTHOPAEDICS NORTHEAST, P.C., TRIPRACTIX, LLC; RAYMOND KUSISTO, and TODD PLESKO,      ) | |
|     **Defendants.**      ) | |
| _____      ) | |
| ORTHOPAEDICS NORTHEAST, P.C., TRIPRACTIX, LLC; RAYMOND KUSISTO, and TODD PLESKO,      ) | |
|     **Defendants/Counterclaimants and Third-Party Plaintiffs,**      ) | |
| **v.**      ) | |
| MEDICAL INFORMATICS ENGINEERING, INC.,      ) | |
|     **Plaintiff/Counter Defendant,**      ) | |
| **and**      ) | |
| DOUG HORNER,      ) | |
|     **Third-Party Defendant.**      ) | |

## MEMORANDUM OF OPINION AND ORDER

This matter is before the court for resolution of several pending motions. The motions, and the court's ruling on each, are as follows:

1. Medical Informatics Engineering, Inc., ("MIE") and Doug Horner ("Horner") filed a Motion for Partial Summary Judgment on January 7, 2008. Docket at 107. Orthopaedics Northeast, P.C., ("ONE"), TriPRACTIX, LLC, ("TPX"), Raymond Kusisto ("Kusisto"), and Todd Plesko ("Plesko") (often referred to collectively as "the Defendants") filed a Joint Brief in Opposition to Plaintiff's and Third-Party Defendant's Motion for Partial Summary Judgment on February 25, 2008. Docket at 126. MIE and Horner filed a reply brief on April 14, 2008. Docket at 134. For the reasons discussed herein, this motion for partial summary judgment is **GRANTED in part and DENIED in part**.

2. ONE, Kusisto, TPX, and Plesko filed a Joint Motion for Partial Summary Judgment on January 7, 2008. Docket at 110. MIE and Horner filed a brief in opposition to this motion on February 25, 2008. Docket at 124. The movants filed a joint reply brief on April 14, 2008. Docket at 137. For the reasons discussed herein, this motion for partial summary judgment is **GRANTED in part and DENIED in part**.

3. MIE filed a Motion to Strike Affidavit of Ken Johnson on February 25, 2008. Docket at 122. ONE, TPX and Plesko filed a joint brief in opposition to the motion on April 14, 2008. Docket at 135. The movants filed a reply brief on April 28, 2008. Docket at 141. For the reasons discussed herein, this motion to strike is **MOOT**.

## I. FACTUAL BACKGROUND

ONE is a medical practice corporation specializing in orthopaedic services. MIE sells and services software products, and provides a telecommunications network for the transmission of patient health information and medical practice data. On October 24, 2004, ONE and MIE entered into a License Agreement that allowed ONE to use certain software known as "WebChart," which electronically stores medical records. The parties simultaneously entered into a Maintenance and Support Agreement ("MSA") that obligated MIE to support WebChart for ONE.

About three months after entering into these agreements with MIE, ONE began constructing three wireless towers in Fort Wayne, Indiana. Shortly thereafter, ONE began to evaluate different software packages in an effort to, among other things, improve its use and storage of medical records. By June 2005, ONE had evaluated 23 software packages, including WebChart. However, WebChart was not the medical records software package ONE ultimately chose to utilize.

When he learned that ONE had rejected WebChart, Doug Horner, the President of MIE, contacted ONE to express his disappointment concerning MIE's loss of such a large and valuable customer. Numerous times thereafter, Horner requested meetings with various ONE physicians and managers in an attempt to discuss the matter. Despite Horner's efforts, ONE did not change its decision.

Allegedly, Horner was extremely discontented about this turn of events and believed that ONE (through certain of its employees) were plotting to compete with MIE in the telecommunications industry. At one point in 2005, ONE set up a separate corporate entity known as triPractix, LLC ("TPX"), which MIE maintains was established specifically to help

facilitate ONE's plan to compete directly with MIE. Horner's resentment ultimately culminated in his making purported "threats" to ONE. Specially, Horner at one point allegedly stated that he "intended to keep ONE's technology employee, Todd Plesko, and Plesko's staff, busy supporting WebChart rather than trying to steal MIE's customers." ONE Counterclaim, ¶ 13. On November 1, 2005, MIE terminated the Marketing Support Agreement with ONE, with the termination to be effective November 30, 2005. In light of the termination of this agreement and Horner's alleged threats, ONE installed a firewall to prevent MIE or anyone else from entering ONE's computer network.

According to ONE, between December 6, 2005, through January 16, 2006, Horner and MIE "undertook an unlawful campaign to access ONE's computer network for the purpose of disrupting ONE's network and business operations," which resulted in MIE allegedly accessing ONE's computer network on ten different occasions "without permission and without right to do so." *Id.*, ¶¶ 15, 19. ONE claims that this unauthorized access caused damage on at least three occasions. *Id.*[1]

On April 25, 2006, MIE filed a complaint in this court against ONE, TPX, Plesko, and Kusisto, asserting claims of copyright infringement, breach of contract, criminal mischief, defamation, trade secret misappropriation, and tortious interference with a business relationship.

---

[1] For example, according to ONE, on December 31, 2005, MIE purportedly accessed ONE's network "through two other medical providers' networks in an attempt to conceal MIE's identity," and made a change to the software which resulted in patients' medical charts not being ready at the time of a patient's appointment. On January 6, 2006, MIE allegedly accessed the ONE network in the same manner and made a change to significantly slow down the retrieval of medical records. Then, on January 15, 2006, Horner allegedly accessed the ONE network, effecting a change that caused the system's printing functions to fail. ONE enlisted the services of TPX to remedy the computer problems allegedly caused by MIE.

(Kusisto is the chief executive officer of ONE.)  On June 14, 2006, ONE asserted counterclaims against MIE alleging computer hacking, criminal mischief, breach of contract, and negligence. ONE and Kusisto filed a separate counterclaim and third-party claim against MIE and Horner, alleging that they made defamatory statements about ONE and Kusisto.  Shortly thereafter, TPX and Plesko also filed a counterclaim and third-party claim against MIE and Horner, alleging defamation.  Finally, TPX asserted a counterclaim of tortious interference against MIE. Additional relevant facts are discussed below as they become pertinent to the issues.

## II. DISCUSSION

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," *id.,* 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for

resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex,* 477 U.S. at 322; *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003). A failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325. A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir. 1993).

### A.  MOTION FOR PARTIAL SUMMARY JUDGMENT BY MIE AND HORNER.

In this motion, MIE and Horner seek summary judgment in their favor "with respect to (1) MIE's claims of breach of contract against . . . ONE, TPX . . . Kusisto . . . and Plesko; (2) MIE's claim of copyright infringement against ONE, Plesko, and Kusisto; (3) ONE's and [TPX]'s claims that MIE violated 18 U.S.C. § 1030; (4) ONE's and [TPX]'s claims of

defamation against MIE and/or Horner; (5) Kusisto's claim of defamation against Horner; and (6) [TPX]'s claim of tortious interference with business relationship against MIE." Motion for Partial Summary Judgment, Docket at 107, pp. 1-2.

### 1. Breach of Contract and Breach of Non-Competition Provision.

MIE maintains that it is entitled to summary judgment on its claim that ONE, TPX, Plesko, and Kusisto violated the non-competition provision of the License Agreement.[2] MIE's and Horner's Memorandum in Support of Their Motion for Partial Summary Judgment ("MIE's and Horner's Memorandum in Support"), Docket at 108, p. 3.[3]

The License Agreement contains a non-competition provision that reads as follows:

> During the term of this Agreement and for one (1) year after termination of this Agreement, Licensee shall not engage in the business of selling or licensing to third parties any computer software that performs substantially the same functions as [WebChart] or is commercially competitive with [WebChart] or any part of it . . . ."

*Id.*, p. 6; MIE's and Horner's Joint Statement of Material Facts in Support of Their Motion for Summary Judgment ("Plaintiffs' Joint Statement of Facts"), Docket at 109, Exhibit 5, Software License Agreement, ¶ 28. MIE and Horner contend that as early as 2005, "Plesko and Kusisto began

---

[2]   According to MIE and Horner, "TPX, while not a party to the License Agreement, is still subject to its terms because ONE, Kusisto, and Plesko formed TPX for the purpose of avoiding the terms of the License Agreement." MIE's and Horner's Memorandum in Support, p. 3. MIE and Horner point out that "[a] non-party to a covenant not to compete may be enjoined from violating that covenant when there is evidence that the non-party is aiding or operating in concert with the covenantor to breach the covenant, or when the non-party is the 'alter ego' of the covenantor." *Id.*, p. 4 (citing *Norlund v. Faust*, 675 N.E.2d 1142 (Ind.App. 1997)).

[3]   The page numbers cited by the court coincide with the page numbers assigned to each page of each party's brief by the court's electronic filing and docketing system. These page numbers may or may not coincide with the page numbering used in those briefs by the parties themselves.

discussing a plan to have ONE form an 'ancillary' business that would sell and maintain medical software" and that in "February 2005, Plesko shared his 'goal' of forming this business with the ONE [Information Technology] committee, which consisted of himself, Kusisto, Dr. Scott Karr, and Dr. Chris LaSalle." MIE's and Horner's Memorandum in Support, p. 12. According to the plaintiffs, Plesko and Kusisto essentially admitted in an exchange of written communications in May of 2005 that starting such an ancillary business might become competitive with MIE. *Id.*, p. 13; Plaintiffs' Statement Facts, ¶¶ 2, 9 and 16 (citing to portions of Deposition of Raymond Kusisto). Allegedly, Plesko and Kusisto discussed achieving the goal of establishing such an ancillary business by acquiring "an existing company that was engaging in the business of selling or licensing EMR software[.]" and that one of the companies they considered acquiring was "PhysCal Practice Management . . . which was an MIE competitor that sold and licensed EMR known as Centricity EMR." *Id.*, p. 12. In addition, MIE and Horner allege that, also in 2005, ONE began approaching potential customers for its new venture, "including medical groups that were customers of MIE." *Id.*, p. 13. The resulting ancillary business that ONE formed became known as "triPractix or TPX." *Id.*, p. 14. The physician owners of ONE approved the plan to form the ancillary business and TPX was formed when articles of incorporation were filed with the Indiana Secretary of State's office on November 11, 2005. *Id.*, p. 15; Plaintiffs' Joint Statement of Facts, Exhibit 4, p. 5 (Deposition of Todd Plesko).[4] Shortly thereafter, TPX purchased the assets of PhysCal for the sum of $2.4 million

_____

[4] According to the Plaintiffs, TPX was owned by a company called Northeast Orthopaedics, LLC, ("NEO"), which "is an entity that is owned by the same 13 doctors who own ONE." Plaintiffs' Memorandum, p. 13. The Plaintiffs maintain that "NEO owns all of ONE's physical assets, such as land, buildings and equipment. . . . NEO and ONE share the same corporate headquarters and employees ONE perform work for NEO while being paid for ONE." *Id.*, n. 3. Therefore, the Plaintiffs claim that the defendants cannot argue that TPX was not subject to the non-competition provision of the License Agreement merely because it was not a

and "began operations on January 2, 2006." *Id*. The License Agreement between ONE and MIE "was not terminated until March 23, 2006." *Id*. As a result of these facts as alleged by MIE, the Defendants violated the non-competition provision of the License Agreement and the Plaintiffs are entitled to summary judgment in their favor on that claim.

The Defendants filed a joint brief in opposition to the Plaintiffs' motion for summary judgment. Defendants' Joint Brief in Opposition to Plaintiff's and Third-Party Defendant's Motion for Partial Summary Judgment ("Defendants' Brief in Opposition"), Docket at 126. The Defendants argue that MIE and Horner are *not* entitled to summary judgment on the issue of breach of the non-competition provision–and also that the Defendants themselves are entitled to summary judgment on this claim–for several reasons. First, the Defendants maintain that the non-competition provision in the License Agreement is unenforceable as a matter of law. *Id*., p. 13. They argue that the provision "is impermissibly overbroad as to its scope and subject matter . . . ." *Id*. The Defendants also make an alternative argument, claiming that "at the very least, a question of fact exists as to which party committed the first material breach." *Id*., p. 14.

The language of the non-competition provision prohibits ONE from "'engag[ing]' in the business of selling or licensing' EMR software for a period of one year." *Id*., p. 13 (quoting License Agreement, ¶ 28). ONE, TPX, Kusisto, and Plesko argue that all they did during the applicable time frame was "merely . . . discuss[] and/or later creat[e] a business plan for a prospective business." *Id*. According to the Defendants, "MIE's interpretation of the [License Agreement] and its assertion that the non-compete [provision] prohibits ONE from engaging in basic business activities which

<hr>

party to the Agreement "because TPX is nothing other than an instrumentality of ONE used to avoid the Non-Competition Provision." *Id*., p. 16.

are not identified, described, or defined in the provision, illustrates the non-compete's [sic] unreasonableness as well as the unreasonableness of MIE's claim against ONE." *Id.* Apparently it is the Defendants' position that the non-competition is unreasonable because it unduly prohibits ONE from "innocently" attempting to form an ancillary business, and because it does not specifically and expressly enumerate that creating a business plan, implementing a marketing strategy, and/or contacting prospective customers are acts that violate the provision. *Id.* According to the Defendants, the only things the non-competition provision prohibits ONE from doing is literally "'engaging in the business of selling or licensing' EMR software for a period of one year." *Id.* The Defendants attempt to draw a distinction between "selling and licensing" and the activities in which they admittedly engaged, including setting up a separate corporation to market and eventually sell medical software that is, arguably, similar in many ways to WebChart. The court does not find this argument persuasive. If all the Defendants had done in this case was discuss starting a business that was similar to MIE's business, set up that business, and prepare to operate that business after the expiration of a one-year period from the termination of its License Agreement with MIE, then their actions may have been innocent enough indeed. But the evidence demonstrates that is not all that happened or, at the very least, that there is a genuine fact issue about what the Defendants did and whether their activities violated the non-competition provision. Simply put, the issue becomes whether the Defendants were innocently planning and preparing eventually to operate a business substantially similar to MIE's once the time limitations of the non-competition provision expired, or whether their actions crossed the line so as to violate the terms of the provision in one or more ways.

The Defendants' elaborate on their argument that the non-competition provision at issue in

this case is unenforceable in their brief in support of their own motion for summary judgment. Defendants' Joint Brief in Support of Motion for Partial Summary Judgment ("Defendants' Brief in Support"), Docket at 112. The Defendants correctly point out that "[c]ovenants not to compete are agreements in restraint of trade, and as such, are disfavored and narrowly construed by courts." *Id.*, p. 38 (citing *Norlund v. Faust*, 675 N.E.2d 1142, 1153 (Ind.Ct.App. 1987)). They also state correctly that non-competition provisions "will only be enforced to the extent their terms are reasonable as to time, place and scope, are 'always strictly construed against the covenantee, and will never be extended beyond the express terms of the agreement.'" *Id.* (quoting *Franke v. Honeywell*, 516 N.E.2d 1090, 1092-93 (Ind.Ct.App. 1987)). Finally, it is well established that "'[t]he ultimate determination of whether a noncompetition covenant is reasonable is a question of law.'" *Id.* (quoting *Sharvelle v. Magnante*, 836 N.E.2d 432, 437 (Ind.App. 2005)).

As stated, the Defendants argue that the non-competition provision in this case is unenforceable since its terms represent an unreasonable restraint on trade by prohibiting ONE or any of its employees from engaging in virtually any type of activity that could be seen as conflicting with the business of MIE. For example, the Defendants maintain that the terms of the provision "would bar the ONE janitor from sweeping the floors at the offices of one of MIE's competitors[.]" and that the provision "would limit a person from doing *any* job at a company, regardless of whether it has anything to do with the subject of the noncompete." *Id.*, p. 39. The Defendants attempt to explain these very extreme examples by citing language from the provision itself. Because the provision expressly prohibits certain actions by the "licensee," and since the term "licensee" is defined therein to include [ONE], the User Entities, and the employees and officers thereof," the Defendants maintain that "the covenant seeks to limit, without limitation, all officers and employees of ONE

without regard to any particular person's access to WebChart or even whether his or her function is computer-related, and MIE also seeks to enforce the covenant against non-signatories." *Id*. Therefore, according to the Defendants, their janitor is subject to unreasonable restraint from sweeping. The Defendants also point to the fact that the provision prohibits ONE or any of its agents or employees from "engag[ing] in the business." *Id*. According to the Defendants, "[t]his is grossly over broad since it would limit a person from doing *any* job at a company, regardless of whether it has anything to do with the noncompete." *Id*.

The court concludes that the Defendants' argument is not persuasive or logical. The Defendants are simply parsing out specific phrases in the non-competition provision, taking them out of context, and arguing that they are unreasonable on their face. But it is the Defendants' argument on this issue, not the non-competition provision itself, that is "grossly overbroad."

Non-competition agreements are extremely commonplace in business contracts and, so far as they are not ambiguous unreasonable in their terms, they will not be disturbed by the courts. In addition, Indiana courts apply "a more liberal review of [the] reasonableness" of a covenant not to compete when the covenant was executed between two entities with equal bargaining power. *Dicen v. New Sesco, Inc.*, 839 N.E.d2 684, 689 (Ind. 2005). In this case, the non-competition provision is clear, concise, and reasonable, contrary to the tortured interpretation the Defendants urge the court to place on it. The provision prohibits ONE, its agents, and its employees from "engag[ing] in the business of selling or licensing to third parties any computer software that performs substantially the same functions as the Licensed System or is commercially competitive with the Licensed System or any part of it." In addition, the provision states clearly that this prohibition is in effect "[d]uring the term of this Agreement and for one (1) year after termination . . . ." The court finds nothing in

this language to be ambiguous or unreasonable. This is especially true since the reasonableness of a non-competition provision, especially one between two equal parties (here, two established and presumably sophisticated business), should be determined in the context of the entire contract in which it is included and in light of the evidence and circumstances regarding its limitations and purpose. *Id*., at 688-89. In this case, ONE entered into the License Agreement to use MIE's WebChart software system for a definite period of time and simultaneously agreed to abide by a clear and simple non-competition provision. The non-competition provision was intended to protect MIE's proprietary interests in its computer program–an imminently reasonable safeguard in this context. Do the terms of the provision place a restraint on trade as the Defendants maintain? Of course–all such provisions operate to do exactly that. The question is whether the resulting restraint is unreasonable and, in this case, the court concludes that it is not.

The court concludes that neither side is entitled to summary judgment in their favor on the issue of breach of the non-competition provision. The Plaintiffs present evidence sufficient for a jury to conclude that the Defendants' did indeed breach the covenant. But much of that evidence is subject to interpretation and inference–specific domains of a jury. For these reasons, both parties' motions for summary judgment on the issue of any breach of the non-competition provision are denied.

In addition to their argument that the non-competition provision is unreasonable and therefore unenforceable, the Defendants also argue that "at the very least, a question of fact exists as to which party committed the first material breach [of the License Agreement and/or Maintenance Service Agreement]." Defendants' Brief in Opposition, p. 14. The Defendants argue that "MIE's unilateral decision to terminate the MSA during the period in which the [License Agreement] was

in effect was without just cause, and it is undisputed that the MSA was terminated for the purpose of 'getting [ONE's] attention.'" *Id*., p. 15 (quoting portion of Deposition of Doug Horner, Defendant's Appendix, Exh. C). The Defendants base their argument that MIE was the first party to breach the contract between the two when MIE sent a letter to ONE on November 1, 2005, terminating the MSA. *Id*. Horner testified in his deposition that the letter "was an attempt to get their attention, because I was being ignored. I was completely being ignored. And I needed something to get them to the table." *Id*. The Defendants argue that "[i]f this does not . . . establish MIE's first material breach, at the very least it creates a genuine issue of fact as to whether MIE was the first party to breach the Agreements, and would therefore preclude summary judgment in favor of MIE on its breach of contract claims against all Defendants." *Id*., p. 15. While the court believes it may be a stretch to interpret this letter as a "material breach," the Defendants are correct that the issue is enough to preclude summary judgment in favor of MIE on its breach of contract claims. A jury must have an opportunity to hear live testimony and examine relevant documentary evidence in order to determine whether MIE was the first party to breach the parties' contractual agreements. Accordingly, the Plaintiffs' motion for summary judgment on their breach of contract claims is denied.

As to MIE's claim of breach of contract against the defendants, MIE alleges that "[f]or approximately eight months before the termination date of the [License Agreement], ONE engaged in a secret plan to create a business that ONE hoped would not only compete with MIE, but destroy it. As part of the plan, ONE approached multiple customers of MIE to ask them to leave MIE and become customers of ONE's new business. To accomplish its plan, ONE retained a third party to create a software product that would transfer data from MIE's software into the software that ONE

planned for its new business . . . . Rather than have the third party create the software on its own, ONE provided it with access to and copies of the MIE software in breach of the [parties'] agreement." MIE's and Horner's Memorandum in Support, pp. 7-8. MIE contends that this alleged plan by ONE was in direct breach of the terms of the parties' License Agreement. As already discussed, MIE contends that ONE's actions violated the non-competition provisions of the Agreement. But MIE also contends that ONE, TPX, Kusisto, and Plesko "breached the License Agreement in other ways." *Id*., p. 18. These other alleged breaches involved the duties imposed upon ONE to "not disclose any information regarding WebChart, which was confidential, to any third parties, . . . not to 'reverse-engineer or decompile' WebChart . . . not to 'make any copies of WebChart in whole or in part . . .,' not to 'modify' WebChart in any way . . . to keep WebChart and all copies of WebChart safe and to 'take all actions reasonably necessary to protect WebChart from unauthorized use, access, or copying,'" to protect against unauthorized use of WebChart by "any parties working for ONE . . .," and to "'cease all use and make no further use, in whole or part, of WebChart" upon termination of the License Agreement. *Id*. Later in their memorandum, the Plaintiffs provide more factual details that they contend constitute breaches of the contract terms by the Defendants. MIE's and Horner's Memorandum in Support, pp. 19-22.

These arguments on the issue of breach of the License Agreement amount to a broader and more detailed assault by the Plaintiffs against the alleged actions of the Defendants. The acts alleged could support the Plaintiffs' general argument that the Defendants breached the License Agreement while also bolstering their argument concerning a breach of the non-competition provision. That is, the factual assertions presented as a general "breach of contract" claim are intertwined with the assertions made by the Plaintiffs in support of their argument that the Defendants breached the non-

competition provision.  The Defendants counter the Plaintiffs' breach of contract claims by asserting that any actions taken by ONE, Kusisto, Plesko, or TPX were, in essence, "defensive" actions.  The Defendants argue that Horner and other MIE employees or agents unreasonably interfered with the performance of the WebChart program by, among other things, accessing it in an intrusive manner for the purpose of wreaking havoc on ONE's ability to utilize the system properly and efficiently.  Defendants' Brief in Opposition, pp. 39-40.  MIE, on the other hand, while conceding that the WebChart program was accessed and changes made to the program, argues that such access was intended to "cause a slight performance problem" . . . "to slow ONE's and TPX's unauthorized attempts to extract date from WebChart" . . . and to "slow ONE's ability to print multiple patients' records in batches."  MIE's and Horner's Memorandum in Support, pp. 26-28.

As a result of MIE's actions in allegedly interfering with the performance of WebChart, the Defendants argue that they were essentially forced to take certain actions to counter MIE's efforts.  According to the Defendants, they were forced "to expend considerable resources, including the time of its employees and the expense of third parties in excess of $100,000 to repair the damages" caused by MIE and Horner.  Amended Counterclaim and Third-Party Claim of Orthopedics Northeast, P.C., Docket at 115, ¶ 28.

Genuine issues of material fact exist with regard to the parties' respective claims for breach of the terms of the License Agreement and the MSA.  One of the most significant issues is one of credibility.  MIE concedes that it accessed the WebChart program and made changes to it, but argues that these actions were taken only to prevent ONE, TPX and/or others from making unauthorized use of the program.  The Defendants similarly argue that any actions they took in copying WebChart files and/or sharing the WebChart program with third parties were taken in an effort to counter the

alleged "attacks" on the program by the Plaintiffs. Both parties go into great detail in their respective pleadings discussing who did what, when they did it, how they did, and (most importantly) why they did it. Ultimately, only a jury is empowered to resolve such issues of credibility. For these reasons, neither side is entitled to summary judgment in its favor on the issue of breach of the License Agreement and/or MSA.

### 2. Violation of MIE's Copyright.

MIE contends that Defendants ONE and TPX violated its WebChart copyright. MIE argues that ONE and TPX infringed on its copyright by (1) "actually cop[ying] WebChart, (2) "allowing a third party, PhysCal, to have access to WebChart and allow[ing] PhysCal to copy portions of WebChart," (3) "direct[ing] and allow[ing] PhysCal to create a derivative work from WebChart's database schema . . .," and (4) "provid[ing] the derivative work to TPX, who used it in its contractual relationship with ONE." MIE's and Horner's Memorandum in Support, pp. 24-25.

ONE does not dispute that it accessed WebChart but argues that its action do not constitute copyright infringement. According to ONE, "each of these four instances of alleged infringement was to facilitate the extraction of ONE's own data from WebChart." Defendants' Brief in Opposition, p. 28. ONE also contends that "the entirety of the incidental accessing or copying of WebChart for the purpose of extracting ONE's own data is fair use." *Id.* In fact, ONE contends that as a result of what it terms its fair use of WebChart, "MIE is not entitled to judgment in its favor. To the contrary, since ONE's use was fair, the Court should enter judgment in ONE's favor on MIE's claim that ONE infringed its copyright." *Id.*, p. 29.

The parties do not dispute that MIE holds a valid copyright on WebChart, so no discussion of the law with regard to copyright validity is necessary. One a party holds a valid copyright, that party holds certain exclusive rights under the Copyright Act. 17 U.S.C. § 106. Those rights include the right "to reproduce the copyrighted work," "to prepare derivative works based upon the copyrighted work," and "to distribute copies . . . of the copyrighted work to the public." *Id*. To prevail on a claim that its copyright was infringed, the copyright holder must establish that (1) it owns the copyright to the subject work, and (2) that the alleged infringer violated one or more of the holder's rights as enumerated in the Copyright Act. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340 (1991); *See also, JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 914 (7th Cir. 2007).

MIE contends that ONE and TPX copied at least portions of WebChart and used its access to WebChart to produce "triScript," a program that MIE argues is not only "'substantially similar' to WebChart, it is wholly identical, such that 'there is no possibility of independent creation.'" MIE's and Horner's Memorandum in Support, p. 25 (quoting *Wilcom Pty. Ltd. v. Endless Visions*, 128 F.Supp.2d 1027, 1031-32 (E.D. Mich. 1998)). Consequently, MIE argues that "[t]he undisputed facts establish that ONE and TPX infringed upon MIE's copyright in WebChart." *Id*.

ONE and TPX point out that mere possession of, and access to, a copyrighted work "does not constitute infringement as a matter of law." Defendants' Brief in Opposition, p. 29. ONE and TPX insist that their actions with regard to WebChart were innocent attempts to extract their own data from the program and that they did not "copy," "reproduce," or "distribute" the program or "prepare derivative works" from WebChart. *Id*.

In addition, ONE and TPX present an alternative argument. They contend that, assuming any copying of WebChart was done, it was "*de minimis* and not actionable as a matter of law." *Id*., p. 32. ONE and TPX first claim that MIE has not established that the "source code" used in WebChart "is original enough to be entitled to copyright protection . . . ." *Id*. ONE and TPX then state that "[e]ven assuming that the portion of the WebChart source code at issue is protectible, and even if the Court were to assume there was copying, . . . the amount of code at issue is both quantitatively and qualitatively insignificant, and is therefore *de minimis* and not actionable as a matter of law." *Id*. ONE and TPX then present a lengthy discussion in their brief explaining that the amount of computer code within the triScript program is "less than 1%" similar to the code that makes up WebChart. *Id*., pp. 34-36. The Defendants cite to the affidavit of Richard Hart, a business systems analyst at TPX who analyzed WebChart and triScript and concluded that the "number of lines of code [present in triScript] represents less than 0.0026% of the total number of lines of WebChart's source code." *Id*., p. 34 (citing affidavit of Richard Hart, Defendants' Appendix, Docket at 127, Exh. QQ).

MIE contends that the facts in this case prove that "PhysCal was provided access to WebChart to create a data migration script, which was given by ONE to TPX and used by TPX in marketing attempts to sell or license EMR software that competed with . . . WebChart." MIE's and Horner's Reply in Support of Their Joint Motion for Partial Summary Judgment ("MIE's and Horner's Reply"), Docket at 134, p. 12. MIE then argues that it "is ONE's and TPX's use of WebChart and its database schema to compete with MIE that removes any fair use defense . . . ." *Id*. MIE also argues, with respect to ONE's and TPX's contention that they merely possessed and had access to WebChart, that "TPX did not just have access to or possession of software; it used a

derivative work created from WebChart, the data migration script, to compete with MIE.  In addition, TPX used source code from WebChart to create a new software program, triScript. . . . Thus, TPX had far more than . . . access to or possession of WebChart." *Id.*, n. 13.

The issue of the Defendants' alleged infringement of MIE's copyrights to WebChart is replete with material fact issues and credibility issues, and therefore not subject to resolution at the summary judgment stage.  The extensive technical arguments and evidence presented by the parties serve only to illustrate this point.  Similar to the issue of breach of contract and breach of the non-competition provision, the conflicting evidence on the issue of copyright infringement can only be sorted out by a jury.  Also like the claims concerning alleged breaches of the License Agreement, MIE presents much evidence from which a jury could conclude that the Defendants violated MIE's WebChart copyright.  But the record as it stands presents myriad fact issues regarding the infringement claim.  Resolution of this claim also will likely turn substantially on expert testimony and it is the domain of a jury to determine the weight and credibility of such testimony. Accordingly, while the court believes that MIE has presented sufficient evidence to support a jury finding of copyright infringement, ONE and TPX have also presented evidence from which a jury could reasonably conclude they have legitimate defenses to such a claim.  As a result, the court denies both motions for partial summary judgment on the issue of copyright infringement.

### 3.  Violations of 18 U.S.C. § 1030.

ONE and TPX have alleged that MIE violated the provisions of 18 U.S.C. § 1030 when MIE accessed ONE computers for the alleged purpose of interfering with ONE's ability to use WebChart for its intended purpose of managing and accessing patient medical records.  ONE Counterclaim, Docket at 115, *¶¶* 21-23.  Section 1030 of Title 18 provides a private cause of action if a party

makes an unauthorized access to another party's computer. 18 U.S.C. § 1030(a)(5)(g). If such unauthorized access caused a monetary loss to the victim of at least $5,000, a private cause of action can be brought under this federal criminal statute. *Id*. ONE alleges that it suffered "in excess of $100,000" in damages as a result of MIE's alleged interference with WebChart. ONE and TPX Counterclaims, ¶ 23.

As previously stated, MIE concedes that Horner accessed WebChart while it was being used by ONE. However, MIE explains this access as follows:

> After ONE cut off MIE's customary access to the WebChart software at ONE on December 1, 2005, MIE became concerned that ONE was not following its obligations under the License Agreement. . . . To assure ONE's compliance with the License Agreement, Horner accessed the WebChart software at ONE through the MIE-owned MedWeb on a limited number of occasions in January 2006. . . . Horner only used the administrative tools that were located within the MIE-owned WebChart software to acquire access to WebChart. . . . Horner's purpose for access was two-fold. First, Horner wanted to make sure that ONE was not improperly using WebChart. . . . Second, Horner had learned that an MIE employee had placed the source code for WebChart on the WebChart server at ONE, and that code remained on the server.

MIE's and Horner's Memorandum in Support, p. 26. ONE then claims that "[d]uring his access to WebChart, Horner made only three changes to the software. . . . His first change was to rename a 'translate table,' which would cause ONE to comply with the limit on the number of physicians allowed to use WebChart. . . . If ONE attempted to provide a new doctor with unlicensed access to WebChart, the renaming of the translate table would cause a slight performance problem with WebChart. . . . The second change was made afer MIE learned that ONE was trying to extract data from WebChart in violation of the License Agreement. . . . This change consisted of removing an index from WebChart. . . . The third change occurred on January 15, 2006, when Horner made a change to the 'batch printing' function of WebChart. . . . This change slowed ONE's ability to print

multiple patients' records in batches, but still allowed individual patient records to be printed. . . . Horner made this change in an attempt to have ONE call MIE to restore the batch printing functions of WebChart, which would allow MIE to retrieve its source code from the WebChart server." *Id.*, pp. 26-27 (internal citations to Plaintiffs' Statement of Facts omitted). Thus, MIE admits to accessing WebChart during the time ONE was utilizing it, but insists that the access was both necessary and innocent. Put another way, MIE contends that its access of WebChart was made only in response to improper acts by ONE that MIE believed violated the parties' License Agreement.

In addition to arguing that its access to WebChart was made for legitimate purposes, MIE also argues that it is entitled to summary judgment on this claim since ONE cannot prove that it suffered a monetary loss in excess of $5,000, which is a prerequisite to a private cause of action under § 1030. ONE claims it had to pay TPX the sum of $104,665 "for the extraordinary time TPX spent addressing the problems caused by Horner's actions[.]" and has produced an invoice it argues supports this assertion. Defendants' Brief in Opposition, p. 37; *see* MIE's and Horner's Joint Statement of Material Facts, Docket at 109, Exh. 33. ONE and TPX also point out that Todd Plesko "testified that TPX spent 'many hours' addressing the WebChart issues, including periods of inaccessibility," . . . that "TPX eventually had to consult an outside vendor to work on one of the problems caused by Horner's actions," . . . and "that ONE retained a consultant to investigate fully the attacks on ONE's network and who prepared a 446-page report detailing the changes that had been made covertly to the WebChart software . . . ." *Id.* (internal citations to record omitted).

MIE counters by arguing that the invoice for $104,665 is bogus. MIE points out that in his deposition testimony, Plesko "testified that TPX conducted an 'audit of exactly how much time' TPX staff spent on problems allegedly caused by MIE, reviewed the 'audit' with Kusisto, and

'agreed on a fair price' of $104,665 for the time spent by TPX." MIE's and Horner's Reply, p. 15.

MIE then contends that "Plesko's testimony is verifiably false. Despite MIE's repeated requests, Defendants did not produce the alleged 'audit' until February 18, 2007[5], approximately one (1) month after MIE filed its motion for summary judgment." *Id*., p. 16. In addition, MIE alleges that "[w]hen MIE finally received the 'audit,' its metadata revealed that the document was not created until May 26, 2006. . . . Thus, the alleged 'audit' that Plesko claims to have shown ONE to determine the amount invoiced . . . to ONE in January 2006 was not even created until four months after the invoice date and approximately one month after this lawsuit was filed. In other words, Defendants have produced no evidence to show how the amount charged to ONE was calculated or if it was reasonable as required by § 1030." *Id*.

Once again, it is clear that there are material fact issues with regard to ONE's and TPX's claims under 18 U.S.C. § 1030 that preclude summary judgment for either party. On the one hand, MIE's recitation of the facts underlying Horner's access of WebChart minimizes Horner's actions, which by itself raises an issue of credibility. And MIE raises a genuine issue of fact with regard to whether ONE and/or TPX suffered pecuniary damages sufficient to maintain a cause of action under this statute. Therefore, no party is entitled to summary judgment in their favor on this claim.

### 4. Claims for Defamation.

Perhaps not surprisingly, given the contentious nature of this lawsuit, several claims of defamation have been asserted between the parties. Defendant/Counterclaimant Raymond Kusisto "brought a defamation claim against MIE and Horner based upon Horner's statements in an August

---

[5] This date in MIE's reply brief appears to be a scrivener's error. MIE's motion for partial summary judgment was filed on January 7, 2008, not in 2007.

15, 2005 letter to the doctors at ONE . . . ."  MIE's and Horner's Memorandum in Support, p. 30.

In that letter, Horner wrote that "[o]nly recently through discussions with other community

physicians, have I been made aware of how deliberately deceptive Ray has been," and "I fear Ray

has misled you as he has misled me."  *Id.*; *see*, Complaint, Docket at 1, Exh. 3 (August 15, 2005

letter).  Horner claims that the statements he made in that letter cannot constitute defamation since,

according to him, they are true statements.  According to Horner, "Kusisto had been planning for

months to compete with MIE by forming TPX and had cautioned Plesko to keep those plans quiet

from MIE. . . . Thus, Horner's statements regarding Kusisto–that he was deceptive and that he

misled Horner–were true and cannot be defamatory."  *Id.*, p. 31 (citing *Doe v. Methodist Hospital*,

690 N.E.2d 681, 687 (Ind. 1997)) (for a statement to be actionable for defamation it must be false).

Horner also argues that his "statement that he feared Kusisto 'has misled you as he has misled me'

is undoubtedly a statement of opinion based upon actual facts known to Horner."  *Id.*  Based on

these arguments, MIE and Horner argue that they are entitled to judgment in their favor on Kusisto's

defamation claim.

Kusisto first counters these arguments by pointing out that merely characterizing a statement

as "opinion" does not necessarily mean it cannot be found to be defamatory.  and challenging his

honesty, integrity and reputation.  *Id.*, p. 46 (citing *Board of Regents v. Roth*, 408 U.S. 564 (1972)).

Kusisto also argues that "during the time the letter was sent, Horner was desperately attempting to

arrange a face-to-face meeting with ONE's physicians.  How better to accomplish this goal to get

past the middle man (Kusisto) and convince the ONE physicians to meet directly with him, than for

Horner to call into question whether the physicians were getting accurate information from their

trusted employee?"  *Id.*  In this way, Kusisto attempts to explain the motivation behind Horner's

statements and establish that they were, in fact, intended as defamatory.

That is the extent of the parties' arguments regarding Kusisto's defamation claim against Horner and MIE. It is not possible, as MIE and Horner urge, for the court to determine the veracity of Horner's statements from the present state of the record. Standing alone, Horner's statements appear, as Kusisto argues, to call into question Kusisto's honesty and integrity especially in relation to his employers, the physician/owners of ONE. One the other hand, determining whether Horner's statements were true would depend to a great extent on whether a jury concluded that Kusisto was intentionally misleading others with regard to his alleged "plot" to compete with MIE in violation with the License Agreement. Since the court already has concluded that the issue of breach of contract is not resolvable on summary judgment in favor of either party, the issue of the truth or falsity of Horner's statements is likewise not resolvable. For these reasons, MIE and Horner are not entitled to summary judgment in their favor on Kusisto's claim of defamation.

In addition to Kusisto's defamation claim, ONE, TPX, Kusisto, and Plesko have all asserted defamation claims against MIE and Horner based on a statement an attorney for MIE made in a newspaper article. On April 29, 2006, the Fort Wayne *Journal Gazette* ran a story reporting that the FBI was investigating MIE for possible computer "hacking" crimes. In that story, MIE's attorney, Matthew Hohman, was quoted as saying that "MIE believes that the defendants caused the FBI investigation to be instituted under false pretenses and for the defendants' own benefit." ONE Counterclaim and Third-Party Complaint, Docket at 28, Exh. B.

Earlier in the course of this lawsuit, on July 17, 2006, MIE filed a motion asking this court to dismiss the defamation claims brought by the Defendants. Motion to Dismiss all Defamation Claims Against Medical Informatics Engineering, Inc. and Doug Horner, Docket at 43**.** MIE argued

that the claims should be dismissed pursuant to Section 586 of the Restatement (2d) of Torts, which provides absolute privilege to an attorney to publish defamatory matter in communications as part of judicial proceedings provided the matters communicated have some relation to the proceedings. On October 17, 2006, the court entered an Opinion and Order denying MIE's motion. Docket at 70. The court held in that Order that the Defendants presented sufficient argument in support of their defamation claims to survive the motion to dismiss. In their present motion for partial summary judgment, MIE and Horner ask the court to "reconsider its position regarding the application of Section 586 at the more fully developed summary judgment stage." MIE's and Horner's Memorandum in Support, p. 32.

The Defendants respond by arguing that MIE and Horner present no new authority to support their argument that the court should reverse its prior ruling. Defendants' Brief in Opposition, pp. 47-48. The parties then go on to reiterate essentially the same arguments they presented when this issue was originally briefed in 2006, bolstered, arguably, with additional evidence in the form of documents and deposition testimony. Both sides present much argument on this issue and dedicate several pages of their respective briefs to discussing these defamation claims. However, these arguments and additional evidence only serve to reveal that several issues of material fact exist concerning these defamation claims. Also, the court reviewed its prior ruling of October 17, 2006, and determines that the holding expressed therein need not be revisited or reconsidered. The court discussed the parties' respective legal arguments at great length in that prior Order, and the arguments made, and evidence presented, in support of the motions for partial summary judgment do not alter the court's analysis, even when the summary judgment standard is applied rather than the more liberal motion to dismiss standard. The court reaffirms its holding that Section 586 of the

Restatement (2d) of Torts does not afford an absolute privilege shielding MIE from a defamation claim based on its counsel's statement to the Fort Wayne *Journal Gazette* under the circumstances of this case.

### 5. Claim for Tortious Interference with Business Relationship.

TPX has asserted a claim against MIE for tortious interference with a business relationship. TPX Counterclaim, Docket at 34, pp. 35-37. MIE seeks summary judgment in its favor on this claim, arguing that "TPX has put forth no evidence that it has suffered any damage from any actions taken by MIE, which is an element of TPX's claim. Thus, TPX cannot prevail in its tortious interference claim, and MIE is entitled to summary judgment on that claim." MIE's and Horner's Memorandum in Support, p. 37. TPX does not contest this portion of MIE's motion for partial summary judgment (in fact, does not address it at all). Accordingly, MIE's motion for partial summary judgment is granted as to TPX's claim against MIE for tortious interference with a business relationship.

### B. MOTION FOR PARTIAL SUMMARY JUDGMENT BY ONE, KUSISTO, TPX, AND PLESKO.

In the Defendants' motion for partial summary judgment, ONE, Kusisto, TPX, and Plesko seek judgment in their favor on the following claims: (1) "Count I of Plaintiff's Complaint" (MIE's claim of copyright infringement); (2) "Count II of Plaintiff's Complaint" (MIE's claim for breach of contract); (3) "Count III of Plaintiff's Complaint" (MIE's claim for defamation); (4) "Count IV of Plaintiff's Complaint" (MIE's claim under 18 U.S.C. § 1030), "Count VI (Trade Secret Misappropriation), and Count VII (Tortious Interference) of Plaintiff's Complaint": and "the issue of liability as to Count III (Breach of the Maintenance and Support Services Agreement) and Count

IV (Breach of the Software License Agreement) of its Counterclaim against MIE . . . ." Defendants'

Motion for Partial Summary Judgment, Docket at 110, pp. 1-2.

Most of the issues or claims on which the Defendants seek summary judgment have been

discussed above and ruled on by the court. These include MIE's claim of copyright infringement,

MIE's claim for breach of contract, MIE's claim for defamation, and MIE's claim pursuant to 18

U.S.C. § 1030 (enumerated as issues (1), (2), (3) and (4)) in the preceding paragraph. Even though

these issues and claims were discussed in the context of MIE's and Horner's motion for partial

summary judgment, the court reiterates its conclusions that genuine issues of material fact exist as

to all of these issues and claims. The court has read and considered the brief filed by the Defendants

in support of their motion (Defendant's Joint Brief in Support of Motion for Partial Summary

Judgment ("Defendants' Brief in Support")), Docket at 112; the opposition brief (MIE's and

Horner's Response to Defendants' Joint Motion for Partial Summary Judgment ("MIE's and

Horner's Response in Opposition")), Docket at 124); and the Defendants' reply brief (Defendants'

Joint Reply in Support of Defendants' Motion for Partial Summary Judgment ("Defendants'

Reply")), Docket at 137. The court concludes that these briefs do not present any legal or factual

basis for changing the rulings the court has made on the first four issues presented in the Defendants'

motion.[6] The remaining issues on which the Defendants seek summary judgment are discussed

---

[6] In their briefs addressing the issues raised by the Defendants' Joint Motion for
Summary Judgment, both sides present certain arguments in addition to those discussed in their
briefs related to MIE's and Horner's motion. For example, the Defendants argue that they are
entitled to summary judgment on Count IV of MIE's Complaint "because MIE has produced no
evidence that any of the Defendants committed criminal mischief or criminal deception under
Indiana law, and MIE alleged in that Count that the Defendants entered into the License
Agreement "'with the intent of gaining knowledge of the software so that ONE could compete
with MIE despite the non-competition clause . . . .'" Defendants' Brief in Support of Motion, p.
46 (quoting from MIE's Complaint, Docket at 1, ¶ 69). Count IV of MIE's Complaint makes

below.

## 1. MIE's Claim for Trade Secret Misappropriation.

The Defendants argue that they are entitled to judgment in their favor on MIE's claim against them for trade secret misappropriation. Defendants' Brief in Support, pp. 51-54. This claim is presented in MIE's Complaint at ¶¶ 80-85. The Defendants contend that MIE has failed to establish sufficiently that it had a valid trade secret that was misappropriated by ONE, TPX, Kusisto, or Plesko. *Id.*, p. 51. The Defendants maintain that in response to discovery requests they sent to MIE, MIE identified the alleged trade secret as "some unidentified 'portions of the code that are confidential.'" Defendants' Brief in Support, p. 51 (citing to and quoting from Appendix to the Defendants' Joint Motion for Partial Summary Judgment, Docket at 111, Tab BB, p. 11). The Defendants argue that "[t]his is wholly insufficient to establish a trade secret claim. '[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing they exist.'" *Id.*, pp. 51-52 (quoting *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912,

---

assertions regarding the Defendants' alleged breach of the License Agreement and non-competition provision. Since the court has determined that material fact issues exist precluding summary judgment for either side on this claim (primarily issues of credibility and determinations concerning the weight to be given to much of the evidence), the Defendants' basis for seeking summary judgment on Count IV in their own motion does not change the landscape. Similarly, in their response brief, MIE and Horner argue, with respect to the claim of copyright infringement, that the "Defendants have not addressed all of the actions that infringed MIE's copyright." MIE's and Horner's Response in Opposition, p. 4. However, the court has already explained why neither side is entitled to summary judgment on the copyright infringement claim and so, once again, this argument does not alter the outcome. Having concluded, then, that none of the new or alternative arguments presented by the parties in their "second set" of briefs (i.e., the briefs relating to the Defendants' motion for partial summary judgment) change the court's analysis or rulings presented previously in this Order, the court will address only the entirely new arguments raised by the Defendants by way of their motion. These include the claims of trade secret misappropriation, tortious interference with a business relationship, and damages issues.

920 (Ind. 1993)).

MIE responds by arguing that "[s]ource code can and does qualify as a trade secret." MIE's and Horner's Response in Opposition, p. 49 (citing *McRoberts Software, Inc., v. Media 100, Inc.*, 329 F.3d 557 (7th Cir. 2003) and *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974)). MIE also cites two additional cases in support of its position that computer source code can qualify as a trade secret. *Id.*, p. 56 (*Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F.Supp.2d 688, 695 (N.D. Ill. 2004) and *Do It Best Corp. v. Passport Software, Inc.*, 2005 LEXIS 7213 (N.D. Ill. 2005)).

In addition to the cases cited by MIE, it is also crucial to read MIE's supplemental discovery request in its entirety. As stated above, the Defendants take the position that they are entitled to summary judgment on MIE's trade secret claim since MIE failed to adequately identify what trade secret was allegedly wrongfully disclosed or appropriated. But ONE's interrogatory and MIE's entire response to that interrogatory read as follows:

> **INTERROGATORY NO. 14:** Identify any and all evidence that ONE and/or Kusisto misappropriated trade secrets of MIE, describe with particularity each trade secret MIE alleges was misappropriated, what steps MIE took to keep and protect its trade secrets, if any, and identify each document and witness in support of your allegations.
>
> **RESPONSE:** Objection. This contention interrogatory is premature. Subject to, and without waiving the right to supplement this response, MIE incorporates into this response its response to Interrogatory 13. MIE further states that the extent to which ONE has misappropriated its trade secrets is unknown.
>
> To protect its trade secrets, MIE included in its contracts for licensing of the Software provisions that prohibited reverse engineering, deconversion, and competition. MIE executed non-competition agreements and non-disclosure agreements with its employees and business partners. MIE also controlled access to the course code of the Software with passwords.
>
> *SUPPLEMENTAL RESPONSE:* MIE's software includes code that is not generally

known or readily accessible to others and MIE derives economic value by virtue of the fact that portions of the code are confidential. ONE's actions described in response to Interrogatory No. 13 with respect to MIE's software also constitute misappropriation of trade secrets.[7]

Appendix to the Defendants' Joint Motion for Partial Summary Judgment, Docket at 111, Tab BB, pp. 10-11. Thus, MIE's answer to ONE's interrogatory was not nearly as vague or ambiguous as ONE represents in its brief. The court finds that MIE's responses are sufficiently specific to permit MIE to present its trade secret misappropriation claim to a jury. Whether MIE's contentions are sufficient to convince a jury that any of the Defendants committed trade secret misappropriation remains to be seen, but MIE's discovery responses were certainly not so opaque as to entitled the Defendants to judgment as a matter of law on this claim.

## 2. Tortious Interference with Business Relationship.

The Defendants also seek summary judgment in their favor on MIE's claim for tortious interference with a business relationship. The Defendants argue that "MIE has failed to come forward with any evidence of an *illegal* act on the part of any of the Defendants. Accordingly, the Court should enter judgment on MIE's interference claim." Defendants' Brief in Support, p. 54. The Defendants point out that "[u]nder Indiana law, the elements of tortious interference with a business relationship are: '(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful

---

[7] MIE's response to ONE's interrogatory number 13 outlines MIE's contentions that ONE and its employees or agents committed various acts that violated MIE's copyright of WebChart. MIE incorporated that answer in its response to ONE's interrogatory number 14. The court believes that, read together, these responses serve to provide an adequate, if arguably not thorough, explanation of MIE's contentions with regard to trade secret misappropriation.

interference with the relationship.'" *Id.* (quoting *Government Payment Service, Inc. v. Ace Bail Bonds*, 854 N.E.2d 1205-1209 (Ind.App. 2006)). The Defendants also maintain that "[i]n addition, Indiana requires 'some independent illegal action' on the part of the defendant.'" *Id.* In the present case, the Defendants argue that "[t]he only evidence MIE has pointed to in support of this claim is that Kusisto allegedly tortiously interfered with its business relationships by engaging in discussions with other practice group managers. . . . Such actions simply do not rise to the level of an independent illegal act." *Id.*

MIE has failed to respond (or, more likely, opted not to respond) to the Defendants' motion for summary judgment on this point. Accordingly, Defendants' motion is granted as to MIE's claim against the Defendants for tortious interference with a business relationship.

### 3. Claims for Certain Damages.

MIE seeks a wide variety of remedies and damages in this case. The Defendants argue in their brief in support of their motion for partial summary judgment that some of MIE's damage claims are not sustainable under the facts and circumstances of this case, and the Defendants seek summary judgment in their favor as to those claims.

The Defendants point out that "MIE's damage computations in this case are set forth in a Valuation Report prepared by Michael Pellegrino." Defendants' Brief in Support, p. 55 (citing to Defendants' Appendix, Docket at 111, Exh. AA, Part 1) (the "Pellegrino Report"). The Defendants argue that the Pellegrino Report "contains highly questionable methodologies and unjustifiable assumptions. However, this Motion is not addressed [sic] to those failings. Instead, the Defendants here focus on the fact that several of the damages claims set forth by Pellegrino are simply not recoverable as a matter of law, and the Court should grant Defendants judgment in their favor on

those claims." *Id.*

The first measure of damages the Defendants challenge is MIE's claim for "value impairment due to NMC timing." *Id.* The Defendants point out that "Pellegrino asserts that MIE is entitled to recover $475,376 representing the 'value impairment' cause[d] by 'delaying the NoMoreClipboard, LLC [("NMC")] launch.'" *Id.* (quoting Pellegrino Report). According to the Defendants, "[t]he purported basis for this damage claim is that '[w]ere it not for the actions of the Defendants, MIE representatives allege that they would have been nine months further along in the launch' of a subsidiary company, NMC." *Id.* (quoting Pellegrino Report).

The parties do not contest that MIE was planning on launching the subsidiary known as NoMoreClipboard nor do they contest that the launch of that subsidiary was delayed by nine months. Where the parties differ is on the reason and cause of that delay. The Defendants argue that the "delay was the result of a decision by MIE: 'MIE delayed the launch of [NMC] due to the timing of the media accounts surrounding the FBI investigation and MIE's need to protect its intellectual property through the lawsuit.'" *Id.* (quoting Pellegrino Report). Therefore, argue the Defendants, since no conduct or action or their part caused the delay, MIE cannot recover damages from them. The Defendants also argue that the damages allegedly related to the delayed launch of NMC were not "'of a class reasonably foreseeable at the time' of the alleged wrongful act." *Id.*, p. 56 (quoting *Ortho Pharmaceutical Corp. v. Chapman,* 388 N.E.2d 541, 555 (Ind.Ct.App. 1979))

MIE counters by arguing that it was, in fact, the acts of the Defendants that caused the delay in launching NMC. MIE claims that "ONE, through Kusisto, was aware of MIE's plans to launch NMC." Plaintiffs' Brief in Opposition, p. 56. In support of this contention, MIE cites to Plaintiffs' Statement of Material Facts, § 37, Exh. 22, p. 22, wherein Horner and Kusisto discuss MIE's plan

33

to launch NMC and Kusisto admits that he "know[s] about it."[8] Horner then explained to Kusisto that MIE was "investing hundreds of thousands of dollars in direct to consumer marketing" to effectuate the launch. *Id.* According to MIE, then, "not only was the harm to MIE reasonably foreseeable, but Kusisto and ONE were actually aware that their actions against MIE could cause harm to its launch of NMC." *Id.*, p. 57.

Whether the launch of NMC was delayed due to a decision by MIE that was unrelated to the events giving rise to this lawsuit, or whether it was delayed as a result of those underlying events, is a matter the jury must resolve. The Defendants maintain that MIE decided on its own to delay the launch and therefore cannot recover damages from the Defendants for the alleged lost revenue. MIE contends that it was forced to delay the launch of its subsidiary because the acts of the Defendants, which ultimately led to the filing of this lawsuit, left MIE with no other option. Consequently, whether MIE is entitled to recover this measure of damages depends on whether it can meet its burden of persuading the jury that the Defendants were ultimately responsible for the delay.[9] As a result, the court concludes that the Defendants are not entitled to summary judgment

---

[8] Kusisto and Horner met personally in November of 2005 to discuss certain issues and recorded their conversation. Exhibit 22 attached to the Plaintiffs' Statement of Material Facts is a transcript of that conversation.

[9] Assuming MIE is successful in persuading the jury that it is entitled to damages stemming from the delay of the launch of NMC, MIE must then meet its burden of proving that its damage calculation is accurate and justified. The Defendants challenge the manner in which MIE has calculated this damage claim for purposes of summary judgment. *See* Defendants' Reply, p. 32. The Defendants also claim that Pellegrino "projected that NMC would have net revenues of $615,883 during its first year of . . . existence; however, the actual revenue during NMC's first year [was] $19,000. Defendants Brief in Support, p. 56, n.16. However, this issue goes to the weight and sufficiency of the evidence once it is presented to the jury and does not change the court's holding, for summary judgment purposes, that MIE may pursue this claim for damages at trial.

on the issue of alleged damages associated with the delay in launching NMC.

The Defendants also argue that as a matter of law MIE cannot recover on its claim for alleged unjust enrichment flowing from the Defendants' alleged breach of the non-competition provision. Defendants' Brief in Support, p. 56. This claim relates to the "profits the Defendants earned or will earn and that the Defendants allegedly would not otherwise have earned[.]" were it not for their alleged breach of the non-competition provision discussed above. *Id*. The Defendants state that "this consists of a discount ONE obtained from GE Healthcare afer ONE severed its ties to MIE. According to Pellegrino, , the discount has an estimated value of $171,000." *Id*. (citing Pellegrino Report, pp. 35-36). The Defendants point out, however, that Pellegrino admitted in his deposition that "he had not considered the possibility that ONE would have obtained the same discount at the end of the non-compete period. *Id*., pp. 56-57 (citing Pellegrino Deposition, pp. 120-23). Defendants contend that "a party injured by a breach of contract . . . is not entitled to be put in a better position than he would have enjoyed absent the breach." *Id*., p. 57 (citing *4-D Bldgs., Inc. v. Palmore*, 688 N.E.2d 918, 921 (Ind.App. 1997)).

MIE claims the Defendants' argument on this point is wrong as a matter of law. MIE states that ""[t]o prevail on a claim of unjust enrichment, a person must establish that 'a measurable benefit has been conferred on the defendant under circumstances in which the defendant's retention of the benefit without payment would be unjust.'" MIE's and Horner's Brief in Opposition, p. 58 (quoting *Creative Demos. Inc. v. Wal-Mart Stores, Inc.*, 142 F.3d 367, 372 (7th Cir. 1998)). MIE argues that "[a]s a result of the License Agreement, ONE (and TPX) had access to MIE's software, database schema and 'know how' regarding licensing EMR software. Only by breaching the Non-Competition Provision in the License Agreement could ONE (and TPX) operate an EMR sales and

licensing company and receive the discount from GE. . . . In these circumstances, it is unjust to allow them to retain the benefits they took from MIE . . . ." *Id.*

Once again, this is an issue that cannot be resolved properly on summary judgment. This measure of damages does indeed appear to be quite speculative, maybe even dubious, based on the arguments the parties present in their briefs. But whether MIE can even ask a jury to award this measure of damages would depend on the evidence presented during trial. If MIE can successfully argue that ONE and/or TPX received a discount from GE as a direct result of having breached the non-competition provision, then MIE can argue that the discount constitutes unjust enrichment. The evidence and argument on this point as presented by the Defendants in their briefs, however, is insufficient to support a finding in their favor that MIE cannot pursue an unjust enrichment claim as a matter of law.

Finally, the Defendants argue that MIE has asserted a claim for damages for "accelerated market entry." The Defendants characterize this claim for damages as "yet another illegitimate attempt to recover 'unjust enrichment' damages from the Defendants." Defendants' Brief in Support, p. 57. According to the Defendants, "Pellegrino relates that because of the alleged breach of the non-compete, the Defendants were able to accelerate TPX's entry into the market by one year and that the Defendants therefore allegedly gained an 'unjust economic benefit' in the sum of $939,456.19." *Id.* (citing Pellegrino Report, pp. 38-40). The Defendants argue that "there is no assertion and no demonstration that MIE would have gained these net revenues but for the alleged breach of contract by the Defendants." *Id.* Therefore, the Defendants claim they are entitled to summary judgment on this claim for damages by MIE.

MIE argues that the Defendants' "argument misses the point. MIE was deprived of a one (1) year period during which ONE/TPX would not compete with it . . . . [The value of that one year period] would be the value of the bargain that MIE made and ONE breached. Thus, MIE is seeking only the benefit of its bargain. A question of fact exists as to the value of that bargain. . . ." MIE's and Horner's Brief in Opposition, p. 59.

The court denies the Defendants' motion for summary judgment on this claim for damages for the same reasons the previous two damage claims were denied. Should MIE prevail on its claims for breach of contract and/or breach of the non-competition provision, then MIE may argue to the jury that a measure of the damages it sustained as a result of that breach was the amount of revenue it lost as a result of losing market share to ONE/TPX for a specific period of time following the breach.

This record in this case, as it stands presently, is replete with fact issues, issues of credibility, and issues concerning the weight and sufficiency of much of the anticipated evidence. The many arguments presented in the cross motions for partial summary judgment, the parties' conflicting interpretations of most of the relevant underlying facts, and the thousands of pages of briefs and supporting documents submitted by the parties in support of their respective motions, demonstrate the complexity of the fact issues, credibility issues, and evidentiary issues present in this case. But a district court's duty when ruling on motions for summary judgment is clear and well established. "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007).

### C. MOTION TO STRIKE BY MIE.

In this motion, MIE seeks to strike the affidavit of Ken Johnson, which was submitted by ONE and TPX in support of their motion for partial summary judgment. Motion to Strike, Docket at 122. MIE argues that "[t]he Affidavit is inadmissable under Rule 56 because it contains hearsay and testimony that is not based upon personal knowledge." *Id*., p. 2. MIE also argues that "[t]he Affidavit should be stricken because it contradicts [TPX]'s 30(b)(6) deposition testimony and because it contains false testimony that is inconsistent with documents previously produced by [TPX]." *Id*.

Johnson's affidavit was submitted by ONE and TPX in support of their argument that they did not violate MIE's copyright. MIE contends that TPX wrote a software program called triScript, which allegedly contained source code taken from WebChart. *Id*. ONE and TPX claim that it was Johnson, a former employee, who wrote the portion of that program that allegedly contains the offending (i.e., copied) WebChart source code.

The Defendants present several reasons why they believe the court should strike Johnson's affidavit and MIE argues adamantly that it should not be stricken. However, the court arrived at its decision regarding MIE's breach of copyright claim without considering the assertions presented in Johnson's affidavit. Therefore, MIE's motion to strike is rendered moot.[10]

---

[10] Having concluded that MIE's motion to strike the affidavit of Ken Johnson is moot, the court obviously has not addressed the substantive arguments presented by the parties concerning that affidavit or the assertions contain in it. In the event the Defendants intend to call Johnson as a witness at trial, any substantive issues that may exist concerning the admissibility or relevancy of his testimony can be addressed at the appropriate time in a motion in limine.

**CONCLUSION**

For the reasons set forth in this Order, the Motion for Partial Summary Judgment filed by Medical Informatics Engineering, Inc. and Doug Horner is GRANTED in part and DENIED in part; the Motion for Partial Summary Judgment filed by Orthopaedics Northeast, P.C., TriPractix, LLC, Raymond Kusisto, and Todd Plesko is GRANTED in part and DENIED in part; and the Motion to Strike the Affidavit of Ken Johnson filed by MIE is MOOT.

Date: September 2, 2008.

   /s/   William C. Lee
William C. Lee, Judge
United States District Court
Northern District of Indiana